# UNITED STATES DISTRICT COURT FOR THE

## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Warden Thomas Carroll, | x | Case No. _ 0 7 - 1 9 4 _ |
| Plaintiff | x | |
| | | |
| vs. | x | **APPENDIX TO MEMORANDUM IN** |
| | | |
| Alonzo W. Morris Jr., | x | **SUPPORT OF Sec. 2254** |
| Defendant | x | **MOTION OF ALONZO MORRIS Jr.** |



FILED

APR – 5 2007

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

BD Scanned

## TABLE OF CONTENTS

A1          Officer Michael Barlow's Police Report

A2, 3       E.M.S. Medical Service Report dated 11/1/99

A4, 5       Officer Barlow's Preliminary Hearing testimony

A6, 7       Witness Georgia Swan McCrea's Statement to Police on 11/1/99

A8          Georgia Swan McCrea's statement to investigator prior to first trial.

A9, 10      Georgia Swan McCrea's statement to investigator after testifying in first
            trial.

A11         Correspondence from Prosecutor James Adkins to Public Defender
            concerning audio taped statements, given for Discovery response.

A12-22      Officer Daniel Davis 2nd trial testimony regarding defendants arrest.

A23-25a     Officer Barlow's Preliminary Hearing testimony regarding identification
            of defendant.

A25b-30     Georgia Swan McCrea's 2nd trial testimony.

A31, 32     Correspondence from Prosecutor James Adkins to Georgetown Police
            Chief; Officer Davis subpoenaed to testify before Grand Jury.

A33, 34     Grand Jury Indictment and True Bill, signed by Prosecutor James Adkins.

A35, 36, 36a Discovery Response filed by Prosecutor James Adkins in 1st trial and
            email from Public Defender Ruth Smythe to Adkins regarding photo line-
            up and fingerprint test.

A37, 38     Prosecutor James Adkins testimony regarding identification of defendant.

A39         Victim James Bibbins 1st trial testimony concerning identification of
            defendant.

A40-51      Expert testimony by Dr. Carl Maschauer on victim's failure to identify
            defendant during 1st trial.

A52-62      Prosecutor James Adkins testimony that witness James Bynnum was
            discovered 3 days prior to 1st trial.

A63-66      Testimony by Prosecutor Adkins and Richard Hughes 1st trial in court identification.

A67-77      Public Defender Ruth Smythe's Motion for Judgment of Acquittal and transcript of hearing on Motion.

A78-103     Supreme Court of Delaware's reversal and opinion of 1st trial (Morris v. State 258, 2000)

A104, 105   Remanded to Superior Court Appointment of counsel and bail hearing.

A106-110    Motion to Dismiss filed by James Liguori Esq., for Defense dated 7/15/02.

A111-125    Superior Court's Memorandum opinion on Motion to Dismiss dated 10/16/02.

A126        James Liguori request for hearing to resolve conflict of interest between himself and defendant.

A127-143    Victims trial testimony during record trial.

A144-150    Officer Daniel Davis testimony regarding fingerprint testing, during 2nd trial.

A151-157    Dr. Carl Maschauer, optemologist testimony, 2nd trial.

A158-160    Officer Daniel Davis 2nd trial testimony regarding warrantless arrest and false probable cause affidavit.

A161-172    James Liguori argument before trial court concerning non-consensual entry into defendant's home to make warrantless arrest.

A173-212    Defendants opening Brief on direct Appeal, pro-se and (Supreme Court Decision) ExD

A213-231    Defendants Post Conviction Motion and Supplemental Memoranda dated 03/2/05

A232-237    Superior Courts decision on Post Conviction Motion dated 4/27/05.

A238-271    Defendants Opening Brief on Appeal to Delaware Supreme Court regarding denial of Post Conviction.

A272-273    Supreme Court of Delaware opinion regarding Appeal.  Morris v. State 900 A2d 101 (Del. Supr. 2006)

A274-277    Officer Daniel Davis testimony on Grand Jury during hearing.

Ex.D    Jury instruction (Page 15 curative instruction on legality of defendant's warrantless arrest)

A278, 279    Prosecutor James Adkins testimony regarding Grand Jury procedure.

A280-283    Officer Michael Barlow's testimony regarding Preliminary Hearing and Grand Jury proceeding.

A284-285    James Liguori's open admission of ineffective assistance of counsel in regard to defendant's Grand Jury argument before the Superior Court.

A286    Officer Davis trial testimony regarding victim's identification.

A287-290    Dr. Carl Maschauer 1st trial testimony regarding victim's eye sight.

A291-292    Dr. Carl Maschauer 2nd trial testimony regarding victims eye sight.

**DEPARTMENT** Georgetown Police Dept

**CONTINUATION SHEET**

| 5 PAGE | | 6 COMPLAINT NO | 52 INVESTIGATING OFFICER |
|---|---|---|---|
| 2 | OF 3 | 81-99-3617 | SGT M BARLOW |

**INTERVIEW VICTIM:**

VICTIM WAS CONTACTED AT THE SCENE ON N. RACE ST. IN GEORGETOWN AT 0748 HRS. HE WAS BLEEDING HEAVILY FROM THE AREA OF HIS RT. EYE, AND HIS CLOTHING WAS COVERED IN BLOOD. HE WAS CONSCIOUS AND ALERT WHEN CONTACTED AND STATED THAT HE WAS HIT WITH A PIPE WIELDED BY THE DEFENDANT, WHOM HE IDENTIFIED AS "J.R. COPES". AT THE TIME OF THE INTERVIEW THE VICTIM WAS MISUNDERSTOOD AS STATING THE DEFENDANT WAS "GERALD" DUE TO THE VICTIM'S SPEACH IMPEDIMENT. THE VICTIM WAS TRANSPORTED TO BEEBE E.R. AND THE INTERVIEW ENDED. NO FURTHER INTERVIEW WAS POSSIBLE AT THE TIME BECAUSE THE VICTIM'S CONDITION RAPIDLY DETERIORATED TO CRITICAL. HE WAS THEN TRANSPORTED TO THE WASHINGTON MEDICAL CENTER IN WASHINGTON D.C. FOR TRAUMA CARE.

**INTERVIEW DEFENDANT:**

DEFENDANT NOT IN CUSTODY AT TIME OF REPORT.

**INTERVIEW WITNESSES:**

W-1 ALAN HILL, ██████ INTERVIEWED AT THE SCENE AT 0750HRS. HE STATED THAT HE WAS GOING TO WORK AT J.G. TOWNSENDS WHEN HE SAW THE VICTIM BEING ASSAULTED BY A BLACK MALE. THE ATTACKER WAS DRESSED IN DARK CLOTHING AND WORE A GRAY OR BROWN BASEBALL-STYLE CAP. HE WAS HOLDING A LENGTH OF WHITE PVC PIPE, WHICH HE DROPPED IN THE STREET AS HE FLED N/B ON N. RACE ST. W-1 THEN RAN OVER TO THE VICTIM AND HELPED HIM TO THE SIDEWALK.

W-2 GEORGIE SWAN, ██████ INTERVIEWED AT THE SCENE AT 0752HRS. SHE STATED THAT SHE WAS DOWN THE STREET AND HEARD A NOISE WHICH DREW HER ATTENTION TO THE VICTIM AND DEFENDANT IN THE STREET. THE VICTIM WAS ON THE GROUND AND THE DEFENDANT WAS HOLDING A PIECE OF PIPE. THE DEFENDANT THEN DROPPED THE PIPE AND FLED UP N. RACE ST. AND TURNED THE CORNER AT PEPPER ST. SHE STATED THAT THE DEFENDANT HAD DARK CLOTHING. W-2 LATER CALLED TO STATE THAT SHE KNEW THE DEFENDANT AND HIS LAST NAME WAS "MORRIS", NOT "COPES", WHICH WAS THE NAME OF THE WOMAN HE LIVED WITH.

**INVESTIGATIVE ACTION:**

UPON ARRIVAL AT THE SCENE STATEMENTS WERE TAKEN FROM THE VICTIM AND WITNESSES (SEE INTERVIEW SECTIONS).

RECOVERED THE WEAPON USED IN THE ASSAULT FROM THE STREET. SECURED SAME FOR FORENSIC EXAMINATION.

CHECKED AREA FOR ANY SUSPECTS OR EVIDENCE, NEGATIVE RESULTS.

RECEIVED REPORT FROM BEEBE E.R. ADVISING OF THE SERIOUS NATURE OF THE VICTIM'S INJURIES

CONTACTED DET. DAVIS AND ADVISED HIM OF THE FACTS OF THE CASE. CASE TURNED OVER TO CRIMINAL INVESTIGATIONS DIVISION.

 **Sussex County Emergency Medical Services**

*Patient Care Report* - *Priority 1 - ALS Transport*

| 11/01/1999 | Medic 104 | Incident: 13352 |
|---|---|---|
| **Bibbins, James** | **SSN: Unknown** | **DOB Unknown** |
| **Location: Rt 9 e/o Georgetown** | Georgetown | |

**History of** The patient is a 73/o male with a chief complaint of Head pain. Pt relates that sh was
**Condition:** riding his bike when he was hit with a pipe. Pt unable to give any additional details of
incident. Pt's only complaint is face and head pain. Pt denies loss of consciousness. BLS
relates large amount of blood loss at scene

**PMH:** HTN

**Medications:** Unknown

**Allergies:** Unknown

─────────────────── *Assessment* ───────────────────

**General Impression:** Pt presents conscious and alert, but not completely oriented.

**Primary Survey**  *Airway:* patent

  *Breathing:* Rate: normal

    Rhythm. regular

    Quality: normal with positive left lung sounds and positive right lung sounds.

  *Circulation:* Carotid pulse is present

    Radial pulse is normal

    Skin is cool, moist and normal in color with normal capillary refill.

  *LOC:* awake

**Head, Face:** Large hematoma over right eye  Large amount of bleeding noted from head and nose.

**Left Pupil:** 3mm and Reactive          **Right Pupil** 3mm and Reactive

**Neck, C-Spine:** Normal, pt denies neck pain          **Jugular Veins:** Normal

  **Chest:** No obvious chest injuries noted

  **Left Lung:** clear          **Right Lung:** clear

**Abdomen, Pelvis:** Normal

**Extremities, Back:** Normal

  **Neurological:** Pt remained conscious and alert, but not completely oriented.

**Differential Diagnosis:** R/O Head injury secondary to assault.

### Trauma Information

**Cause:** Assault

**Mechanism of Injury:** Pt was riding his bike when he was hit in the face with a pipe. Pt
denies loss of consciousness. Unable recall events of incident.

─────────────── *Summary* ───────────────

07:47

A-3

| 11/01/1999 | Medic 104 | Incident: 13352 |
|---|---|---|
| **Bibbins, James** | **SSN: Unknown** | **DOB Unknown** |
| **Location: Rt 9 e/o Georgetown** | **Georgetown** | |

07:47
    BLS arrival on scene

07:50 Time of Alert

08:01 ALS arrival to patient

08:01 Trauma Intervention: C-collar with result of: Pt had c-collar in place prior to ALS arrival

08:01 Trauma Intervention: long backboard with result of: Pt properly placed on LBB with CID and straps.

08:01 Oxygen administered at 15 lpm via non-rebreather mask

08:02    Vitals Signs - Pulse: 92  Respirations: 30  Blood Pressure: 220/140  SpO2: 99%

08:02    GCS - Eyes: 4  Verbal: 4  Motor: 6  GCS Total: 14    ECG: SR

08:03 Transport initiated to Beebe Medical Center on A 93.

08:05 18 gauge IV successfully established in left antecubital infusing 50 ml of 0.9% NaCl solution.

08:06    Vitals Signs - Pulse: 88  Respirations: 16  Blood Pressure: 210/110  SpO2: 99%

08:06    GCS - Eyes: 4  Verbal: 4  Motor: 6  GCS Total: 14    ECG: SR

08:09 Medical Direction from Dr. Shreeve at Beebe Medical Center: BMC advised of trauma pt and need for Trauma Team. No orders requested or given.

08:14    Vitals Signs - Pulse: 90  Respirations: 18  Blood Pressure: 210/100  SpO2: 99%

08:14    GCS - Eyes: 4  Verbal: 4  Motor: 6  GCS Total: 14    ECG: SR

08:14 Arrival at Beebe Medical Center and care turned over to Trauma Team in bed # 2.

**Reassessment and Reponse**

    Pt remained conscious during transport. Pt had periods of slow deep respirations. Pt was still unable to recall events of incident.

Signature: _Holly R Cox_

      Holly R. Cox, NREMT-P

**Medics on the Call**
Cox, Holly
McCabe-Severs, Jennie

1          At some point later in the morning, and again I can't say

2    when that was, we had a complainant come into the station and make a

3    complaint. Actually it was a check, she wanted us to check on the welfare of

4    an infant who was at an address on Douglas Street in Georgetown. And I

5    responded to that address and encountered the defendant - -

6          Q.        My client?

7          A.        - - in this case, and his girlfriend and apparently

8    their child that they share together, in addition to the complainant, who is the

9    mother of the defendant's girlfriend. And there was a - -. I'm not going to say

10   it was an argument, because I didn't hear either the defendant or his girlfriend

11   say anything, but the mother was berating them for various issues regarding

12   her grandchild.

13         Q.        You don't recall what time this was?

14         A.        I don't recall what time it was, sir.

15         Q.        Do you recall what - -

16         A.        It was within a few hours, a couple of hours of

17   the original incident.

18         Q.        Did you ask at that point, did you have in your

19   mind the description of the person from the previous incident that we talked

20   about?

1          Q.          So when you ran across my client a couple

2     hours later, you don't recall seeing any of the alleged clothing that the

3     attacker was wearing?

4          A.          That's correct.

5          Q.          Did you speak to my client at that incident you

6     went to?

7          A.          Only very briefly. He actually spent very little

8     time there after I arrived, and then left in a vehicle.

9          Q.          But he wasn't being detained by you?

10         A.          He was not being detained by me at that time.

11    Because, quite frankly, I didn't draw the conclusion from J.R. Copes to J.R.

12    Morris. It wasn't until about a half an hour after that incident that I was re-

13    contacted by the original witness, who said that she knows that people him

14    call J.R. Morris, people call him J.R. Copes, or refer to him as J.R. Copes.

15         Q.          And although you weren't as precise as the

16    other sergeant who testified, you've been a police officer about nine years,

17    two months, and about two or three days?

18         A.          If you say so. Thank you.

19         MR. BRADY:     No further questions, Your Honor.

20         THE COURT:     Mr. Adkins, any further questions?

LINDA A. LAVENDER
Official Court Reporter

A - 6

Georgia Swan

What time did you get to work this morning?
I guess about a quarter to eight. About 7:40 I guess.
Were you in the plant?
No I was - what happened was - when I came down the street here, beside the police
station I cam up to the stop sign light and I seen this black dude really running and I
said he's really running right. And then I turned right to go up to the Plant then I see
these two white dudes running, you know, in the same direction. So, I usually park my
car up near the plant. So I park my car on the cement. When I pull in to park I see
James' bike laying on the ground and he was standing up holding his head like this. At
first I thought it maybe was a car-hit and run. Skeeter was standing there and then the
two white dudes they was all excited then he went this way he went this way. They was
just talking. And I said what happened, what happened. And they said some guy hit
him. And they said with a pipe. And that he had gone in the fence at the plant to get a
pipe. Did any body call 911? I asked James, because he was coherent, and I said
James what happened. And he said, first I thought he said Gerald and then I found out
later it was J.R. because I know of this J.R. because I use to hang out Dunbartons in
my former life. Thank God I don't do that stuff more. And I'd hang out there and this
girl Nora who goes with J.R. at the time, this was last year, and I remember hearing that
name and I remember him always being in the midst of confusion. I can't really tell you
exactly what he looks like but I remember being in his company and I was all "high" up
and stuff.
Do you remember what his last name was?
No, but I know they said something about his dad does some kind of work,
construction, or something he does. I guess he's got it wrote on the side of his truck.
Some kind of work he does. I called down there this morning and talked to somebody
and they said they had put it in the computer or whatever and ran a check and they
couldn't find a Gerald Copes and that's when I investigated around the plant. You
know how people talk. And then they said it was a J.R. That's when I connected the
two - J.R. and Nora. And they said he hadn't been long getting out of jail. And then
they said this certain person, Alonzo Morris, had been out of jail two weeks. They said
when I mentioned the name to a couple people at the plant, they said yeah that's his
dad's name, so if he's a Jr., evidentally his Alonzo Morris Jr.
Did Mr. Bibbens say anything? As far as why this happened?
He said this is over Nora. That's all he said.
Mr. Bibbens. Is he married?
No. He's the type of person, he just likes, likes to hang around the younger generation
that hangs around younger girls and stuff and get him for his money, more or less.
Somebody said he was living with Nora at Dunbarton.
Do you know what apartment it was?
No.
Do you know Cheryl Vain?
Um. She's a good friend of hers.
Okay.

A.b

A - 8

02/22/00- 01:50 pm-  I called Townsend, Georgetown, DE.
856-2525.
Spoke with Georgie M. Swan.  Ms. Swan advised that she was the
second at the scene on the day of this incident.  She said the
victim, the (older man), was lying on the road and said to her:
"JR did it".
I asked Ms. Swan if she knew JR, she responded "not at all".  Ms.
Swan said, she went to the police and told them what the old man
has said, "that's all she did".
Ms. Swan stated, -she did not witness the incident, she did not
identify the defendant either, because she did not see anything.


     Fifi

Certify:         N
Subject:         Alonzo Morris
Date:            Monday, March 13, 2000 at 11:20:21 am EST
Attached:        None

Ruth:
RE: Interview of Georgie Swan.

At 10:30 AM on 3/13/00, I interviewed witness Swan in the waiting area of Superior Court #1.

I gave her my business card and advised her I was a Public Defender Investigator. I told her that we were representing Alonzo Morris. I told her that I had reviewed a transcript of a tape recording which was provided to Mr. Morris' attorney by DAG Adkins. I told her the tape contained the story she told to the police regarding the assault on Mr. Bibbins. I asked her if she recalled making the tape recording to the police regarding the incident? She said she did. I told her I wanted to verify what she told the police that day.

She said that on the day of the incident she saw a black male running south on Race Street at the intersection where the police station is located. She didn't know the name of the intersecting street, so I drew a small schetch of the area with the street names and she indicated that it was at Pepper and Race right where the police station is.

She said she was on her way to Townsends where she works. She said it was approximately between 7:30 AM and 8:00 AM. She said she starts work at 8:00 AM. She said she was driving in her car, traveling (east) on Pepper Street just getting ready to turn south onto race street and she observed a black male running north on Race street just as she was turning into the intersection. She said the black male turned and ran onto Pepper Street (east). She said the best she could recall was that the black male was wearing dark clothing.

She verified the story she gave to the police, stating that when she got to Townsends she saw James Bibbins on the ground with his bicycle laying along side of him. She can't remember if he was laying or sitting on the ground. She said Bibbins was holding his hand on his head and he was bleeding. I told her that in the recorded statememnt she made to the police, she said that she had asked Bibbins what happened and she told her that he was hit in the head. And when she asked Bibbins if he knew who hit him he told her that it was "Gerald". I asked her if that was correct? and she said "yes". I asked her if she knew Mr. Bibbins prior to the incient and she stated "yes"!

She said there were a lot of people mingling around talking about what happened and she realized after talking with them that the man who assaulted Bibbins was JR. She said, what Mr. Bibbins probaly said to her when she asked who hit him, was "JR" but it just wasn't clear to her at the time.

Swan was obviously annoyed to talk to me about the incident and stated that

asked her if she could see the face of the black male she saw running on the
day of the incident and she said she wasn't going to answer anymore
questions.
Don

A 10

*Proth* :
A-11



**M. JANE BRADY**
**ATTORNEY GENERAL**

**STATE OF DELAWARE**
**DEPARTMENT OF JUSTICE**

**NEW CASTLE COUNTY**
Carvel State Building
820 N. French Street
Wilmington, DE 19801
Criminal Division (302) 577-8500
Fax: (302) 577-2496
Civil Division (302) 577-8400
Fax: (302) 577-6630

**KENT COUNTY**
Sykes Building
45 The Green
Dover, DE 19901
Criminal Division (302) 739-4211
Fax: (302) 739-6727
Civil Division (302) 739-7641
Fax: (302) 739-7652

**SUSSEX COUNTY**
114 E. Market Street
Georgetown, DE 19947
(302) 856-5352
Fax: (302) 856-5369

**PLEASE REPLY TO:**

Sussex County
March 9, 2000

Ruth M. Smythe, Esquire
Office of the Public Defender
1 South Race Street
Georgetown, DE 19947

RE:   State v. Alonzo W. Morris, Jr.
      ID#9911000751

Dear Counsel:

Please find enclosed copies of taped statements of Alonzo W. Morris, Jr, Alan Hill, Georgie Swan, Rick Hughes, Ronald Higgins, Dale Berner and Lenora Middleton.

Yours truly,

James W. Adkins
Chief Prosecutor

Enclosures
JWA/abw

cc:   Prothonotary
      file

A-11

```
 1     Q     Henry Lee was probably there talking --

 2     A     He was there.

 3     Q     -- about blood transfers and all that stuff?

 4     A     Yes.

 5     Q     Was I there?

 6     A     I don't remember you.

 7     Q     In any event, didn't you take notes about

 8   blood transfers, where there are splatterings, and

 9   things like that, on the people's clothing?

10     A     There are splatterings, but I didn't take any

11   notes.

12     Q     You arrested my client at 2:00 o'clock in the

13   afternoon on the 1st of November; is that right?

14     A     Yes.

15     Q     And he had on an Oriole's shirt?

16     A     I couldn't swear to that, sir, but apparently

17   so.

18     Q     Well, do you remember previously testifying

19   at a hearing about his having an Oriole's shirt on?

20     A     I don't remember.

21           MR. LIGUORI:  Your Honor, can I mark this for

22   identification, please?

23           THE CLERK:  Marked as Defendant's Exhibit C
```

1        A    Yes.

2        Q    When did you prepare your warrant for Alonzo

3   Morris in this case?

4        A    I couldn't give you an exact time.

5        Q    Well, roughly speaking, Mr. Adkins asked you

6   and you refreshed your recollection with your report

7   that you arrested Alonzo at 2:00 o'clock?

8        A    Yes.

9        Q    So, obviously, you had to prepare it prior to

10   that?

11       A    Yes.  If there is a copy of the warrant,

12   there should be a time stamped on the warrant.

13       Q    Maybe Mr. Adkins can find that for us.  In

14   any event --

15            MR. LIGUORI:  May I approach, Your Honor?

16            THE COURT:  Yes.

17            (Witness being handed a document).

18            THE WITNESS:  It is not stamped on the face.

19   Apparently this is a copy that was generated out of the

20   computer and not --

21   BY MR. LIGUORI:

22       Q    For purposes right now, Detective, you agree

23   with me that you obviously had to prepare the warrant

Davis – Cross                              B-93

1    before 2:00 o'clock in the afternoon?

2        A    I am guessing.

3        Q    Are you telling me you arrested my client

4    without a warrant?

5        A    Yes, sir.

6        Q    Did you arrest him?

7        A    I placed him in custody, yes, sir.

8        Q    Where did you find him?

9        A    At, I believe, his grandmother's house.

10       Q    Where is that?

11       A    On Douglas Street.

12       Q    And what was he wearing?

13       A    That, I cannot tell you.

14       Q    Did you take any notes of that?

15       A    No, I did not.

16       Q    You had just come from the homicide

17   conference?

18       A    In the morning, yes, sir.

19       Q    And you have had the opportunity to

20   understand about transfer of blood or transfer of hair

21   or fibers, or anything; correct?

22       A    Well, the conference isn't that detailed.

23   But I am aware of what you are telling me or what you

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

1        A    Yes, sir.

2        Q    And you do that because you want to have a

3   neutral and detached person make an independent

4   determination as to whether or not someone should be

5   arrested; is that fair to say?

6        A    Yes, sir.

7        Q    Whether or not they should be at liberty or

8   not at liberty; is that fair to say?

9        A    Yes.

10       Q    Did you do that in this case?

11       A    I believe so, yes.

12            MR. LIGUORI:  I forgot to mark this,

13   respectfully.  Mark this for identification.

14            THE CLERK:  Marked as Defendant's Exhibit D

15   for identification.

16            MR. ADKINS:  Your Honor, could I see that?

17            MR. LIGUORI:  Probable cause affidavit.

18            MR. ADKINS:  Can I just see it?

19            Your Honor, I have no objection if

20   Mr. Liguori wants that to be a Defendant's exhibit, as

21   long as the underlining and things like that are

22   explained.

23            MR. LIGUORI:  I will do that, Your Honor, and

1    we will try to clean it up.  Maybe there is a better

2    copy that maybe the officer might have.

3    BY MR. LIGUORI:

4         Q    What I want to do, for purposes of your

5    testimony here, is ask you to go to the highlights of

6    Defendant's D for identification and -- I can't use

7    that red thing because it gave me a headache watching

8    you do it.  So I am going to do this.  I want you to

9    tell me -- you prepared this?  This is your signature;

10   is that right?

11        A    Yes, sir.

12        Q    The 1st of November, 1999?

13        A    Yes, sir.

14        Q    You have a copy in front of you?

15        A    Yes, I do.

16        Q    And the part that is shown, it talks about

17   Alonzo Morris?  This is the probable cause affidavit

18   for Alonzo Morris; is that right?

19        A    Yes, sir.

20        Q    And you state and, in fact, swear that upon

21   your arrival, the victim -- that's Mr. Bibbins; right?

22        A    Yes, sir.

23        Q    The victim was contacted and made a

Davis - Cross                    B-98

1    statement; correct?

2         A    Yes, he did.

3         Q    Mr. Bibbins, the victim, stated that he had

4    been in an argument with Alonzo Morris?  Did he say

5    that?

6         A    Alonzo Morris, no.

7         Q    Did Mr. Bibbins say that?

8         A    No.

9         Q    He did not say that?

10        A    No.

11        Q    But you swore that he said that; correct?

12        A    Yes, I did.

13        Q    You swore that he said he was in an argument

14   with Alonzo Morris on a phone call that Bibbins made to

15   Mr. Morris' girlfriend?

16        A    Yes.

17        Q    That's not what Mr. Bibbins says, is it?

18        A    Mr. Bibbins said --

19        Q    I will let you rehabilitate yourself for

20   Mr. Adkins.  Just answer yes or no.

21             THE COURT:  He can answer yes or no and give

22   an explanation, Mr. Liguori.

23             MR. LIGUORI:  I apologize.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A - 18

Davis – Cross                    B-99

1    BY MR. LIGUORI:

2        Q    Did Mr. Bibbins say at the scene that the

3    argument was over Mr. Bibbins' making a phone call to

4    Mr. Morris' girlfriend?

5        A    Mr. Bibbins stated that the reason he was

6    assaulted was over a phone call from J. R.'s

7    girlfriend.

8        Q    I don't wanted to beat a dead horse.  You

9    look at this.  Who made the phone call?  I am a neutral

10   and detached Magistrate.  I am going to read this.  Who

11   made the phone call?

12       A    Mr. Bibbins.

13       Q    It is wrong; isn't it?

14       A    Yes, it is incorrect.

15       Q    You are incorrect, or is Mr. Bibbins

16   incorrect?

17       A    The statement was incorrect on the warrant.

18       Q    And who said Alonzo Morris?

19       A    Nobody did.  I did.

20       Q    So you then presented this document that had

21   inconsistencies in it?

22       A    Unfortunately so, yes, sir.

23       Q    Things that were not even said were in here;

1    correct?

2         A    Yes.

3              MR. LIGUORI:  At some point in time, I will

4    give a clean copy.

5              THE COURT:  I am not concerned with a clean

6    copy or unclean copy.  It has been explained to the

7    jury.

8              MR. ADKINS:  I have no objection to that

9    coming in.

10             THE COURT:  You want to move it?

11             MR. LIGUORI:  I do.  I would like to use that

12   one.  This is my personal one with notes on it.

13             MR. ADKINS:  That is my only one that I may

14   need.

15             MR. LIGUORI:  I will make a copy.

16             THE COURT:  Substitute it later.

17             MR. LIGUORI:  Thank you.

18   BY MR. LIGUORI:

19        Q    So how does it come that you, in your

20   investigation, decide unilaterally to put words in

21   Mr. Bibbins' mouth?

22        A    There is -- I have known Alonzo Morris to be

23   the person that Mr. Bibbins said it was.

Davis — Cross                    B—101

1       Q    How does it come that you put words in

2   Mr. Bibbins' mouth?

3       A    I don't put words in his mouth.

4       Q    You said that he said Alonzo Morris.

5       A    That's something that I generalized.

6       Q    Generalized for a Magistrate?

7       A    Yes, sir.

8       Q    To justify the fact that you already arrested

9   him without a warrant?

10      A    I had taken him in custody, yes.

11      Q    I can split hairs.  Was he going to leave?

12      A    No, sir.

13      Q    He was arrested, wasn't he?

14      A    I had taken him into custody, yes, sir.

15      Q    You then, to justify what you had done, went

16  to the Magistrate and inserted out of the mouth of the

17  victim, "Alonzo Morris"?

18      A    As I know him to be, yes, sir.

19      Q    Well, what is your job?  To do what you know

20  to be or to take down what victims or witnesses tell

21  you?

22      A    Both.

23      Q    Well, let's discuss that then.  In an

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

Davis – Cross                          B-102

1    investigation of a dying declaration, what would you

2    rather have?  What you believe was said or what was

3    actually said?

4        A    What was actually said.

5        Q    Well, what was actually said in this

6    situation was not what you showed the Judge, was it?

7        A    Well, no.  He called him by J. R., which I

8    knew to be Alonzo Morris.

9        Q    Did he call him J. R. or did he say Jerrold?

10       A    Well, he said J. R., but unfortunately for

11   Mr. Bibbins, his jaw was broken.  So with respect to

12   that, I am sure it sounded like Jerrold.

13       Q    So how do you know that, Officer?  That is

14   something you are interjecting.  You never spoke to

15   him, did you?

16       A    No.  I did talk to his doctor later on.

17       Q    But we are talking about at the scene.  He is

18   sitting on the sidewalk and you are getting this

19   information and you and Barlow are working hand in

20   hand?

21       A    Officer Barlow got the statement before I

22   arrived.

23       Q    You and Barlow are working hand in hand.

1    much it weighs.  It was a ragged pipe.  It was ragged cuts or ragged breaks on

2    both ends of the pipe.

3                    Q.        Okay.  So what did you do next?

4                    A.        Well, first I called for medical assistance and

5    provided first aid to Mr. Bibbins.  I asked him what the circumstances were

6    regarding, you know, why he'd been attacked.  He said that J.R. had gotten

7    into an argument with him concerning over his girlfriend.  And at that time, I

8    wasn't able to question him any further because the medical personnel got

9    there and they immediately began working on him, so I wasn't able to talk to

10    him anymore.

11                    Q.        All right.  How were you able to determine who

12    this J.R. was?

13                    A.        The two witnesses who I spoke to at the scene,

14    also spoke to the victim and they had only seen him from a distance, their

15    view was actually from about half a block away.  They saw him running away.

16                    However, the one witness, Georgie Swan, knew J.R.,

17    actually Alonzo Morris.  However, she didn't know him as Alonzo Morris, she

18    only knew him as J.R.  But she also remembered that he actually wasn't J.R.

19    Copes, he was actually J.R. Morris, but apparently the members of the

20    community called him Copes because he used to live with a woman named

Q.     And do you see the person who was described

as J.R., who was identified in a photo lineup as the attacker her in this

courtroom?

A.     Yes. The defendant, Alonzo W. Morris, Jr. is

the gentleman sitting next to Mr. Brady at the defense table.

6            MR. ADKINS:  Thank you. No more questions.

7            THE COURT:  Mr. Brady?

8            MR. BRADY:  Yes, Your Honor, if I may have a moment.

9            (PAUSE).

10                 CROSS-EXAMINATION

11    BY MR. BRADY:

Q.     Did you conduct this photo lineup?

A.     Did I?

Q.     Yes.

A.     No, I didn't. Detective Davis did.

16    Q.     So you can't tell me how it was composed?

17    A.     I do not know, sir.

Q.     And Detective Davis is the one that did the

interviews with the people at Harvey's Plumbing?

A.     That's correct, sir.

McCREA - DIRECT

1    on the left side of North Race Street?

2        A.    Right.

3        Q.    As you turn right to proceed down to

4    Townsends?

5        A.    Yes.

6        Q.    As you were stopped at that stop sign that

7    morning sometime between 7:30 and quarter of eight on

8    November 1st, 1999, did you see anything unusual while

9    you were sitting there at the stop sign?

10       A.    As I approached the stop sign to stop, I

11   looked to my right to check for traffic and I seen a

12   man running extremely fast, coming up the street.  He

13   came past me -- or came in front of me rather.

14       Q.    Would he be going towards Townsends or away

15   from Townsends?

16       A.    He was running away from Townsends.

17       Q.    Did you see his face well enough to ever

18   recognize him again?

19       A.    No.

20       Q.    Did you proceed from that stop sign?

21       A.    Yeah.

22       Q.    What did you do?

23       A.    I turned on -- right on Race Street.  I

DAVID WASHINGTON
Official Court Reporter

A - 25 b

direction.

2      Q.   Was he pointing towards the intersection you

3   just came from, Pepper Street and North Race Street?

4      A.   Yes.

5      Q.   Did he say anything else to you?

6      A.   I asked him why did he do this or what for.

7   He said it was about Lenora.   That's all I remember.

8      Q.   About Lenora?

9      A.   Yes, he mentioned the name Lenora.

10         MR. ADKINS:   Excuse me.

11         (Pause.)

12         MR. ADKINS:   Ms. McCrea, I don't have any

13   further questions of you right now.

14                    CROSS-EXAMINATION

15   BY MR. LIGUORI:

16      Q.   Good afternoon, Ms. McCrea.

17      A.   Good afternoon.

18      Q.   My name is Jim Liguori.   I am representing

19   Alonzo Morris.   What I want to do is ask you to please

20   tell us, when you saw this gentleman run towards you,

21   did he turn, did he turn and run?

22      A.   He was running, I mean, you know --

23      Q.   You are at --

McCREA - CROSS

1        A.    I said, honestly speaking, back then, I don't

2    remember the exact words that I said.

3        Q.    Did you recall when you met Mr. Bibbins on

4    the roadway there, was he coherent?

5        A.    He seemed to be.

6        Q.    Did he tell you that Gerald had struck him?

7        A.    No, he said J.R.

8        Q.    You are certain of that?

9        A.    Yes, I am.

10       Q.    You did not tell Officer Davis that you

11   thought he said Gerald?

12       A.    Like I say, I don't know, honestly remember

13   what I said at that time.  It could have been Gerald,

14   Junior, something in that respect.

15       Q.    Would you like to hear the tape of what you

16   said?

17       A.    Whatever.  If I have to.

18       Q.    Well, did you tell Officer Davis that you

19   thought Mr. Bibbins told you Gerald had struck him?

20       A.    As I say it again, I can't honestly remember.

21   That was three, four years ago.  I don't remember.

22       Q.    Did you do any investigation yourself of this

23   incident?

DAVID WASHINGTON
Official Court Reporter

McCREA - CROSS

        that?

2             THE COURT:  You may be able to stipulate to

3   it, stipulate this is the tape and I will let you work

4   on that.  Let's not do it right now.  I want a dress

5   rehearsal.

6             MR. LIGUORI:  All right, done.

7             (Whereupon, counsel returned to the trial

8         table and the following proceedings were had:)

9   BY MR. LIGUORI:

10        Q.    Did you speak with any police officers at the

11   scene of the incident?

12        A.    I can't remember.

_3        Q.    What do you remember about the incident,

14   specifically with regard to what you observed?

15        A.    Like I say, when I was approaching the stop

16   sign and about to turn on Race Street, I saw a black

17   man running extremely fast.  I thought it was

18   abnormal, caught my attention may be a minute or so.

19   I proceeded down Race Street and started pulling into

20   my parking area.  That's when I saw Mr. Bibbins.  Alan

21   Hill, he was assisting him up from the road and his

22   bike was laying in the road.  The closer I got to him,

23   I realized he was bleeding.  I ran over to him in

DAVID WASHINGTON
Official Court Reporter

### McCREA - CROSS

 1    excitement.  I asked -- started asking him about what

 2    happened.  That's when he pointed in the direction

 3    behind me, towards the police station.  He said -- at

 4    first, I couldn't understand whether he was saying

 5    Gerald.  I thought he was saying Gerald.  And then --

 6        Q.    That's what I asked you and you said you

 7    didn't know.

 8        A.    It's coming back to me.  The more I think

 9    about it, and I thought he said Gerald did it, but he

10    was saying evidently --

11        Q.    Hang on a second.  I don't mean to interrupt

12    you because you are on a roll here.  Originally

13    Mr. Bibbins said to you -- you thought he said Gerald

14    did it?

15        A.    I thought he said that, but evidently he

16    wasn't --

17        Q.    Why do you say "evidently"?

18        A.    Because I could have misunderstood him.

19        Q.    Do you recall, now it is coming back to you,

20    that you did your own investigation in this matter?

21        A.    I really don't know how to answer that,

22    because I don't know what you mean by "investigating".

23    I mean, like I said, it was a conversation piece,

McCREA - CROSS

1    people were talking, and I don't remember exactly

2    every little detail.

3              MR. LIGUORI:   May I have one moment, Your

4    Honor?

5              THE COURT:   Yes.

6              (Pause.)

7    BY MR. LIGUORI:

8         Q.   This gentleman I have my hand on his

9    shoulder, do you know this gentleman?

10        A.   No, I don't.

11        Q.   You ever met him in your life?

12        A.   Not to my knowledge.

3         Q.   Ever seen him before in your life?

14        A.   Not to my knowledge.

15             MR. LIGUORI:   Nothing further, Your Honor.

16             Thank you, ma'am.

17             MR. ADKINS:   I have no redirect, Your Honor.

18   I ask she be excused.

19             THE COURT:   Excused, subject to recall.

20             You are still working at Townsends?

21             THE WITNESS:   Yes.

22             THE COURT:   You can go to work and

23   everything.   They may give you a call to come back.


                    DAVID WASHINGTON
                  Official Court Reporter



**M. JANE BRADY**
**ATTORNEY GENERAL**

### STATE OF DELAWARE
### DEPARTMENT OF JUSTICE

**NEW CASTLE COUNTY**
Carvel State Building
820 N. French Street
Wilmington, DE 19801
Criminal Division (302) 577-8500
Fax: (302) 577-2496
Civil Division (302) 577-8400
Fax: (302) 577-6630

**KENT COUNTY**
Sykes Building
45 The Green
Dover, DE 19901
Criminal Division (302) 739-4211
Fax: (302) 739-6727
Civil Division (302) 739-7641
Fax: (302) 739-7652

**SUSSEX COUNTY**
114 E. Market Street
Georgetown, DE 19947
(302) 856-5352
Fax: (302) 856-5369

**PLEASE REPLY TO:**

Sussex County Office

November 5, 1999

Chief William Topping
Georgetown Police Department
Georgetown, DE 19947

      RE: *Grand Jury*

Dear Chief Topping:

The following officer(s) are subpoenaed to the Attorney General's Office at the designated times for presentation of the designated cases to the Sussex County Grand Jury on <u>Monday, November 15, 1999</u>.

| Officer | Time | Defendant |
|---------|------|-----------|
| D. Davis | 1:10 p.m. | Alonzo Morris |

If you need any further information, please contact Carol Wilkins at 856-5353.

Sincerely,

James W. Adkins
Deputy Attorney General



A-31

②

```
*********************
***   TX REPORT   ***
*********************
```

TRANSMISSION OK

| | |
|---|---|
| TX/RX NO | 4721 |
| CONNECTION TEL | 98587374 |
| CONNECTION ID | |
| ST. TIME | 11/05 09:52 |
| USAGE T | 00'48 |
| PGS. SENT | 1 |
| RESULT | OK |

A-32



IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR SUSSEX COUNTY

THE STATE OF DELAWARE       *   CRIMINAL ACTION NOS.
                            *   S99-11-
        vs.                 *
                            *
ALONZO W. MORRIS, JR.       *      INDICTMENT BY THE
I.D. 9911000751             *       GRAND JURY
                            *
                            _____

The Grand Jury charges that ALONZO W. MORRIS, JR. did commit the

following offense(s), to-wit:

### COUNT 1 - ASSAULT IN THE FIRST DEGREE - S99-11- 0097

ALONZO W. MORRIS, JR. on or about the 1st day of November, 1999, in the

County of Sussex, State of Delaware, did intentionally cause serious physical injury

to James Bibbins by means of a deadly weapon, to-wit: defendant struck James

Bibbins in the head with a P.V.C. pipe, in violation of Title 11, Section 613(a)(1) of

the Delaware Code.



(4.)

## COUNT 2 - POSSESSION OF A DEADLY WEAPON DURING THE COMMISSION

## OF A FELONY - S99-11-0090

ALONZO W. MORRIS, JR. on or about the 1st day of November, 1999, in the County of Sussex, State of Delaware, did knowingly possess a deadly weapon during the commission of a felony by possessing one P.V.C. pipe, a deadly weapon during the commission of Assault in the First Degree as set forth in Count One of this Indictment which is herein incorporated by reference, in violation of Title 11, Section 1447 of the Delaware Code.

A TRUE BILL

_____
(Foreperson)

_____
(Secretary)

s/M. JANE BRADY
ATTORNEY GENERAL

_____
DEPUTY ATTORNEY GENERAL

DATE: November 15, 1999
jj

A-34



**M. JANE BRADY**
**ATTORNEY GENERAL**

**STATE OF DELAWARE**
**DEPARTMENT OF JUSTICE**

**NEW CASTLE COUNTY**
Carvel State Building
820 N. French Street
Wilmington, DE 19801
Criminal Division (302) 577-2055
Civil Division (302) 577-2500
Fax: (302) 577-6630

**KENT COUNTY**
Sykes Building
45 The Green
Dover, DE 19901
(302) 739-4211
Fax: (302) 739-6727

**SUSSEX COUNTY**
114 E. Market Street
Georgetown, DE 19947
(302) 856-5352
Fax: (302) 856-5369

**PLEASE REPLY TO:** Sussex

January 4, 2000

Ruth Smythe, Esquire
Public Defender's Office
1 South Race Street
Georgetown, DE  19947

> **RE: State v. Alonzo W. Morris, Jr.**
> **Cr.A.Nos.  S99-11-0096 & 0097**
> **I.D. #9911000751**

Dear Counsel:

Pursuant to Superior Court Criminal Rule 16, the following information concerning the above captioned case is being supplied.

Rule 16(a)(1)(A):  Relevant written, recorded or oral statements made by defendant or any juvenile or adult co-defendant in response to interrogation by a person then known by the defendant to be a state agent:

Defendant made an oral statement the substance of which is contained in the enclosed copy of Det. Davis' Supplement Report, dated November 1, 1999 containing one page.

Rule 16(a)(1)(B):  Defendant's Prior Record.

Enclosed is a copy of defendant's known criminal history record information as same is maintained in the Attorney General's Office Case Tracking System.  Although this is the single best source of such data available within the State, I caution you that such information is occasionally incomplete or inaccurate.  I therefore suggest that you discuss this matter with your client who should be able to correct erroneous data and complete the record as needed.  In addition, I intend to discuss any discrepancies with you prior to trial.

A-35

A2

State v. Alonzo W. Morris, Jr.
January 4, 2000
Page - 2 -

Rule 16(a)(1)(C):  Documents and Tangible Objects.

Inspection of documents and tangible objects will be
permitted upon reasonable notice and during normal business hours.
Please contact my office to arrange for a mutually convenient time
for inspection.  Please contact Det. Davis of Georgetown Police
Department to see the recovered PVC pipe, and photos of the crime
scene and the victim.

Rule 16(a)(1)(D):  Reports of Examinations and Tests.

Results or reports of mental or physical examinations and
scientific tests or experiments which the State intends to use
during its case-in-chief, or material to the defense:

See enclosed copy of the victim's medical records from Beebe
Medical Center.

Rule 16(a)(1)(E):  Expert Witnesses.

The identity and substance of the opinions of expert
witnesses:

Are as follows:  Anis K. Saliba, M.D., Thomas Shreeve, M.D.,
and Frances Esposito, M.D. may be called as expert medical
witnesses to testify concerning the facts and conclusions
contained in the medical records of the victim provided herein.

Please be advised that this response, together with any
acknowledgments of information to be supplied when received,
constitute the State's entire response to its discovery
obligations under Rule 16 and/or any written request filed by the
defendant.  If, prior to or during trial additional evidence or
material is discovered which is subject to discovery shall be
disclosed immediately.  Further discovery, except to the extent
referred to herein is objected to as being outside the scope of
the State's obligation under Rule 16.  Should you wish to pursue
the matter further, please file a motion to compel further
response as provided by Rule 16.

Please be advised that when the victim was interviewed at
the scene, he incorrectly stated the defendant's name as "J.R.
Copes" and said that "J. R. Copes" had hit him.

State's Reciprocal Discovery Request:

Pursuant to Superior Court Criminal Rule 16(b), please
provide me with the following:

To:          Ruth M. Smythe@Sussex@Pub_Defender
From:        James Adkins@Sussex@Justice
Certify:     N
Subject:     re: Alonzo Morris
Date:        Monday, January 24, 2000 at 1:24:40 pm EST
Attached:    BEYOND.RTF

Ruth,

     Sorry to be so late in responding to your E-mail. The defendant was
not identified by photo lineup, so there is no array to view. The victim
and witnesses who identified him knew who he was. Although Georgetown P.D.
attempted to find latents on the PVC pipe there were no latents found. Due
to the overlap in the defendant`s convictions, I am not considering him to
be an habitual.

                          Jim

---------- Original Text ----------

From: Ruth M. Smythe@Sussex@Pub_Defender, on 1/5/00 1:43 PM:

I understand above was identified by photo lineup - may I see the array?
Also, I would be interested in knowing what the fingerprint analysis shows
since my client so adamantly denies this crime.  Also, in reviewing his
record, I note that the burglary and kidnap case were the same incident and
sentenced on same date.  Are you still considering him to be habitual?  I
did not see the necessary convictions to fit that statute.  Ruth

A-36 b

HAPPY😊MAIL

ADKINS - Direct

1    may have had two or three others.  Certainly not
2    more than that.  Not many.

3        Q    Your case, in your 15 or 20 hours of
4    preparation, a lot of your case was still on the
5    cuff, up in the air, wasn't it, in respect that you
6    didn't know exactly what the witnesses were going
7    to say, is that correct?

8        A    You know, that's the way I've always felt
9    about this case, that, you know, cases are brought
10   into this courtroom and everybody wants lawyers to
11   be well prepared.  And well prepared lawyers don't
12   ask questions that they don't know answers to.  So
13   it really -- when everybody is asking questions
14   that they know the answers to, not that it's
15   rehearsed, but you're just putting it on and you
16   know exactly what is going to happen.

17            In this case I would think it was kind of
18   refreshing, because it was, I think, about four
19   months after the incident there had not been any
20   identification procedures, any photo lineups done.
21   There was not a script in this case.  We weren't
22   calling X, Y and Z to the stand knowing that they
23   had already identified a person in a photo lineup.

KATHY S. PURNELL
OFFICIAL COURT REPORTER

A39

ADKINS - Direct

1    And I think I told this possibly to the jury in

2    opening also, that, you know, these witnesses are

3    going to take the stand, they were out there on

4    that sidewalk by Harvey's, there was no photo

5    lineup done.  It's been four months.  And I'm going

6    to ask them, do you see the person who did this; do

7    you think you can remember enough to identify a

8    person.  And I didn't have a clue as to what they

9    were going to say.

10        That's what happened with every witness,

11   including Rick Hughes, who was absolutely sure that

12   Alonzo Morris was the perpetrator.  I knew that

13   James Bynum could identify him, because he knew

14   Alonzo Morris since Alonzo Morris was a boy.  With

15   respect to James Bibbins, he told me when I

16   interviewed him prior to this trial, that he knew

17   J.R., he had seen J.R. before, he knew J.R.'s

18   daddy, Alonzo Morris, Sr., and he knew him and he'd

19   be able to identify him.  Okay.  So I asked him.

20   That was the biggest shock in that trial for me,

21   because I came into this trial thinking that James

22   Bibbins was going to be able to identify Alonzo

23   Morris, and he didn't.  I contend it's because he's

JAMES BIBBINS - Direct        A-77

1        A      Right across my temple and hit me right in

2    my eye.

3        Q      Were you wearing your glasses at the time?

4        A      Yep, I was wearing my glasses.

5        Q      What happened to your glasses?

6        A      He tore them up.

7        Q      What happened to your eye?

8        A      He put it out.

9        Q.     I want you to look around this courtroom

10   and tell me if you see the person who hit you with

11   that pipe on November 1st.  You can stand up, if you

12   want.

13            (Brief pause.)

14   BY MR. ADKINS:

15       Q      Sit down and give me an answer.

16       A      No, I don't see him.

17       Q      You don't see him?

18       A      No.

19            MR. ADKINS:  Your Honor, I'm not going to

20   have anymore questions for Mr. Bibbins right now.  I

21   may call one more witness.

22            Let me change my way of going here, Judge.

23   Let me go ahead and finish up with Mr. Bibbins so I

KATHY S. PURNELL

    1    term?

    2        A    I have degree, a Doctor of Optometry.  So I

    3    am an optometrist.

    4        Q    You have a Doctor of Optometry?

    5        A    Correct.

    6        Q    Are you licensed to practice in the State of

    7    Delaware?

    8        A    Yes, sir.

    9        Q    Do you, in fact, practice in the State of

   10    Delaware?

   11        A    Yes, sir.  Yes, I do.

   12        Q    For how long have you been a licensed

   13    practicing Doctor of Optometry?

   14        A    Seventeen years.

   15        Q    Do you have an office here in Georgetown?

   16        A    Yes, sir, I do.

   17        Q    And are you familiar with a seventy-five-

   18    year-old gentleman, an African-American man, by the

   19    name of James Bibbins?

   20        A    Yes, I am.

   21        Q    Is James Bibbins a patient of your practice

   22    and has he been for a few years?

   23        A    Yes, sir, he has since 1976.

1      Q     Since 1976.  Just prior to November 1st of

2    1999, any time within six months or a year after that,

3    was Mr. Bibbins at your office for any type of eye exam

4    where you would do an examination of his eyesight in

5    his left and right eyes?

6      A     Yes.  He was in on June 23rd, 1999.

7      Q     At that time, June 23rd, 1999, did he have

8    any severe right eye trauma or injury?

9      A     No, sir.

10     Q     Did he have an eye exam at that time?

11     A     Yes, sir, he did.

12     Q     Could you please detail for us, if you could

13   -- I guess eye doctors talk in terms of people having

14   20/20 vision or 20/40, whatever.  Do you have anything

15   with regard to his vision when he had two eyes prior to

16   June 23, 1999?

17     A     Yes.  The right eye, he had best corrective

18   visual acuity of 20/50, and the left eye, he had best

19   corrective visual acuity of 20/70.  And that was with

20   his glasses.

21     Q     Has Mr. Bibbins had any other eye, I will

22   call them maladies, for lack of a better term, even as

23   of June, 1999?

1      A    Yes, sir.  He was diagnosed with glaucoma

2   before that, and glaucoma is an eye disease where you

3   lose your vision over a period of time.

4      Q    In what way did the glaucoma affect

5   Mr. Bibbin's vision, in terms of affecting distance

6   peripheral vision?  Could you explain a little bit more

7   about what the glaucoma means in Mr. Bibbins' case?

8      A    How it affected his eyes is that it would

9   cause him to lose his peripheral vision.  He would

10  still have straight-ahead vision, for example, looking

11  directly at you, but he may not be able to see things

12  off to the side.

13     Q    Did your office also have Mr. Bibbins or have

14  you had him in subsequent to November 1st, 1999, with

15  regard to eye examinations and prescription glasses?

16     A    Yes, sir.

17     Q    And when have you had him in subsequent to

18  that?

19     A    He has been in a couple of times.  The most

20  recent time that I see that we did a more comprehensive

21  exam was January 19th, 2000.  And at that time, he was

22  unable to see out of his right eye anything at all,

23  including light.  His best corrective visual acuity was

1    20/70 again, same as it was back in June.

2         Q    That is for the left eye?

3         A    That is for the left eye.

4         Q    Which is the only seeing eye?

5         A    Which is his only seeing eye.

6         Q    Would you say he is legally blind in his

7    right eye?

8         A    Yes.  More than legally blind.  He has

9    absolutely no sight.  In fact, the determination they

10   are trying to determine now is whether or not they have

11   to remove the eye.

12        Q    So in addition to having glaucoma and loss of

13   peripheral vision with both eyes, now, after November

14   1st and as recently as January, what would be his

15   peripheral vision, if you can explain it to the jury,

16   with no right eye and just the left eye at 20/70 and

17   glaucoma in the left eye?

18        A    Everything from basically in front of his

19   nose to the right, he does not see because his eye is

20   completely missing or not functioning.  In the left

21   eye, which would pretty much take care of straight

22   ahead and out to left, his eyesight has been

23   compromised.  So, basically, he has a little bit of

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 43

1    tunnel vision looking straight ahead, but falling off
2    to the right.

3        Q    Can you describe his glaucoma condition in
4    even more detailed terms in terms of whether he has
5    perfectly round tunnel vision or whether even that is
6    compromised?

7        A    On May 24th of 1999, a vision field test was
8    performed.  A threshold vision field test determines
9    how sensitive your eye is and it tells us how much
10   damage to your peripheral vision has been done.

11          At that time, he had a very irregular-shaped
12   field of view, and it was not actually even centered.
13   It was -- looking at it here, it is actually skewed so
14   that he really misses more to the left with some still
15   central vision.  But it is missing more on the left
16   side than it is on the right.  So it is sort of oval.

17       Q    Did you have the opportunity to see James
18   Bibbins in your office at 9:00 a.m. this morning?

19       A    Yes, sir, I did.

20       Q    And did you do any type of eye exam with him?
21       A    I checked to see if his vision had improved
22   or decreased since January, and it was still 20/70 this
23   morning with his glasses on.

1      Q      How about his peripheral vision?  Can you say

2    anything about that at this point as of today?

3      A      I did not check that today, but I would say

4    it is certainly no better.  It is either going to be

5    the same or worse, based on his glaucoma.

6      Q      Now, I want to ask you another question to

7    try to explain this to the jury, if you can.  Let's say

8    you have people who see good, and let's say they have

9    20/20 vision.

10     A      Correct.

11     Q      You said that Mr. Bibbins only sees at all

12   out of his left eye and he has 20/70 vision.  Could you

13   tell us what that means in terms of his being able to

14   see clearly a distance away?

15     A      What 20/70 means is that what a person can

16   see at seventy feet, Mr. Bibbins would only be able to

17   see something twenty feet away.  He would have to be

18   somewhere between one-fourth as close or one-third as

19   close.

20     Q      So can you correlate that in terms of feet?

21   In other words, would he be able to see clearly, for

22   example, facial features more than ten or fifteen feet

23   away, or whatever?

Maschauer - Direct                     B-81

1           A     No, he would not.  Most people can see

2     clearly facial features, if you are looking for

3     freckles, moles, anything along those lines, fine

4     detail, you are only going to see it thirty or forty

5     feet away.  That means, basically, he would be able to

6     see it ten to twelve feet away maybe, at best.

7           Q     Ten or twelve feet?

8           A     Yes, sir.

9                 MR. ADKINS:  Your Honor, I have a tape

10    measure here.  I would like permission to approach the

11    witness and give him one end and walk over to the

12    defendant with the other end.

13                THE COURT:  You may do so.

14                MS. SMYTHE:  At the same time, I would like

15    Mr. Adkins to measure from the door to the entrance of

16    the court.

17    BY MR. ADKINS:

18          Q     What is your reading, Dr. Maschauer?

19          A     It says twenty-three feet seven inches.

20                MR. ADKINS:  Thank you.

21                I don't have any more questions of

22    Dr. Maschauer.  If Ms. Smythe wants him to measure

23    anything else, I will leave the tape measure with him.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER          A 46

1            Your Honor, I really don't want to get in a

2     situation where Ms. Smythe is a witness in this case.

3     If we are going to have measurements, I would rather

4     she somehow use a witness who is on the stand.

5            THE COURT:  Very well.

6                     CROSS EXAMINATION

7     BY MS. SMYTHE:

8        Q   Doctor, would you come down here, please?

9        A   (The witness leaves the stand.)

10       Q   Would you read where we are at now?

11       A   Seventeen feet, eleven inches.

12           THE COURT:  Where is that from, just for the

13    record?

14           MS. SMYTHE:  This is from the entrance, the

15    gate into the main portion of the courtroom --

16           THE COURT:  What was the measurement?

17           MS. SMYTHE:  -- to the defendant.  Seventeen

18    feet, eleven inches.

19    BY MS. SMYTHE:

20       Q   Doctor, you are talking about seeing, I

21    think, moles and seeing such things clearly from a

22    distance of twenty to seventy feet?

23       A   I said that.

Maschauer - Cross                         B-83

1        Q    20/70?

2        A    Correct.  That is his visual acuity.

3        Q    How about actually just seeing a person's

4    facial features and recognition?  How would that work?

5    Would that be just as difficult?

6        A    I would certainly think so.

7        Q    Facial features are as difficult as mouth

8    marks and scars on the skin?

9        A    I am sure if you recognized someone that is

10   more family, like a family member, you would probably

11   see them a greater distance because you are used to

12   seeing their face.  In general, looking at features of

13   people, I think twenty or thirty feet or so would be

14   the length.

15       Q    But at twenty feet you could see pretty well?

16       A    An average person, sure.

17       Q    No, a person with the 20/70 vision in one

18   eye?

19       A    No, ma'am.  That is what I was saying.  This

20   person could only see between a third or fourth of that

21   distance.  So, at best, if we seen even forty feet, a

22   distance of forty feet, Mr. Bibbins would only be able

23   to see between ten and twelve feet.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

1      Q     In manner of recognition of people?

2      A     Yes, ma'am.

3      Q     That hasn't changed since this mishap in

4    November?  That reading was the same?

5      A     Yes, ma'am.  In his one remaining good eye.

6      Q     In the one eye?

7      A     Yes, ma'am.

8      Q     Does he have cataracts, as well?

9      A     Yes, ma'am, he does have some very early

10   cataracts.

11     Q     Did he have them in November?

12     A     I didn't see him in November.  But, yes, I am

13   sure he did.

14     Q     And today's vision is still 20/70?

15     A     Yes, ma'am.

16           MS. SMYTHE:  Thank you.

17                      REDIRECT EXAMINATION

18   BY MR. ADKINS:

19     Q     So by the same token, Dr. Maschauer, if on

20   November -- I will give you this hypothetical.  If on

21   November 1st, just prior to his losing the sight in his

22   right eye, so he, therefore, had the sight in his right

23   eye, as well as the sight in his left eye, he was

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A-49

1    within a foot or two of a person arguing with them,

2    should he have any problem in identifying that

3    individual whom he is having an argument with that

4    close?

5         A      He wouldn't have trouble then or now.

6         Q      If they were that close?

7         A      Absolutely.

8                MR. ADKINS:   Thank you.   No further

9    questions.

10               MS. SMYTHE:   No further questions, Your

11   Honor.

12               THE COURT:   May he be excused?

13               MR. ADKINS:   I ask that he be excused.

14               THE COURT:   Thank you, Doctor.   You are not

15   to talk about your testimony with anyone until the case

16   is over.

17                              (Witness steps down.)

18               MR. ADKINS:   The State calls officer Mike

19   Barlow.

20   Whereupon,

21                    MICHAEL RICHARD BARLOW

22   was called as a witness by and on behalf of the State

23   of Delaware and, having been first duly sworn, was

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

ADKINS - Direct

1    goad.  You know, I am going to allow the question.

2         THE WITNESS:  You know, this is just real

3    broad, I guess.  I mean real speculation on my

4    part, maybe 15 or 20 hours.  I mean I interviewed

5    witnesses and --

6    BY MR. LIGUORI:

7    Q    You didn't interview James Bynum until

8    three days before the trial, correct?

9    A    I don't know how many days it was right

10   now, before the trial.  I know it was around that.

11   The trial was approaching.  How that happened was

12   we had a lady by the name of Joyce Bailey who I

13   knew as a witness that I was going to call.  And as

14   I often do in my final preparation for trial, I do

15   interview witnesses with my chief investigating

16   officer present.

17        I remember going to her home with Officer

18   Davis and interviewing her about the case.  She is

19   the one who, for the first time, brought up the

20   name of Houseman and said, you know, he saw the

21   whole thing.  And then we found out that Houseman

22   was James Bynum, and Officer Davis found him and

23   interviewed him.  That's what he said.  It was just

ADKINS - Direct

1    one of those things, that he was found kind of late

2    in the game.

3         Q    Well, he was found late in the game

4    because you didn't interview Joyce Bailey until

5    late in the game, either, right?

6         A    Well, I usually don't interview witnesses

7    two or three months in advance immediately after

8    the police interview them.  I read my police

9    reports, I read the summaries of what they've told

10   the police.  I might listen to any taped

11   statements.  But I usually don't kind of re-invent

12   the wheel of the police investigation two or three

13   months prior to trial.

14         But when I know a case is going to trial,

15   it hasn't pled at case review or whatever, then

16   when I do my final preparation, so it's fresh in my

17   mind and things are fresh in the State's witnesses'

18   minds, I do interview my witnesses just prior to

19   trial.  And sometimes I mean you'd be surprised at

20   what it reveals.  In this case, it revealed the

21   name of James Bynum.

22         Q    And the fact remains that James Bynum was

23   the crucial witness for your case, is that right?

ADKINS - Direct

1        A    Well, he was an. eyewitness to the events
2    who could identify Alonzo Morris as the assailant.
3    So yes, he was very important.

4        Q    And this case was just an identity case,
5    correct?   That was your whole case, just an
6    identity case, is that right?

7        A    Well, I'm not sure I know what you mean by
8    that.   Identity certainly was an issue.   I don't
9    think anybody disputed that Mr. Bibbins was very
10   seriously injured and that he was attacked while he
11   was riding his bicycle to work at Townsends.   If
12   you mean that, that certainly wasn't disputed.   So
13   it was mainly about proving who did this, and we
14   did it by eyewitnesses and by motive and other
15   circumstantial evidence.

16       Q    I might be mistaken, but I think in Volume
17   A, about Page 43 of the transcript, you said to
18   Judge Stokes that this whole case was an identity
19   case.   That's what I'm trying to ask you.

20       A    I have to look at it.   I mean, you know,
21   if I said that, I said that.   Certainly identity
22   was a big part of the case.   But I think it was
23   overwhelming evidence of his guilt, as the judge

A 55

ADKINS - Direct

1    also said, which I can't give you a page, but

2    almost overwhelming evidence of guilt in this case.

3        Q    And your objective was to convict

4    Mr. Morris, is that right?

5        A    Well --

6        Q    Mr. Adkins, we can take a break. I mean

7    you're struggling here. Do you want to take a

8    break for anything?

9        A    I'm not struggling with your question.

10       Q    I know you're not.

11       A    I know you're not meaning that. But I

12   have -- it's called pleural effusion. I have some

13   fluid on the lung. It gives me pain from time to

14   time. What was the last question?

15       Q    The question was with regard to your

16   objective, was to prosecute Alonzo Morris. Is that

17   right, to convict Alonzo Morris?

18       A    Just as in any other case that I have

19   prosecuted. If I review the evidence and I have

20   any doubt about the person's guilt, I don't

21   prosecute the case. I nolle pros it. In this

22   case, I reviewed the evidence. I had no doubt

23   whatsoever about his guilt. And so, therefore, in

ADKINS - Direct

1    my opinion, justice was to convict him of this

2    crime, and I put forth the evidence, yes, with the

3    objective of convicting him.

4         Q    And you had no doubt about this case

5    before you presented it to the Grand Jury, if I

6    understand what you're saying.  Is that right?

7         A    Well, I wasn't --

8              THE COURT:  What is the relevancy of the

9    Grand Jury proceedings?

10             MR. LIGUORI:  It goes into the issue of --

11             THE COURT:  And if you want to do the

12   sidebar out of the presence of the witness, you can

13   do so.

14             MR. LIGUORI:  Not at all.  It goes to the

15   issue of the initiation of the charge itself, and

16   the fact that they wanted to prosecute Alonzo

17   Morris, their prosecuting Alonzo Morris.

18             THE COURT:  Well, the thrust of your

19   analysis or your thing is not to criticism of

20   prosecuting your client, it is what took place at

21   trial.

22             MR. LIGUORI:  Your Honor, my other part of

23   my motion was that the prosecution was initiated

KATHY S. PURNELL
OFFICIAL COURT REPORTER

ADKINS - Direct

1    improperly.

2              THE COURT:  All right.

3              MR. LIGUORI:  That's, I think, No. 6 in my

4    motion.

5              THE COURT:  You are right.  I forgot about

6    that.  I was curious how you were going to prove

7    that, so I will let you ask a few questions on

8    that.

9              MR. LIGUORI:  Thank you.

10   BY MR. LIGUORI:

11        Q    So your being convinced of Alonzo Morris'

12   guilt, because you're not going to convict anybody

13   that's not guilty in your mind, was done prior to

14   presentment to the Grand Jury, is that right?

15        A    Well, certainly if we don't feel the

16   person is guilty, we have the option of not sending

17   it to the Grand Jury, and we did send it to the

18   Grand Jury.  So in that way, yes.

19        Q    And you did not have the benefit of James

20   Bynum at the time you presented this to the Grand

21   Jury, is that right?

22        A    That's right.

23        Q    Are you familiar at all with the reasons

ADKINS - Direct

1    or the objective of an opening statement at the

2    beginning of a trial that a prosecutor gives?  What

3    are the purposes of an opening statement?

4         A    I think the purpose of the opening

5    statement is to, as I said many times, give the

6    jury an outline or a road map as to where the State

7    intends to go, what we intend to prove.

8         Q    In this particular case, why did you

9    interject in your opening -- and that was not

10   objected to on all the issues -- well, the defense

11   may bring up this red herring about certain things.

12   That's not something you were intending to prove,

13   correct?

14        MS. AYVAZIAN:  Excuse me, Your Honor.

15        THE COURT:  I will hear from the State on

16   the objection.

17        MS. AYVAZIAN:  None of these issues were

18   raised on appeal.  None of these issues were raised

19   in the motion to dismiss.  It appears as though

20   these irrelevant questions are an opportunity for

21   defense counsel to retry the case from start to

22   finish, and that is not the purpose of this

23   hearing.  I think under the circumstances, Mr.

ADKINS - Direct

1    stated it was the intent of the State to set out

2    what they intend to prove, where they intended to

3    go, you then went off on at least three occasions

4    it would be red herrings that the defense may bring

5    up.  Why did you do that?

6         A    I don't know.  I'd like to see it in the

7    context.

8              THE COURT:  Why don't you read those

9    portions that you're talking about.  The State

10   basically preempted the tags.  Re-read it in the

11   record if you have it there available.

12             MR. LIGUORI:  I have it, Your Honor.  May

13   I approach, Your Honor?

14             THE COURT:  Yes.  One or the other.  You

15   read it into the record so we have the record here

16   of what we are talking about, so somebody looking

17   at a transcript of this does not have to go find

18   another transcript to make sense of it.  That will

19   also benefit counsel at the table.

20             THE WITNESS:  Well, I read 53 down to the

21   bottom of 54.  I haven't seen it yet.

22   BY MR. LIGUORI:

23        Q    All right.  Keep on going then.  It's

ADKINS - Direct

1    around there, 53 to 56. . I marked A-56, but in

2    context I want you to start at 53 to see your train

3    of thought.  Also maybe on A-57, Line 8, finish

4    reading it.

5              THE COURT:  A what?

6    BY MR. LIGUORI:

7        Q    Volume A, Page 57, Line 8, I believe.  And

8    the point, Mr. Adkins, I'm trying to get at is, in

9    your opening to the jury, you're talking about red

10   herring the defense may bring up.

11       A    I think that as a prosecutor, when you

12   review the facts of your case and review what you

13   want to say in opening to give the jury a good

14   preview, I think it is smart, I think it behooves

15   you to not only talk about the strengths of your

16   case and what you intend to prove, but also talk

17   about anything that could be perceived as a

18   weakness in your case and hit that immediately in

19   your opening so that the jury -- so that, you know,

20   you've done your opening, the defense attorney gets

21   up and they say, oh, he didn't tell you that, and

22   he didn't tell you that, and he didn't tell you the

23   other thing.

ADKINS - Direct

1         Well, you know, I don't want to be up
2    there in my opening statement being perceived as
3    hiding anything from the jury. So if I tell them
4    about things that I think are going to come up in
5    the trial, that they could offhand perceive as a
6    weakness in the case, but also explain to them
7    other evidence that I intend to present that will
8    show them that it really is not a weakness, I don't
9    see anything wrong with bringing that out in my
10   opening statement. In fact, I think it's wise to
11   do so, rather than to be perceived as hiding
12   weaknesses in the case.

13        In this case, Mr. Bibbins did not say
14   Alonzo Morris did this to me. He said, J.R. Copes
15   did this to me. I was trying to tell them that's
16   not the end of the story. There sits Alonzo
17   Morris. He said J.R. Copes did it. That's not the
18   end of the story, because you're going to find --
19   you know, we're going to connect this name, J.R.
20   and J.R. Copes to the defendant.

21   Q.   Have you read State v. Brokenbrough and
22   all those cases that is talking about using
23   language like red herring and improper comments?

$A 61$

ADKINS - Direct

1       A     I read a lot of improper comment cases.  I

2    don't see anything improper about what I said in my

3    opening.

4       Q     Well, you said originally the purpose of

5    an opening is to tell the jury where you intend to

6    go, is that right?

7       A     That's correct.

8       Q     But what you were doing was also telling

9    the jury where the defendant was intending to go?

10            THE COURT:  Where is he going to help me

11   out on that argument?  I'm at 57.

12            MR. LIGUORI:  Line 8, I think one of

13   them --

14            THE COURT:  What is a red herring?  He

15   says a red herring.

16            MR. LIGUORI:  Right.

17            THE COURT:  Well, he says red herring, but

18   he is saying it in the context of his case.

19   Bibbins said J.R. Copes, that he is going to put

20   that forth in his case.

21            MR. LIGUORI:  If you read through, Your

22   Honor, you'll see what he's saying is the defense

23   is going to possibly make a red herring.  We all

KATHY S. PURNELL
OFFICIAL COURT REPORTER

A 62

ADKINS - Direct

1   may have had two or three others.  Certainly not

2   more than that.  Not many.

3      Q    Your case, in your 15 or 20 hours of

4   preparation, a lot of your case was still on the

5   cuff, up in the air, wasn't it, in respect that you

6   didn't know exactly what the witnesses were going

7   to say, is that correct?

8      A    You know, that's the way I've always felt

9   about this case, that, you know, cases are brought

10  into this courtroom and everybody wants lawyers to

11  be well prepared.  And well prepared lawyers don't

12  ask questions that they don't know answers to.  So

13  it really -- when everybody is asking questions

14  that they know the answers to, not that it's

15  rehearsed, but you're just putting it on and you

16  know exactly what is going to happen.

17         In this case I would think it was kind of

18  refreshing, because it was, I think, about four

19  months after the incident there had not been any

20  identification procedures, any photo lineups done.

21  There was not a script in this case.  We weren't

22  calling X, Y and Z to the stand knowing that they

23  had already identified a person in a photo lineup.

KATHY S. PURNELL
OFFICIAL COURT REPORTER

$A$ - 63

1    And I think I told this possibly to the jury in

2    opening also, that, you know, these witnesses are

3    going to take the stand, they were out there on

4    that sidewalk by Harvey's, there was no photo

5    lineup done.  It's been four months.  And I'm going

6    to ask them, do you see the person who did this; do

7    you think you can remember enough to identify a

8    person.  And I didn't have a clue as to what they

9    were going to say.

10            That's what happened with every witness,

11   including Rick Hughes, who was absolutely sure that

12   Alonzo Morris was the perpetrator.  I knew that

13   James Bynum could identify him, because he knew

14   Alonzo Morris since Alonzo Morris was a boy.  With

15   respect to James Bibbins, he told me when I

.16  interviewed him prior to this trial, that he knew

17   J.R., he had seen J.R. before, he knew J.R.'s

18   daddy, Alonzo Morris, Sr., and he knew him and he'd

19   be able to identify him.  Okay.  So I asked him.

20   That was the biggest shock in that trial for me,

21   because I came into this trial thinking that James

22   Bibbins was going to be able to identify Alonzo

23   Morris, and he didn't.  I contend it's because he's

 1      Q    I'm going to ask you have you ever been

 2  shown -- has anybody ever shown you a picture or

 3  anything of this individual between then and now?

 4      A    No, not at all.

 5      Q    And have you ever known this individual

 6  personally, this assailant before then?

 7      A    No, not at all.

 8      Q    I'm going to ask you whether you see that

 9  person in the courtroom.

10      A    (Witness pointing to defendant.)

11      Q    Are you sure about that?

12      A    Yes.

13           MR. ADKINS:  Could you please note the

14  witness has identified the defendant.

15  BY MR. ADKINS:

16      Q    After he ran by you, where did he go?

17      A    He ran straight by me and went -- I think

18  he turned on Pepper Street.  I wasn't for you sure,

19  because I was going down to check the older guy out.

20  But I mean he come right at me.

21      Q    So if you're standing in front of Harvey's

22  Plumbing, say you're me, and Harvey's Plumbing is

23  right here on your left -- say it's right here on

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR SUSSEX COUNTY

STATE OF DELAWARE,            )
                             )
     V.                      )
                             )
ALONZO MORRIS,               )
                             )
     Defendant,              )

NOTICE OF MOTION

TO:  James Adkins
     Deputy Attorney General
     Department of Justice
     114 E. Market Street
     Georgetown, Delaware  19947

     PLEASE TAKE NOTICE, that the within Motion for Judgement of

Acquittal will be presented to this Honorable Court on March 24,

2000.

Dated:  3/22/2000

                         RUTH M. SMYTHE
                         Assistant Public Defender
                         Office of the Public Defender
                         1. South Race Street
                         Georgetown, DE  19947

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR SUSSEX COUNTY

STATE OF DELAWARE,    )
                      )
                      )
V.                    )
                      )
                      )    I.D. # 9911000751
ALONZO MORRIS,        )
                      )
                      )
Defendant,            )

## MOTION FOR JUDGEMENT OF ACQUITTAL

COMES NOW, the defendant, Alonzo Morris, by and through his attorney, Ruth M. Smythe, Esquire, who respectfully moves this Honorable Court for Judgement of Acquittal not withstanding the verdict pursuant to Superior Court Criminal Rule 29 (c). The defendant and counsel submit the following:

1. Trial in the above case was before The Honorable Richard F. Stokes, March 13, 2000.

2. During testimony Sgt. Ronald Barlow of the Georgetown Police Department admitted he tesitifed incorrectly at Defendant Morris' preliminary hearing twice. He was twice asked by Deputy Attorney General Adkins whether or not witnesses to the assault for which Morris was being tried had been identified by eye witnesses and he replied "Yes by a photo lineup." In fact, there never was a photo lineup.

3. During testimony, Detective Daniel Davis of the Georgetown Police Department admitted he wrote incorrectly in his

A 68

sworn , signed affidavit of probable cause. In this document Detective Davis wrote "the victim identified his attacker to be Alonzo Morris". This was another falsehood - the victim indeed identified his attacker to be Gerald or JR Copes, not Alonzo Morris.

4.    Further, the jury had insufficient evidence to convict Alonzo Morris, Jr., of the assault in as much although two eyewitnesses identified him, several eyewitnesses were unable to; further, one eyewitness, Sgt. Brock of Department of Corrections testified he personally observed Defendant Morris coming out of the street by the Post Office just entering Market Street in Georgetown between 8:05 and 8:15. This would indicate that Alonzo Morris, Jr. could not have been the assailant of the victim.

WHEREFORE, the defendant respectfully moves this Honorable Court for Motion of Acquittal of Judgement not withstanding the verdict.

RUTH M. SMYTHE
Assistant Public Defender

A. 69

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR SUSSEX COUNTY

--------------------------X

STATE OF DELAWARE            :  ID No. 9911000751

                             :

v.                           :  Criminal Action Nos.
                                S99-11-0096 and 0097

ALONZO W. MORRIS, JR.,       :

        Defendant.           :

--------------------------X

T R A N S C R I P T
O F
P R O C E E D I N G S

Sussex County Courthouse
Georgetown, Delaware
Friday, March 24, 2000

The above-entitled matter was scheduled
for hearing in open court at 9:45 o'clock a.m.

BEFORE:

THE HONORABLE RICHARD F. STOKES, Judge.

APPEARANCES:

JAMES W. ADKINS, Deputy Attorney General,
    appearing on behalf of the State of
    Delaware.

RUTH M. SMYTHE, Assistant Public Defender,
    appearing on behalf of the Defendant.

KATHY S. PURNELL
OFFICIAL COURT REPORTER

A-70

1                    P R O C E E D I N G S

2            THE BAILIFF:  Your Honor, Ms. Smythe

3    requested that we do the other matter she and

4    Mr. Adkins have together on Alonzo Morris.  It will

5    take only a couple of moments.

6            MS. SMYTHE:  It should not take long.

7            THE COURT:  All right.

8            MS. SMYTHE:  Your Honor, good morning.  I

9    filed the motion for judgment of acquittal and I

10   stand on what is outlined in the motion requesting

11   that the verdict be overturned.

12           THE COURT:  Mr. Adkins.

13           MR. ADKINS:  Well, Your Honor, as I'm sure

14   you recall, two of out of these three items were

15   brought up in trial.  It was brought up, I believe,

16   on the record in the courtroom.  Also this claims

17   that the defendant had concerns about Sergeant

18   Ronald Barlow testifying, that there are photo

19   lineups at preliminary hearing.  I think he was

20   trying to classify that as personal by the officer

21   at the time, although this motion does not speak

22   that strongly.  And as to personal, there has to be

23   intent to make a false statement under oath, and I

1    think what Sergeant Barlow did is a distance from

2    that.

3         We certainly would never ever condone the

4    type of mistake that Sergeant Barlow made at the

5    preliminary hearing. But despite that fact, I don't

6    believe that there should be this remedy of judgment

7    of acquittal for Alonzo Morris for various reasons.

8         Number one, I don't feel that it was

9    personal at the preliminary hearing. Number two,

10   whatever happened at the preliminary hearing is kind

11   of water under the bridge. Because after the

12   preliminary hearing, he was indicted by the grand

13   jury, and from that point forward, he was held on

14   that charge. Furthermore, the issue about the

15   credibility of Sergeant Barlow and this statement

16   was, I think, used very aggressively by the defense

17   in pointing it out in front of the jury for

18   impeachment purposes. So I think that was the best

19   use that could be made of that information at trial.

20   It was used by the defense, and the jury still saw

21   fit to find the defendant guilty as charged of

22   assault first and the weapons charge.

23        As to Item No. 3 in this motion for

1    judgment of acquittal about Daniel Davis writing in

2    the probable cause affidavit that the victim

3    identified his attacker to be Alonzo Morris, I just

4    think that is semantics.  That's the State's

5    position.  The officer was identifying in his arrest

6    warrant the true name of the defendant, and it's my

7    position that he was not trying to lie or anything

8    else.  You remember the facts of the case and this

9    investigation that the victim said, "J R. did it."

10   J.R. Copes and all of these matters about the

11   different names were brought out at trial.  So I

12   don't think that is an adequate basis for the motion

13   for judgment of acquittal.

14         And also the fourth item here in the motion

15   about insufficient evidence, certainly the jury had

16   no doubt about the sufficiency of the evidence in

17   this case, because there was a rather quick verdict

18   in this case.  And I disagree that two eyewitness

19   identifications, combined with all the other

20   evidence in the case concerning motive, cannot

21   constitute sufficient evidence to support this

22   verdict.

23         So for all those reasons, we ask that this

1    motion be denied.

2             THE COURT:    Is there anything further,

3    Ms. Smythe?

4             MS. SMYTHE:    No, Your Honor.

5             THE COURT:    All right.    This is the motion

6    for judgment of acquittal presented in the matter of

7    State versus Alonzo Morris.    In motions for judgment

8    of acquittal, one must review the record and the

9    evidence presented to see if any rational jury would

10   return a verdict of guilty, based upon the competent

11   evidence presented.

12            In this case, there was almost overwhelming

13   evidence of guilt.    The defendant, Mr. Morris, was

14   identified by at least two eyewitnesses, if my

15   memory is correct.    It was an employee from a

16   hardware store that took the stand and pointed him

17   and identified him as the assailant.

18            This was a case where the defendant was

19   found guilty of attacking an older man who was

20   living with a former girlfriend of the defendant's.

21   It was a confrontation, and the defendant ran up and

22   took a PVC pipe, swatted him in the head, poked his

23   right eye almost out, blinded the man.    But for

1   luck, the man might have been killed.  But in any

2   event, we had an eyewitness from one of the stores

3   in the area that clearly identified him, pointed him

4   out in court.

5        There was an older gentleman, who's name

6   escapes me right now, but he identified the

7   defendant as the assailant and he knew the defendant

8   for a rather long period of time and familiar with

9   him.  He also had the victim -- the victim made

10  spontaneous declarations that "J.R. did it," if my

11  memory is right.  Of course, all counts on those

12  statements as to identity, in any event, are not

13  hearsay, but in any event, they're spontaneous,

14  "J.R. did it."  And the defendant himself is known

15  as J.R.  I think there might have been reference to

16  J.R. Copes, but J.R., the defendant, lived in the

17  area near the Copes people, may have been a relative

18  as well.

19       There was opportunity for the defendant to

20  commit the crime, and there was motive.  So I'm not

21  surprised that the jury took approximately ten

22  minutes to return a verdict.  It might have been 15

23  minutes, but it wasn't very long.  A valiant effort

A 75

1  was made by the defense, but the evidence was

2  overwhelming.

3       Now, this argument is being presented, of

4  course, the motive being that this is a jealous

5  fellow, he doesn't want anybody around his ex, and

6  that came out. And this thing about the photo

7  lineup, the question about the photo lineup, there

8  was testimony at the preliminary hearing about one

9  of the officers involved in the case, Officer

10  Barlow, that a photo lineup had happened.

11       Now, at trial it was very clearly presented

12  to a jury that the photo lineup had not occurred,

13  and Barlow was cross-examined by defense counsel

14  very effectively, and by that point, he had a prior

15  consistent statement under oath and let him have it

16  on that. If that was all the case was about, I

17  guess we could go home. There is a lot more to this

18  case than that.

19       So the jury knew that there was a prior

20  false statement by Barlow and they took that into

21  account, and the credibility, is as they're entitled

22  to do. This is not a case like Franks versus

23  Delaware, where you have a false affidavit by your

*A 76*

KATHY S. PURNELL
OFFICIAL COURT REPORTER

1  affiant that's false and there is the subsequent

2  search and bad things happen in those kinds of

3  cases.   This is not Franks versus Delaware.   There

4  was no search done or anything like that, and you

5  can't hide your identity, either.

6          So as far as the reference in the affidavit

7  of the probable cause, the attacker was Alonzo

8  Morris.   All that is a reflection of Daniel Davis'

9  extensive background investigation that led to the

10  conclusion that the defendant was the assailant.

11          So for these reasons, the motion is denied.

12          MS. SMYTHE:   Thank you, Your Honor.

13          (Whereupon, the proceedings in the

14      above-entitled matter were concluded.)

15

16

17

18

19

20

21

22

23

*A 77.*

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ALONZO W. MORRIS, JR., | § | No. 258, 2000 |
| | § | |
| Defendant Below, | § | Court Below:  Superior Court of |
| Appellant, | § | the State of Delaware in and for |
| | § | Sussex County |
| v. | § | |
| | § | Cr.A. Nos.    IS99-11-0096 |
| STATE OF DELAWARE, | § |                     IS99-11-0097 |
| | § |                     IS96-08-0631 |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted:  October 24, 2001
Decided:     March 28, 2002

Before **VEASEY,** Chief Justice, **WALSH, HOLLAND, BERGER** and **STEELE,** Justices, constituting the Court en Banc.

Upon appeal from the Superior Court. **REVERSED and REMANDED.**

Clayton A. Sweeney, Jr., Esquire, Wilmington, Delaware, for Appellant.

Kim Ayvazian, Esquire and John Williams, Esquire (argued) of the Department of Justice, Dover, Delaware, for Appellee.

**VEASEY,** Chief Justice:

 A-78

In this case we reaffirm the principle that it is improper for prosecutors to argue that the jury may acquit the defendant only if the jury finds that the State's witnesses are "lying."[1] The trial court here committed plain error by failing to intervene sua sponte and take appropriate action to cure the effect of this patently improper prosecutorial argument.

We decline to address a further aspect of this case that was raised for the first time at oral argument in this Court. That issue is whether the defendant may now, on this record, raise the bar of double jeopardy, thus preventing a retrial, on the ground that the prosecutorial misconduct was so egregious that it was plainly designed to goad the defendant into moving for a mistrial in order that the State could improve its chances of conviction on a retrial. Although in certain circumstances the double jeopardy clauses of the Fifth Amendment of the Federal constitution[2] and Article I, Section 8 of the Delaware constitution[3] may be available as a remedy for egregious prosecutorial misconduct,[4] the issue may

---

[1] *Fensterer v. State*, 509 A.2d 1106 (Del. 1986).

[2] U.S. Const. amend. V ("[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb; . . . .").

[3] Del. Const. art. 1, § 8 ("[N]o person shall be for the same offense twice put in jeopardy of life or limb.").

[4] *See*, e.g., *Oregon v. Kennedy*, 456 U.S. 667, 676 (1982) (where governmental conduct is intended to "goad" the defendant into moving for a mistrial, a retrial may be barred on double jeopardy grounds).

A police investigation led to the indictment of Alonzo Morris, Jr. for first-degree assault and possession of a deadly weapon during the commission of a felony. At trial, the State produced two eyewitnesses who identified Morris as the person who attacked Bibbins. But Bibbins was unable to identify Morris as his assailant. Morris presented an alibi defense by testifying that, on the morning of the assault, he left his girlfriend's apartment between 7:45 a.m. and 8:00 a.m., stopped at the post office and arrived at his residence ten or fifteen minutes later. Morris' testimony was corroborated, at least in part, by the testimony of his girlfriend and that of Sergeant Ronald Brock, who testified that he saw Morris near the post office at about 8:10 a.m. on the morning of the assault.

The jury found Morris guilty of both crimes charged. The Superior Court found that the convictions violated Morris' probation. The court sentenced Morris to ten years in prison for the assault conviction, twenty years in prison for the weapons conviction, and five years and three months in prison for the violation of probation. Morris appeals his sentence on various grounds, including prosecutorial misconduct.

### *Morris' Claim of Prosecutorial Misconduct*

Morris argues that the prosecutor made several improper statements during closing argument that undermined the fairness of his trial. Because defense

-3-

*A80*

> Douglas Street. It would seem to me . . . that I went
> from that area back to the station, ran computer checks,
> then was told by the secretaries that there might be an
> incident up on Douglas Street, and then left from the
> police station and went to that. So it was a chain of
> events. I don't believe could have been more than forty
> minutes in total.

During closing argument the prosecutor summarized this testimony as follows:

> [Barlow] says it was about 30 to 40 minutes afterwards
> that, you know, between the time he was there by Mr.
> Bibbins' side and the time he was at Douglas Street
> talking to those other parties about the complaint, is
> when he saw J.R. Morris there. Well, that puts him
> there probably about 8:10 or 8:15.

Morris argues that this statement is improper because Barlow clarified on

re-direct that the "chain of events . . . began when [Barlow] was *last* with

Bibbins (about 8:00 a.m.), and estimated he arrived at Douglas Street 40 minutes

later."[7] Morris' argument mischaracterizes Barlow's testimony. The prosecutor

asked Barlow to choose one of two options as the starting point of the chain of

events: (1) "the time you were actually standing there by Mr. Bibbins' side" or

(2) "the time that you had cleared" the assault scene. Barlow chose the former

---

[7] Appellant's Op. Brief at 39 (emphasis in original). The precise chronology is important to Morris' alibi defense. If Barlow saw Morris at his home on Douglas Street at about 8:10 a.m., he could not have been across town at the post office as both he and Brock testified. If Barlow did not arrive until about 8:30 a.m., Morris would have had sufficient time to go to the post office, see Brock, and walk home to meet Stephens before Barlow's arrival.

A-81

Although the prosecutor's statement does not accurately reflect Bibbins' unqualified testimony ("No, I don't see him."), the statement does find some support in the testimony of the State's expert. The prosecutor could legitimately ask the jury to infer from the expert's testimony that Bibbins' eyesight was sufficiently poor that he could not identify Morris, who was seated about twenty-four feet away at the defense table.[8] Although the prosecutor did not explicitly disclose that his statement was based on an inference drawn from the expert's testimony, the record does support the prosecutor's inference and hence the statement was not improper.

Second, Morris argues that, during the State's rebuttal summation, the prosecutor referred to facts not in evidence relating to whether the view of a witness was blocked. Sergeant Brock testified that, at about 8:10 a.m., he saw and waved to Morris, who was standing on a side street near the post office, as Brock drove by. The prosecutor sought to impeach Brock's testimony by contending that a two-story house would have blocked Brock's view of Morris as Brock approached the side street.[9] During cross-examination, the prosecutor, on several occasions, asked Brock about the house, but Brock did not agree that the

---

[8] Cf. Hooks v. State, 416 A.2d 189, 204 (Del. 1980) ("The prosecutor in his final summation should not be confined to a repetition of the evidence presented at trial.").

[9] This fact would undermine Brock's testimony because it supports the State's argument that Brock did not have time to identify and acknowledge Morris before Brock passed the side street on which Morris was standing.

A-82

presented at trial.[12]  In the present case, a review of the trial transcript indicates

that the prosecutor's assertion concerning the "big house on the other corner

blocking [Brock's] view" has no evidentiary support at all.  Although Brock

testified that there is a line of houses on the side street, he testified that he did not

notice a big house on the corner that might block his view down the side street.

Because there is no other evidence that the two-story house exists, the

prosecutor's assertion that such a house exists  and was "blocking his view" was

an improper misrepresentation of the evidence.  We need not decide, however,

whether this misstatement standing alone would have constituted plain error

because there was other prosecutorial misconduct that constitutes plain error

requiring reversal.

Morris argues that the prosecutor improperly distorted the State's burden

of proof in his closing argument:

> How many liars are we going to have to have in this
> case for [Morris] to be not guilty?  Well, you'd better
> be satisfied that James Bibbins is lying when he says he
> knows who did this to him and that it's J.R.  It's J.R.
> Copes.[13]  You'd better be satisfied that James Bynum,
> who's known him since he was a baby boy, that he's
> lying, when there has been no reason to think that James

---

[12] *See Hughes v. State*, 437 A.2d 559, 567 (Del. 1981) ("It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.") (quoting *ABA Standards, Prosecution and Defense Functions* (1971)).

[13] Morris is also known as "J.R. Copes."

-9-

A 83

prosecutor's improper argument that the jury may acquit Morris only if the State's witnesses were lying was egregious and patently improper under established case law. It was inexcusable in light of *Fensterer* and, in fact, was significantly more severe than the brief statement by the prosecutor in *Fensterer*.[18]

We must determine next whether this prosecutorial misconduct was plain error and requires reversal of Morris' sentence and vacation of his conviction. To constitute plain error, "credibility must be a central issue in a close case" and the State's improper statements must "be so clear and defense counsel's failure to object so inexcusable that a trial judge . . . has no reasonable alternative other than to intervene."[19]

This case is distinguishable from *Trump v. State*[20] where we found no reversible error. Here, unlike *Trump*, the improper statements are, indeed, "so clear and defense counsel's failure to object so inexcusable that [the trial judge had] . . . no reasonable alternative other than to intervene."[21] We find that the

---

[18] In *Fensterer*, the prosecutor stated: "To believe the defendant and disbelieve the State, you would have to believe that [the State's witnesses] committed perjury in this case. And I would assert to you they have not." *Fensterer*, 509 A.2d at 1111.

[19] *Trump*, 753 A.2d at 964.

[20] *Id.*

[21] *Id.*

A84

Constitution[23] and Article I, § 8 of the Delaware constitution[24] and *Oregon v. Kennedy*,[25] among other authorities.  We asked for supplemental memoranda on this point.

Morris and the State agree that a properly presented claim that retrial is barred by double jeopardy cannot be raised unless and until the State elects to reprosecute.[26]  Accordingly, the issue is not ripe and we decline to pass upon the question.  Whether or not the State will seek a retrial and, if so, how the double jeopardy issue will be presented to the Superior Court and how it will rule are all, of course, unknown future events.  As interesting as this issue is, we may

---

[23] U.S. Const. amend. V ("[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb; . . . .").

[24] Del. Const. art. I, § 8 ("[N]o person shall be for the same offense twice put in jeopardy of life or limb.").

[25] 456 U.S. at 676 (1982).

[26] *Bailey v. State*, 688 P.2d 320, 322 (Nev. 1984) ("We conclude, however, that unless and until the state refiles the attempted murder charge, the double jeopardy claim is premature; accordingly, we decline to address it at this time. On remand, if the state refiles the murder charge, appellant may raise his double jeopardy claim in district court by the appropriate motion."); *cf. Sumpter v. DeGroote*, 552 F.2d 1206, 1208 (7th Cir. 1977) ("On remand, Sumpter raised a timely double jeopardy objection to retrial of the sex issue."); *United States v. Conley*, 503 F.2d 520, 521 (8th Cir. 1974) (refusing to consider a defense of former jeopardy raised for the first time on appeal because "constitutional immunity from double jeopardy is a personal right which if not affirmatively pleaded by the defendant *at the time of trial* will be regarded as waived") (emphasis added); *State v. Davison*, 46 S.W.3d 68, 78 n.4 (Mo. Ct. App. 2001) ("On remand, however, Mr. Davison would be able to raise this [double jeopardy] claim at any new trial.").

*A 85*

## A.    Whether the Jury Had a Rational Basis for Finding Morris Guilty

Morris argues that the Superior Court erred in finding that the jury had a rational basis on which to conclude that Morris assaulted Bibbins.    Morris contends that the State did not produce sufficient competent evidence to prove beyond a reasonable doubt that he was the person who attacked Bibbins.[29] Morris preserved his sufficiency-of-the-evidence challenge for appeal by presenting a timely motion to acquit under Superior Court Criminal Rule 29 in the trial court.[30]

The Superior Court's decision to grant or deny a motion to acquit is subject to de novo review by this Court. As a general rule, a conviction must be sustained if "any rational trier of fact, viewing the evidence in the light most favorable to the State, could find the defendant guilty beyond a reasonable doubt."[31] In denying Morris' motion to acquit, the trial court found that "there

---

[29] Morris also argues "when a defendant raises a defense of alibi, the State must [disprove the alibi] beyond a reasonable doubt." Appellant's Opening Brief at 27. As support for this proposition, Morris cites *Rogers v. State*, 343 A.2d 608, 610 (Del. 1975). Morris' argument is based on a misreading of *Rogers*. The *Rogers* Court held that the trial court's instruction requiring the defendant to prove an alibi as an affirmative defense was erroneous. *See id.* Applying the appropriate standard for constitutional errors, the Court concluded that "we are satisfied beyond a reasonable doubt that the error in the charge to the jury [requiring the defendant to prove his alibi] was harmless error." *Id.* The Court did not hold that the State was required to disprove the alibi beyond a reasonable doubt. *Cf. Craig v. State*, 457 A.2d 755, 760 (Del. 1983) (suggesting that, to overcome an alibi defense, "the State must prove presence beyond a reasonable doubt").

[30] *See Monroe v. State*, 652 A.2d 560, 563 (Del. 1995) ("A claim of insufficiency of evidence is reviewable only if the defendant first presented it to the trial court, either in a motion for a directed verdict or a Rule 29 motion for judgment of acquittal.").

[31] *Robertson*, 596 A.2d at 1355 (internal citations omitted).

- 15-

A 86

and that Morris had a reason to attack Bibbins. This evidence was sufficient to support Morris' conviction.

## *B.* *Whether the Superior Court Plainly Erred by Admitting Hearsay Testimony Concerning Bibbins' Statements After the Assault*

At trial, the State presented the testimony of several eyewitnesses who spoke to Bibbins immediately after the assault. These witnesses testified about Bibbins' descriptions of the assailant and about his theory on the reason for the attack. For example, Rick Hughes testified that Bibbins told him that someone attacked him "because [the assailant's] girlfriend was staying with me. He called me up and cussed me out on the phone and I hung up on him." Alan Hill testified that Bibbins' told him that "some guy named J.R., they had a dispute over some girl, somebody disrespecting somebody. . . ." Georgie McCrea also testified that Bibbins' mentioned that the girlfriend's name was Nora.

Although trial counsel did not object to these statements, Morris now argues the statements are hearsay and do not fit within a recognized exception.[33] The State contends that the hearsay statements were admissible as a present sense impression under D.R.E. 803(1).[34]

---

[33] Appellant's Op. Brief at 46.

[34] State's Ans. Brief at 31.

$A\ 87$

- 17-

statements concerning his telephone conversation with the assailant and the assailant's relationship with "Nora," by contrast, do not describe or explain the recent event (that is, the attack) or Bibbins' condition (for example, his injuries). As a consequence these statements are not admissible under D.R.E. 803(1) as a present sense impression.

Bibbins' statements about these earlier events are admissible under D.R.E. 803(2) as excited utterances.   Under 803(2), a statement is admissible if it "relat[es] to a startling event or condition" and is "made while the declarant is under the stress of excitement caused by the event or condition." In *Gannon v. State*, we held that this exception requires the proponent to establish that: "(1) the excitement of the declarant [was] precipitated by an event; (2) the statement being offered as evidence [was] made during the time period while the excitement of the event was continuing; and (3) the statement must be related to the startling event." [40]

In the present case, Bibbins' made the contested statements immediately after a "startling event"—the assault.   Moreover, the statements relate to the attack because they identify the assailant and identify a possible motive for the

---

[40] *Gannon v. State*, 704 A.2d 272, 274 (Del. 1998).

A88

-19-

counsel objected because one of the convictions was for assault.    As a compromise, defense counsel agreed to permit cross-examination concerning the burglary and kidnapping convictions, and the prosecutor agreed not to cross-examine on the assault conviction.    On appeal, Morris argues that the Court was still obligated to undertake the balancing analysis described in D.R.E. 609.[45]    The State argues that Morris waived his right to the balancing analysis by agreeing to the compromise.[46]    Before we reach this waiver question, however, we must establish whether the trial court was obligated to engage in the balancing test with respect to the kidnapping and burglary convictions.

The trial court's decision to admit evidence of prior felony convictions is subject to review in this Court for an abuse of discretion.[47]    Under Rule 609, the trial court must first determine whether the conviction involved a felony or whether the conviction involved dishonesty or false statement.[48]    Rule 609(a)(1)

---

[45] Appellant's Op. Brief at 48-49. Rule 609(a) provides:

> For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted but only if the crime (1) constituted a felony under the law under which the witness was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect or (2) involved dishonesty or false statement, regardless of the punishment.

[46] State's Answering Brief at 23.

[47] *Allen v. State*, 644 A.2d 982, 985 (Del. 1994).

[48] *See Gregory v. State*, 616 A.2d 1198, 1203 (Del. 1992) ("The trial court, clearly, was required to determine whether prior convictions for delivery and possession of marijuana with intent to deliver are crimes within the meaning of Rule 609 involving dishonesty or false statement.").

A89

(1) whether kidnapping is a crime involving dishonesty and (2) whether a burglary conviction based on kidnapping, as distinct from robbery or theft, is a crime involving dishonesty or false statement.[53]

This Court has defined "dishonesty" to mean "the act or practice of lying, deceiving, cheating, stealing or defrauding."[54] Although this Court has not addressed whether kidnapping is a crime involving dishonesty, the Iowa Supreme Court has held that kidnapping does not involve "dishonesty or false statement."[55] Similarly, we find that D.R.E. 609 required the Superior Court to apply the balancing test to Morris' kidnapping conviction because it did not involve dishonest conduct.[56]

The trial transcript suggests that Morris agreed to waive the application of balancing test by agreeing to permit cross-examination on the kidnapping conviction in exchange for the State's promise not to discuss the assault

---

[53] *Tucker v. State*, 692 A.2d 416 (Del. 1996) (holding that robbery, theft, and burglary are crimes involving dishonesty). *See also Tinnen v. State*, Del. Supr., No. 70, 1986, Horsey, J. (Jan. 27, 1987) (receiving stolen property conviction admissible under D.R.E. 609(a)(2)); *Paskins v. State*, Del. Supr., No. 194, 1994, Veasey, C.J. (Mar. 15, 1995) (holding that robbery is a crime involving dishonest conduct); *Webb v. State*, 663 A.2d 452, 461 (Del. 1995) (holding that shoplifting is a crime involving dishonesty).

[54] *Gregory*, 616 A.2d at 1204.

[55] *State v. McKettrick*, 480 N.W.2d 52, 59 (Iowa 1992). *See also People v. Zataray*, 219 Cal.Rptr. 33, 38 (Cal. Ct. App. 1985) ("Simple kidnapping in violation of section 207, however, is a felony which does not necessarily involve dishonesty."); *State v. Schroff*, 492 A.2d 190, 193 (Conn. App. Ct. 1985) (holding that kidnapping "do[es] not reflect directly on the credibility of one who has been convicted of them").

[56] See 11 *Del. C.* §§ 783, 783A (defining kidnapping as "unlawfully restrain[ing] a person" for specific purposes).

- 23 -

$A90$

## *Conclusion*

The prosecutor at Morris' trial improperly commented that the jury could not acquit Morris unless the jury found that the State's witnesses were lying. We reaffirm that such egregious prosecutorial misconduct is reversible error, and it is plain error in a case like this where credibility of witnesses is central. Accordingly, we reverse Morris' sentence and vacate his conviction. We remand this case to the Superior Court for proceedings consistent with this Opinion.

$\mathcal{A}9$|

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    5
                       ( as of   07/18/2003 )

   e of Delaware v.  ALONZO W MORRIS                    DOB: 08/01/1972
   .e's Atty: JAMES W ADKINS , Esq.          AKA:
 'efense Atty: JAMES E LIGUORI , Esq.


      Event
'o.  Date              Event                        Judge
-------------------------------------------------------------------------
      SUPREME COURT.
      05/02/2002
      RECORDS RETURNED FROM SUPREME COURT.
 1    05/02/2002
      MANDATE FILED:  THE CASE IS REMANDED WITH INSTRUCTIONS TO TAKE SUCH
      FURTHER PROCEEDINGS THEREIN AS MAY BE NECESSARY IN CONFORMITY WITH
      THE OPINION OF THIS COURT
      SUPREME COURT #258,2000
 2    05/02/2002
      ORDER: WE REVERSE MORRIS' SENTENCE AND VACATE HIS CONVICTION. WE
      REMAND THIS CASE TO THE SUPERIOR COURTG FOR PROCEEDINGS CONSISTENT
      WITH THIS OPINION/ FILE SENT TO CHAMBERS 5/2/02
 4    05/02/2002
      DISCOVERY RESPONSE FILED BY JAMES ADKINS
 J    05/02/2002                               STOKES RICHARD F.
      LETTER FROM JAMES ADKINS TO JUDGE STOKES
      RE:  REQUEST SCHEDULING OF BOND HEARING AND SET NEW TRIAL DATE
      DUE TO SUPREME COURT'S DENIAL OF MOTION FOR REARGUMENT.
'0    05/02/2002
      E-MAIL MEMORANDUM FROM CISSY VAVALA TO COUNSEL
      SCHEDULING BOND HEARING
      05/03/2002
      MEMORANDUM FILED TO FILE FROM JUDY GOFF
      RE: VOP HEARING DEFERRED UNTIL DISPO OF NEW CHARGES
;1    05/03/2002
      LETTER FROM CLAYTON SWEENEY TO PROTHONOTARY'S OFFICE
      RE:  MOTION TO WITHDRAW AS COUNSEL SCHED. FOR 5/9/02 AT 11:00AM.
 J    05/06/2002
      MOTION TO WITHDRAW AS COUNSEL FILED BY CLAYTON A. SWEENEY, JR.
;6    05/09/2002                               GRAVES T. HENLEY
      MOTION TO WITHDRAW AS COUNSEL GRANTED.
      BOND CHANGED TO A TOTAL OF $40,000.00 CASH ON ORIGINAL CHARGES AND
      $10,000.00 SECURED ON VOP
      JUDGE ORDERS MR SWEENEY TO PREPARE A MEMO OUTLINING BASIS FOR NEW
      TRIAL FOR THE NEW ATTORNEY.
;2    05/09/2002                               GRAVES T. HENLEY
      ORDER: MOTION TO WITHDRAW AS COUNSEL AND ANY RESPONSES THERETO
      IS GRANTED.  IT IS SO ORDERED BY JUDGE GRAVES ON 5/9/02.
;3    05/15/2002
      LETTER FROM JUDGE GRAVES TO JUDGE NORMAN VEASEY
      RE: REQUESTING ADVISEMENT AS TO WHETHER THE VOP WAS REVERSED.
;4    05/17/2002                               GRAVES T. HENLEY
```



A 164

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page     6
                       ( as of  07/18/2003 )

    e of Delaware v.  ALONZO W MORRIS                        DOB: 08/01/1972
  . _e's Atty: JAMES W ADKINS , Esq.          AKA:
  efense Atty: JAMES E LIGUORI , Esq.


       Event
  o.   Date          Event                                 Judge
 --------------------------------------------------------------------------
       DEFENDANT'S LETTER FILED.
       REQUESTING SECURED BOND
 5     05/17/2002                                  GRAVES T. HENLEY
       MEMORANDUM FILED.  BOND WAS PREVIOUSLY SET AND JAMES LIGUORI APPOINTED
       AS NEW COUNSEL.  REQUEST IS MOOT.
 6     05/28/2002
       LETTER FROM JAMES E. LIGUORI, ESQUIRE TO JUDGE GRAVES:  REQUEST FOR
       CONTINUANCE OF 8/26/02 JT.
  .    06/05/2002
       LETTER FROM NORMAN VEASEY TO JUDGE GRAVES
       RE: ANSWERING REQUEST FOR CLARIFICATION ON BEHALF OF SUPERIOR COURT
       AND COUNSEL
 8     06/11/2002
       NOTICE OF SERVICE - DISCOVERY REQUEST FILED BY JAMES LIGUORI.
       06/19/2002
       LETTER FROM TAMMY KEARNEY TO COUNSEL, RE: CONFIRMING TRIAL IS CONT'D
       FROM 8/26/02 TO 9/9/02 AT THE REQUEST OF MR. LIGUORI.
 0     07/16/2002
       MOTION TO DISMISS FILED BY JAMES E. LIGUORI, ESQUIRE
       (SEND TO CHAMBERS FOR JUDY GOFF TO SCHEDULE A TELE-CONFERENCE WITH
       JUDGE GRAVES.)
       07/17/2002                                  GRAVES T. HENLEY
       LETTER FROM JAMES LIGUORI TO JUDGE GRAVES
       RE:  ENCLOSING ORDER THAT HAD BEEN LEFT OUT OF MOTION TO DISMISS
       THAT WAS PREVIOUSLY FILED.
       SENT TO CHAMBERS TO ADD TO FILE.
 2     07/25/2002
       LETTER FROM JUDY GOFF TO JAMES ADKINS AND JAMES LIGUORI
       RE: OFFICE CONF. SCHED. 8/13/02 AT 8:30
 3     07/26/2002
       STATE'S RESPONSE  TO MOTION TO DISMISS FILED BY KIM AYVAZIAN, ESQ.
       RESPONSE AND FILE SENT TO CHAMBERS ON 7-29-02
 4     07/26/2002
       DISCOVERY RESPONSE FILED BY JAMES ADKINS, ESQ TO JAMES LIGUORI, ESQ.
 5     08/06/2002
       MOTION FOR MODIFICATION OF BAIL FILED BY JAMES LIGUORI.
       SCHEDULED TO BE HEARD ON 8/13/02.
 6     08/08/2002
       EMAIL FILED TO SHIRLEY JOHNSON, SCI RE: THE DEFENDANT SHALL BE HELD IN
       PRE TRIAL STATUS UNTIL THE COURT REVIEW THE CASE DUE TO THE
       SUPREME COURT ADVISING THAT THE CONVICTION DID NOT STAND.
 7     08/13/2002                                  GRAVES T. HENLEY
```

A 105

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR SUSSEX COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE, | : | I.D. NO. 9911000751, 9606013452 |
| v. | : | |
| ALONZO W. MORRIS, JR., | : | |
| Defendant. | : | |

## NOTICE OF MOTION

TO:  Prothonotary
     Superior Court
     P. O. Box 756
     Georgetown, DE  19947

**PLEASE TAKE NOTICE** that the within Motion to Dismiss will be heard at the earliest convenience of the Court.

LIGUORI, MORRIS & REDDING

BY: _____
JAMES E. LIGUORI, ESQUIRE
46 The Green
Dover, DE  19901
(302) 678-9900
Attorney for Defendant

DATED: _____

A 106

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR SUSSEX COUNTY

STATE OF DELAWARE,           :        I.D. NO. 9911000751, 9606013452

    v.                                                   :

ALONZO W. MORRIS, JR.,              :

       Defendant.                      :

## MOTION TO DISMISS

NOW COMES, James E. Liguori, Esquire, attorney for Defendant and pursuant to Criminal Rule 12(b)(1) prays the Court to dismiss indictment and/or retrial of the above Defendant for the following reasons:

1.      Defendant was previously tried, convicted and won reversal on appeal on the same charges he is now facing for trial before the Court on September 9, 2002;

2.      Defendant's successful reversal by the Delaware Supreme Court left unanswered one issue in this motion.  Specifically, Defendant avers that the State should be barred from proceeding with prosecution in this case because the Defendant's protections afforded him under the United States and Delaware Constitutions in regard to the Double Jeopardy Clause of those Constitutions bars further prosecution;

3.      The State's argument to the jury was improper and was purposefully improper, egregious and inexcusable;

4.    The State's argument was intended to goad the defense into asking the Court for a mistrial so as to afford the prosecution a more favorable opportunity to convict Defendant at a successive prosecution;

5.    The indictment in this matter should be dismissed because the State used erroneous and perjurious testimony before the Grand Jury in its successful attempt at returning a true bill of indictment against Defendant;

6.    The impairment of Defendant's procedural rights as a result of Paragraph 5 above rises to the level of a material defect in the institution of this criminal action presently before the Court.

WHEREFORE, Defendant prays this Honorable Court for a hearing well in advance of trial to take evidence and hear argument in the above two issues.

Respectfully submitted,

LIGUORI, MORRIS & REDDING

BY: _____
JAMES E. LIGUORI, ESQUIRE
46 The Green
Dover, DE 19901
(302) 678-9900
Attorney for Defendant

DATED: 7/15/02

cc:    Mr. Alonzo W. Morris, Jr.

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR SUSSEX COUNTY

STATE OF DELAWARE,                    :        I.D. NO. 9911000751, 9606013452

    v.                                :

ALONZO W. MORRIS, JR.,                :

        Defendant.                    :

## CERTIFICATE OF SERVICE

I, Sharon E. Currey, secretary to James E. Liguori, Esquire, do hereby certify that

on July 15, 2002, I personally mailed via United States mail postage prepaid the

foregoing Motion to Dismiss to the following:

    Honorable T. Henley Graves
    Sussex County Superior Court
    P. O. Box 756
    Georgetown, DE  19947

    and

    Jim Adkins, DAG
    Department of Justice
    114 E. Market Street
    Georgetown, DE  19947

                                    _____
                                    SHARON E. CURREY



## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

### IN AND FOR SUSSEX COUNTY

STATE OF DELAWARE        :       Defendant ID # 9911000751

                              :

v.                          :

                              :

ALONZO MORRIS          :

### MEMORANDUM OPINION

Date Submitted: September 6, 2002
Date Decided: October 16, 2002

Kim E. Ayvazian, Esquire
Office of Attorney General
114 East Market Street
Georgetown, DE 19947
Attorney for State of Delaware

James E. Liguori, Esquire
Liguori, Morris & Redding
46 The Green
Dover, DE 19901
Attorney for Defendant, Alonzo Morris

GRAVES, J.

In Morris v. State, 795 A.2d 653 (Del. 2002), the Supreme Court reversed the Defendant's convictions of assault and possession of a deadly weapon during the commission of a felony. The reversal was based on two findings of prosecutorial misconduct.

The Court found that the prosecutor improperly distorted the State of Delaware's ("the State") burden of proof by stating "How many liars are we going to have in this case for [Morris] to be found not guilty?" An argument that the jury may acquit the Defendant only if it finds the State's witnesses are "lying" dilutes the State's burden of proving the Defendant guilty beyond a reasonable doubt. Fensterer v. State, 509 A.2d 1106 (Del. 1986). After the jury makes its credibility determinations, the jury still must consider those credibility determinations together with all of the evidence and then determine if the State has proven the Defendant guilty beyond a reasonable doubt. Based on this prosecutorial error, the case was reversed.

The second finding of prosecutorial error was that the prosecutor argued to the jury that a house would have blocked a witness's view, but there was no testimony concerning this. Thus, it was a misrepresentation.

At the oral argument of this case before the Supreme Court the Defendant claimed, for the first time, that in the event the Supreme Court reversed his conviction, then the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution and similar amendment of the Delaware Constitution, Article I, Section 8, should bar reprosecution. Morris claimed that the prosecutor intended to goad the defense into moving for a mistrial; and that even though a mistrial was not requested, the Double Jeopardy Clause still should bar a retrial. This point struck a responsive chord in that the Supreme Court then requested supplemental memoranda on this issue and on whether Delaware should adopt a broader, more protective double jeopardy standard than

1

A112

under the Federal standard. Ultimately, the Supreme Court decided that it would be premature to rule on a double jeopardy claim because it was unknown as to whether or not the State would reprosecute upon reversal. The State has elected to reprosecute and therefore the Defendant is pursuing his argument that the Double Jeopardy Clause bars his retrial.

## LEGAL BACKGROUND

A.     Double Jeopardy and Reversals

Retrial-is not precluded for those cases where a conviction is obtained, but then there is a reversal for trial error by the prosecutor or otherwise. United States v. DiFrancesco, 449 U.S. 117, 130-131 (1980), except if the reversal is for insufficiency of evidence to support a conviction. Monroe v. State, 652 A.2d 560 (Del. 1995). In other words, except for a reversal arising from insufficient evidence to support the verdict, there is no double jeopardy bar to retry a defendant if the appellate court reverses the conviction. Bailey v. State, 521 A.2d 1069, 1075 (Del. 1987).

B.     Double Jeopardy and Mistrials

(i)     U. S. v. Dinitz

If a mistrial is granted without the agreement or consent of a defendant, then that mistrial must be based on "manifest necessity"; otherwise, the bar of double jeopardy would bar a retrial. U.S. v. Dinitz, 424 U. S. 600 (1976) ("Dinitz"). But, if a defendant moves for a mistrial or agrees to a mistrial, the double jeopardy bar to prosecution is waived except in limited circumstances. U.S. v. Dinitz, 424 U.S. at 607,608. This waiver is based on the defendant's control over his own case. It is the defendant's decision not to take the case to verdict. He makes the election by making the mistrial application or consenting to it. If it is granted and the trial aborted, then he knows he is subject to retrial. What is important is the defendant's control over whether he should go to verdict

2

A-113

(i.e. take his chances) or seek a mistrial. If error is injected into his trial and he does not seek a mistrial and is convicted, then he can pursue a reversal on appeal. If reversed, he is subject to retrial.

## THE EXCEPTION

In <u>Dinitz</u>, the Court held that a defendant would have double jeopardy protection if the prosecutor intended to provoke the mistrial application (goading the defense into a mistrial motion). <u>Dinitz</u> also holds that "bad faith" or "overreaching" conduct by a prosecutor or judge also may result in the bar of double jeopardy, if reprosecution is attempted.

> The Double Jeopardy Clause does protect a defendant against governmental actions intended to provoke mistrial requests and thereby to subject defendants to the substantial burdens imposed by multiple prosecutions. It bars retrials where 'bad-faith conduct by judge or prosecutor,' <u>United States v. Jorn, supra,</u> 400 U.S., at 485, 91 S.Ct., at 557, threatens the '(h)arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict' the defendant. [Citations omitted.]

<u>U.S. v. Dinitz,</u> 424 U.S. at 611.

(ii)    <u>Oregon v. Kennedy</u>

Six years later, in <u>Oregon v. Kennedy,</u> 456 U.S. 667 (1982) ("<u>Oregon v. Kennedy</u>"), the United States Supreme Court limited the application of double jeopardy to circumstances where the prosecutor intentionally goaded the defense into requesting a mistrial. The Supreme Court chose to refine <u>Dinitz</u> by removing bad faith or overreaching as an independent basis for applying double jeopardy.

The Court explained why it adopted a standard that focused on the intent of the prosecutor as opposed to a separate alternate overreaching or bad faith prosecutorial conduct standard which Justice Stevens argued in his concurring opinion. Justice Stevens' concern was that the majority

3

A-114

decision had unnecessarily lopped off prior precedent by refining Dinitz in such a way that it removed

from the analysis the alternate grounds of bad faith.

> The majority held as follows:

> By contrast, a standard that examines the intent of the prosecutor, though certainly not entirely free from practical difficulties, is a manageable standard to apply. It merely calls for the court to make a finding of fact. Inferring the existence or nonexistence of intent from objective facts and circumstances is a familiar process in our criminal justice system. . . .

> - Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause. A defendant's motion for a mistrial constitutes 'a deliberate election on his part to forgo his valued right to have his guilt or innocence determined before the first trier of fact.' United States v. Scott, 437 U. S. 82, 93, 98 S.Ct. 2187, 2195, 57 L.Ed.2d 65 (1978). Where prosecutorial error even of a degree sufficient to warrant a mistrial has occurred, '[t]he important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of such error.' United States v. Dinitz, supra, 424 U.S., at 609, 96 S.Ct., at 1080. Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion.

Oregon v. Kennedy, 456 U.S. at 675-676.

In summary, the defendant has control of whether or not he seeks a mistrial as opposed to

going to verdict and seeking a not guilty verdict. If he goes to verdict and is convicted, he can seek

a reversal on appeal. Since double jeopardy does not apply if the case is reversed on appeal, it should

not apply when a mistrial motion by the defense causes the trial to be aborted, unless it was the intent

of the prosecutor to goad the mistrial application. Regardless of the prosecutor's reasons, whether

it be to gain advantage in a second trial or merely harassment, if the Court finds the State intentionally

A 115

caused the defense to seek a mistrial, then that subverting of justice requires that double jeopardy bar future prosecution.

      (iii)    Bailey v. State

In Bailey v. State, 521 A.2d 1069 (Del. 1987) ("Bailey"), the Delaware Supreme Court had the opportunity to discuss mistrials and double jeopardy under both the Fifth Amendment to the United States Constitution and Article I, §8 of the Delaware Constitution. The Court determined that the analysis of the double jeopardy claim would be identical under either the federal constitution or Delaware's constitution.

The Court noted the tension in the defendant's double jeopardy interest in having the State's criminal allegations resolved in a single proceeding versus society's interest in enforcing criminal laws by way of a trial, regardless of the verdict. Society's interest sometimes results in more than one trial because the defendant is entitled to a review of the trial process on appeal. A reversal for grounds other than insufficiency of evidence will result in a retrial due to society's interest in ultimately reaching a verdict consistent with our criminal and procedural jurisprudence. Bailey v. State, 521 A.2d at 1075.

Bailey provides an analysis of both Dinitz and Oregon v. Kennedy, noting that Oregon v. Kennedy refined or limited Dinitz. Since the analyses of the Federal and State constitutions are identical, our Supreme Court embraced the holding of Oregon v. Kennedy finding "that Double Jeopardy considerations would bar a subsequent trial only if the conduct giving rise to the mistrial was conduct by the prosecutor or the court which was *intended* to provoke a mistrial". Bailey v. State, 521 A.2d at 1078.

$A-116$

But then there is language in Bailey that is troublesome, and it is found at page 1079:

For the reasons that we have already outlined, there was a manifest necessity for the *sua sponte* declaration of a mistrial by the Superior Court. The record does not support Bailey's contention that the prosecutor's final line of questioning was motivated by bad faith or intended to cause a mistrial. Under the circumstances of this case, the double jeopardy clauses of the State and Federal Constitution provide no bar to Bailey's retrial and neither does the applicable Delaware statute.

By concluding that the record did not support Bailey's theory that the prosecutor's question was motivated by bad faith "or" intended to cause a mistrial, the Court used language more compatible with the broader standard of Dinitz.

If, as I believe, Delaware is in the Oregon v. Kennedy camp, then Bailey's use of "or" does cause some confusion.

Later, in Sudler v. State, 611 A.2d 945 (Del. 1992), the Supreme Court's analysis of the double jeopardy standard and mistrials was limited to intentional goading by the prosecution to get the defense to apply for a mistrial. Sudler v. State, 611 A.2d at 948. Bad faith or overreaching is not a part of the Sudler analysis.

The Superior Court has applied the limited "goading" exception in State v. Freeman, Del. Super., Cr. A. Nos. IN-91-02-0207-0209, Herlihy, J. (July 22, 1991); State v. Weddington, Del. Super., Cr. A. Nos. IN86-02-0427, et al., Gebelein, J. (November 10, 1998); State v. Washington, Del. Super., Cr. A. Nos. IN-91-01-0558, et al., Herlihy, J. (Feb. 13, 1992); and State v. Long, Del. Super., K91-12-0047, Steele, J. (July 23, 1992), aff'd, Del. Supr., No. 367, 1992, Walsh, J. (June 21, 1993).

But, I think that because of the use of "or" in Bailey, a broader standard continues to be argued. Bad faith or overreaching conduct was argued in this case. In State v. Dorsey, Del. Super.,

6

A.117

Def. ID# 9609013882, Gebelein, J. (April 12, 2001), aff'd, 782 A.2d 263 (Del. 2001), the Superior

Court held:

> The Court now finds that while prosecutorial misconduct deprived Dorsey of
> a fair trial, that misconduct was neither intended to provoke the defendant to move
> for a mistrial, nor was the prosecution motivated by bad faith or malice, engaged in
> oppressive tactics, or acting to seriously prejudice and harass the defendant.
> Therefore, the Double Jeopardy Clause of the Delaware Constitution is not implicated
> to bar retrial of the defendant.

On appeal, the Supreme Court commented that the Superior Court found "that the

prosecution had not willfully provoked a mistrial or exhibited the kind of bad faith conduct the double

jeopardy bar to retrial is intended to address." In the Matter of the Petition of James Dorsey for a

Writ of Prohibition, 782 A.2d 263 (Del. 2001), citing Bailey v. State, supra. See also State v. Lloyd,

Del. Super., Def. ID# 0102010574, Jurden, J. (May 10, 2002) for a discussion and a review of the

"bad faith" standard used in a minority of states.

In State v. Long, supra, ("Long"), then Judge Steele interprets Bailey as requiring a two

prong test: bad faith and a declaration of a mistrial to afford the prosecution an advantage at a later

trial by intentionally goading the defense into the mistrial application. He also noted that the bad faith

or overreaching may be shown by a pattern or sequence of misconduct leading up to the triggering

of a mistrial. This analysis harmonizes Bailey with Oregon v. Kennedy and does not consider bad

faith as a separate ground.

I adopt the Long reasoning that for double jeopardy to be considered as a bar to reprosecution

following a mistrial, the Court must find that the prosecution injected overreaching or bad faith

conduct into the trial with the intent to cause a mistrial.

7

A-118

Nevertheless, as I analyze the facts of this case, I also shall rule based on all of the defendant's arguments, including the broader, separate bad faith argument, in the event my analysis is wrong.

## THIS CASE

On September 6, 2002[1], this Court conducted an evidentiary hearing to permit the defendant a full opportunity to develop his arguments. Wide latitude was granted to allow the defendant to develop most of his theories, including allowing, over the State's objections, an examination of the prosecutor involved in the trial.

First, I find that although the defense has argued creatively and forcefully, there is a significant problem with its position. At his trial, there was no mistrial application. The defense is presumed to be in control of its destiny. By not electing to apply for a mistrial, the defense made the decision to take the case to verdict, obviously hoping for a defense verdict. But the defense also knew that if convicted, there would be grounds to seek a reversal on appeal. Without a mistrial or mistrial application, this can be said to be much ado about nothing.

Alternatively, I shall examine the State's conduct under the theory that, regardless of the lack of a mistrial application, the State's conduct still fell into that conduct which the Oregon v. Kennedy holding targeted.

What if the State intentionally goaded the defense in an attempt to obtain a mistrial, but the defense did not bite. In other words, if there is an unsuccessful intentional attempt to cause a mistrial, should double jeopardy attach? I think not because that would turn the previously discussed double jeopardy jurisprudence on its ear. A defendant could obtain the benefit of deciding to go to a verdict

---

[1]On September 6, 2002 this Court ruled on the matter and promised a written decision to follow. This is that decision.

8

$A$-119

and then seek to have double jeopardy applied following a reversal. He would have his cake and could also eat it. But for purposes of judicial economy, (we only want to do this once), I allowed the defense the opportunity to establish that the State "attempted" to intentionally cause a mistrial so the State should be barred by double jeopardy.

Based upon the evidence presented on September 6, I find that the prosecutorial misconduct was not done intentionally for the purpose of goading the defense into a mistrial application or in an attempt to seek an advantage by a second trial.

The defense argued that, cumulatively, the errors and mistakes of the State showed a pattern of misconduct which can be used to support the inference that the State was trying to generate error in order to cause a mistrial. I did find a comment in the State's opening statement which could be construed to be one of burden shifting concerning standard of proof. Other than that, I find the remaining State's actions argued by the defense to have been reasonably appropriate, when considered in the context of what was happening at that particular time of the trial.

The defense argued that there was a basis for inferring that the State would wish to sabotage its own case in hopes of obtaining a better opportunity to convict the Defendant at a second trial. The victim was unable to identify the Defendant at trial. While this was a surprise to the State, there were other witnesses who identified the Defendant as the person who struck the victim with a pipe, causing a loss of vision in one eye. One of those witnesses had personally known the Defendant for a very long period of time.

The State's case also was based upon other evidence including motive, opportunity, and statements by the victim immediately after the incident which identified the Defendant as being the person who assaulted him.

9

A-120

Taking into consideration my review of the transcript and the trial judge's comment that the evidence was overwhelming, I find that the strength of the State's case would not give rise to an inference that the State was attempting to sabotage it.

Testimony was elicited that the State's case now may be stronger, if there is a second trial, but that is for reasons I find were unknown to the State at the time of the first trial. Another eyewitness has been located and interviewed and reportedly has identified Mr. Morris. I find that to be a result of the preparation for the retrial.

I also note that on several occasions, the prosecutor was very cautious and sought judicial guidance before asking certain questions in the presence of the jury. For example, the prosecutor received permission to cross-examine the Defendant under Delaware Rules of Evidence, Rule 609 for a specific felony, but chose not to out of an abundance of caution, and so advised the Court and defense counsel. This cautious approach does not fit the pattern the defense seeks to paint.

In summary, I find that the State did not intentionally attempt to cause a mistrial. I find that the State did not intentionally inject error into the case. Trial through the adversarial process creates an emotional, competitive environment in which, unfortunately, sometimes one takes his eye off the ball. Trials and closing arguments are fluid and lawyers are human. Mistakes will be made. All of us need to be more diligent in an effort to minimize error and the potential for prejudice against the defendant.

Finally, I consider the Defendant's argument that even absent a mistrial application and absent a finding of intentional goading by the prosecutor in an attempt to obtain a mistrial, I should still apply double jeopardy to bar retrial. This is considered because when the Supreme Court requested

10

$A$ 121

supplemental briefing on double jeopardy, it was considering a broader standard than when the State intentionally seeks to goad the defense into a mistrial application.

This is the defense's third line of attack and is only being considered in the event the Delaware Supreme Court construes Bailey differently than I have interpreted it in this ruling. The basis for the defense's argument is that a finding of bad faith conduct or overreaching by a prosecutor is sufficient reason to attack double jeopardy and bar retrial. It is the separate double jeopardy ground "lopped off" by the Court in Oregon v. Kennedy per Justice Stevens' concurring decision.

The problem I have with this argument initially is getting a handle on what is meant by "bad faith" or "overreaching". There is no definition of it. Justice Stevens suggests that it be developed on a case-by-case basis. The majority ruling in Oregon v. Kennedy rejected this approach as there are few standards for its application. Where is the line between mistakes and bad faith mistakes? Is it that the prosecutor should have known better? That is a tough standard because conceivably every mistake by a prosecutor is preventable had they known more law or more information about their case. Is it "we'll know it when we see it"?

If a broader standard is adopted because of egregious conduct, it must be done with eyes wide open as to the consequences. Every defense counsel will seek a hearing in all similar cases and the trial court will have to determine which side of the line the prosecutor's transgression fell. As the majority in Oregon v. Kennedy noted, such a standard would be a slippery slope.

Applying the guidance offered by Justice Stevens in his concurring opinion, I find that there is no evidence to support the Defendant's position that there was bad faith or overreaching in this case. There is nothing to show the State was motivated to put the Defendant through the expense and/or embarrassment of a criminal trial, just for that reason, regardless of the verdict. I do not find

11

$A$-122

the prosecutor was calculating to inject just enough prejudice into the case to insure conviction but not enough to warrant reversal. I do not find that there was egregious prosecutorial misconduct which "rendered unmeaningful the defendant's choices to continue or to abort the proceeding". Oregon v. Kennedy, 456 U.S. at 689 (Stevens, J., concurring).

Finally, I do not find that the prosecutor's misconduct was "deliberate misconduct". I think it was done unintentionally and out of ignorance. That is an unfortunate finding because of the Supreme Court's frustration with the failure to learn from previous mistakes.

In summary, I find no bad faith or overreaching to the degree included in Justice Stevens' view, but again "to the degree" is the problem with the application of his standard.

And now a word from the bully pulpit, and these comments are not limited to those involved in this case. The frustration of the Supreme Court with "deja vu all over again" as to prosecutorial misconduct is apparent in its recent decisions on the subject. Between the lines, the Court seems to be saying "What are we going to have to do to curtail this?"

What might they do? Consider State v. Breit, 930 P.2d 792 (N.M. Supr. 1996), where the New Mexico Supreme Court applied double jeopardy to bar retrial holding that "when a trial is severely prejudiced by prosecutorial misconduct, the double-jeopardy analysis is identical, whether the defendant requests a mistrial, a new trial, or on appeal, a reversal." The New Mexico Supreme Court likewise was frustrated with misconduct. "There are numerous examples of cases, like the one at the bar, in which, despite repeated warnings from the court, a new trial is deemed necessary because of incessant prosecutorial misconduct, even though there was no intention to cause a mistrial." State v. Breit, 930 P.2d at 799. Compare our recent Supreme Court's comment in Williams v. State, 803 A.2d 927 (Del. 2002).

12

$\mathcal{A}$ /23

If we, prosecutors, defense counsel and trial judges, do not solve the problem on which the Supreme Court is shining a light, then we should not be shocked if the Supreme Court moves in a different direction to fix it. I hope it does not come to that as I agree that a bad faith or overreaching standard is the slippery slope noted in Oregon v. Kennedy, and once the slipping starts, who knows where it will end.

For the reasons aforestated, the defense application to bar reprosecution under the double jeopardy clause of the Federal and State Constitutions is denied.

**IT IS SO ORDERED.**

A 124

# Liguori, Morris & Redding

**Attorneys At Law**
46 The Green. Dover. Delaware 19901
(302) 678-9900 • Fax (302) 678-3008



James E. Liguori
Gregory A. Morris
Laura A. Yiengst

September 23, 2002

Honorable T. Henley Graves
Resident Judge
Sussex County Superior Court
P. O. Box 746
Georgetown, DE 19947

> **Re:  Ex-Parte Communication**
> **State v. Alonzo W. Morris, Jr.**

Dear Judge Graves:

I've enclosed a portion of a pro se motion the above Defendant filed with the Supreme Court.

I'm troubled by the highlighted area of Page Three of his petition because not only is his assertion false, but he intimates that the court and I are somehow in collusion to prevent Defendant from a fair hearing and/or trial.

I truly believe that for Mr. Morris to make such an allegation against me and the court compromises my ethical obligation to act as his zealous attorney.

I can only see trouble ahead, if at this juncture, the Defendant is already resorting to lies and innuendo to our Supreme Court about my relationship with him and the court. I request an in camera hearing as soon as practical with the Defendant, myself and the court to determine whether there exists an ethical reason for me to request removal from further representation of this Defendant.

Respectfully submitted,

James E. Liguori

JEL:sec

Enclosure

cc:    Mr. Alonzo W. Morris, Jr.

*A 19 C*

BIBBINS - DIRECT

1    Q.   You happened along the Townsends plant at 25

2  of eight?

3    A.   Yes.

4    Q.   So you were a little early that morning?

5    A.   Yeah.

6    Q.   Where did you leave from first thing that

7  morning on your bicycle?

8    A.   I left from Dunbarton.

9    Q.   Dunbarton Apartments?

10   A.   Yeah.

11   Q.   When you got there -- let me ask you

12  something else:  Is there a place called Harvey's

13  Plumbing just before you get to the Townsend's plant?

14   A.   That's right, a place called Harvey's

15  Plumbing.

16   Q.   Is that on the same side of the street as the

17  Townsend's plant?

18   A.   Yes, on the same side.

19   Q.   Was there anything in between the Townsends

20  plant and Harvey's Plumbing on that side of the road?

21   A.   No, there is nothing in between it.

22   Q.   Well, when you got there to between Harvey's

23  Plumbing and the Townsend's plant on your bike that

1   morning about 25 until eight, did anything unusual

2   happen?

3       A.   Yeah, I met J.R. Copes. And he said to me,

4   he said: Old man, you disrespected me on the phone.

5   He said: Now, I'm going to whip your gray ass. I

6   said: You may whip me, but I am not scared. So at

7   that time, I got off the bike. So he started north on

8   Race Street and he throwed a rock. It hit me in the

9   side. I didn't pay it no mind. I went on, I was

10  going on to punch in. By the time I got about 35 or

11  40 feet of where I was going to punch in, he ran in

12  the fence and got a pipe, came down behind me. When

13  he came down behind me, he struck me aside the head

14  with the piece of pipe.

15      Q.   So you saw him that morning, right?

16      A.   Yes.

17      Q.   You had this conversation with him; is that

18  correct?

19      A.   Yeah.

20      Q.   Did you see him just before he struck you in

21  the head with the pipe?

22      A.   Yeah, I seen him before. I saw him. When I

23  turned around, he was right on top of me with the

BIBBINS - DIRECT

1        A.    No, I didn't.

2        Q.    So you still have the same right eye?

3        A.    The eye is still in there.

4        Q.    Do you know a person by the name of Georgie

5    McCrea, used to be Georgie McCrea?

6        A.    Yes, I know her.

7        Q.    How do you know her?

8        A.    I used to work with her.

9        Q.    Where does she work?

10       A.    To Townsends.

11       Q.    That day that you got hit with this pipe and

12   you were sitting there on the curb bleeding, did

13   Georgie McCrea come up to you there?

14       A.    Yeah.

15       Q.    And did you speak to her?

16       A.    Yeah, I spoke to her.

17       Q.    Was she asking you any questions?

18       A.    Yeah, she asked me what happened.  I told her

19   a guy hit me and his name was Junior Copes.

20       Q.    Did you tell her what this was about?

21       A.    No, I didn't tell her what it was about

22   either.

23       Q.    Either what it was about and who it was about

DAVID WASHINGTON
Official Court Reporter

BIBBINS - DIRECT

1    that you got hit.

2         A.    No, I didn't tell her, no.

3         Q.    Are you sure?

4         A.    Yeah.

5         Q.    Was she asking you about that?

6         A.    Yes.

7         Q.    When you spoke to her did you speak to her

8    voluntarily of your own freewill?

9         A.    Yes, I spoke with her of my own freewill.

10        Q.    Did you tell her the truth?

11        A.    Yeah, I told her the truth.

12        Q.    Did you ever know a girl by the name of

13   Lenora Middleton?

14        A.    Yeah, I knocked on her door one time.

15        Q.    I'm not asking you about knocking on her door

16   one time, I want to know if you know her.

17        A.    Yeah, I know her.

18        Q.    And you say J.R. Copes hit you with the pipe.

19   Do you have an opinion as to why he hit you with the

20   pipe?

21        A.    On kind of Lenora Middleton.

22        Q.    Do you remember if you said anything to

23   Georgie McCrea about Lenora Middleton?

BIBBINS - DIRECT

1    A.    I don't remember whether I said anything to
2    her about it or not.

3    Q.    Now, why do you say J.R. Copes hit you about
4    Lenora Middleton?

5    A.    Because I knocked on her door one time and he
6    was on the phone and he must have asked her who is
7    that knocking on your door. She said:  It's
8    Mr. Bibbins. And he said:  Put him on the phone. I
9    took the phone. I give the phone back to her. I
10   don't have anything to talk to him, I said, I don't
11   know him. I gave it back to her. That's why he said
12   I disrespected him I guess.

13   Q.    Then was there a time during the year prior
14   to November 1st of '99 when you got struck, either
15   late '98 or early '99 that you actually stayed at the
16   apartment with Lenora Middleton?

17   A.    Yes, I did.

18   Q.    Do you know Joyce Bailey whose name now is
19   Joyce Horsey?

20   A.    Yeah, I know her.

21   Q.    Were you ever living with -- sharing the same
22   apartment with Joyce Bailey?

23   A.    Yeah, I was living in the apartment with

1    Joyce Bailey.

2         Q.    Did there ever come a time when the two of

3    you moved out of that apartment?

4         A.    Yeah, Joyce Bailey moved out and we moved

5    over there with Lenora.

6         Q.    Lenora who?

7         A.    Lenora Middleton.

8         Q.    What apartment complex was that?  Where was

9    that?

10        A.    It was over to Dunbarton.

11        Q.    Is that the Dunbarton Apartments in

12   Georgetown?

13        A.    Yeah.

14        Q.    Do you remember about how long you stayed

15   there with Lenora Middleton?

16        A.    I stayed there about two months.  I didn't

17   stay over there --

18        Q.    The whole time you were staying there Joyce

19   Bailey was staying there?

20        A.    Yeah, she was staying there too.

21        Q.    And you referred to a phone call that was

22   made there to Lenora's by J.R., correct?

23        A.    Yeah.

BIBBINS - DIRECT

1      Q.    Was that during the time you were staying

2    there?

3      A.    No, I wasn't staying there then.

4      Q.    You don't think you were staying there then?

5      A.    I wasn't staying there then.  I was staying

6    at Joyce Bailey's.

7      Q.    But when Joyce Bailey moved, you moved with

8    her to Lenora Middleton's; is that right?

9      A.    That's right.

10     Q.    You stayed there about how long?

11     A.    I stayed about two months.  Probably two

12   months and-a-half I stayed over there.

13          MR. ADKINS:  Excuse me a moment.

14          (Pause.)

15   BY MR. ADKINS:

16     Q.    Did Junior say anything to you that day he

17   hit you about the phone?

18     A.    He told me I disrespected him on the phone.

19     Q.    Do you know what relationship, if any, Lenora

20   Middleton, back then, had to J.R.?

21     A.    That was his girlfriend.

22     Q.    So you are staying there in the same

23   apartment with his girlfriend; is that right?

1          A.    Yeah.

2                MR. ADKINS:  Your Honor, I don't have any

3     further questions at this time of Mr. Bibbins.  May we

4     approach?

5                THE COURT:  Yes.

6                (Whereupon, counsel approached the bench and

7          the following proceedings were had:)

8                MR. ADKINS:  I think there are several ways

9     that what he said to Georgie McCrea comes in:  There

10    is present-sense impression, there is excited

11    utterance, and also a third way.  I tried to establish

12    some foundation for 3507 here to Georgie McCrea.  And

13    if one of the ways that this would come in is 3507, I

14    didn't know whether you wanted to have that discussion

15    with defense counsel about whether he prefers the

16    cross-examination of Mr. Bibbins now or have me call

17    Georgie McCrea now and have me call James Bibbins

18    back.  That's what I wanted to cover up here at

19    sidebar.

20               THE COURT:  What is the preference?

21               MR. LIGUORI:  I would like to cross-examine

22    him now.

23               THE COURT:  You waive any rights you have

DAVID WASHINGTON
Official Court Reporter

凡 lll の

1   under Smith?

2          MR. LIGUORI:   Exactly.   And hopefully you can

3   do the issues of hearsay with Georgie McCrea to see if

4   it becomes admissible.

5          THE COURT:   He said there are two different

6   tracks he is on.   If it is admissible under 803(1) and

7   (2), then it is admissible under 3507, if it is

8   admissible.   So basically you go out on two different

9   horses and ride them.   Let me go ahead on 3507

10   grounds, the procedure, that is what most defense

11   counsel want to do, but the Supreme Court says they

12   basically have to offer him up for cross-examination

13   after they have done the 3507, so we will go with the

14   procedure Mr. Adkins suggested then.

15          MR. LIGUORI:   Thank you.

16          (Whereupon, counsel returned to the trial

17      table and the following proceedings were had:)

18          THE COURT:   Mr. Liguori.

19                    CROSS-EXAMINATION

20   BY MR. LIGUORI:

21      Q.   Mr. Bibbins, good afternoon.

22      A.   Good afternoon.

23      Q.   My name is Jim Liguori.   I'm representing

DAVID WASHINGTON
Official Court Reporter

1    300 feet.

2        Q.    Okay.  You meet -- I guess according to what

3    Mr. Adkins was saying to you in his questioning, you

4    meet Georgie McCrea-Swan or Swan-McCrea; is that

5    right?

6        A.    Yes.

7        Q.    She is known to you, you know her?

8        A.    Yeah.

9        Q.    She was at the scene with Alan Hill?

10       A.    Yeah.  Yeah, she was at the scene.

11       Q.    Was she helping you?

12       A.    I don't know.  I don't know whether she was

13   helping me or not.  Alan hill sat me down.  I was

14   losing a lot of blood.  I couldn't see everything

15   because my eyes were all blurred up.

16       Q.    Did there ever come a time that you spoke

17   with a police officer before you were taken from the

18   scene?

19       A.    Yeah, I spoke with the police officer.

20       Q.    What police officer do you recall speaking

21   with?

22       A.    I don't know who it was.

23       Q.    It wasn't this gentleman seated here, was it?

DAVID WASHINGTON
Official Court Reporter

A-142

1       A.    I don't know whether it was him or not.  I

2    really couldn't see him.

3       Q.    But you remember speaking with a police

4    officer?

5       A.    That's right.

6       Q.    What did you speak to the police officer

7    about?

8       A.    He asked me -- he asked me what happened to

9    me.

10      Q.    That makes sense, that's what a police

11   officer wants to know, he wants to know what happened

12   to you, Mr. Bibbins?

13      A.    That's right.

14      Q.    What did you say, Mr. Bibbins?

15      A.    I said a man hit me named Junior Copes.

16      Q.    This is important to me, sir.  Did you say

17   that you had been in an argument with Alonzo Morris?

18      A.    Never.  I never been -- outside of that day,

19   that's the only time I had any talk with him.

20      Q.    My point is, I want to be precise for the

21   ladies and gentlemen of the jury:  While you were on

22   the side of the street with people --

23              MR. ADKINS:  Your Honor, may we approach?

DAVID WASHINGTON
Official Court Reporter

A 122                    A-143

 1   depending on who you were and how young you were.

 2              MR. LIGUORI:  Objection.

 3              THE COURT:  It is your pace.  So I am

 4   striking the answer.

 5              MR. ADKINS:  I think I am done with that at

 6   this point.  Take your seat.

 7              THE COURT:  Ed, can you move that back?

 8              THE BAILIFF:  Yes, Your Honor.

 9   BY MR. ADKINS:

10      Q    Officer Davis, I would like to hand you

11   Exhibit 1.  Do you recognize that?

12      A    Yes, sir, I do.

13      Q    Have you ever been in possession of that

14   before?

15      A    Yes, sir.

16      Q    How did you come into possession of that?

17      A    Officer Barlow took this at the scene for

18   evidence and then gave it to me for processing.

19      Q    What, if anything, did you do with that pipe?

20      A    Well, considering the diameter of the pipe,

21   how large it is, what we basically do in order to find

22   fingerprints, we would fume anything that the assailant

23   came in contact with.  What I mean by that is basically

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 144

Davis – Direct                              B-72

1   a fume is a process where fingerprints are raised from

2   any object.

3              In order to do this, you would have to

4   surround the object and enclose it and process it as in

5   fuming.  The process of fuming I used is basically a

6   heated chamber with Super Glue, for lack of a better

7   term, and, basically, the fumes adhere to the oils of

8   the fingerprints which is on the item.  after the

9   fuming is done, you are able to recognize if there are

10  any prints on the item.

11      Q    And when you did that process, were you able

12  to make out any type of latent prints on that pipe?

13      A    After the fuming, I couldn't find anything

14  that I could see.  So, basically, my second step was to

15  dust it with fluorescent powder.  Fluorescent powder

16  during the day or during regular light, you couldn't

17  see it.  But in the darkness of a room with a UV light,

18  if there were any prints on the pipe, they would show

19  up immediately.  It is almost like fluorescence.

20      Q    You did that process?

21      A    Yes, sir.

22      Q    With respect to either of these processes,

23  were you able to locate any visible latent prints

A 145

Davis - Direct                                B-73

1    whatsoever?

2         A    No, I wasn't.

3         Q    If you had located any visible latent

4    fingerprint, what would you then do with it?

5         A    I would basically lift a print, attach a

6    crime report to the print, and send the print to S.B.I.

7         Q    For what purpose?

8         A    For identification.

9         Q    You don't do that process?

10        A    No, I do not.

11        Q    You lift latent prints?

12        A    Yes, I do.

13        Q    There were no latent prints of value on that

14   pipe?

15        A    I could not find any, sir.

16        Q    Is there anything about that pipe that would

17   tend to deter there being latent prints?

18        A    Basically, when you are lifting latent

19   prints, in order to get a print, the space would have

20   to be smooth and flat.  Unfortunately, for this piece

21   of pipe, it is very old.  It has been scarred and

22   busted.  And even if there was a print on there, I

23   doubt if I would be able to lift it and have it

A-146

Davis – Direct                          B--74

 1    analyzed.

 2         Q    Do you know if there is any family or people

 3    by the name of Copes who live on Douglas Street?

 4         A    Yes, sir.

 5         Q    And do you know anybody in particular?

 6         A    The only name that comes to mind at this time

 7    is Francine, and I am not sure if that is Mr. Morris'

 8    aunt or cousin.  I am not sure of the relation.

 9         Q    Do you know Alonzo Morris, Jr.?

10         A    Yes.

11         Q    Do you know if he goes by any nickname?

12         A    Yes.  He goes by two names.  J. R. Copes and

13    J. R. Morris.  I know him as J. R. Morris or Alonzo

14    Morris, Jr.

15         Q    Did you make the arrest in this case?

16         A    Yes.

17         Q    Do you know approximately what day and what

18    time?

19         A    I believe it was the same day, November 1st.

20    But for the time, I know it was in the afternoon, but I

21    don't know the exact time.

22         Q    Would you have that time noted in a police

23    report or any other thing that you have written in this

1   Mr. Morris, did he?

2       A     No, he did not.

3       Q     We now have Mr. Bibbins saying, "Oh, that is

4   Alonzo Morris over there," yesterday, didn't he?

5       A     Yeah, he did.

6             MR. LIGUORI:  May I have that pipe, ma'am?

7   BY MR. LIGUORI:

8       Q     I guess this is sort of like the stuff you do

9   in what we are going to call CSI Georgetown?  That's

10  what we are going to call that.  That's the kind of

11  stuff?

12      A     If you want to call it that, yes, sir.

13      Q     Let me ask you this.  You previously

14  testified, haven't you, at that hearing in March about

15  the examination you did to this item, didn't you?

16      A     Yes, I did.

17      Q     Did you testify with regard to the fact that

18  you put it in a heated chamber and fumed it?

19      A     I believe I did, sir.

20            MR. LIGUORI:  May I approach, Your Honor?

21            THE COURT:  You may.

22  BY MR. LIGUORI:

23      Q     Let me show you your sworn testimony and ask

1    you to read it.  Page 108, Mr. Adkins.

2         A    The whole thing, sir?

3         Q    You can just look at that, and then I am

4    going to ask you questions, Officer.

5         A    (Witness reading).

6         Q    Under oath in March of 2000, did you swear

7    that you did a fuming of that item?

8         A    No.

9         Q    You didn't, did you?

10        A    I didn't?

11        Q    You didn't say it, did you?

12        A    No, I did not.

13        Q    So you told the Court that day that you, in

14   fact, only did a dusting; correct?

15        A    I believe that was the question.

16        Q    Fluorescent dusting.  No, that wasn't the

17   question.  The question was, "What did you do?," and

18   you didn't talk about fuming, did you?

19        A    No, sir, I didn't.

20        Q    Tell us about this chamber.  How big is this

21   chamber?

22        A    Well, basically, we didn't have a chamber

23   until I had to make it.  I had to make the whole

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

-149

Davis – Cross                                    B-79

1    chamber.  It was approximately maybe six, six and a
2    half feet long.  I had to make it.  It was wrapped in
3    plastic, see-thru plastic, and sealed with duct tape in
4    order to contain the fumes.

5         Q    So it is something that is not recognized as
6    being scientific; it is something that you put
7    together?

8         A    Well, the process is scientific, I would
9    imagine.

10        Q    The application of the process, though, is
11   the way you conjured up this box?

12        A    Yes.

13        Q    Or chamber?

14        A    It basically didn't matter in any way or
15   shape the chamber is constructed, although the fuming
16   is basically what you have to do.

17        Q    We saw a lot of the photos of where people
18   apparently have put dirt down to cover up Mr. Bibbins'
19   blood?

20        A    Yes.

21        Q    You were up at a conference at Vo-Tech;
22   right?

23        A    Polytech.

| 1 | (Whereupon, counsel approached the bench |
| 2 | and the following proceedings were had:) |
| 3 | MR. LIGUORI: Respectfully, I would ask for a |
| 4 | proffer as to what this physician is going to testify |
| 5 | to. The last time he was called, it was to buttress |
| 6 | the fact that Mr. Bibbins could not identify Mr. Morris |
| 7 | in the courtroom. Mr. Bibbins has identified my client |
| 8 | in the courtroom, and I don't believe that the |
| 9 | testimony is relevant or necessary now. |
| 10 | THE COURT: That may not be the purpose. I |
| 11 | don't know if that is why he is calling him. |
| 12 | MR. ADKINS: It is not. I think I have to |
| 13 | prove the element of serious physical injury. I think |
| 14 | I have to prove the loss of a bodily organ. That is, |
| 15 | that he has total, one hundred percent, loss of |
| 16 | eyesight in the right eye. |
| 17 | THE COURT: That is what it is going to be |
| 18 | limited to? |
| 19 | MR. ADKINS: I am going to ask what his |
| 20 | eyesight was before and what it was after, and what |
| 21 | were the injuries to his eye. |
| 22 | MR. LIGUORI: That is no problem. |
| 23 | (Whereupon, counsel returned to the trial |

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 151

1         table and the following proceedings were had:)

2    Whereupon,

3                        CARL MASCHAUER

4    was called as a witness by and on behalf of the State

5    of Delaware and, having been first duly sworn, was

6    examined and testified as follows:

7                      DIRECT EXAMINATION

8    BY MR. ADKINS:

9        Q    Good afternoon, Dr. Maschauer.

10       A    Good afternoon.

11       Q    Doctor, are you a licensed and practicing

12   ophthalmologist in the State of Delaware?

13       A    Yes, sir, I am.

14       Q    And how long have you been a licensed and

15   practicing ophthalmologist in Delaware?

16       A    Twenty years.

17       Q    Where is your practice physically located?

18       A    502 West Market Street.  Right down the

19   street past the high school.

20       Q    Here in Georgetown?

21       A    Correct.

22       Q    What is that?  What do you call your

23   practice?

Maschauer – Direct                B-143

1        A    It is Sussex Eye Center.  It is a

2    professional association.

3        Q    Have you had as one of your patients

4    Mr. James Bibbins, an elderly gentleman?

5        A    Yes, sir.

6        Q    Was he one of your patients prior to November

7    1, 1999?

8        A    Yes.  He first came to our office in 1996.

9        Q    Just prior to November 1, 1999, could you

10   please explain to the jury what the physical condition

11   of his eyes were and his vision?

12       A    When last seen in May of 1999, Mr. Bibbins

13   had vision acuity of 20/50 in the right eye and 20/40

14   in the left eye.  He also had some retinal problems and

15   glaucoma, which gave him tunnel vision, which basically

16   means he can see things almost like looking through a

17   paper towel.  But at that time, it was 20/50 in the

18   right eye and 20/40 in the left eye.

19       Q    Was that without glasses or with prescription

20   glasses?

21       A    That would have been with his best

22   correction, with glasses.

23       Q    So did you prescribe glasses for him to wear?

1       A    Yes.  He was wearing them at that time, yes.

2       Q    And did you see him after his injury on

3    November 1, 1999?

4       A    Yes.  He was seen on January 19, 2000, and at

5    that time, his vision in his right eye -- well, there

6    was no vision.  He couldn't see light.  You could shine

7    a bright light in his eyes and he saw absolutely

8    nothing.  Just darkness.  And the left eye had 20/50

9    visual acuity.

10       Q    So even the vision in the left eye had

11    worsened; is that right?

12       A    At least that day when we recorded his

13    vision.  It can vary a little bit.  Each person any day

14    they come in, they might see a little bit better one

15    day than another.  The right eye was significantly

16    different because he couldn't see anything.

17       Q    Was he one hundred percent absolutely blind

18    in the right eye?

19       A    Absolutely one hundred percent.  In fact,

20    there was a recommendation at first that his eyeball

21    should be removed because so much damage had been done

22    that it was worried that it would become painful for

23    Mr. Bibbins.

1       Q      Did you bring the medical records with you

2   with regard to Mr. Bibbins?

3       A      Yes, sir.

4       Q      Included in those records is there a

5   description from Washington Hospital as to the injuries

6   to his right eye?

7       A      Yes, sir.

8             MR. LIGUORI:   I think we should approach.

9             (Whereupon, counsel approached the bench

10      and the following proceedings were had:)

11            MR. LIGUORI:   If he is trying to get to those

12   record or anything, I object.  We were told at sidebar

13   the reason.

14            THE COURT:   I don't think you are going to

15   get the Washington records in through him.  He is an

16   ophthalmologist.

17            MR. ADKINS:   He is a medical doctor and he

18   has formulated his opinion not based upon what the

19   Washington records said.  He based his opinion by

20   shining a light in his eye and finding out he is blind.

21   That is something you and I can do.

22            I understand he brought in certain medical

23   expertise, but he is objecting to -- here is my

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A-155

Maschauer – Cross                    B-146

1   position on this.  I, of course, sent to Mr. Liguori

2   months ago the records of Dr. Maschauer, his total

3   packet, and that is what he has here today.  Included

4   in those records is this letter from Washington

5   Hospital that does describe the injury to the right

6   eye.  I guess it would be my attempt to get this in

7   through business records of his, that these are his

8   business records.

9            THE COURT:  I not going to let you piggyback

10  in that fashion.

11           MR. ADKINS:  All right.

12           (Whereupon, counsel returned to the trial

13       table and the following proceedings were had:)

14           MR. ADKINS:  I have no further questions.

15           THE COURT:  Mr. Liguori?

16           MR. LIGUORI:  Thank you, Your Honor.

17                    CROSS-EXAMINATION

18  BY MR. LIGUORI:

19       Q    Thank you for coming in.  I just wanted to ask

20  you do you know if Mr. Bibbins has a Delaware driver's

21  license?

22       A    Yes, sir, I do.

23           MR. LIGUORI:  Nothing further.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 156

1            MR. ADKINS:  Redirect on that.

2                    REDIRECT EXAMINATION

3    BY MR. ADKINS:

4        Q    You testified that he is blind in his right

5    eye.  Do you know of any way that you can get a

6    driver's license when you are blind in your right eye?

7    What is going on here?

8        A    Absolutely.  Delaware law allows a person to

9.   be blind in one eye, and it does not hold that against

10   the fellow eye.  All you have to do is have 20/50

11   visual acuity in one eye in order to get a driver's

12   license.

13           Even though Mr. Bibbins has tunnel vision,

14   the law does not say you have to have peripheral

15   vision.  There is absolutely no reason Mr. Bibbins

16   can't get a driver's license based on the current

17   Delaware laws.

18       Q    Are you familiar with the testing they give

19   for a driver's license, eye testing?

20       A    Yes.

21       Q    Does that test check out peripheral vision?

22       A    No.  That is not a requirement.  Just being

23   able to see 20/50, which Mr. Bibbins can.

Davis - Cross                    B-97

1    we will try to clean it up. Maybe there is a better

2    copy that maybe the officer might have.

3    BY MR. LIGUORI:

4        Q    What I want to do, for purposes of your

5    testimony here, is ask you to go to the highlights of

6    Defendant's D for identification and -- I can't use

7    that red thing because it gave me a headache watching

8    you do it. So I am going to do this. I want you to

9    tell me -- you prepared this? This is your signature;

10   is that right?

11       A    Yes, sir.

12       Q    The 1st of November, 1999?

13       A    Yes, sir.

14       Q    You have a copy in front of you?

15       A    Yes, I do.

16       Q    And the part that is shown, it talks about

17   Alonzo Morris? This is the probable cause affidavit

18   for Alonzo Morris; is that right?

19       A    Yes, sir.

20       Q    And you state and, in fact, swear that upon

21   your arrival, the victim -- that's Mr. Bibbins; right?

22       A    Yes, sir.

23       Q    The victim was contacted and made a

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 158

Davis - Cross                    B-98

1    statement; correct?

2        A    Yes, he did.

3        Q    Mr. Bibbins, the victim, stated that he had

4    been in an argument with Alonzo Morris?  Did he say

5    that?

6        A    Alonzo Morris, no.

7        Q    Did Mr. Bibbins say that?

8        A    No.

9        Q    He did not say that?

10       A    No.

11       Q    But you swore that he said that; correct?

12       A    Yes, I did.

13       Q    You swore that he said he was in an argument

14   with Alonzo Morris on a phone call that Bibbins made to

15   Mr. Morris' girlfriend?

16       A    Yes.

17       Q    That's not what Mr. Bibbins says, is it?

18       A    Mr. Bibbins said --

19       Q    I will let you rehabilitate yourself for

20   Mr. Adkins.  Just answer yes or no.

21            THE COURT:  He can answer yes or no and give

22   an explanation, Mr. Liguori.

23            MR. LIGUORI:  I apologize.

A159

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

1   BY MR. LIGUORI:

2        Q    Did Mr. Bibbins say at the scene that the

3   argument was over Mr. Bibbins' making a phone call to

4   Mr. Morris' girlfriend?

5        A    Mr. Bibbins stated that the reason he was

6   assaulted was over a phone call from J. R.'s

7   girlfriend.

8        Q    I don't wanted to beat a dead horse.  You

9   look at this.  Who made the phone call?  I am a neutral

10  and detached Magistrate.  I am going to read this.  Who

11  made the phone call?

12       A    Mr. Bibbins.

13       Q    It is wrong; isn't it?

14       A    Yes, it is incorrect.

15       Q    You are incorrect, or is Mr. Bibbins

16  incorrect?

17       A    The statement was incorrect on the warrant.

18       Q    And who said Alonzo Morris?

19       A    Nobody did.  I did.

20       Q    So you then presented this document that had

21  inconsistencies in it?

22       A    Unfortunately so, yes, sir.

23       Q    Things that were not even said were in here;



1          THE BAILIFF:  Yes, sir, Your Honor.

2          (Whereupon, the jury returned to the jury

3       room.)

4          THE BAILIFF:  Clear, Your Honor.

5          THE COURT:  Mr. Morris, I just want to

6    confirm for the record that you understand that you

7    have a personal decision as to whether or not you

8    wish to testify.  I would expect that you would

9    consult with your attorney in making that decision.

10   The decision whether or not to testify is your

11   decision.  Do you understand that?

12          THE DEFENDANT:  Yes, sir.

13          THE COURT:  You have chosen not to

14   testify, is that correct?

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  Thank you.  I just want to

17   confirm that.

18          Now, what is the hearing that you wanted

19   on that?

20          MR. LIGUORI:  What I wanted to explore was

21   whether or not it was an illegal arrest in that

22   Danny Davis, without warrant, entered the residence

23   of Marcella Wilson-Williams and arrested for a

1    felony Alonzo Morris. Now, I will tell you as an
2    officer of the court that I re-read the transcript
3    of my client. My client says to his father -- may
4    I get it?

5              THE COURT:  Yes.

6              MR. ADKINS:  C-87.

7              MR. LIGUORI:  At C-87, Line 10, I will put
8    it in context. So I said, "Daddy, what is he
9    talking about? He said, they want to come and
10   search the house. And about that time I see like
11   20 police officers surrounding my house. And I'm
12   like, what in the world is going on. Then I said,
13   whoa, Daddy, tell them to stay outside and tell
14   Danny Davis to come in here and talk to me and tell
15   me what's going on."

16             Now, respectfully, Your Honor, I think
17   that does not bode well for my argument with regard
18   to a violation --

19             THE COURT:  Is this like a request to
20   suppress, a post-trial request to suppress?

21             MR. LIGUORI:  Brought out now based upon
22   the testimony. Yes, I would ask you to consider
23   that. However, as an officer of the court, I'm

A 162

```
 1    telling you I don't know whether or not the
 2    evidence supports my argument right now.  I'm
 3    wondering if I should explore that further by
 4    having a hearing with Alonzo Morris, Sr. present to
 5    find out where Danny Davis exactly was at the time
 6    he was talking to his son, the defendant, Alonzo
 7    Morris, Jr.
 8           THE COURT:  Let's come to the sidebar.
 9           (Whereupon, counsel approached the bench
10       and the following proceedings were had:)
11           THE COURT:  I just do not want to ask some
12    pointed question; you have your client there.
13           MR. LIGUORI:  Out of an abundance of
14    caution.
15           THE COURT:  You waived everything.  I mean
16    do you have to file a motion to suppress like
17    pre-trial?
18           MR. LIGUORI:  Other than this, I'm
19    wondering, because I read this transcript at least
20    two times, and I thought that he had, in fact,
21    invited Danny Davis in.  I didn't see any real
22    problem with that.  However, my client tells me
23    that Danny Davis was already in the house when he
```

```
 1    talked with Alonzo Morris, Sr.  And he just told me
 2    that yesterday -- two days ago.  So I thought it
 3    was something I had to put on the record out of an
 4    abundance of caution that maybe we can explore.
 5              Yes, I think if it was a normal
 6    circumstance it would have been a motion to
 7    suppress originally prior to trial.  But I still
 8    think you have the discretion to allow something
 9    like that to come in, if there is an error.
10              THE COURT:  Now?
11              MR. ADKINS:  What are you suppressing?
12              MR. LIGUORI:  His arrest.
13              MR. ADKINS:  I mean evidence came from the
14    arrest.  I don't understand what --
15              MR. LIGUORI:  It would be an illegal
16    arrest.
17              THE COURT:  So what?
18              MR. LIGUORI:  And then what would come
19    from that --
20              THE COURT:  What gets suppressed?
21              MR. LIGUORI:  What would come from that
22    would be the fact that -- well, okay.
23              THE COURT:  You have nothing to suppress.
```

1            MR. LIGUORI:  I do have certain things I
2       think I could suppress.

3            THE COURT:  Like what?  What did they
4       take?

5            MR. LIGUORI: Like his statements.

6            THE COURT:  Then use the statements.

7            MR. LIGUORI:  It doesn't matter.  Now to
8       put him on the stand -- he was concerned about
9       that.  He was concerned about it the last time.

10           THE COURT:  You made the decision.  I am
11      not going back and having a hearing at the end of
12      the trial and then decide whether or not we are
13      going to change your trial tactics.

14           MR. LIGUORI:  No.  Here's what I'm saying.
15      I'm saying there was a statement taken as a result
16      of his being arrested.  The defendant chose, I
17      believe, not to testify for a myriad of reasons,
18      one of them being that Mr. Adkins, he believes,
19      effectively cross-examined him previously with this
20      taped statement that he gave Danny Davis.

21           I'm just saying to the Court if this came
22      up -- if, in fact, it comes up out of the blue like
23      he said it did, that you might want to consider

KATHY S. PURNELL
OFFICIAL COURT REPORTER

A 165

1    allowing us to explore it to see if it was an

2    illegal arrest, and the fruits of that illegal

3    arrest is his confession.

4         THE COURT: You have waived it.  It has

5    been waived.  Now, this case is a situation where

6    because of the history of the case, the waiver is

7    even more important.  In most cases, we do not get

8    a full rehearsal.

9         MR. LIGUORI:  Right.

10        THE COURT:  I guess it was not a

11   rehearsal.

12        MR. LIGUORI:  We got a dry run.

13        THE COURT:  And the requirement of filing

14   a motion to suppress pre-trial is valid there.

15   Now, here he has had the opportunity -- and I have

16   seen him pulling the transcripts back and forth --

17   to study these transcripts, hasn't he?

18        MR. LIGUORI:  Yes, he has.

19        THE COURT:  You all have seen the

20   transcripts.  I do not have a motion.  I am not

21   about to entertain a motion to suppress at the

22   close of the evidence and then make decisions on

23   whether we reopen the case and do something else.

1    So your application is denied.

2           MR. LIGUORI:  I would ask you if it's

3    denied -- and I respect that completely -- if it's

4    denied because of the timing, of waiting until the

5    end?  Because I think I mentioned earlier that I

6    was going to do it when the jury was out.

7           THE COURT:  I understand.  Did you raise

8    that?  But you raised that during the middle of

9    trial within the last --

10          MR. LIGUORI:  I agree completely.  What

11   I'm saying is I didn't -- I hope the Court is not

12   saying it's denied because I rested my case.  I

13   would have raised it up sooner, but I thought I

14   mentioned to the Court --

15          THE COURT:  I am denying it not because

16   you rested your case, I am denying it because it

17   was not made pre-trial and the information was

18   fully available.

19          MR. LIGUORI:  I agree, Your Honor, it

20   could have been explored previously.  It just came

21   out to me, and I just thought out of the abundance

22   of caution to bring it to the attention of the

23   Court.

```
 1              THE COURT:  I appreciate what you are
 2    saying.  All right.
 3              Now, what we will do is we will adjourn
 4    into chambers.  Do you all want to close on Monday
 5    morning?
 6              MR. LIGUORI:  Yes.  Absolutely, please.
 7              THE COURT:  All right.
 8              MR. ADKINS:  Yes.
 9              THE COURT:  Then I will send the jury
10    home.
11              MR. ADKINS:  As a result of this, we're
12    not having any type of hearing because it's more of
13    the nature of a motion to suppress, and, therefore,
14    not anymore argument on whether Your Honor will
15    give the instruction about the felony arrest?
16              THE COURT:  No.  I am going to give that,
17    a police officer may arrest a person for a felony
18    without an arrest warrant.  I am going to give
19    that.
20              MR. ADKINS:  So we don't have any factual
21    hearing about that anymore?
22              THE COURT:  No, we are not hearing about
23    that.
```

1          MR. ADKINS:  May I approach?

2          THE COURT:  Yes.

3          (Whereupon, counsel approached the bench

4     and the following proceedings were had:)

5          THE COURT:  Your objection is?

6          MR. ADKINS:  I hope I am not wrong about

7     this, but the last time I read the arrest section,

8     which I think Your Honor may be looking for, you do not

9     have to have a warrant to arrest for a felony, even if

10    it is out of the presence.  Mr. Liguori keeps talking

11    about --

12          (Whereupon, the Bailiff approached the

13     bench and had a conference with the Court.)

14          THE COURT:  All right, take them out.

15          (Whereupon, the jury returned to the jury

16     room.)

17          MR. ADKINS:  Mr. Liguori keeps talking like

18    if you are arrested, you have to have a warrant.  I

19    want the jury instructed that it is not.  We heard that

20    enough as a negative like he did something wrong, and

21    he didn't.

22          THE COURT:  The perception I am getting is

23    that you are being critical of him as in the finger-

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 169

1   prints, and this, that, and the other, because he

2   didn't have a warrant.

3        MR. LIGUORI:  No, I am showing, as I said in

4   my opening, that he rushed to judgment.  That's what I

5   am saying.  I do not even want to do it

6   chronologically.  You can make a curative instruction,

7   but I think, respectfully, that I am allowed to ask.

8        THE COURT:  You are allowed to ask.  I just

9   want the jury to know that --

10        MR. LIGUORI:  I respectfully submit that I

11   think if the felony is not committed in your presence,

12   you need to have probable cause.

13        THE COURT:  "An arrest by a peace officer

14   without a warrant for a felony, whether committed

15   within or without the State, is lawful whenever the

16   officer has reasonable ground to believe the person to

17   be arrested has committed a felony, whether or not a

18   felony has, in fact, been committed."  There is nothing

19   about "in his presence" there.

20        "Or a felony has been committed by the

21   person to be arrested, although before making the

22   arrest, the officer had no reasonable ground to believe

23   the person committed it."  That's, I presume, when he

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A-170

1           MR. LIGUORI:  Payton v. New York.

2           THE COURT:  He was invited in the house.

3    They didn't storm through the house.  They were given

4    consent.

5           THE COURT:  I will let you look at Payton v.

6    New York.

7           MR. ADKINS:  Mr. Morris asked them to come in

8    and speak to Danny Davis because he was told Danny

9    Davis was there.

10           THE COURT:  What I am saying is I am still

11    leaning toward giving the curative, but I am going to

12    let him do research.

13           (Whereupon, counsel returned to the trial

14        table and the following proceedings were had:)

15           THE COURT:  All right.

16           THE BAILIFF:  The defendant had to use the

17    bathroom.

18           THE COURT:  You want me to take a break?

19           (Whereupon, a brief recess was taken.)

20           MR. ADKINS:  With regard to scheduling,

21    Dr. Saliba has arrived.  I arranged for him to be here

22    at 2:00.  He does have a very busy schedule.  I would

23    ask the Court to have him sandwiched in.

IN THE SUPREME COURT OF THE

STATE OF DELAWARE

NO. 21, 2003

ALONZO W. MORRIS, JR.

Defendant Below,
Appellant

V.

STATE OF DELAWARE

Plaintiff Below,
Appellee.

FILED:

ALONZO W. MORRIS JR.
PO. BOX 500 S.C.I.
Georgetown, DE. 19947
S.B.I.# 263971

PRO-SE DEFENDANT Below,
Appellant

A 173

## TABLE OF CONTENTS

TABLE OF CONTENTS ......................................... ii

TABLE OF CITATIONS ....................................... iv

NATURE OF PROCEEDINGS .................................... 1

SUMMARY OF ARGUMENTS ..................................... 3

ARGUMENT ................................................. 14

1.) THE TRIAL COURT ABUSED ITS DISCRETION BY ALLOWING THE
STATE TO PROSECUTE MORRIS IN VIOLATION OF DOUBLE JEOPARDY
CLAUSE PROTECTIONS.

A.) SCOPE OF REVIEW

B.) MERITS OF ARGUMENT ................................. 14

2.) THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING MORRIS'
MOTION TO DISMISS INDICTMENT.

A.) SCOPE OF REVIEW

B.) MREIT OF ARGUMENT...................................... 18

3.) THE TRIAL COURT ABUSED ITS DISCRETION WHEN OVER OBJECTION
IT FAILED TO PROTECT MORRIS' 4th AMENDMENT RIGHTS.

A.) SCOPE OF REVIEW

B.) MERIT OF ARGUMENT .................................. 23

4.) THE STATE USED KNOWN PERJURIED EVIDENCE TO OBTAIN MORRIS'
CONVICTION.

A.) SCOPE OF REVIEW

B.) MERIT OF ARGUMENT .................................. 33

TABLE OF CITATIONS

## CASES CITED

MORRIS V. STATE 795 A2d.653 ( DEL.SUPR. 2002 )

DONNELLY V. DeChistoforo 416 U.S. 637, 648, 94 S.Ct. 1874

BERGER V. UNITED STATES 295 U.S. 78,88, 55 S.Ct. 629, 633

BROKENBROUGH V. STATE 522 A2d. 864   (DEL. SUPR. )

PAYTON V. NEW YORK 445 U.S. 573, 100 S.Ct. 1371

WOODY V. STATE 765 A2d. 1262 ( DEL. SUPR. )

WONG SUN V. UNITED STATES 371 U.S. 479, 83 S.Ct. 412

ILLINOIS V. GATES   426 U.S. 213 ,231 , 103 S.Ct. 2317

THOMPSON V. STATE 539 A2d. 1055 ( DEL. SUPR. )

WHITELEY V. WARDEN WYOMING STATE PENITENTIARY 401 U.S. 1031,1035, 91 S.Ct.,
1031.

LAVAN V. STATE 10 F. SUPP. 2d. 384

U.S. V. LONG HUANG YOU 198 F. SUPP.2d. 393

UNITED STATES V. GLOVER 957 F2d. 1004

UNITED STATES V. CHAVEZ- VILLARREAL 3 F3d. 127

DU BOSE V. LEFEVRE V. 619 F.2d. 973

BURKS V. EGELER 512 F.2d. 221, 230

FRANKS V. DELAWARE   438 U.S. 154 , 98 S.Ct. 2674

QUARLES V. STATE 696 A2d. 1334

UNITED STATES V. BASURTO 497 F.2d. 781

STIRONE V. UNITED STATES 361 U.S. 212, 80 S.Ct. 270

UNITED STATES V.  SERUTO 609 F.2d. 807

A 175

## NATURE OF PROCEEDINGS

On March 28th,2002 this Honorable Court over turned Appellant

Morris' first conviction for "JUDICAL ABUSE OF DISCRETION and

PROSECUTORIAL MISCONDUCT." Appellant filed a Motion to Dismiss

under Superior Court Rule 12 (b), based apon the assertation

that there were material defects in the institution of prosecu-

tion perjured evidence used to obtain the Indictment.Appellant

Morris also claimed Double Jeopardy,due purposeful misconduct

injected into the initial trial.Evidentary hearings were held

on 9-6-02 in the Superior Court,Sussex County before Judge T.

Henely Graves.Both motions were denied and trial began on 11-19

2002.Morris was found guilty of all charges and sentenced to

33years 6 months level 5. this appeal followed.

1

## SUMMARY OF ARGUMENT

1.) The state violated Morris' protections afforded by this Courts
under Delaware independent interpretation of the Double Jeopardy
Clause. ( DEL . CONST. ART. 1 SEC. 8 )

2.) The trial court abused it's discretion by allowing the state to use
known false testimony to obtain the grand jury indictment.

UNITED STATES V. BASURTO 497 F.2d. 781

3.) The trial court abused it's discretion when over objection it
allowed the state to violate Morris's 4th , 5th, & 14th amendment
right's . PAYTON V. NEW YORK 445 U.S. 573, 100 S.Ct. 1371

4.) The state used false evidence to obtain a conviction.

NAPUE V. ILLINOIS 360 U.S at 269 ; GILES V. MARYLAND supra, at 74,

$K17$

STATEMENT OF FACTS

On March 28th,2002 the Supreme Court reversed appellant Morris'
conviction of Assault 1st and Possession of a Deadly Weapon
During the Commission of a Felony. Morris' attorney filed two
motions,Double Jeopardy and Dismissal of the Indictment due to
Perjurious testimony used to secure indictment. This hearing
was held on September 6th,2002 in the Superior Court Sussex
County before the Honorable T. Henley Graves. Three witnesses
testified,James Adkins Deputy Attorney General,Daniel Davis and
Michael Barlow of the Georgetown Police Department.Adkins was
the first to testify in regard to the improper statements made
by him during appellant Morris' first trial. On direct Adkins
states he has been an attorney since 1978 and Cheif Prosecutor
for Sussex County since 1990. Adkins states that recalls seminars
and memo's presented in regard to prosecutorial misconduct
and "Hughes" "never to call the witness a liar"(see Sept.6th
2002-hearing transcript pages 6 thru 9) Adkins believes his
statements were poor judgement and in artful. Adkins states"What
I was trying to do was argue during that portion of my closing
the credibility of these facts were not simply amazing coincid-
ences,"and that"the jury judge the credibility of these witnesses
and come to the conclusion that all of this really added up to
proof beyond a reasonable doubt"(Sept.6th transcript at pages
9 to 11)Adkins"adamantly disagree's"with this court's ruling
that his comments were egregious and patently improper. He states
that Fensterer was different in his opinon then the remarks during
closing arguements in this case.

A 178

3

Adkins states at page 15 that indenty was a big part of the case.
Attorney for the appellant asked Adkins"and you had no doubt
about this case before you presented it to the Grand Jury?"
(page 17 & 18 Sept.6th,2002 transcript of Evidentary Hearing)
Adkins states that Bynum was not a witness prior to or during
Grand Jury proceedings. Adkins testifes that four months after
the incident(assault),there had been no identification procedure.
"We weren't calling x,yand z to the stand knowing that they had
already identified a person in a photo line-up.I(Adkins)didn't
have a clue as to what they were going to say"(see pg.31,32 of
Sept.6th Hearing Transcript) Adkins states"I felt confident two
witnesses were going to identify the defendent,James Bynum and
the victim James Bibbins.(at pg 34)Adkins was questioned concerning
Bibbins failed in court identification and Adkins ablity to convict
Morris during the first trial(pg 39 Evidentary Hearing Transcript
Sept.6th 2002)Adkins states"At that moment, "absolutely"he was
concerned that he would not be able to convict Morris."So at some
point,that's right,I didn't know."Attorney for the defendent asks
Adkins"and who presented this case to the Grand Jury?"Adkins
responded,"Well I certainly didn't,and I wasn't present,It would
have to be a Georgetown Police Officer,but I don't know that I
really know for sure first hand who the officer was."(see pg 55
& 56 of the Evidentary Hearing Transcript Sept.6th,2002)Adkins
faxed the subpeona to the Gerogetown P.d., also signed the true
bill of indictment on the day of the Grand Jury Proceeding.

   The next witness to testify at the Sept.6th,2002 regarding
perjurious evidence presented before the Grand Jury was Detective
Daniel Davis of the Georgetown Police Department.(pg.74 of Hearing
on Sept.6th,2002)Ayvazian, attorney for the state argues that,

ᄂ                                                                    A 179

"the issues were raised at triali,both during trial: and afterword in a motion to dismiss the indictment.She states"It was never ruled upon."(pg 75 to 78)Attorney for the defense agrued the illegality of the states use of perjurious evidence before Grand Jury to obtain an indictment against the accused which initiated the trial process.,based upon the fact that evidence in the warrant affadavit and Preliminary Hearing were false this was used and violated Morris' rights.(at pg 77 to 80)

Davis testifed that he prepared the warrant affadavit and summarized what the victims statement was.(at 82,83)Attorney for the defense asks"and you go into the Grand Jury armed with what?" Davis replies,"Probable cause sheet and crime report."(84 to 85) Davis states he didn't remember testifying before the Grand Jury. By request of James Adkins,Davis was the only person subpeonaed by the state to testify before the Grand Jury on Nov.15,1999.

Officer Michel Barlow was the last witness to testify at this evidentary hearing, he states he was first at the scene on Nov 1st. Barlow was asked if he presented the information before the Grand Jury,he responded,"I didn't."(at pg 86 & 87)Barlow was questioned about testifying at preliminary hearing concerning identifying the assailaint by photo line-up.Barlow states it was his bielf that there was a photo line-up done. He and Davis discussed this information prior to testifying on November 4th,1999.(at pg 89)

The Honorable Judge T. Henley Graves ruled that the defendent Alonzo W. Morris Jr. failed to prove that the state used perjurious evidence to obtain a Grand Jury indictment and also failed to prove that Deputy Attorney General James Adkins intentionally injected error into Morris' trial,warranting sua sponte intervention by Superior Court Judge Richard Stokes in absence of defense counsels failure to object.

A 180

$\varsigma$

On November 12th,2002 Morris' trail began,the state presented eleven witnesses. The victim James Bibbins was the first to testify. Bibbins testified that at around 7:35 am on November 1st he was riding his bike to work.At the time he encountered a person he identifies as J.R. Copes.(Trial)Transcript pg A-65 to 67)James Adkins Deputy Attorney General asked Bibbins,"Do you know Georgie Swan,"Bibbins responded"yes!" Adkins asks"Did you tell her what this was about?"Bibbins answers, "No,I didn't tellher what it was about."(at a-72,73)Bibbin states"She asked me what happened. I told her a guy hit me and his name is Junior Copes."Bibbins goes on to explain why he believes this happen and can only guess. (at A-74)"That's why he said I disrespected him,I guess." Adkins concluded his direct examination and asked to approach the bench concerning"establishing some foundation for 3507 lane to Georgie McCrea"Attorney for the defense opts to cross examine Bibbins. Bibbins remembers speaking to the police officer,Bibbins states "I said a man hit me named Junior Copes"(at A-87)Attorney for the defense says,"My question to you is:Did you use the name Alonzo Morris?" Bibbins responds"No I used Junior Copes"(at A-88) Bibbins states he was not living with Middleton at the time of the alledged phone call and the call happened October 1st,1999. (at A-90)Bibbins states that one month prior to the assault a phone confrontation occurs between him and Morris at Middleton's apartment Bibbins never spoke with any one on the phone that day. Middleton testifies she didn't live in Dunbanton on October 1st 1999.(at A-137)

Bibbins identifies Morris during cross examination,Bibbins states Morris was the person who struck him on November 1st,1999 at (A-91)Bibbins admitts he was unable to identify Morris in March of 2000.at(A-92)Bibbins states that"Gerald"lived with Lenona

6

$A\ 181$

Middleton (at A-93) When asked was his recollection better closer to the incident or

better today? Bibbins responds, "It's better today." (at A-95) Bibbins recalls speaking

with an officer while at the Washington DC Hospital, in November of 1999. (at A-97)

Attorney for the defense asks" Did you then indicate to the police officer that you didn't

know why this incident occurred? "Bibbins states "Yeah, I guess I told him that, but then

they operated on my head. There were a lot of things I probably couldn't even

remember."(at A-105) Georgie McCrea was the second witness to testify. She states that

on November 1st, 1999 while going to work she abserved a black male running fast (at A-

112) Adkins asks McCrea, "Did you see his face well enough to ever recognize him

again? McCrea says NO!" McCrea states, "I asked him why did he do this or what for.
He

said it was about Lenora" (at A-114) Bibbins states he never told McCrea why it occurred

after being asked repeatedly (A-72, A-73, A-93) McCrea states Bibbins told her J.R. did

it (A-117) when asked to describe the person she saw run by her that day, McCrea

responded "All I know it was a black man. That's all " (at A-119) McCrea states she has

never been in the company of Alonzo Morris (at A120 McCrea states "I couldn't

understand whether he was saying Gerald, I thought he was saying Gerald. "(at A-123)

McCrea states she doesn't know the defendant and has never seen him before (A-124)

  In late 1998, Lenora Middleton was the girlfriend of J.R. Morris. Middleton testifies

that she lived at Dunbarton Apartment up until 1998 (A-129 Middleton states when told

investigator John Perry she couldn't recall the date of the phone call between Morris and

Bibbins (A-134to136) Middleton states that in October 1999 she didn't live in

Georgetown one month prior to the assault.

7

(A-137,138)Middleton admitts she is a crack cocaine addict,diagnosed manic depression with suicidal tendenices(A-134)James Bynum and Ineshia Mitchell identify Morris at trial.Bynum states he was awaiting Mitchells arrival the morning of the assault(A-176)Bynum states he saw Morris and Bibbins arguing then Morris hit Bibbins(A-177,178)Bynum states Morris looked directly at he and Mitchell as Morris ran by(A-189)Bynum states Morris wore a green army jacket(A-186)Mitchell testifies while walking to 405 N.Race St. she saw Morris coming from Douglas St. going to Race St.(B-21) Mitchell states J.R. jogged past us,he wasn't running or anything (B-22)Mitchell states here were not vans or people standing around down the street.Mitchell states the street was clear accept for Bibbins and Morris(b-25)[1]Mitchell testifies Morris throwing the p.v.c. pipe behind the police station in the zoning and planning area(B 28,29)[2]Mitchell didn't contact authorities until October 2002.Richard Hughes identifies Morris as the assailant.(B-43)hughes states "we were standing out in the road loading trucks."Hughes recalls seeing two guys twenty to thirty feet infront of him,in the middle of the road arguing.Hughes states he witness the victim get hit.(B-41)Hughes states Morris dropped the pipe by the curb(b-42)Hughes states he didn't recall making a statement to police prior to November 3rd,1999(B-44)Hughes states Morris ran straight

---

1.Bynum states Harvey's plumbing men where standing around down the street.(at A-177)also see Rich Hughes testimony at B-40

2.Hughes states the assailant dropped the pipe in the road by the curb(b-42)also see Det.Davis testimony at(B-91)

8

by him and made a right(B-45)Hughes was never shown a photo lineup
of suspects(B-46)Hughes recalls Bibbins stating he knew who the
man was who struck him."He(Bibbins)said that his girlfriend,the
guys girlfriend,was living with him and he was mad,or something,
because she wouldn't let him over to his house."(B-50)Hughes didn't
mention a phone call or anyone named Nora.Hughes states it wasn't
speifically his recolletion of events which prompted the totality
of the events that occured but collectivelly the conversation
concerning these wants as remembered by other person he spoke
with about the incident.(B-51)Daniel Davis of the Georgetown
Police Department states he was at a homicide conference at Polytech.
8:00am on November 1st,1999 officer Barlow from the Georgetown
Police Department called him about this case(B-57)Davis estimates
the distance from Townsends to Morris's Douglas St. home"walking"
would take a minute(B-69)Davis used Georgie McCrea's testimony
concerning her version of events which contradicts his estimates
and distances(B-67,70&71)Davis testifies Morris goes by two
names J.R. Copes and J.R. Morris(B-74)Davis arrested Morris at
14:00 hours,2 o'clock in the afternoon 11-1-99.Davis states he
testifed in March of 2000 and never mentioned fuming the pipe
(B77 to 79)Davis states he arrested Morris without a warrant
(B-93)Davis was asked for a photogragh of the defendant taken
the day of the assault.(B-95)Davis states"retrieving that photo-
graph is minute"Barlow states that the warrant affadavit used
to justify the warrantless arrest of Morris was incorrect.Davis
admitts presenting a document that had inconsistances in it to
obtain a warrant(B-95 to 99)Davis states he identified the assailant
(B101 to102)Davis admitts Barlow didn't give information that
Alonzo Morris was the attacker,Davis states"HE(Barlow)asked

$A 184$

9

me if I knew either a Jerrold or J.R. Copes and I said YES I do.
(B103)Davis states,he generalized the identity of the attcker(B101)
Davis didn't speak with the victim prior to arrest of Morris
non after arrest on 11-1-99(B102 to 104)

Dr.An'is Saliba and Dr.Carl Maschauer testify as to Bibbins
medical condition.Saliba testimony contradicts Davis's in that
Saliba read's a nurse's note written on November 1st,1999 at 10:50am
Bibbins speech was clear(B127,127)Dr.Maschauer testifies as to
Bibbins vision(B147)Maschauer states that Bibbins best corrective
vision is his right eye was 20/50 and in the left eye sight in
the remaining left eye is worse(B144)Maschauer testifies that
Bibbins best corrective vision in his left eye is 20/40(B143)
Bibbins absolutely blind in his right eye(b144)Maschauer states
Bibbins has a drivers license and Delaware law allows a person
that has 20/50 visual active to obtain driving license(B147)
Medical records given under rule 16 motion for Discovery state
Bibbin visual activity in his left eye.The only eye with which
he is able to see is 20/70 leaving him legaly blind(B147)

Officer Mike Barlow was the first witness to testify for
the defense.(B148)Barlow states he was in the presence on November
1st,1999(B153,154)Barlow states he contacted Davis that morning
after Beebe Medical Center contacted Barlow concerning Bibbins
condition(B155)Barlow states he pick up a four foot white P.V.C
pipe at the scene of the crime(B157) Barlow states"I was going
to retain it for possible future forensic processing(B158)Barlow
had no idea finger prints were taken(B158)Barlow doesn't recall
dicussing with Davis anything concerning finger prints,yet does
recall testifying at preliminary hearing on November 4th,three
days after this incident(B158)Barlow doesn't recall who he spoke
with concerning finger print analysis of the pipe but was confronted

with his prior testimony during the Preliminary Hearing(B158,159)
Barlow states he responded to the scene at 7:47am and questioned
the victim concerning the assault(B160)Barlow states the victim
said that"he had been hit by a man that he originally thought
he was calling Jerrold Copes"(B161)later he found out that he
was incorrect.But at the time of the inital response to the crime
scene he believed the victim said Jerrold Copes(B162)Later Barlow
was contacted by a female witness(Georgie Swan)who gave him this
information.Barlow never know Morris to be known as J.R. Copes
B(162)Due to Bibbins vernacular Barlow believed Jerrold Copes
was the assailant(B162 to 164)Barlow represents that his inital
report was written prior to Morris arrest.Barlow states two witness
were spoken to at the scene of the crime.(B165&1179)Barlow spoke
with all the witnesses(Berner,Hughesand Faulkner)on November 3rd
1999 one day prior to the preliminary Hearing(B167)Barlow states
he didn't have any inforamtion that four witnesses identify Morris
by photo line-up prior to that hearing(B168)Barlow didn't recall
what Morris wore on the day of the arrest(B169,170)Barlow states
he didn't do any investigation of this case after November 1st,1999
(B171)Barlow state at the time he spoke with Morris the morning
of the assault after clearing the crime scene,after speaking
with the victim,ten to twenty minutes after receiving inforamtion
that the assailant was Jerrold.He had no inforamtion that it was
J.R. or any Copes or connection to Alonzo Morris JR.(B181)

     Russell Monatt finger print section supervisor for the state
Bureau of Identification testified as an expert witness for the
defense(C14,15)Mcnatt states he has prior experience in expert
testimony in ala courts in the state of Delaware(C17)Mcnatt
states the pipe was able to pick up finger prints.Mcnatt testifies

This surface is a hard, non-porous surface of which a fingerprint should be able to be lifted from that surface. (C17&25)

Matthew Esterson a witness from Harvey's Plumbing testifies "One of the employees at Harvey's Plumbing had run into the office" "I walked outside to see what was happening." "I notice a man on a bicycle that was trying in the street and a man jog past the office at the same point as I was walking out." (C28) Esterson state Rick Hughes ran into the office and called 911 (C35) Sergeant Ronald Brock of the Department of Corrections testify he was working overtime for the transportation division. (C39) at 8:10 or 8:15am Brock went to High's Dairy and observed Morris walking (C40, 41) Brock

states that on November 1st, 1999 he witnessed Morris waking toward Market Street (C42-45) Kathy Stevens testifies that her and Morris Spent the night together at her apartment (Georgetown Apartments) on 10-31-99. (C47 Stevens states that her and Morris got out of bed at about 6 or 6:15am on 11-1-99 dressed then began to walk to High's store (C47, 48) Stevens testifies that on the morning of 11-1-99 Morris wore blue jeans and a black, orange, yellow and while t-shirt. (C47, 48 after leaving the store she recalls Morris contacting his father (C48) then returning to her apartment. Steven and Morris discuss avoiding conflict with Stevens mother and Morris tells he will wait for her at the Georgetown Post Office (C48, 49) Stevens states she watched Morris exit the back door then tells him her mother pulled up (C49) Stevens states she witnessed Morris walk to Douglas Street about 10 or 15 feet in front of her (C50, 53,56) Stevens states she recalls

no police or crowds on Race Street when her, Alonzo and their son walk down the street

**12**

A 187

(C53) Stevens testifies that she is certain Alonzo was at the Post office between 8:10 or

8:20 am (C53) on 11-1-99.  Marcella Wilson-Williams, grandmother of the defendant

(C77) testifies that between 7:15 and 7:30am on November 1st, 1999

Morris called her (C78).  Eric Mooney an attorney the defense used to read prior

testimony of Ronald Higgins was presented before the court.  (C-81, 82) as explained in

the following arguments, the state violated Morris's 4th, 5th and 14th Amendment Rights

also by re-trying Morris this court should rule Double Jeopardy Provisions protect Morris

from intentional egregious misconduct by prosecutor del. Const. Art. 1 Sec 8.

A/89

ARGUMENT

## I. TRIAL COURT ABUSED ITS DISCRETION BY ALLOWING THE STATE TO PROSECUTE MORRIS IN VIOLATION OF DOUBLE JEOPARDY CLAUSE PROTECTIONS.

### A. SCOPE OF REVIEW

Trial counsel filed a timely motion under rule 12 to dismiss the charges against Morris under Del. Const. Art. 1 Sec 8 "(No person shall be for the same offense twice put in jeopardy of life or limb)." This courts standard of review is abuse of discretion.

### B. MERITS OF ARGUMENT

The trial court abused its discretion by denying appellant's motion to dismiss based on double jeopardy clause provisions. Appellant's argument is that prosecutorial misconduct throughout preliminary proceeding and trial must be viewed in accessing the merits of this issue.

On March 28th, 2002 this court ruled that "In this case we reaffirm the principle that it is improper for prosecutors to argue that the jury may acquit the defendant only if the jury finds that the states witnesses are lying." Morris v. State 795 A.2d 653 (Del. 2002). Trial Judge Henley T. Graves ruled that: "In summary, the defendant has control of whether or not he seeks a mistrial as opposed to going to verdict and seeking a not guilty verdict." (Memorandum opinion Honorable Judge Graves at page 4, dated October 16th, 2002)

"the defense if presumed to be in control of its destiny. By not electing to apply for a

**14**

A-190

mistrial, the defense made a decision to take the case to verdict, but the defense also

knew that if convicted, there would be grounds to seek a reversal on appeal."

"Without a mistrial or mistrial application, this can be said to be much to do about

nothing." (Memorandum Opinion - Honorable Judge Graves at page 8, dated October

16th, 2002).

The trial Judge is bias and totally over looked the actual intent of the "Double

Jeopardy Clause" which must be afforded to all criminal defendant's.  This court held

that prosecutorial misconduct, (Egregious misconduct) was plain error warranting

reversal of defendant Morris conviction and that the trial court committed plain error

by failing to intervene sua sponte and take appropriate action to cure the effect of this

patently improper prosecutorial argument.

Judge Graves clearly overlooks the responsibility of the prosecutor to refrain from

violating clearly established laws.  More importantly the responsibility of the court to

maintain the orderly administration of justice, preserving the only guarantee a criminal

defendant must have, "a right to a fair trial."

Deputy Attorney General Adkins challenged the integrity of the trial court egregious

Prosecutorial Misconduct, which shifts the burden of proof, is an independent act,

violating the very sanctity of the court.  A criminal defendant cannot be held

responsible for an independent act of blatant disregard for well-established law.

**15**

A-19(

The trial court omits the duty of it's prosecutor's to act responsibility in it's ruling by requiring a criminal defendant in insure state officials upheld the integrity of there official functions. A duty inherent to a prosecutor is to protect the rights of the people as well as prosecute criminals.

Judge Graves ruled that he found burden shifting comments in the opening statements concerning the standard of proof. Other than that, he found the remaining State's actions argued by the defense to have been appropriate, when considered in the context of what was happening at that particular time in trial.

(Memorandum Opinion Judge Graves Page 9)

The court ruled that the State did not intentionally attempt to cause a mistrial and this appellant agrees. James Adkins did not intentionally attempt to cause a mistrial, but Adkins "despotic" actions proves that prosecutor's have "auto cratic" influence which render a criminal defendant due process provisions null in void.

Justice Douglas in his dissenting opinion held: The function of the prosecutor under the Federal Constitution is not to take as many skins of victims as possible to the wall. His function is to vindicate the right of people as expressed in the laws and give those accused of crime a fair trial.

(Donnelly v. De Chistoforo)

416 US 637, 648, 94 SCt 1874

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a

**16**

criminal prosecution is not that it shall win a case but that justice is done.  It is as
much his duty to refrain from improper methods calculated to produce a wrongful
conviction as it is to use every legitimate means to bring about a just one.

Berger v. United States,

295 US 78, 88, 55 sct. 629, 633

In Broken Brough, this court held: "(a) repetition of the same type or category of
errors, adversely affect the integrity of the judicial process.

Broken Brough v. State Del. Supreme 522 A2d. 864

The issue in this case must not be limited to the defense application for a mistrial or if
this court applies a broaden state standard, then that given under Oregon v. Kennedy a
defendant will seek a hearing in similar cases.  This type error, "under clearly established
law," should have never occurred.  This issue at bar is will this court draw the line by
affording a criminal defendant the protection inherent in our jurisprudence. Burden
shifting is not simply a violation but a break down in the judicial process as a whole.
Denial of a defendants right to be proven guilty beyond a reasonable doubt basically
renders the right to elect a trial by jury and a criminal defendant's right not be required to
prove him innocent, to no avail.  The retrial of a defendant in cases where the
prosecutor's actions undermine the integrity of the judicial process by denying the very
principle for which a criminal defendant may elect to stand trial must not be tolerated.  To
rule that Delaware's "Double Jeopardy Clause" does not protect a criminal defendant
against this type of error is plainly stating that prosecutor's have the freedom to violate
the very essence of our civil liberties.

<strong>17</strong>

A195

II. TRIAL COURT ABUSED ITS DISCRETION BY DENYING DEFENDANTS
    MOTION UNDER SUPERIOR COURT RULE 12(B), TO DISMISS AN
    INDICTMENT BASED ON PERJURED EVIDENCE.

A. SCOPE OF REVIEW

Trial Counsel filed a timely motion to dismiss the indictment based on the fact that
perjured testimony was used to obtain indictment. (PG 17 & 18 of Sept. 6
evidentiary hearing)

B. MERIT OF ARGUMENTS

The court abused it discretion in permitting the state to use knowingly false
evidence to obtain indictment. United States v. Basurto 497 f2d. 781. Here a clear
violation of defendants 5th Amendment rights is apparent. The Fifth Amendment
provides that "(n) o person shall be held to answer for a capitol, or other wise
infamous crime, unless on present no or indictment of a Grand Jury." The purpose
of that requirement is to limit a person's jeopardy to offenses charged by a group
of his fellow citizens acting "independently" of either the prosecutor or the judge.
Stirone v United State, 361 US 212, 80 S.c.t. 270, (1960) The independent action
of

The Grand Jury was impaired by the use of perjuries testimony used to obtain the
indictment against the accursed. United States v Serubo 609 F2d. 807, 818 (3rd cir
1979). Prosecutors have on ethical obligation strictly to observe the status of the
Grand jury as an independent body (see American Bar Association, standards for
criminal justice standard 3-3.5 at 3.48 (2 ed. 1980); United States Attorney's

**18**

A-198

manual 9-11.015 (august 17, 1978)n  Delaware Rules of professional conduct rule

3.3

4. (d) In an exparte proceeding, a lawyer shall inform the tribunal of all material

facts known to the lawyer, which will enable the tribunal to make an informed

decision, whether or not the facts are adverse.

Rule 3.4 (b) A lawyer shall not falsify evidence, counsel or assist a witness to testify

falsely the merits of appellant's arguments are based upon the fact that James Adkins

knew there were not identification procedures done. (Page 31 of Evidentiary hearing

transcript date Sept 6th, 2000) Adkins states: "In this case I would think it was kind of

refreshing, because it was I think, about four months after the incident there had not been

any identification procedures, any photo line ups done."

Appellant's argument to this court is based upon sworn testimony. March of 2000

during the first trial the state purposely withheld the fact that Daniel Davis of the

Georgetown Police Department, arrested Morris without a warrant then falsified in the

warrant affidavit the statement made by the victim to the police (B-96 to 103) Davis state

"the statement on the warrant is incorrect" (B-99)" and who said Alonzo Morris?"

(Davis) Nobody did I did." So you then presented this document that had

inconsistencies in it? (Davis) "Unfortunately so, yes, sir." "Things that were not even

said were in here; correct?" (Davis) "Yes." (B-99) Bibbins never made the statement in

the warrant affidavit, justifying the warrant less arrest.

Secondly Barlow the officer who testified at preliminary hearing states there are two

ways during the investigation Morris was identified as the assailant.

**19**

A 190

A. Georgie Swan McCrea

B. Four witnesses from Harvey's Plumbing I.D. defendant via Photo line-up.

McCrea testifies on November 12th 2002

    Q) This gentleman I have my hand on his shoulder, do you know this gentleman?

    A) McCrea: "No, I don't".  (A-124)

    Q) You ever met him in your life?

    A) McCrea: "Not to my knowledge".

    Q) Ever seen him before in your life?

    A) McCrea: "Not to my knowledge". (A-124

Barlow intentionally falsified in his sworn testimony during preliminary hearing that

McCrea knew the defendant and provided them with information identifying Morris as

the assailant.  (Preliminary hearing then script at page 6 and 7)  Barlow wrote in his

police report: W-2 Georgie Swan interviewed at scene at 07:52 hrs. she stated that she

was down the street and heard a noise, which drew her attention to the victim and

defendant in the street . The victim was on the ground and the defendant was holding the

pipe. W-2 hater called to state that she knew the defendant and his last name was Morris,

"not Copes", which was the name of the woman he lived with. (see exhibit A, police

report). Barlow intentionally misrepresented the statement made by McCrea in his police

report. Having a taped statement of McCrea's observation of what she saw Barlow knew

Swan was not an eyewitness to the crime. McCrea did not witness Bibbins being hit, she

did not identify the (assailant) based on her personal observation therefore any evidence

presented by the State that McCrea was an eyewitness who identifies Morris or that she

**20**

personally knew Morris and she witnessed Morris attack Bibbins was known to be false.

McRae's misrepresented statements were used to identify the assailant. McCrea never

knew Alonzo Morris Jr, and plainly states in her trial testimony that she never met

Morris, nor has she seen Morris before in her life. (A-124). None of the evidence

presented on November 1st, 1999 in the warrant affidavit was true concerning Bibbins

statement made to police justifying the warrant less arrest of Morris. None of the

evidence presented on November 4th, 1999 during the preliminary hearing was true

concerning the eyewitness identifications. McCrea never actually knew Morris and never

witnessed the assault and the four witnesses from Harvey's Plumbing never identified

Morris via photo line-up. There was no evidence of any eyewitness identifying Morris in

this assault and the state based on false representations of a material fact "(identification)"

obtained a grand jury indictment. Chief prosecutor Adkins had a duty to notify the court

and opposing counsel that the information presented in both proceedings were perjuries.

Instead Adkins condoned this miscarriage of justice and obtained an indictment based on

know false evidence. United States v. Basurto 497 F2d. 781 today the grand jury relies

upon the prosecutor to initiate and prepare criminal cases and investigates which comes

before it. (at 785) Adkins testifies he was not present during the grand jury proceedings

and did not know first hand who the officer was who presented the evidence testimony is

material, and when jeopardy has not attached. Whenever the prosecutor learns of any

perjury committed before the grand jury, he is under a duty to immediately inform the

court and opposing counsel and if the perjury may be material also the grand jury, in

order that the appropriate action may be taken. Basurto 497 F2d at 785, 86. The factual

**21**



misstatements in both government agents testimony were material, necessary to a finding of probable cause to initiate a warrant and binding Morris over for a grand jury indictment. Morris was prejudiced by the misstatements of material facts. "Deliberate introduction of perjured testimony is perhaps the most flagrant example of misconduct". United States v. Hogan 712 F2d 762. Morris due process rights were violated under clear Delaware Constitutional statue and United States Constitutional laws governing the use of known perjured testimony to obtain the grand jury indictment.

**22**

A-198

III. THE TRIAL COURT ABUSED ITS DISCRETION WHEN OVER OBJECTION IT
FAILED TO PROTECT DEFENDANT'S 4TH AMENDMENT RIGHT TO BE
FREE FROM UNREASONABLE SEARCH AND SEIZURES.

A.) SCOPE OF REVIEW

Trial counsel objected to the arrest of appellant Morris on the grounds that it was

illegal. (without probable cause). Detective Davis of the Georgetown Police

Department warrant less arrest was based on information known to be false by

affiant in the warrant affidavit, justifying the warrant less arrest.

The trial court ruled that appellant waived his rights to suppression of the evidence and

ruled that Payton v. New York 445 US 573, 100 SCt. 1371 was applicable in that appellant

consented to Detective Davis warrant less arrest and intrusion into Morris's home.

B). MERITS OF ARGUMENTS

The trial court abused tis discretion in permitting the state to violate clearly

established laws governing the rights of the people to be free from unreasonable

search and seizures.

(Del. Const. Art. 1, Sec. 6 & U.S.C.A. 4, 5, 14) Appellate Court may not accept police

officer's conclusion that probable cause for arrest existed without opportunity to examine

in detail the grounds upon which he reached that conclusion. Garner v. State Del. Supr.

314 A2d 908. Generally law enforcement officers may arrest an individual only if the

seizure is supported by probable cause. Woody v. State Del. Supr. 765 A2d 1262 (2001).

The Delaware statute, which authorized warrant less arrests, requires "reasonable grounds

to believe" the person to be arrested has committed a felony. (11 Del. C. sec. 1904 (b)

**23**

A499

(1). When an arrest is made without a warrant, the requirements to satisfy a determination of probable cause must be at least equal to those where an arrest warrant is obtained. Thompson v. State Del. Supr. 539 A2d. 1055, citing Wong Sun v. united Stated 371 U.S. a5 479, 83 S.C.T. at 412. The factual basis for the warrant less arrest must be disclosed to the court when the basis for the arrest is challenged. Id at 1056. Appellant argues that Detective Daniel Davis of the Georgetown P.D. lacked probable cause to make the warrant less arrest and the trial court abused it's discretion by ruling Davis entered Morris home consensually. Davis testified that Morris was arrested without a warrant (B91, 92)

Q) exactly what time did you become the chief investigating officer in the case? (Davis) "I was at the homicide conference. I received a phone call. I couldn't give you an exact time. It was 8:00 or 8:30 in the morning".

Q) When did you prepare your warrant for Alonzo Morris in your case? (Davis)"I couldn't give you an exact time.

- Q) For purposes right now, Detective, you agree with me that you obviously had To prepare the warrant before 2 o'clock in the afternoon? (B 92, 93) (Davis) "I am guessing".

- Q) Are you telling me you arrested my client without a warrant? (Davis) "Yes Sir".

Q) Did you arrest him? (Davis) "I placed him in custody, yes, sir".

Q) Where did you find him? (Davis) "At, I believe his grandmothers house".

**24**

A 200

The record is plain; Detective Davis arrested Morris without a warrant. Davis then
testifies that the warrant affidavit is incorrect (B96-99)

    Q)  Did Mr. Bibbins stay at the scene that the argument was over Mr. Bibbins
        Making a phone call to Mr. Morris's girlfriend.

    Q)  It's wrong, isn't it? (Davis) The statement was incorrect on the warrant.

    Q)  And who said Alonzo Morris? (Davis) "Nobody did, I did".

    Q)  So you then presented this document that had inconsistencies in it? (Davis)
"Unfortunately so, Yes Sir".

    Q) Things that were not even said were in here; correct? (Davis) "Yes. (B100)
Bibbins never made the statement used by Davis to obtain a warrant for Morris arrest.
Long before the law of probabilities was articulated as such practical people formulated
certain common sense conclusions about human behavior jurors as fact finders are
permitted to do the same and so are law enforcement officers the evidence thus collected
must be seen and weighed not in terms of library analysis by scholars but as understood
by those versed in field of law enforcement. Illinois v. Crates 462 U.S./ 213, 231, 103
S.C.t. 2317. This court held: rumor, suspicion or even "strong reason to suspect" has
never been adequate in American legal history to support a warrant for arrest. A fortior
mere suspicion cannot support a warrant less arrest. Thompson v State Del. Supr.
329 A2d 1055 (1988) Bibbins never identified Alonzo Morris or even communicated any
of the information presented by Davis in his warrant affidavit. Justice Harlan states: The
decisions of this court concerning fourth amendment probable cause requirements before
a warrant for either arrest or search can issue require that the judicial officer issuing such

A 281

a warrant be supplied with sufficient information to support an independent judgment that

probable cause exists for the warrant. Whitely v Warden Wyoming State Penitentiary

401 US 1031, 1035, 92 S.C.t. 1031 (1971)

The sole support for the arrest warrant issued at Detective Davis request was the

complaint, which states: upon police arrival the victim was contacted and made a

statement Mr. Bibbins (the victim) stated that he had been in a argument with Alonzo

Morris over a phone call that Mr. Bibbins make to Morris's girlfriend. The argument

became heated and Mr. Morris struck Mr. Bibbins in the head was a P.V.C. pipe.

(Warrant, affidavit of probable cause) The complaint consists of nothing more than

complaints conclusion that the individual named there in perpetrated the offense

described in the complaint. The actual basis for Davis's conclusion was an informer tip,

(Georgie Swan McCrea, who didn't witness the assault and never saw Morris in her life)

(A 123, 124) but that fact, as well as every other operative fact, is omitted from the

complaint. The state used known perjuries testimony presented by Office Barlow to

rehabilitate the testimony Detective Davis gave to secure an arrest warrant. Barlow

testifies that McCrea contacted him, giving him information that Gerald was J.R. Copes

and J. R. Copes was actually Alonzo Morris. (Preliminary Hearing transcript pg 6 & 7).

No information was given to the magistrate or at preliminary hearing that Bibbins was

initially believed to have identified the assailant as Gerald (Police report pg 2, A123, 124,

B181). Barlow States:

Q) So you were with him (Bibbins) about twelve or thirteen minutes?

(Barlow)"Approximately". Information was given to the magistrate or at preliminary

**26**

A707

hearing that Bibbins was initially believed to have identified the assailant as Gerald.
(Police report pg 2, A-123,124; B-181) Barlow states: "So you were with him (Bibbins)
about twelve or thirteen minutes? (Barlow) "Approximately.

Q) Then ten minutes later, ten to twenty minutes later you are in the presence of
my client? (Barlow) "Yes".

Q) And at the time you are in the presence of my client, you understand that it
may be J.R.? (Barlow) "No".

Q) And you have no connection with Gerald or J.R. or any copes and Alonzo
Morris, Jr.

(Barlow) "That's Correct". (B-181)

No information concerning Alonzo Morris, Jr. was given to police on November 1st
19999 from any eyewitness to the assault that Alonzo Morris, Jr. was the assailant. The
evidence presented to the magistrate and at preliminary hearing concerning the process of
identification of Morris was known to be false, yet necessary to obtain a judicial
determination of probable cause. Davis lacked probable cause to initiate a warrant less
arrest. Trial counsel argues before the court: Mr. Liguori: I respectfully submit that I
think if the felony is not committed in your presence you need to have probable cause.
The court: "An arrest by a; peace officer without a warrant for a felony, whether
committed within or without the state, is lawful whenever the officer has reasonable
ground to believe the person to be arrested has committed a felony, whether or not a
felony has in fact been committed. There is nothing about, "in his presence" there. Or a
felony has been committed by the person to be arrested, although before making the

27

arrest, the officer had no reasonable ground to believe the person committed it. That's I

presume, when he has been told to go arrest the guy. That is (b), for a felony I don't think

there is anything about "presence" in that. (B-109 to 110). Judge Graves totally ignored

the fact that Davis did not have probable cause to arrest Morris with or without a warrant.

The Court: he was invited in the house. They did not storm thought the house. They

were given consent. I will let you look at Payton v. New York. Mr. Adkins: Mr. Morris

asked them to come in a speak to Danny Davis because he was told Danny Davis was

there. (B-111). Appellant argues that police officer Detective Daniel Davis lacked

probable cause to make a warrant less arrest and trial court abused it's discretion by

ruling Davis entered Morris's home consensually. Davis testified that Morris was

arrested without a warrant (B-91, 92)

Q) Exactly what time did you become the chief investigating officer in the case?
(Davis) "I was at the homicide conference. I received a phone call. I could not hive you
an exact time. It was 8:00 or 8:30 in the morning.

Q) When did you prepare your warrant for Alonzo Morris in you case? (Davis)
"I could not give you a exact time.

Q) For purposes right now, Detective, you agree with me that you obviously had
to prepare the warrant before 2:00 in the afternoon? (B-92, 93) (Davis) "I am guessing".

Q) Are you telling me you arrested my client without a warrant? (Davis) "Yes
sir".

Q) Did you arrest him? (Davis) "I placed him in custody, yes, sir.

Q) Where did you find him? (Davis) "at, I believe his grandmothers house".

**28**

A-204

Trial counsel argues: what I wanted to explore was whether or not it was an illegal arrest in that Danny Davis, without warrant, entered the residence of Marcella Wilson Williams and arrested for a felony, Alonzo Morris. (C-83, 84).

At C-87, line 10, I will put it in context. (Morris) So I said, "Daddy, what is he talking about"? He said they want to come in and search the house. And about that time I see like 20 police officers surrounding my house. And I am like whoa, tell them to stay outside and tell Danny Davis to come in here and tell me and tell me what is going on. Now, respectfully, your honor I think that does not bade well for my argument with regard to a violation.

The court: Is this like a request to suppress, a post-trial request to suppress.

Trial counsel: Brought out now based upon the testimony, yes I would ask you to consider that:

The Fourth Amendment states: "the right of the people to be secure in their persons, houses, papers and affects against unreasonable searches and seizures, shall not be violated and no warrant shall be issued, but upon probable cause. U.S. Const. Amend. IV and Del. Const. Art 1 Sec. 6".

"The protection afforded by the Fourth Amendment's warrant requirement against official entry into private homes without prior approval by a neutral magistrate was among the significant goals of our forefathers fight for independence more then 200 years ago Lavan, 10 F. Supp. 2d at S84.

This if because "(a)t the core of the Fourth Amendment, whether in the context of a search or an arrest, is the fundamental concept that any governmental intrusion into an

**29**

A 205

individual's home... must be strictly circumscribed. Payton v. New York 445 U.S. 573, 586, 100 sct. 1371 (1980) states: Fourth amendment to United States constitution made applicable to states by Fourteenth Amendment, prohibits police from making warrant less and non consensual entry into suspect's home in order to make routine felony arrests. Whether a consent was in fact voluntary or was the product of duress or coercion, expressed or implied was never determined by the court in this case. U.S. v. Long Juang You. 198 F. Supp. 2d 393 (S.D.N.Y. 2002).

The ultimate question presented is whether "the officer had a reasonable basis for believing Morris was the person identified as the attacker"?

A consensual encounter ripens into a seizure, whether an investigative detention or an arrest, when a reasonable person under all circumstances would believe he was not free to walk away on other wise ignore the police United States v. Glover 957 f2d 1004, 1008 (2d cir. 1992) "the test is an objective one based on how a reasonable innocent would view the encounter". U.S. v. Long Huang You 198 F. Supp 2d. 396 (S.D.N.Y. 2002) The admissibility of the challenged evidence turns on a two-pronged inquiry: Whether the consent was voluntarily given and whether it was an independent act of free will. The first probe focuses on coercion, the second on casual connection with the constitutional violation. Even though voluntarily given, consent does not remove the taint of an illegal detention if it is the product of that detention and not an independent act of free will. To determine whether the casual chain was broken, we consider (1) temporal proximity of the illegal conduct and consent. (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct. The burden of admissibility rests on

**30**

n 706

the government. U.S. v. Chavez-Villarreal F3d. 127, 128 (1993) (5th cir). Knowing use by state of perjured testimony deprives defendant of due process whether prosecutor makes false statements himself or allows false statement of witness to go uncorrected, and it makes no difference that materially false testimony goes only to credibility of witness. Dubose v. Lefeure 619 F2d 973

Due process does not guard against all error in state criminal proceedings but does require that state action be consistent with fundamental principles of liberty and justice. Burks v. Egeler.5|2F2d 221, 230

The state was under an obligation to correct the false testimony, material to the arrest and indictment of the accused.

Where defendant makes a substantial preliminary showing that false statement knowingly and intentionally or with reckless disregard for the truth was included by affiant in warrant affidavit and if allegedly false statement is necessary to findings of probable cause Fourth Amendment requires that a hearing be held at defendants request.

(Franks v. Delaware 438 U.S. 154).

Despotic acts of intentional denial of appellant Morris 4th 5th and 14th Amendment rights, shows JAMES Adkins autocratic influence over Sussex County justice system.

Full scale seizure occurring when police effectuate arrest of suspect for commission of crime may only occur when police have established probable cause that suspect has committed crime. Quarles v. State Del. Supr. 696 Azd 1334.

The question presented to this court is whether the police approached defendant in such a manner that he felt compelled to yield to the officers control and if so whether the police

**31**

A 267

had an ariculable basis to suspect he was committing a crime. Quarles v. State 696 Azd 1337.

Morris saw 20 police officers surrounding his home. That fact was not considered. Morris was not free to ignore the police presence in and around his home thus any consent given was not voluntary but a direct result of massive show of police authority. The fact remains that:

1) Morris was arrested, without a warrant.

2) Taken to a magistrate and a warrant obtained based upon "known false" evidence by Officer Daniel Davis of the Georgetown Police Department.

Lacking probable cause to arrest Morris Detective Davis falsified in his affidavit of probable cause the basis for Morris warrant less arrest. The primary taint of Morris being denied liberty based on nothing more than Detective Davis's assumption was justified ex-post facto by false testimony given by officer Barlow concerning identification of Morris as the assailant.

**32**

A 208

IV. THE STATE USED KNOWN PERJURED TESTIMONY TO OBTAIN A

   CONVICTION AGAINST APPELLANT

A. SCOPE OF REVIEW

   Trial counsel did not object to the admission of testimony regarding Bibbins

   visual activity. Thus, this courts standard of review is plain error. Smith v. State

   Del. Supp., 669 A2d, 1, 6 (1995)

B. Merits of Argument

The state used perjured testimony to obtain a conviction of appellant Morris on

November 13th, 2002 Dr. Carl Maschauer testifies that he is a doctor, licensed and

practicing ophthalmology (B-142) Maschauer states: "when last seen in May of 1999, Mr.

Bibbins had a vision activity of 20/50 in the right eye and 20/40 in the left". "That would

have been with his best correction, with glasses. Maschauer states: He (Bibbins) was

seen on January 19, 2000 (B-144) James Adkins, Chief Deputy Attorney General and

prosecutor asks: did you bring the medical records with you with regard to Mr. Bibbins?

Maschauer says: "Yes".

Trial counsel asks:

   Q) Thank you for coming in. I just wanted to ask you do you know if Mr.

Bibbins has a Delaware driver's license? (Maschauer) "Yes, sir, I do. (B-146)

James Adkins tries to rehabilitate the position of the state and suborns perjury.

   Q) Adkins: You testified that (Bibbins) is blind in his right eye. Do you know of

any way that you get a drivers license when you are blind in your right eye? (B-147)

   A) Maschauer: Absolutely Delaware allows a person to be blind in one eye, and it

**33**

A 209

does not hold that against the fellow eye. All you have to do is have 20/540 visual activity in one eye in order to get a drivers license. (B-147).

Q) Adkins: Does that test check out peripheral vision?

A) Maschauer: No. That is not a requirement. Just being able to see 20/50, which Mr. Bibbins can.

The prosecutor may not knowing present false testimony and has a duty to correct testimony that he knows if false. Napue v. Illinois 360 U.S. 264, 269 790 S.C.T. 1173. The state knew by way of official documents and previous trial testimony that Bibbins best corrective visual activity in his only remaining eye (left) is 20/70.

James Adkins on March 14th, 2000 had Janus Bibbins attend the office of Dr. Maschauer testified on March 14th, 2000. (A-262) Adkins: Could you please detail for us, if you could, I guess eye doctors talk in terms of people having 20/20 vision or 20/40, whatever. Do you have anything with regard to his vision when he had two eyes prior to June 23, 1999.

Maschauer: Yes, the right eye, he had best corrective visual activity of 20/50, and the left eye, he had best corrective visual activity of 20/70. And that was with his glasses (A262) date March 14th 2002.

Adkins: And when have you had him in subsequent to that?

Maschauer: He has been in a couple of times. The most recent time that I see that we did a more comprehensive exam was January 19th, 2000. And at that time he was unable to see out of his right eye anything at all including light. His best corrective visual activity was 20/70 again same as it was in June. (A 263, 264) date March 14th, 2000.

**34**

A 210

Adkins:  did you have the opportunity to see Janis Bibbins in your office at 9:00 am this morning?

Maschauer:  Yes, sir I did.

Adkins:  And did you do any type of eye exam with him?

Maschauer:  I checked to see if his vision had improved or decreased since January, and it was still 20/70, 20/20 this morning with his glasses on.  (A 265, 266)  dated March 14th, 2002.

*Trial testimony justifying Bibbins failed in court identification on March 13th, 2002*

Adkins:  You say that Mr. Bibbins only sees at all out of his left eye and he has 20/70 vision.  Could you tell us what that means in terms of his being able to see clearly a distance away?  (A-266) date March 14th, 2000.

Adkins knew Bibbins was able to see Morris in the first trial and failed to identify Morris. Adkins used the false testimony to justify Bibbins failed identification in the prior trial yet his ability in the present to obtain driving licenses.  The issue was material; Bibbins vision was used by the state to justify his failed identification on March 13th, 2000. The state argued in its answering brief No. 258, 2000 dated December 15th, 2000 at page 5.  "The state subsequently called Bibbins eye doctor who testified that Bibbins best corrective vision in his only remaining eye was 20/70".

Bibbins visual ability was material to both the prosecution and defense.  Bibbins failed in court identification on March 13th, 2000 and Dr. Maschauer's eye exam on march 14th, 2000 was used by the state to justify Bibbins inability to identify Bibbins inability to identify Morris in a prior hearing.  (A-103, 104)

**35**

A-21(

Adkins: Put your hand up to the eye you are blind in which eye is that?

Bibbins: My right eye.

Adkins: But you see better to your left

Bibbins: That is correct, that is right

Adkins: And this hearing back in march that Mr Liguor asked you about was it in this same room or a different room?

Bibbins: I believe it was a different room.

Incorporated in with this argument is the trial transcripts dated March 14th, 2000. It is clear that Dr. Maschauer testifies that Bibbins is unable to see things a distance away. Adkins used this artfully; having medical document and prior testimony that show Bibbins has 20/70 visual activity. False testimony of material fact was knowingly presented at trial on November 13th, 2002 concerning Bibbins visual ability.

**36**

A212

## CONCLUSION

Wherefore, defendant below, appellant Alonzo W. Morris, Jr. respectfully requests that this court reverse his convictions and findings of violation and rule that the Double Jeopardy clause denies the State to re-try Appellant Morris.

Respectfully Submitted,

Alonzo W. Morris, Jr.
SBI# 263971
P.O. Box 500 S.C.I.
Georgetown, DE 19947

IN THE SUPREME COURT OF THE STATE OF DELAWARE

ALONZO W. MORRIS, JR.,                )
                                       ) No. 21, 2003
            Defendant Below,           )
            Appellant,                 ) Court Below: Superior Court
                                       ) of the State of Delaware in
v.                                     ) and for Sussex County
                                       )
STATE OF DELAWARE,                     ) Cr. ID # 9911000751
                                       )
            Plaintiff Below,           )
            Appellee.                  )

Submitted: February 13, 2004
Decided: March 3, 2004

Before **HOLLAND**, **BERGER** and **STEELE**, Justices.

## *ORDER*

This 3rd day of March, 2004, upon consideration of the briefs of the parties,
and given our standard of review it appears to the Court that the judgment of the
Superior Court should be affirmed on the basis of and for the reasons set forth in
its Order dated December 19, 2002.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior
Court is **AFFIRMED.**

BY THE COURT:

_____
Justice

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR SUSSEX COUNTY

| | |
|---|---|
| STATE OF DELAWARE | * |
| | * |
| V. | * |
| | *          No. _____ |
| Alonzo Morris | * |
| Name of Movant on Indictment | * |
| | * |
| Alonzo Morris | * |
| Correct full name of Movant | * |
| | * |

## MOTION FOR POSTCONVICTION RELIEF

### INSTRUCTIONS

(1)    This motion must be legibly handwritten or typewritten, and signed by the movant under penalty of perjury.

(2)    All grounds for relief and supporting facts must be included, and all questions must be answered briefly in the proper space on the form.

(3)    Additional pages are not permitted. If more room is needed, use the reverse side of the sheet.

(4)    No citation of authorities is required. If legal arguments are submitted, this should be done in a separate memorandum.

(5)    Only convictions that were included in the same plea argument or were tried together may be challenged in a single motion.

(6)    When the motion is completed, the original must be mailed to the Prothonatary in the county in which the judgment of conviction was entered. No fee is required.

(7)    The motion will be accepted if it conforms to these instructions. Otherwise, it will be returned with a notation as to the deficiency.

### MOTION

1.    County in which you were convicted    Sussex

2.    Judge who imposed sentence    T. Henely Graves

3.    Date sentence was imposed    12/19/02

A 213-

4.   Offense(s) for which you were sentenced and length of sentence(s):
     Assault 1st Degree 20 years mandatory
     Possession of a Deadly Weapon 10 years T.I.S.

5.   Do you have any sentence(s) to serve other than the sentence(s) imposed because
     of the judgment(s) under attack in the motion? YES _X_ NO ___
     If your answer is "yes" give the following information:
     Name and location of court(s) which imposed the other sentence(s).
     Sussex County Superior Court
     Date sentence(s) imposed: ___
     Length of sentence(s): 18 months and 5 years 3 month Level 5

6.   What was the basis for the judgment/s of conviction? (check one)
          ( ) Please of guilty
          ( ) Please of guilty without admission of guilty (Robinson Plea)
          ( ) Please of nolo contendere
          ( ) Verdict of jury
          (X) Finding of judge (nonjurty trial)

7.   Judge who accepted plea or presided at trial  T. Henely Graves

8.   Did you take the witness stand and testify? (check one)
          No trial ( )  Yes ( )  No (X)

9.   Did you appeal from the judgment of conviction? YES _X_ NO ___
     If you answer is "yes" give the following information:
          Case number of appeal 21, 2003
          Date of court's final order of opinion 3/04

10.  Other than a direct appeal from the judgment(s) of conviction, have you filed
     any other motion/s or petition/s seeking relief from the judgment/s in state or
     federal court? Yes ( ) No (X) How many? ( )
     If your answer is "yes", give the following information as to each:
          Nature of proceeding/s ___ N/A ___

     _____
     _____
          Grounds raised ___ N/A ___

     _____
     _____
     _____
          Was there an evidentiary hearing? ___ N/A ___
          Case number of proceeding/s ___ N/A ___
          Date/s of court's final order/s or opinion/s ___ N/A ___
     Did you appeal the results? ___ N/A ___

11.  Give the name of each attorney who represented you at the following stages of the
     proceedings relating to the judgment/s under attack in this motion:

A 219

At plea of guilty or trial ___James Liguori_____

On appeal __Pro-se_____

In any postconviction proceeding __N/A_____

12.  State every ground on which you claim that your rights were violated. If you fail
     to set forth all grounds in this motion. you may be barred from raising additional
     grounds at a later date. You must state facts in support of the ground/s which you
     claim. For your information. the following is a list of frequently raised grounds
     for relief (you may also raise grounds that are not listed here): double jeopardy.
     illegal detention, arrest, or sear and seizure, coerced confession or guilty plea:
     uninformed waiver of the right to counsel, to remain silent, or to speedy trial.
     denial of the right to confront witnesses, to subpoena witnesses, to testify, to
     ineffective assistance of counsel, suppression of favorable evidence, or unfulfilled
     plea agreement.

     Ground one: Ineffective Assistance of counsel
     Supporting Facts: (state facts briefly, without citing cases)
     On 11/1/99 defendant was arrested without warrant.  Police entered defendants
     home to make warrant less arrest, then obtained the warrant based upon
     information affiant knew to be false, enclosed in the warrant's affidavit of
     probably cause.  Defense counsel failed to properly litigate defendants 4th
     Amendment claim competently denying defendant effective assistance of counsel:
     procedural defaults in the initiation of prosecution violated defendants due
     process right to a fair trial.

     Ground two: Ineffective Assistance of counsel
     Supporting Facts: (state facts briefly, without citing cases)
     Defense counsel failed to competently litigate defendant's motion to dismiss.
     Due Process considerations prohibit Government from obtaining indictment based
     on known perjured testimony.  Counsel for the defense failed to investigate into
     evidence or introduce any evidence demonstrating the factual basis for the
     motion, allowing the prosecution to violate defendant's 5th and 14th Amendment
     rights.

     Ground three: Ineffective Assistance of counsel
     Supporting Facts: (state facts briefly, without citing cases)
     On 9/6/02 defense counsel failed to properly litigate defendants claim of double
     jeopardy.

     Ground four: Ineffective Assistance of counsel
     Supporting Facts: (state facts briefly, without citing cases)
     Defense counsel failed to file proper objection to states uses of impermissibly
     suggestive procedures to identify defendant.

     Ground five: Ineffective Assistance of counsel
     Supporting Facts: (state facts briefly, without citing cases)
     Defense counsels failure to object to improper jury instruction denied defendant a
     fair trial.  Prosecutions request to have jury instructed that Police did nothing

A 215

unlawful in the arrest of defendant, presented to the jury that the arrest was lawful and foreclosed jury from considering that Police fabricated evidence in warrants affidavit.

Ground six:  Ineffective Assistance of counsel
Supporting Facts: (state facts briefly, without citing cases)
During trial defense counsel failed to properly vindicate defendants Due Process Rights by (1) Allowing expert testimony on fingerprint analysis without being given any data that such test was ever done, in violation of defendants Discovery Request.  Also by allowing expert testimony by eye doctor on victims visual acuity to go unchallenged knowing this testimony was false.

Ground seven:  Ineffective Assistance of counsel
Supporting Facts: (state facts briefly, without citing cases)
Defense counsel had a conflict of interest that compromised his ethical obligation to represent defendant as a zealous attorney.

If any of the grounds listed were not previously raised, state briefly what grounds were not raised, and give your reason/s for not doing so:
Defense counsels ineffective assistance as a whole was never raised previously because issues could only be raised in this motion.  Supporting evidence will be supplied in separate memorandum, incorporating prosecutorial misconduct, police misconduct and prosecutorial manipulation of a legal process, insupport of the aforemention allegations.

Wherefore, movant asks this court to grant him all relief to which he may be entitled in this proceeding.
I declare the truth of the above under penalty of perjury.

Date 3/2/05

_Alonyo Morris Jr_
Signature of Movant

IN THE COURT OF THE STATE OF DELAWARE IN AND FOR SUSSEX COUNTY

Alonzo W. Morris Jr.

Defendant

v.

State of Delaware

Plaintiff

Motion for Post Conviction Relief

Supplemental Memoranda for Defendant Alonzo W. Morris Jr.

Filed: 2nd Day of March, 2005

Alonzo W. Morris Jr.

P.O. Box 500 SCI

Georgetown, DE 19947

SBI# 263971

Dated this 2nd Day of March, 2005

1 ~~A Z16~~

A 217

## GROUND ONE

Ineffective Assistance of Counsel

### Statement of Facts

On November 1st, 1999, defendant Alonzo Morris was arrested by Detective Daniel Davis without an arrest warrant, after which Detective Davis carried Morris before a magistrate and obtained the arrest warrant based upon information enclosed in the affidavit of probable cause Davis knew to be false and necessary to a finding of probable cause, for the warrantless arrest. (See ex A, Affidavit of Probable Cause)

### Argument

Petitioner argues that defense counsel failed to properly litigate Fourth Amendment claims competently:

a.)     Defendant's warrantless arrest was not supported by probable cause. [1]

b.)     Entry into defendants home to make warrantless arrest was unreasonable violation defendant Fourth Amendment rights. [2]

The right to counsel is a fundamental right; it assures fairness, and thus legitimacy, of adversary process. U.S.C.A. Const. Amend. 6

Petitioner argues that counsel's unprofessional error so upset adversial balance between defense and prosecution that trial was unfair and verdict rendered suspect. Kimmelman v. Morrison 106 sct.2574 (1986)

---

[1] Franks v. Delaware 438U.S.154,98Sct.2674,57 Led2d667, Garner v. Delaware 314A2d 912

On 7/15/02, defense counsel filed a Motion to Dismiss based upon the following reasons:

1. Double Jeopardy and,

2. Indictment should be dismissed due to use of perjurious and erroneous testimony before the Grand Jury in a successful attempt a returning a true bill of indictment.

   Superior Court Criminal Rule 12 (b), (1) (See ex B – Motion to Dismiss)


On September 6th, 2002, defense counsel argued before Honorable Judge T. Henely Graves that he believed evidence enclosed in the probable cause affidavit was false and used by the state to obtain indictment; yet never under applicable state law properly challenged the validity of the allegedly false evidence used to obtain the warrant itself.

A lawyer shall provide competent representation to a client.  Competent representation requires the legal know ledge, skill, thoroughness and preparation reasonably necessary for the representation of the client. (Del. C. Ann. Rule 1.1 Competence)

A competent attorney should have known that in order to properly present a Fourth Amendment violation before the trial court, strict adherence to Rule 12 (b) (3) of Superior court Criminal Rules must be applied.  Franks v. Delaware 438 U.S. 154, 98 sct. 2674, 57 Led2d 667, Franks v. Delaware 398A2d783

---

[2]  Payton  v.  New  York  445U.S.573,100  sct.1371,  United  States  v.  Long  Huang  You
198F.supp.393(S.D.N.Y.)

A 219

Under "Franks" the United States Supreme Court held: "Where defendant makes substantial preliminary showing that false statement knowingly and intentionally, or with reckless disregard for the truth, was included in search warrant affidavit and if allegedly false statement is necessary to a finding of probable cause, Fourth Amendment requires that a hearing be held at defendant's request".

On November 13th, 2002 Detective Davis testified that the statement given in the warrant affidavit was incorrect and the victim did not make the statement given by Davis in his affidavit of probable cause. (See ex C – vol.B pg 96 to 99)


Defense Counsel petitioned the trial for a post-trial motion to suppress, at the close of trial that was denied as untimely. (See ex D Vol C pg 83 to 90)

Defense Counsel argued Payton v. New York, 445 U.S. 573, 100 Sct.137, 63Led2d639; yet in regard to this issue never presenting the fact that, entry into Morris's home to make a warrantless arrest was never supported by probable cause. This also undermined by Defense Counsel's failure to properly submit before the court, the state's burden to prove that Detective Davis received "voluntary consent" to enter Morris's home to make the warrantless arrest.

In Garner vs. State 314A2d 908 (Del. Supr. 1973) Delaware law established that, for all valid arrests, with or without a warrant, police officer "posses" information which would warrant a reasonable man that a crime has been committed and the person sought has or is committing a crime (Del. Const. Art. 1 sec 6) Morris's arrest was unlawful. Detective Davis obtained a Judicial consent of the warrantless arrest based upon information known at the time of his affirmance to be false. (Delaware v. Cooley 457 A2d. 352) On 11/1/99, medical documents show the victim was unable to recall the events of the incident. (See ex E medical record)

4

A 220

Defendant was entitled to a "Franks Hearing"; a judicial determination by the trial court whether or not, probable cause existed after the false information was set to one side. If after the evidentiary hearing there remained insufficient information to justify probable cause, "all evidence" acquired thereafter is tainted by the initial illegality and subject to exclusion for use at trial. [3]

Defendant asks that this Court grant him, his right under Franks v. Delaware to a "Franks Hearing." The "Cause" is ineffective assistance of counsel; the failure of incompetent counsel to file for a motion to suppress under Superior Court Criminal Rule 12(b), (3) allowed the state to use false evidence to obtain a conviction. [4]   Napue v. Illinois 360 U.S.264, 79 sct.1173, 3Led.2d1217 (1959) "A conviction obtained through use of false evidence, known to be such by representatives of the state, must fall, under the Fourteenth Amendment, the same result obtains when the state, although not soliciting false evidence, allows it to go uncorrected when it appears" (Napue Supra 360 U.S. 269) This "prejudiced" defendant's right to a fair trial. Defendant prays that this court in the "interest of Justice," grant petitioner relief.

---

[3]  United States v. Basutro 497 F.2d781(9th cir.) [see ex G 1&2 subpoena sent to Georgetown Police Dept. from deputy Attorney General James Adkins requesting Daniel Davis to appear before Grand Jury. Davis presented false information by way of his warrant affidavit before Grand Jury, on 11/15/99]

[4]  United States v. Basutro 497 F.2d781 (9th cir.) [see ex E subpoena sent to Georgetown Police Dept. from Deputy Attorney General James Adkins requesting Daniel Davis to appear before Grand Jury. Davis presented false information by way of his warrant affidavit before Grand Jury, on 11/15/99]

## Ground Two

Ineffective Assistance of Counsel; defense Counsel failed to adequately investigate and present evidence to support defendant's claim; that false evidence was used by state to obtain the indictment.

### Argument

On 7/16/02, defense counsel filed a motion to dismiss. (See ex F) Defense counsel petitioned this court to dismiss the indictment due to the use of perjurious evidence to obtain the indictment. Defendant submits to this court that Detective Daniel Davis was subpoenaed to appear before the Grand Jury, on November 5th, 1999, by Deputy Attorney General James Adkins (see ex G). Mr. Adkins signed the true bill of indictment filed on November 15, 2000, in the Superior Court of Sussex County. Defense Counsel never presented this evidence to support defendants claim, therefore; never established who was present at the Grand Jury proceedings.

The motion to dismiss based upon use of perjurious evidence to obtain the indictment was heard on 9/6/02 and denied by Superior Court for failure of defense to show that any false information was used to initiate process. This allowed the state to proceed to trial in violation of the defendant's right to require the prosecution's case to survive the crucible of meaningful adversarial testing.

Defense Counsel failed to investigate into what evidence was used to obtained the indictment or establish that absent the false information in the warrant's affidavit and erroneous testimony given during the preliminary hearing there remained no evidence to initiate the trial process. Failure to introduce evidence to support defendants claim that erroneous evidence was given before the Grand Jury constituted deficient performance on the part of defense counsel. The evidence would constitute a stronger defense and there was no conceivable strategic or tactical reason not to use this evidence prior to or during the trial. United States v. Hogan 712 F2d 757 (2nd Cir. 1983) and United States v. Basutra

6

497 F2d. 781 (9th GR 1974)    Delaware Rule of Conduct 3.3(a).(4) states: "A lawyer shall not knowingly offer evidence that the lawyer knows to be false. If the lawyer has offered material evidence and comes to know of its falsity the lawyer shall take reasonable remedial measures." Failure of defense counsel to establish that the evidence given by Detective Davis in the warrants affidavit and preliminary hearing testimony given by Officer Barlow concerning identification of defendant via photo line-up were inherently false, both necessary to initiate process and obtain the true bill of indictment is inexcusable. Defense counsel never required the state to show any remedial measures had been taken to correct the afore mentioned evidence thus allowing defendants rights under the 5th and 14th Amendments to be violated. The defendant's rights under the 6th Amendment were violated when defense attorney failed to adequately investigate and introduce evidence that showed Deputy Attorney James Adkins was advocate for the state at all proceedings, from preliminary hearing on November 4th, 1999; throughout both trials. Also, as the attorney on record Adkins knew or should have known that all information given concerning the process used to identify the accused was erroneous. Any evidence submitted by the state at best was "hearsay" and "the use of hearsay testimony before a Grand Jury raises questions about the validity of an indictment only when the prosecution misleads the Grand Jury into thinking it is getting first hand testimony when it's really receiving hearsay". (United States v. Estepa 471 F2d.1132 and United States v. Leibowitz 490 F2d.39) Because the adversarial testing process generally will not function properly unless defense counsel has done some investigation into prosecutions case and into various defense strategies the United States Supreme Court has noted that counsel has a duty to make reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary. (Butterfeild v. Gibbson 236 F3d.1715) Failure of defense counsel to show that the state had no evidence to show defendant had been identified by eyewitnesses prior to March 13th, 2000 relieved the state of its duty to show that absent false information there remained any evidence to obtain the true bill of indictment. Defendant had shown under the two prong analysis of Strickland that (1) Defense attorney's failure to establish

7

A223

Deputy Attorney James Adkins was the prosecutor on record who signed the true bill of indictment on November 15th, 1999 and Detective Daniel Davis of the Georgetown Police Department was the only witness subpoenaed to testify before the Grand Jury on the above date and that absent the information given in Davis' warrant affidavit and the erroneous evidence concerning identification of the accused via photo line-up there remained no factual information to support the states case concerning the eyewitness identification of the defendant as the accused.

(2) This deficiency prejudiced the defense where there is a high probability that absent the false information the defendant would not have been indicted. There was no conceivable strategic or tactical reason not to use the evidence during the evidentiary hearing on 9/6/02 or during trial in the event that the motion was denied to impeach the credibility of Detective Davis, [Under Superior Court Rule 26.2 (f),(3)]: After a witness other than the defendant has testified on direct examination the court, on motion of a party who did not call the witness shall order the Attorney General to produce, for examination and use of the moving party any statement of the witness that is in their possession and relates to the subject matter concerning the witness, has testified, a statement however taken or recorded or a transcription thereof made by witness to a Grand Jury. Defense Counsel failed to litigate defendants claim under the 5th and 14th Amendments which allowed the state to present erroneous evidence to obtain a true Bill of Indictment.

8

A22 4

## GROUND THREE

Defense Counsel failed to properly litigate defendant's claim of Double Jeopardy.

## Argument

On 9/6/02, defense counsel argued before Superior Court that prosecutor may have goad the defendant into moving for a mistrial yet never question public defender Ruth M. Smythe as to why she did not petition the court for mistrial; establishing facts that would show that Ms Smythe was in collusion with the prosecutor to obtain conviction; denying defendant's right to a fair trail. Oregon v. Kennedy 456 U.S. 667 (1982), United States v. Dinitz 424 U.S. 600(1976) United States v. Jorn 400 U.S. v. 470(1971) United States v. Cronic 466 U.S.648

## GROUND FOUR

Defense Counsel failed to litigate defendant's right to be free from suggestive in court identifications.
(Due Process 14th Amend. U.S.C.A.)

## Argument

Defendant's argument is based upon the suggestiveness under which he was identified by James
Bibbins, on 11/12/02 and Rick Hughes, on 11/13/02. On 3/13/00, both witnesses were asked, for the
first time to identify the assailant in open court. The defendant was never identified under any pre-trial
procedures; therefore, the prosecution violated defendant's due process rights by intentionally creating
a suggestive procedure under which the defendant was to be identified. The Due Process Clause
protects the accused from the use against them of evidence derived from unreliable identifications that
result from impermissibly suggestive procedures. United States v. Rogers 126 F.3d.655(5[th]Cir.1997).
The admissibility of the in-court identifications must be viewed independently due to the fact that
Bibbins failed to identify the defendant at the initial in-court identification, but at a subsequent trial in
this matter identified the defendant as his attacker, on 11/12/02. Secondly, Rick Hughes a witness to
the crime identified Morris as the assailant on March 13, 2000, during the first trial and again, at the
subsequent re-trial, on 11/13/02. These identifications should have been excluded due to the
suggestiveness of the encounters. On September 6, 2002, advocate for the state James Adkins states,
"In this case I (Adkins) would think it was kind of refreshing, because it was, I think about four
months after the incident there had not been any identification procedures, any photo line-ups done.
There was not a script in this case. We (Adkins) weren't calling x, y, and z to the stand knowing that
they had already identified a person in a photo line-up and I think I told this to the jury in opening also,
that you know, these witnesses are going to take the stand, they were out there on that sidewalk by

10    A226

Harvey's Plumbing, there was no photo line-up done. · It's been four months and I'm going to ask them, do you see the person who did this; do you think you can remember enough to identify a person. And I (Adkins) didn't have a clue as to what they were going to say." (see ex H) Prosecutor Adkins knew that under no procedures was Morris identified. The admissibility of the in-court identification given by Rick Hughes, on November 13, 2002, must be governed by a two step test which the court must ask (1) whether Rick Hughes identification of the accused in the first trial, on March 13, 2000, was impermissibly suggestive and (2) whether the procedure under which Morris was identified posed a very substantial likelihood of irreparable misidentification. The United States Supreme Court held that: Usually the witness must testify about an encounter with a total stranger under circumstances of emergency or emotional stress, "the witness recollection of the stranger can be distorted easily by circumstances or by later actions by the police". citing Mason v. Brathwaite 432 U.S.100,97

SCt.2244,2252 (1977) Thus reliability is the linchpin in determining the admissibility of Rick Hughes identification testimony. The 5 factors are: (1) The opportunity of the witness to observe the criminal at the time of the crime; (2) the witnesses' degree of attention; (3) the accuracy of the witnesses prior description; (4) the witnesses level of certainty; (5) the time between crime and identification. This court need only consider the words spoken directly out of the mouth of Prosecutor James Adkins, on 9/6/02. Reliability being the prerequisite for admissibility of the in-court identifications forces the court; in the interest of justice to consider whether or not it is a violation of defendants Due Process Rights to place the defendant at the defense table during the first trial and ask Rick Hughes if he was able to identify the accused. The alleged taint concerns the encounter between the witness and defendant in the courtroom deliberately arranged by the state. Hughes' statement given to police never gave the indica of reliability necessary to allow the state to use his testimony concerning identification;

11      A229

or to use Rick Hughes as a witness concerning the identity of a person whom he had not previously known or identified under any procedure.

On March, 2000, Hughes testifies that he remembers saying to himself that he did not know if he could identify the assailant (see ex I transcript of 1st trial date March 13, 2000). This statement along with Prosecutor Adkins' testimony given on 9/6/02, concerning his own uncertainty about all the witnesses at Harvey's Plumbing (including Rick Hughes), ability to identify the defendant as the accused prior to testifying on March 13, 2000 shows that the suggestive identification procedure violates due process, due to the fact that the identification possesses no aspect of reliability, for reliability is the linchpin in determining the admissibility of the identification testimony itself.     (U.S. vs     Emanuele 51F.3d.1123(3rd Cir.1995)  Eyewitness identifications should be those of witness, not the product of governmental suggestion, intentional or unintentional, subtle or overt, identification testimony is to be excluded on basis of undue governmental suggestion where specific events leading to the identification were so impermissibility suggestive as to give rise to very substantial likelihood of irreparable misidentification. (U.S. v. Narcisco 446F.Supp.252 (3rd.Cir.)cf. (Simmons v. United States 390U.S.354,88 SCt.971)  It is obviously suggestive to ask a witness to identify a perpetrator for the very first time in the courtroom when the witness was never asked to identify a perpetrator under any procedure prior to the in court encounter; to identify the person they see seated at defense table during trial when it is clear who the defendant is was unreliable and impermissibly suggestive given rise to a very substantial likelihood of irreparable misidentification.     United States v. Archibald 734F.2d.938,941,943, (2nd Cir 1984); also see United States v. Hill 967.F2d.226,232, (6th Cir. 1992), United States v. Bush 749F.2d.1227,1233 (7th Cir. 1984). Defendant also raises that the victim James Bibbins' in-court identification of the defendant during the 2nd trial, on 11/12/02 had to have been excluded due to the suggestiveness of the 2nd encounter. Initially, Bibbins was unable to identify the

A22 9

51F.3d.1123 (3rd.Cir.1995)  The assault occurred on·11/1/99; Bibbins never positively identifies his attacker and when questioned by emergency medical technician Holly Cox, victim was unable to recall the events of incident. (see ex E)  On 11/11/99, Bibbins was asked by Detective Davis if "JR" did this to him, allegedly the victim nodded yes.  The victim's condition, on 11/1/99 and 11/11/99, totally supports defendants argument that Detective Davis' question (see ex J) "if the person who did this to him was "JR" also known as Alonzo Morris", after Davis had falsified in the affidavit of probable cause that Bibbins made a statement to police that Alonzo Morris was his attacker are two specific events where "Eyewitness identification was a product of governmental suggestion, thus identification must be excluded on basis of undue governmental suggestion.  The identification, on 11/1/99 and 11/11/99, leading to Bibbins failed in-court identification, on 3/13/00 and subsequent in-court identification, on 11/12/02, is evidence derived from impermissibly suggestive procedures.  The Due Process protects the accused from the use against them of evidence derived from unreliable identifications that result from impermissibly suggestive procedures.  Defense Attorney never presented this before the court denying defendant the right to a fair trial.

13    4238

## GROUND SEVEN

### Argument

On 9/23/02, defense attorney petitioned the trial court to inquire into a potential conflict of interest with the defendant.(see ex K)   There was never any inquiry made by trial court, denying the defendant's right to choose knowingly and intelligently whether to accept defense counsel's representation in light of such indifference to material, factual and legal issues or to a course of action; or afford the defendant his right to conflict free counsel and the right to an attorney of undivided loyalty, the choice as to which right is to take precedence must generally be left to defendant and not dictated by government.   Thus, the Supreme Court of the United States set a mandate in Holloway v. Arkansas 435 U.S.475 requiring automatic reversal by reviewing court in confliction of interest cases only where the trial court fails to give the defendant the opportunity to show that potential conflicts impermissibly imperil his right to a fair trial.   Once the trial court fails to inquire into the potential conflict, reviewing court can presume that the possibility for conflict has resulted in ineffective assistance of counsel. s citing Lewis v. State.757A.2d.709, State v. Bacon 658A.2d.67cf. Cuyler supra 446 U.S.335, Satterwhite Supra 486 U.S.249 and Snyder supra.291 U.S.97

---

s see ex. K  Letter from Defense Attorney James Liqouri to trial court Judge T. Henley Graves.

A 239

SUPERIOR COURT
OF THE
STATE OF DELAWARE

T. HENLEY GRAVES
*RESIDENT JUDGE*

SUSSEX COUNTY COURTHOUSE
1 THE CIRCLE, SUITE 2
GEORGETOWN, DELAWARE 19947
TELEPHONE (302) 856-5257

April 27, 2005

N440
Alonzo Morris
SBI No. 00263971
Sussex Correctional Institution
P. O. Box 500
Georgetown, DE 19947

### RE:    Defendant ID No. 9911000751(R-1) - Postconviction Motion

Dear Mr. Morris:

Mr. Morris was convicted of assault[1] in the first degree and possession of a deadly weapon during a felony. He was sentenced to 27 years, followed by probation.

The conviction was based upon the eyewitness testimony of the victim, James Bibbins, who knew him. He was convicted based upon the testimony of James Bynum who knew both the Defendant and the victim. Mr. Bynum testified he watched Defendant and victim "arguing"; he saw the victim get on his bike and pedal away, saw the Defendant pick up a pipe and go after Mr. Bynum, striking him in the head and then saw the Defendant run past the witness and he "looked dead at us". The "us" included another State's witness, Ineshia Mariguel Mitchell, who was with James Bynum. She testified she knew the Defendant and testified to seeing the above described events occur. Finally, another eyewitness, Richard Hughes, said he was waiting to start work at Harvey's Plumbing and Heating and observed the above events. He testified as to the graphic details including getting an eyeball to eyeball look at the Defendant after the assault took place. Mr. Hughes identified the Defendant as the assailant. The assault caused permanent injuries including but not limited to the victim's loss of sight in the damaged eye.

The Defendant offered testimony which placed him away from the crime scene. The Defendant did not testify.

---

[1]Mr. Morris' first conviction was reversed by the Supreme Court based upon the State's closing argument.

-1-

Alonzo Morris
Page 2
April 27, 2005

All grounds alleged are based on ineffective assistance of counsel. Therefore, the Defendant must establish that his attorney made mistakes or errors in his defense which were objectively unreasonable. Additionally, he must establish the claimed error caused him actual prejudice. *Strickland v. Washington*, 466 U. S. 668 (1984).

## **GROUND ONE**

The Defendant includes multiple claims in Ground One. After attempting to make sense out of these issues, I believe I have included all of them in the following summary.

The Defendant complains that he was arrested by the police without a warrant. Defendant alleges his attorney was ineffective for not making motions concerning his warrantless arrest.

He states the arrest warrant, which was obtained following his physical arrest, had inaccuracies in the probable cause portion of the application which the officer later admitted on cross-examination were mistakes or assumptions by the officers.

He claims that his attorney should have made a motion as to his claim that the entry into the Defendant's house to make a warrantless arrest was improper.

Defendant also argues that his indictment should have been dismissed due to the use of "perjurious and erroneous testimony before the Grand Jury". He offers nothing to substantiate this claim other than his assumption that if errors were made in the probable cause affidavit, then errors were made in the Grand Jury testimony.

Upon review of these claims, I conclude his claims have no factual or legal merit.

The Defendant was arrested for this assault with a deadly weapon without a warrant. A warrant was not needed.[2] He was arrested in his home immediately following the police investigation. He didn't testify at his second trial, but he did testify at his first trial. The transcript establishes that the police came to the Defendant's home and advised the Defendant's father why they were there. When Defendant's father reported this to the Defendant, he testified he told his father to "tell [Officer] Danny Davis to come in and talk to me", thereby establishing reasonable grounds to conclude the entry into his home was by consent.

Probable cause existed for his arrest. Consent allows police entry into the house without a warrant. The admitted errors in the probable cause affidavit did not contribute to the Defendant's

---

[2]11 Del. C. §1904(b)

-2-

Alonzo Morris
Page 3
April 27, 2005

arrest. The warrant was not obtained until after the arrest. Again, based upon what the police knew at the time they went to the Defendant's residence, probable cause existed for a felony arrest.

After he was arrested, a warrant was obtained. At trial, the police admitted that there were mistakes in the warrant. Nevertheless, it is clear to me that the police investigation quickly and correctly developed the Defendant as the person who assaulted the victim. The police had probable cause to arrest the Defendant regardless of any subsequent errors in the warrant application.

Since the Defendant has no proof of "perjurious" Grand Jury testimony, this complaint factually fails.

I find that trial counsel committed no errors under the aforementioned facts by not pursuing motions to suppress and/or motions to dismiss based on the aforementioned complaints.

Additionally, as to the prejudice prong of *Strickland*, the Defendant offers no prejudice. (I presume he thinks that these alleged illegalities would set him free; but at best, if there were a basis to file a Motion to Suppress, he has not pointed to one piece of evidence that was admitted into evidence which would have been suppressed under his present application.) Without prejudice, the claims against his attorney must fail.

Ground One fails and is dismissed.

## GROUND TWO

The Defendant alleges his attorney failed to adequately investigate and present evidence to support Defendant's position that false evidence was used to obtain the indictment.

The Defendant makes conclusory allegations that his indictment was based upon perjury. He attacks his trial attorney as being ineffective for not investigating and coming up with evidence to support this claim. He faults his attorney for not investigating "what evidence was used to obtain the indictment".

The Defendant offers no evidence to support his allegations other than the admitted mistakes contained in the probable cause affidavit for the arrest warrant. This is no basis for me to infer that there was perjury in the State's presentation of the case to the Grand Jury, and, therefore, the entire prosecution is somehow tainted and should now be dismissed.

Defendant has not shown his attorney breached an objective standard of reasonable representation by failing to investigate the Grand Jury proceedings, nor has he established any prejudice. He has not shown that the Grand Jury was misled into indicting of the Defendant.

-3-

A234

Alonzo Morris
Page 4
April 27, 2005

As an aside, the Defendant criticizes his attorney for not impeaching the credibility of Detective Davis during trial by way of the mistakes and/or assumptions in the probable cause warrant. The Defendant is mistaken. His trial attorney did attack the officer's credibility for this and other reasons.

This ground is dismissed.

## GROUND THREE

Defendant alleges that his attorney "failed to properly litigate Defendant's claim of double jeopardy".

He claims his second trial attorney should have questioned his first trial attorney as to why she didn't ask for a mistrial. Such an examination would have established she was "in collusion with the prosecutor to obtain a conviction".

I do not find fault with counsel based on the above argument because it is clear that there was not even an objection made by first trial counsel as to the portion of the State's argument that was found to be erroneous by the Supreme Court. If she missed the objection, then how could she have been thinking about a mistrial. Based on the missed objection, the Defendant received a new trial. This claim is frivolous.

Finally, the double jeopardy arguments have been presented to this Court and the Supreme Court by three different attorneys. It has been adequately adjudicated.

This ground is dismissed.

## GROUND FOUR

Defendant attacks trial counsel for failing to litigate his in-court identification. Defendant complains that his identification by the victim, who did not identify him in Court during the first trial, was suggestive. He also complains that the identification by Mr. Hughes, the Harvey's Plumbing employee, was suggestive.

I'm satisfied that there was no error by trial counsel as to the in-court identification of the Defendant by the victim. While it is true that the victim wasn't able to identify Mr. Morris at the first trial, it was brought out that the assault blinded him in his right eye and the Defendant was seated to the witness' right side during the first trial, but to his left side in the second trial.

Presumably because the victim didn't identify the Defendant at the first trial, the State did not

-4-

$A$ 235

Alonzo Morris
Page 5
April 27, 2005

ask the victim to identify anyone. Neither did the defense attorney. When defense counsel asked the victim to describe his assailant, the victim pointed out the Defendant and said "There he is". Thereafter, the victim was examined and cross-examined vigorously as to that identification. It is noteworthy that this was not a "stranger" assault; the victim knew the Defendant. I do not find fault with defense counsel for not "litigating" the in-court identification by the victim. The victim was put to the test by vigorous cross-examination.

Finally, the Defendant can establish no prejudice as to this allegation of ineffective assistance of counsel. Mr. Morris ignores the two most important eye witnesses in this case, James Bynum and Ineshia Mariguel Mitchell. These witnesses knew the Defendant and the victim from their community. They had no ax to grind. They reported what happened. They testified to the assault by Mr. Morris against an elderly man peddling his bike away from Mr. Morris. The evidence that Mr. Morris is guilty was overwhelming.

## GROUND FIVE

The Defendant alleges his attorney should have objected to the Court's instruction concerning the felony arrest of the Defendant without the necessity of a warrant.

I do not know if trial counsel objected or not, but the instruction is not a misstatement of the law and therefore there is no basis to make this claim.

It is dismissed.

## GROUND SIX

In this very brief allegation, the Defendant claims his attorney was ineffective by not properly vindicating the Defendant's due process rights by (1) his performance as to the fingerprint testimony and (2) knowingly allowing the eye doctor to present false testimony.

The Defendant does not develop these conclusory allegations and they are dismissed for that reason.

## GROUND SEVEN

Defendant argues his trial counsel had a conflict of interest that compromised his ethical obligations to zealously represent the Defendant.

Trial counsel was court-appointed. It was a difficult assignment because of interesting but difficult double jeopardy arguments that had to be made prior to trial.

-5-

A236

Alonzo Morris
Page 6
April 27, 2005

At some time, appointed counsel was upset with the Defendant about remarks the Defendant was making about counsel's performance, etc. This was discussed in open Court.

There is nothing to establish that a breakdown of the attorney-client relationship occurred in this case. There is nothing to support the conclusory allegation that defense counsel was not zealous. He was zealous. Defense counsel did a fine job, but he had the problem of having bad facts from a defense viewpoint. Two neutral eyewitnesses who knew the Defendant, saw the Defendant pick up a pipe and chase an old man, blinding him.

Defense counsel and the Defendant don't have to like each other. As appointed counsel, your attorney's responsibility was to give you the best defense he was capable of, within his professional and ethical guidelines. I am satisfied that he did that.

Defendant's multiple claims for relief based upon ineffective assistance of counsel are denied.

**IT IS SO ORDERED.**

Yours very truly,

T. Henley Graves

THG:baj
cc:     Prothonotary

-6-

A 237

IN THE SUPREME COURT OF THE STATE OF DELAWARE

Alonzo Morris, Jr.,                    ) Case No.: 215, 2005
                                       )
          Appellant/Plaintiff,         )   Court Below:  Superior Court
                                       )   Of the State of Delaware and for
     Below                             )   Sussex County
                                       )   Cr.A.No. 9911000751 (R-1)
     vs.                               )
                                       )
State of Delaware,                     )
                                       )
          Appellee/Defendant           )
                                       )
     Below

_____

ON APPEAL FROM THE SUPERIOR COURT

OF THE STATE OF DELAWARE

IN AND FOR SUSSEX COUNTY

_____

APPELLANT'S OPENING BRIEF

_____

Dated this 9/06/2005

Alonzo Morris, Jr.
Delaware Correctional Center
Smyrna, DE 19977

A 238

## TABLE OF CONTENTS

TABLE OF CONTENTS....................................................................................ii-iii
TABLE OF CITATIONS ................................................................................ iv-v
NATURE OF PROCEEDING............................................................................1
SUMMARY OF ARGUMENT ..................................................................... 2-3
STATEMENT OF FACTS ............................................................................ 4-7
ARGUMENT ............................................................................................... 8-28

I.   SUPERIOR COURT ABUSED ITS DISCRETION BY DENYING DEFENDANT
     CLAIM THAT DEFENSE COUNSEL'S FAILURE TO PROPERLY LITIGATE
     DEFENDANT'S 4TH AMENDANT CLAIMS COMPETENTLY; DENIED
     DEFENDANT'S RIGHT TO A FAIR TRIAL.............................................8-9

     A. Scope of review.............................................................................8

     B. Merits of Argument..................................................................... 8-9

II.  DEFENSE COUNSEL FAILED TO ADEQUATELY INVESTIGATE AND
     PRESENT EVIDENCE TO SUPPORT DEFENDANT'S CLAIM THAT FALSE
     EVIDENCE WAS USED BY STATE TO OBTAIN INDICTMENT ............... 10-14

     A. Scope of Review ..........................................................................10

     B. Merit of Argument ...................................................................10-14

III. DEFENSE COUNSEL'S FAILURE TO PROPRELY LITIGATE DEFENDANT'S
     DOUBLE JEOPARDY CLAIM VIOLATED DEFENDANT'S RIGHT TO THE
     EFFECTIVE ASSISTANCE OF COUNSEL.............................................15-17

     A. Scope of Review ..........................................................................15

     B. Merit of Argument .................................................................15-17

IV.  TRIAL COURT ABUSED ITS DISCRETION BY DENYING DEFENDANT'S
     POST-CONVICTION CLAIM THAT DEFENSE COUNSEL'S FAILURE TO
     OBJECT TO STATES USE OF EXPERT TESTIMONY REGARDING FINGER
     PRINT TEST PERFORMED BY POLICE THAT WAS NEVER PROVIDED
     TO DEFENSE UNDER RULE 16 ....................................................18-19

     A. Scope of Review ..........................................................................18

     B. Merit of Argument .................................................................18-19

A 239

V.    TRIAL COURT ABUSED ITS DISCRETION BY DENYING
      DEFENDANTS POST-CONVICTION CLAIM THAT DEFENSE
      COUNSEL'S FAILURE TO OBJECT TO IMPROPER JURY
      INSTRUCTION DENIED DEFENDANT A FAIR TRIAL ..............................................20-2?

      A.  Scope of Review .................................................................................................20

      B.  Merit of Review ..............................................................................................20-21

VI.   TRIAL JUDGE ABUSED HIS DISCRECTION IN DENYING
      DEFENDANTS POST-CONVICTION MOTION CLAIM THAT DEFENSE
      COUNSEL'S FAILURE TO OBJECT TO IMPERMISSIBILITY
      SUGGESTIVE IN-COURT IDENTIFICATIONS DENIED DEFENDANTS
      RIGHT TO FAIR TRIAL .........................................................................................22-25

      A.  Scope of Review .................................................................................................22

      B.  Merit of Argument ...........................................................................................22-25

VII.  TRIAL COURT ABUSED ITS DISCRETION BY DENYING
      DEFENDANTS CLAIM THAT DEFENSE COUNSEL'S FAILURE TO
      OBJECT TO FALSE EXPERT TESTIMONY PRESENTED BY
      PROSECUTION DENIED DEFENDANT A FAIR TRIAL .........................................26-27

      A.  Scope of Review .................................................................................................26

      B.  Merit of Argument ...........................................................................................26-27

VIII. TRIAL COURT ABUSED ITS DISCRETION BY DENYING
      DEFENDANTS POST-CONVICTION CLAIM THAT DEFENSE
      COUNSEL NOTIFIED THE COURT OF POTENTIAL CONFLICT OF
      INTEREST WHICH DENIED DEFENDANT RIGHT TO THE EFFECTIVE
      ASSISTANCE OF CONFLICT FREE COUNSEL ...........................................................28-29

      A.  Scope of Review .................................................................................................28

CONCLUSION

A 2 40

## TABLE OF CITATIONS

United States Supreme Court Cases

Beck v. Ohio, 379 U.S. 89 ............................................................................................9, 21

Chapman v. California, 386 U.S. 18............................................................................24

Cuyler v. Sullivan, 446 U.S. 343 .........................................................................13, 29

Franks v. Delaware, 438 U.S. 14 ...............................................................................20

Giles v. Maryland, Supra .............................................................................................13

Holloway v. Arkansas, 435 U.S. 475...........................................................................28

Kimmelman v. Morrison, 477 U.S. 365.........................................................................8

Mason v. Brathwaite, 432 U.S. 118 ............................................................................23

Napue v. Illinois, 360 U.S. 264, 269.....................................................................13, 26

Neil v. Biggers, 409 U.S. 188 ......................................................................................22

Oregon v. Kennedy, 456 U.S. 667(1962) ...............................................................15, 16

Satterwhite v. Texas, 486 U.S. 249..............................................................................28

Stovall v. Denno, 388 U.S. 293 ...................................................................................22

Stirone v. United States, 361 U.S. 212 (1960)............................................................12

Simmons v. United States, 390 U.S. 384......................................................................24

Strickland v. Washington, 466 U.S. 668.............................................10, 15, 18, 20, 26

United States v. Ash, 413 U.S. 300..............................................................................12

Wood v. Georgia, 450 U.S. 261....................................................................................29

Cases

Brown v. Craven, 424 F2d. 1167 (9 th Cir) ................................................................29

Campbell v. Rice, 265 F3d. 879 (9th Cir.)...................................................................28

A 241

Blanco v. Singletary, 943 F2d. 1477 (11thCir.)............................................................10

Delaware v. Cooley, 457 A2d. 352 Del. Supr. ...........................................................8, 20

Fensteren v. State, 509 A2d. 1112 ................................................................................16

Garner v. State, 314 A2d. 908 Del. Supr. ................................................................8, 20

Johnson v. State, 550 A2d. 903 Del. Supr. ..................................................................18

Lewis v. State, 757 A2d. 709 Del. Supr....................................................................28

Morris v. State, Del SUPR. 256, 2000.......................................................................5, 15

Pennewell v. State, 822 A2d. 397 Del. Supr..................................................................8

Secrest v. State, 697 A2d. 64 Del. Supr.....................................................................18

State v. Walker, 444 A2d. 277 Del. Sup. Ct. ...............................................................21

Tejado v. Dubois, 142 F3d. 18 (1st Cir.) ...............................................................10, 20

Trump v. State, 753 A2d. 964......................................................................................16

United States v. Basurto, 497 F2d. 781 (9th Cir.)....................................................10, 13

United States v. Emanuele, 51 F3d. 1123 (3rd Cir.)................................................22, 23

United States v. Narcisco, 466 F. Supp. 252 (3rd Cir.) ................................................23

Wilson v. Commonwealth, 695 SW2d 854, 857 (Ky. 1985).....................................24, 25

Woody v. State, 765 A2d. 1257 Del Supr.......................................................................8

STATUTES AND RULES
Delaware Rules of Conduct 3.3 (a). 4...........................................................................12

A242

Nature and stage of the proceedings

ON March 3rd, 2005 defendant filed a Post-Conviction Relief in the Superior Court Sussex County. On April 27, 2005, Honorable T. Henley Graves denied defendant's request and on May 23rd, defendant filed a Notice of Appeal to this Court of Superior Courts appealing the April 27th, 2005 denial of defendant Post-Conviction motion.

1

A243

## SUMMARY OF ARGUMENTS

1.        Whether defense counsel failed to properly litigate defendant, Alonzo Morris', 4th amendment claim competently; denying defendant's right to a fair trial and the effective assistance of counsel.

2.        Whether defense counsel's failure to litigate diligently and competently defendant's Motion to Dismiss, allowed government to obtain an indictment based on known perjured testimony resulting in a denial of the defendant's right to a fair trial and the effective assistance of counsel.

3.        Whether defense counsel failed to litigate properly defendant's double jeopardy claim, by failing to question former defense counsel, Ruth Smythe, concerning her failure to object to prosecutorial remarks in closing statement to jury violating the defendant's right to the effective assistance of counsel.

4.        Whether defense counsel failed to enter proper objections to state's uses of impermissibly suggestive procedures to identify defendant, constituted a lack of diligent and competent representation that resulted in the denial of the defendant's right to a fair trial and the effective legal assistance.

5.        Whether defense counsel failed to object to improper jury instructions requested by prosecution; that foreclosed the jury from considering police fabrication of defendant's arrest warrant and prejudiced the defendant's case.

6.        Whether defense counsel failed to vindicate properly defendant's due process rights by allowing expert testimony on fingerprint analysis to be presented by the

2

A-244

prosecution despite the fact that the prosecution failed to comply with rule 16 discovery requests giving notice that such tests was ever performed.

7.     Whether defense counsel failed to defend zealously Alonzo Morris' due process rights by allowing expert testimony by the eye doctor on the victim's visual acuity to go unchallenged, although counsel knew this testimony to be false, denied defendant a fair trial.

8.     Whether defendant's request to the trial court for inquiry into a potential conflict of interest between the defendant and defense counsel, ignored by the trial court, constituted a judicial abuse of discretion.

3

A245

## STATEMENT OF FACTS

On November 1st, 1999, Officer Daniel Davis of the Georgetown Police Department without a warrant entered Alonzo Morris'(here and after defendant)residence to make a felony arrest. (A13–A16) Officer Davis took defendant before a magistrate at Justice of the Peace Court number 3 in Sussex County, presented "indorised, inaccurate, and generalized" information in his questionable warrant and affidavit of probable cause to justify the arrest of the defendant. (A17-A23) On November 4th, Officer Michael Barlow of the Georgetown Police Department testified during the Preliminary hearing that upon his arrival at the scene of the assault, he spoke with the victim, James Bibbins, who he, correctly thought identified "Jerrold Copes" as the attacker. (A24-A31) Armed with only the inaccurate information that George Swan and McCrea knew and could identified the defendant, the false information that four employees from Harvey's Plumbing identified the defendant via photo line-up, and the inconsistent information in the warrant's affidavit of probable cause, Officer Daniel Davis, the state's only witness before Grand Jury and Prosecutor James Adkins obtained a *true* bill of indictment. (A32-A42, also A1 docket No. 2 date 1/1/2000) During the defendant's first trial on March 13th, 2000 in the presence of the jury, each witness was asked for the first time if he or she could identify the defendant. (A32-A34) On March 22nd, 2000 Defense Counsel, Ruth M. Smythe, filed a Motion for Judgment of Acquittal (A45-A55)but Smythe failed to buttress the motion with supporting facts with regards to the defendant's claims, or make oral arguments in furtherance of Alonzo Morris' plea for acquittal.

A 296

On March 31st, 2000, Ruth Smythe filed a Notice of Appeal based only upon defendant's violation of probation. (A3, docket no. 31 date 6/5/00) Defendant obtained private Counsel and on March 28th, 2002, defendant's conviction was overturned by this court.[1] (Morris v. State 258, 2000). On May 9th, 2002 private counsel withdrew and Superior Court Judge T. Henley Graves appointed James Liguori as defense counsel. (A5-A7) July 15th, 2002 Liguori filed a Motion to Dismiss, pursuant to Del.Crim.R. 12(b)(1). (A56-A59) September 6th, 2002 defense counsel presented this motion before Superior Court, Sussex County Honorable T. Henley Graves presiding. Prosecutor James Adkins (A32-33, A60-A79), Officer Daniel Davis (A80-A92) and Officer Michael Barlow (A93-A76) both of the Georgetown Police Department testified in this matter. Judge Graves denied defendant's claim as without merit.[2] (A97-A114) Defense Counsel, James Liguori, admitted his failure to establish the identities of those who testified before the Grand Jury. This inadequate representation produced conflicting interests between defendant and counsel (A102-A110). Defendant then filed a Writ of Prohibition with this court date 9/11/02. (A115-A116) Defense Counsel filed for ex-parte hearing with Superior Court to inquire into a conflict of interest between defendant and defense Counsel (A117). Superior Court never inquired into the matter. (A8)

On November 12th, 2002 defendant's second trial began. Defense Counsel's opening statement was that police rushed to judgment. (A118)

James Bibbins (the victim) stated that on November 1st, 1999, he told a police officer "Junior Copes" assaulted him (A119-A127). Bibbins stated that he never told witnesses or police what the incident was about. (A136-A146) and (A128-A131) On cross examination Bibbins identified Morris as his attacker. (A132-A134) Defense counsel established that a "Jerrold" did live with

---

1.   [1] Ex. A. Morris v. State. Del Supr. 256, 2000

2.   Please review (A41-A44: A58, A64,65, A78-A89, A91-A95)

A247

1   Lenora during the time Bibbins was there. (A135) ~~Rick Hughes an employee from Harvey's~~

2   ~~plumbing gave an account of the incident on November 1st (1999 (A147-A151)~~ ~~This~~ was

3   ~~Hughes second in court identification done in front the jury. Defendant requested James Liguori~~

4   ~~to investigate and to introduce two witnesses with whom Hughes communicated concerning the~~

5   ~~identity of the accused. (A154-A157)~~ Hughes spoke with three inmates by phone while each

6   person was housed with Morris at Sussex Correctional Institution, specifically inquiring about

7   ~~Morris' identity.~~ Officer Davis testified that he did two separate finger print tests for latents on

8   the pvc pipe both of which were never disclosed in defendants Rule 16 discovery request.(A162-

9   A164) ~~Defense Counsel presented Russell McNatt of the Delaware State Police, a finger print~~

10   ~~expert but refused to request the P.V.C. pipe be tested to determine if Davis's testimony was~~

11   ~~true.~~ (A165-A178) Prosecution presented Dr. Carl Maschuer (ophthalmologist) to testify

12   concerning victim's James Bibbins' eye sight. On March 14th, 2000, Maschuer testified that

13   Bibbins visual acuity was 20/70 in his remaining eye (left eye); then on November 13th, 2002,

14   Mascher stated Bibbins visual acuity worsened from 20/40 to 20/50 in contradiction of both

15   medical records and testimony given by Maschuer on March 14th, 2000. (A191-A196) Defense

16   Counsel petitioned the trial court for a Post-trial Motion to Suppress, at the close of evidence for

17   both parties. (A197-A204) Prosecution requested a jury instruction to cure any negative

18   impression upon the jury of police wrongdoing in reference to defendant's warrant-less arrest

19   (see Ex C page 13 Judge's Charge to Jury)

20

21     On March 19th, 2002 this court affirmed the Superior Court's Ruling denying defendants

22   direct appeal. (see ex D) On March 3rd, 2005 defendant filed Post Conviction Relief, arguing

23   that defense counsel's ineffective assistance denied defendant a fair trial by failing to litigate

24   properly the defendants 4th amendment claim; failing to competently litigate defendant's Due

25   Process Rights allowing the State to obtain indictment based upon false evidence; failing to

26   properly litigate defendant's Double Jeopardy Claim; failing to object to impermissibly

27   suggested procedures, and to identify defendant; failing to object to improper jury instruction

28   that foreclosed the jury from considering police fabrication in obtaining warrant for arrest;

failing to object to expert testimony by Officer Davis concerning finger print test and eye

A248

1  examination results that were never provided under Rule 16, and by failure of trial court to

2  inquire into potential conflict of interest. (A12- A229)  Superior Court Judge T. Henely Graves

3  denied each of defendant's arguments. (see Ex E. Superior Court decision dated 4/27/05) This

4  Appeal followed.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

A249.

## ARGUMENT

I.    SUPERIOR COURT ABUSED IT'S DISCRECTION BY DENYING
DEFENDANTS CLAIM THAT DEFENSE COUNSEL'S FAILURE TO LITIGATE
PROPERLY  DEFENDANT'S 4TH AMENDMENT CLAIMS COMPETENTLY
DENIED DEFENDANT'S RIGHT TO A FAIR TRIAL DUE TO INEFFECTIVE
ASSISTANCE OF COUNSEL.

A.    SCOPE OF REVIEW

The Courts standard of review is whether the Superior Court abused it's discretion in denying defendant's claim that counsels failure to litigate properly defendants 4th Amendment claims denied defendants right to the effective assistance of counsel and a fair trial. *see* Kimmelman v. Morrison 477 U.S. 365(1986) The issue of the sufficiency of the information within the arrest warrant's affidavit of probable cause is reviewed de novo. A determination of the historical facts leading up to defendant's warrantless arrest and a decision as to whether the historical facts viewed from the stand point of an objectively reasonable police officer amount to reasonable ground to believe defendant committed a crime. *see* Garner v. State 314A2d.908 (Del Supr.); Delaware v. Cooley 457A2d.352 Del Supr.); Woody v. State 765A2d.1257 (Del supr.)

B.    MERIT OF ARGUMENT

Superior Court Criminal Rules have held that motions to suppress be filed no later than ten days after the date of initial review. Pennewell v. State 822 A2d.397 (Del Supr.) Defense counse elected not to petition the trial court with a showing by preponderance of evidence  that a false statement either knowingly, intentionally, or with reckless disregard for the truth was  included in the warrant  affidavit by affiant pursuant to  Superior Court rule 12 (b)(3) or  Superior Court Rule 41 (f). The failure

A 250

of defense counsel to file a motion to suppress prior to the trial resulted in the waiver of the defendant's right to a full and fair hearing on the merit of defendant's fourth amendment claims. (A197-A204). Defense counsel's incompetence allowed the prosecution to proceed to trial without affording the defendant the opportunity to challenge the veracity of the warrant's affidavit and have the court make a determination as to whether probable cause existed when the officer's took the defendant into custody, making a felony arrest, without a warrant. A determination that police lacked probable cause to arrest the defendant would have rendered all evidence obtained as a direct result of the unlawful arrest inadmissible as evidence against Alonzo Morris, the accused. An arrest without a warrant bypasses the safeguards provided by an objective pre-determination of probable cause and substitutes a far less reliable procedure vulnerable to the shortcomings of hind-sight judgment and subjectivity. Here, the police officer's sworn statement of direct, personal contact between the officer and victim induced a prudent and disinterested magistrate to credit this statement as a reasonable ground to believe that the defendant committed a crime. Beck v. Ohio 379 U.S. at 96

A251

1

ARGUMENT

2    II.    DEFENSE COUNSEL FAILED TO ADEQUATELY INVESTIGATE AND

3          PRESENT EVIDENCE TO SUPPORT DEFENDANT'S CLAIM; THAT FALSE

4          EVIDENCE WAS USED BY STATE TO OBTAIN INDICTMENT.

5

6    A.    SCOPE OF REVIEW

7          The standard and Scope of review is whether the Superior Court abused it's

8    discretion in denying defendant's claim that counsel failed to properly litigate

9    defendant's 6th Amendment provision, failing to properly investigate and present

10   evidence to trial court supporting defendant's claim that false information was given

11   to grand jury by state witness to obtain indictment. United States v. Basurto 497

12   F2d.781 (9th Cir.1974); (see ex E pages 3 and 4)

13

14   B.    MERIT OF ARGUMENT

15

16        Defendant's rights to Due Process were violated where defendant had to stand trial

     on an indictment which government knew was based on perjured testimony, the
17
     perjured testimony was material and jeopardy had not yet attached. United States v.
18
     Basutro 497 F2d.781 (9th Cir. 1974) Defendant must show that defense counsel's
19
     representation fell below an objective standard of reasonableness and that defense
20
     was prejudiced by counsel's errors to the extent that there is a reasonable probability
21
     that the outcome of defendant's case would have been different if not for defense
22
     counsel's poor representation. Strickland v. Washington 466 U.S.668, (1984);
23
     Blanco v. Singletary 943 F2d. 1477(11th Cir.1999) and Tejeda v. Dubois 142 F3d.
24
     (1st Cir.1998) Defense counsel filed a notion to Dismiss on 7/16/02 arguing Double
25
     Jeopardy and dismissal of the indictment due to perjurious and/or erroneous evidence
26
     presented before grand jury to obtain a true bill of indictment. (A56-A59) On 6/9/02
27
     defense counsel presented Superior Court with this motion. Defense counsel
28
     questioned Prosecutor James Adkins (A78,79) and two police officers from the

10

Georgetown Police Department, Daniel Davis (A80-A92) and Michael Barlow(A93-A96), in regard to the defendant's grand jury argument. Each witness stated that he neither knew nor was a part of the Grand Jury proceeding. Superior Court Judge T. Henley Graves states that "there are no transcripts of the grand jury testimony and no court reporter was present during testimony or voting." (see ex F) Defense counsel openly admits his failure to adequately argue defendants 5th Amendment claim. (A97-A98) Defense counsel failed to establish who was present at Grand Jury proceedings. November 5, 1999, four days after defendant's unlawful warrantless arrest, prosecutor James Adkins subpoenaed Officer Daniel Davis to testify before Grand Jury on November 15, 1999. (A41, 42)

No other witnesses were requested to appear before the Grand Jury (A43-A44)

No witnesses had identified defendant prior to this proceeding, nor after this hearing until March 13th, 2000 during defendant's first trial. (A33-34) Defendant's arrest based upon the false affidavit of probable cause and false testimony that defendant was identified by witnesses via photo line-up and also by witness Georgie Swan McCrea who the state claimed knew the defendant and provided the actual identity of the accused to police. (A13-A40) This was the only information available to the state at time of Grand Jury hearing. (A80-A88) The defense had every reason to conclude that Officer Davis' testimony consisted of the information given by him in the warrant's affidavit and that Officer Barlow's preliminary hearing testimony concerning the process of identification performed by police, were the bases that initiated the prosecution; therefore defense counsel's failure to present the Court with the State's Subpoena of Officer Davis to testify at the Grand Jury hearing and Prosecutor James Adkins signature of the Indictment,(A44), denied the defendant's rights to presentation of, and inquiry into evidence necessary to litigate competently, the defendant's claim. United States and Delaware 5th Amendment provides that, "No person shall be held to answer for a capital or otherwise infamous crime unless on a

A253

presentment or indictment of a Grand Jury..." The purpose for this safeguard is to limit a person's jeopardy to offences charged by a group of his fellow citizens acting independently of either the prosecutor or Judge. Stirone v. United States 361 U.S.212 (1960) Delaware Rule of Conduct 3.3(a),(4) states: "A lawyer shall not knowingly offer evidence that the lawyer knows to be false. If the lawyer has offered material evidence and comes to know of its falsity the lawyer shall take reasonable remedial measures." Defense counsel's failure to establish the identity of those present at the Grand Jury proceeding in the absence of any evidence from the State to contradict defendant's claim resulted in the denial of defendant's right to counsel at a critical stage in defendants trial. Counsel failed to subject the prosecution's case to meaningful adversarial testing; the grand jury relied upon the prosecutor (James Adkins) to initiate and to prepare this criminal case, and to investigate properly all the information which came before it. James Adkins' signature of the indictment ensures that he was present while the grand jury heard Officer Davis' testimony. Adkins called and questioned the witness and drew the indictment. The state had a duty which attached at the point it learned of the perjury before the Grand Jury to investigate and to cure the infraction. To allow the defendant to stand trial when the prosecutor knew that Morris was never identified by witnesses via photo line-up, and was aware that the victim never made the statement enclosed in the warrant affidavit, and knew that the police had no evidence other than the aforementioned false testimony to present to grand jury, only allowed the cancer to grow. The adversarial process protected by the 6th Amendment requires the accused have counsel acting in the role of an advocate, and the right to the effective assistance of counsel. Therefore, it is the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. The text of the 6th Amendment requires assistance to the defendant when confronted with the intricacies of the law and the zealous advocacy of the prosecutor. United States v. Ash 413 U.S.300,309 (1973) The 6th Amendment is meant to assure fairness in the adversary criminal process and unless the accused receives the effective assistance of counsel, "a serious risk of injustice

12                    A25⁴

infects the trial itself." Cuyler v. Sullivan 446 U.S. 343   Defense counsel failed to act in the role of an advocate. The adversarial process lost its character as a confrontation between adversaries when the defense failed to provide the trial court with the prosecution's subpoena of Officer Davis, the State's sole witness, to testify before the Grand Jury on 11/5/99 (A1,A42),  Prosecutor James Adkins signature of the indictment on 11/15/99, the date of the grand jury proceeding (A43,44) and the inability of prosecution to provide the court with any information to contradict the defendant's claim that false information within the warrant's affidavit and false preliminary hearing testimony concerning the process used to identify defendant were not available as exculpatory evidence to assist the grand jury in formulating an unbiased decision. These material breaches are supported by the legal standing that, "A conviction obtained through use of false evidence known to be such by representatives of the state must fall under the 14th Amendment".  Napue v. Illinois, Supra. "The principle that a state may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty..." *See* Giles v. Maryland Supra Id. at 74.

The long standing rule that the prosecution's use of known false testimony at trial requires reversal of conviction must extend to situations where the prosecution allowed the defendant to stand upon false evidence.  There are severe and material consequences to defendants when perjured Grand Jury testimony is introduced at trials, because defendants have no effective means of cross examination or rebuttal of any perjured testimony given at a grand jury proceeding. United States v. Basurto 497 2d.781,786(9th Cir.1974)  Defense counsel's failure to provide trial court with any exculpatory information impaired the integrity of the adjudicative process. This impairment was evident in every probable cause determination from arrest, to preliminary hearing to Grand Jury testimony, all of which require that an oath be sworn verifying the veracity and sincerity of the information provided by the state. and had to be remedied at earliest opportunity.  Impairment of Grand Jury's ability to

A 255

# ARGUMENT

III.    DEFENSE COUNSEL'S FAILURE TO PROPERLY LITIGATE DEFENDANT'S
DOUBLE JEOPARDY CLAIM VIOLATED DEFENDANT'S RIGHT TO THE
EFFECTIVE ASSISTANCE OF COUNSEL.

A.    SCOPE OF REVIEW

The scope of review is whether the Superior Court abused it's discretion in
denying defendant's Post Conviction claim, that counsel's ( James Ligouri's)
failure to question the Public Defender Ruth Smythe, (counsel for defendant's
first trial), concerning her failure to move for a mistrial in a timely manner or
to make basic objections to the Prosecutor's improper closing remarks,
resulted in the denial of the defendant's right to present evidence leaving the
defendant with no control over the course to be followed. Defense counsel's
failure to conduct representation in a diligent and competent manner allowed
improper closing remarks to go unchallenged, thus precluding defendant's
attempt to obtain reversal on appeal. Oregon v. Kennedy 456 U.S. 667 (1962)
Strickland v. Washington 466 U.S. 668 (1982)

B.    MERIT OF ARGUMENT

During defendants first trial the prosecutor, James W. Adkins, improperly
distorted state's burden of proof. This court reversed defendant's conviction.
Defense presented an oral argument for the first time that Delaware should
adopt an independent statute ruling that in light of egregious misconduct on
part of prosecution, Double Jeopardy should bar retrial. (A242-A255)  This
Court declined to address the claim, ruling this issue not ripe for
determination. Morris v. State 795 A2d.656  On remand, defense filed a
Motion to Dismiss on this issue (A56-58) The Court appointed defense

A256

counselor, James Liguori, presented the motion before Superior Court Judge T. Henley Graves on 9/6/02.  Liquori questioned prosecutor concerning his improper remarks, arguing to the Court that prosecution took advantage of public defender (A256-A265) Ironically trial court found the record to be replete with examples of the prosecutor bending over backwards and malsing every attempt to ensure a fair and unbiased trial for the defendant, failing to safeguard the defendant's rights and at the same time zealously prosecuting this case (A266) Defense counsel over defendant's objections refused to question Public Defender, Ruth Smythe concerning her failure to object to or to seek a mistrial in regard to prosecutorial misconduct in closing statement to jury. Fensteren v. State 509A2d.1112, Trump v. State 753 A2d.964  Trial Court ruled, that without a mistrial application Oregon v. Kennedy does not apply to defendant's case.(A267-A269)  Although the trial court ruled prosecutorial misconduct was a mistake by prosecutor, it held that: **At his (defendant's) trial, there was no mistrial application." "The defense is presumed to be in control of its destiny." "By not electing to apply for a mistrial, the defense made the decision to take the case to verdict." "But the defense also knew that if convicted, there would be grounds to seek reversal on appeal." Without a mistrial or mistrial application, this can be said to be much ado about nothing."** (see ex F pg 8)  Defense counsel's failure to establish Smythe's continual ineffectiveness throughout defendant's first trial was clearly poor judgment and defense had no factual advantage or reason not to use this evidence. Public defender Smythe allowed the State to use false information to arrest. (A13) Preliminary hearing testimony concerning identification was false, and allowed the state to obtain indictment and impermissibly suggestive in court identifications on March 13th, 2000, first day of defendant's first trial (A48-A55, A14-A27, A32-A34) More importantly Smythe after first trial filed a notice of appeal with this court, criminal action number 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, defendant's violation of probation

A 25 7

sentence.(A209-A211) Smythe's incompetence provided the defense with a consistent pattern of ineffectiveness by public defender's office, denying defendant his rights, under the 6th Amendment, to counsel at a critical stage of defendant's trial which should have been presented to the trial court, included in it's decision and record for this Honorable court's consideration on appeal. Defendant was denied the opportunity to present evidence to show public defender's actions were not motivated by a tactical or strategic act on the behalf of the defense, but rather an act of collusion between her-self and the prosecution. Failure of defense counsel to question effectively public defender, Ruth Smythe concerning her failure to request a mistrial in regard to the state's burden shifting closing argument and her (Smythe's) failure to file a notice of appeal based upon defendant criminal conviction not his violation of probation would have denied the trial court the presumption that, "the defense is presumed to be in control of it's destiny." Defendant did not make a choice to carry the case to verdict, he did not have the legal knowledge, the legal advise, or the wherewithal to give informed consent either implicitly or explicitly that would have led to this conclusion. The defendant did not have the competence to act upon such legal circumstances with the intent challenge the issue on direct appeal. (see ex F pg 8)

17

A 258

ARGUMENT

IV.   TRIAL COURT ABUSED ITS DISCRETION IN DENYING DEFENDANT'S
      POST-CONVICTION CLAIM THAT DEFENSE COUNSEL'S FAILURE TO
      OBJECT TO THE STATE'S USE OF EXPERT TESTIMONY REGARDING THE
      FINGERPRINT TEST PERFORMED BY POLICE THAT WAS NEVER
      PROVIDED TO DEFENSE PURSUANT TO RULE 16.

A.   SCOPE OF REVIEW

The scope of review is whether the trial court abused its discretion in denying
the defendant's claim that trial counsel's failure to object to use of expert
testimony by state violated defendant's right to a fair trial. Strickland v.
Washington 466 U.S. 668 (1984); Johnson v. State 550 A2d 903,911 (Del
Supr. 1988)

B.   MERIT OF ARGUMENT

The Court abused its discretion in denying defendant's claim that trial
counsel's failure to object to State's use of expert testimony concerning
fingerprint analysis without providing an expert report denied defendant a fair
trial. Rule 16(c) provides a continuing duty to disclose, which includes the
duty to disclose the substance of an opinion, as soon as the decision is made to
call a witness. Secrest v. State 697 A2d at 64 Here, the state was subject to
the discovery obligation. The State did not disclose the substance of the
opinion. Thus, trial counsel's cross examination was completely adlib and
unguided. (A162-A164) Defendant presented expert testimony by Russell
McNatt, Finger Print Section Supervisor for the State Bureau of Identification
for the Delaware State Police (A165-A178). Detective Daniel Davis of the
Georgetown Police Department testified for the State's case-in-chief that he

18

A 259

1  performed two finger print tests, fuming, and latent finger print analysis both

2  of which were never disclosed to defense under Rule 16 or Jencks Act. On

3  March 13th, 2002, Detective Davis testified during trial that he had performed

4  a fuming fingerprint test, which was never provided by state in its discovery

5  response nor following testimony pursuant to the requirements under the

6  Jencks Act. (A158-A164) This undisclosed expert testimony denied defense

7  the crucial opportunity to prepare any response to such evidence. Defense

8  counsel's failure to object to a clear violation of Rule 16(a)(1); (c),(D)and (E)

9  resulting in the denial of the defendant's right to petition the trial court to have

10  the P.V.C. pipe re-tested by a unbiased expert to determine if the condition of

11  the weapon actually prevented police from obtaining any fingerprints from the

12  P.V.C. pipe and the ability to reach a conclusive determination as to whether

13  or not the P.V.C. pipe was tested properly by police and whether testimony

14  concerning the P.V.C. pipe was accurate was never presented to jury. Defense

15  counsel's failure to object to state's use of undisclosed expert testimony

16  concerning the police officer's fuming fingerprint test precluded defendant

17  from conducting a diligent investigation and from presenting evidence to

18  show that defendant never possessed the weapon.

19

20

21

22

23

24

25

26

27

28

19

A 260

ARGUMENT

V.    TRIAL COURT ABUSED ITS DISCRETION IN DENYING THE DEFENDANT'S
POST CONVICTION CLAIM THAT DEFENSE COUNSEL'S FAILURE TO
OBJECT TO IMPROPER JURY INSTRUCTIONS DENIED DEFENDANT A FAIR
TRIAL.

A.    SCOPE OF REVIEW

The Scope of review is whether the trial court's denial of defendant's claims
that defense counsel's failure to object to improper jury instructions denied
defendant a fair trial. Strickland v. Washington 466 U.S.668 (1984) and
Tejeda v. Dubois 142 F3d 18 (1st Cir.1998)

B.    MERIT OF ARGUMENT

On March 13th, 2002, trial prosecutor, James Adkins, petitioned the trial court
for a curative instruction, to insure the jury was made aware police did not
unlawfully arrest the defendant (A205-A208). United States and Delaware
Constitutional law prohibit arrests with or without a warrant, which are not
supported by probable cause. Garner v. State 314 A2d, U.S.C.A. Const.
Amend. 4.

The issue before the trial court for consideration was whether, given the
information presented by both the prosecution and the defense, viewed in light
of the unbiased application of law, the police had probable cause to make a
warrantless felony arrest. Franks v. Delaware 438 U.S. 14; Delaware v.
Cooley 457 A2d. 352 Defense counsel's incompetence allowed the
prosecution to have a curative instruction given to the jury which prohibited
the jury from considering the arrest of the defendant as an unlawful arrest in
violation of state and federal law. (see ex C pg 15)

20                    A 261

Although, police are permitted to make felony arrest without an arrest
warrant, absent probable cause such an arrest is unlawful U.S.C.A. Const.
Amend 4; Del. C. Ann. Const. Art.1 section 6. The law requires police
officers in all valid arrests, conducted with or without warrants, to possess
information which would justify a reasonable man in believing that a crime
had been committed. Beck  Ohio 379 U.S. 89; State v. Walker 444 A2d.277
(Del. Sup. ct. 1982) An examination of the warrant's affidavit of probable
cause and the sworn testimony of affiant Detective Daniel Davis, show that
police intentionally misrepresented information to obtain the arrest warrant.
(A13, A15-A23)  Defense counsel's failure to present the trial court with
relevant facts and supporting case law to show the court that defendant's
arrest was in-fact unlawful, allowed the prosecution to request and be given a
curative instruction concerning the legality of the unlawful arrest of defendant
and denied the defendant's right to a jury instruction that properly applied the
law, allowing for a fair, measured, determination by jury.

21

A262

1        ARGUMENT

2

3    VI.    TRIAL JUDGE ABUSED HIS DISCRECTION IN DENYING DEFENDANT'S

4           POST-CONVICTION MOTION CLAIM THAT DEFENSE COUNSEL'S FALURE

5           TO OBJECT TO INPERMISSIBILY SUGGESTIVE IN-COURT

6           IDENTIFICATIONS DENIED DEFENDANT THE RIGHT TO A FAIR TRIAL.

7      A.    SCOPE OF REVIEW

8            The scope of review is whether the Superior Court abused its discretion in

9            denying movant's Post-Conviction motion claim that counsel failed to object

10           to impermissibly suggestive in-court identifications of defendant. Stovall v.

11           Denno 388 U.S. 293 (1967), U.S. v. Emanuele 51 F.3d 1123 (3rd cir, 1995)

12           and U.S.C.A. Const. Amends.5, 14

13

14     B.    MERIT OF ARGUMENT

15           Government identification procedure violates due process when it is

16           unnecessarily suggestive and creates substantial risk of misidentification

17           Neil v. Biggers 409 U.S. 188,198 (1972)

18

19           1. On March 13th, 2000, during defendant's first trial, the victim, James

20           Bibbins, was asked by the prosecutor to stand up and to look around the court

21           room to see if he could identify the assailant who assaulted him. (A276)

22           Bibbins, after being told by the prosecutor to sit down, after he looked

23           throughout the entire court room, testified that he did not see the person who

24           hit him in the courtroom. The prosecutor later presented expert testimony

25           from the victim's eye doctor that Bibbins' visual activity was 20/70, which

26           meant that Bibbins could not identify facial features that were more than

27           twelve or fifteen feet away. (A181-A185) The prosecutor even measured the

28           distance from defendant to witness stand to justify Bibbins's failure to identify

             Alonzo Morris, the defendant, as his attacker. (A184-A189) During

22                        A 463

1   defendant's second trial, James Bibbins(the victim), on cross examination,

2   identified the defendant as his attacker. (A132,A133) Defense counsel's

3   failure to object to any in-court identifications resulted in the denial of

4   defendant's right to a fair trial since defense counsel's inaction left unresolved

5   the key issue of the origin of the victim's recollection or identification of his

6   assailant. Specifically, the defense counsel failed to establish whether or not

7   the victim's recollection or identification of the assailant was that of an

8   independent witness or the result of suggestion by the prosecution. (A238-

9   A240) At defendant's second trial, expert testimony from the victim's

10  ophthalmologist, Dr. Maschuer, testified that Bibbins had a visual acuity of

11  20/50, which would have allowed him to identify facial features more than 30

12  to 40 feet in distance also allowing the victim to obtain a Delaware drivers

13  license. A suggestive and unnecessary identification procedure does not

14  violate due process so long as the identification possesses sufficient aspects of

15  reliability, for reliability is the "linch pin" in determining the admissibility of

16  identification testimony. Mason v. Brathwaite 432 U.S. 106 In determining

17  the reliability of identification procedures the 3rd circuit used a totality of the

18  circumstances test. Only factors relating to the reliability of the identification

19  are relevant to a due process analysis. Independent evidence of culpability

20  will not cure a tainted identification procedure, nor will exculpatory

21  information ban the admission of reliable identification testimony, U.S. v.

22  Emanuele 51 F3d. 1126 (3rd cir.1995) citing Mason v. Brathwaite 432 U.S.118

23  Eye witness identifications must be those of Eyewitnesses not the product of

24  Governmental suggestion, intentional or unintentional, subtle or overt.

25  *See* United States v. Narcisco 446 F. Supp. 252 (1997) The specific events

26  leading to the victim's, James Bibbins' second opportunity to identify the

27  accused was so impermissibly suggestive as to give rise to a substantial

28  likelihood of irreparable misidentification

23

A264

(*see* Simmons v. United States supra, 390 U.S. 384. The Witnesses' original opportunity to observe the defendant, the degree of attention during that observation, the accuracy of the initial description, the witness' degree of certainty when viewing defendant and the length of time between crime and i identification are to be considered in the totaling of circumstances test. The defendant was denied the opportunity show that the prosecution arranged each confrontation by deliberately arranging both in court identifications which singled out the defendant in open court in the presence of the jury.

Wilson v. Common Wealth 695 SW2d 854, 857 (Ky. 1985) Although the prosecution presented two in-court identifications by James Bynum and Irishia Mitchell, the victim's testimony was central to prosecution, therefore the prosecution's prejudicial actions with respect to the victim are at the crux of the defendant's claim that he was effectively denied the right to fair trial. Defense counsel's failure to object to the suggestive in-court identification procedures which singled out the defendant and allowed the victim, James Bibbins, to identify Alonzo Morris as the assailant denied defendant's right to the effective assistance of counsel and contributed to the conviction of the accused. Chapman v. California 386 U.S. 18, 24 (1967).

1. On March 13th, 2000 the prosecution asked witness, Rick Hughes to identify the assailant for the first time during trial in the presence of the jury (A33,34). During the defendant's second trial, Hughes was again asked by prosecution to identify defendant during trial proceeding. The prosecution deliberately arranged both impermissible suggestive in-court identifications. To place a defendant at the defense table and ask a witness who has not previously identified defendant under any procedure was unnecessarily suggestive. The Prosecution's false testimony during the preliminary hearing concerning defendant being identified by Mr. Hughes and other co-workers at

24

A 245

1  Harvey's Plumbing (A26) and the Prosecutor's Intentional false representation
2  in response to the defense's request to see the photo array, and the prosecution's
3  inaccurate assertion that the victim and witnesses who identified the defendant
4  knew defendant were never presented to trial court for consideration. (A32-34)
5  The identification procedure pursuant to which Rick Hughes impermissibly
6  suggestive in-court identification were conducted violated defendant's 5th and
7  14th Amendments rights. Defense Counsel failed to present evidence that Hughes
8  questioned inmates during telephone conversations in order to obtain a
9  description of Alonzo Morris. (A154, 155,157) This would have supported a
10  defense objection to the reliability of Hughes identification and the unnecessarily
11  suggestive manner in which the prosecution obtained the in-court identifications.
12  Wilson v. Common Wealth 695 S.W.2d 854, 857 (KY.1985)

25

A 26 b

1

2

ARGUMENT

3

VII. TRIAL COURT ABUSED ITS DISCRETION BY DENYING DEFENDANT'S

4

CLAIM THAT DEFENSE COUNSEL'S FAILURE TO OBJECT TO FALSE EXPERT

5

TESTIMONY PRESENTED BY THE PROSECUTION DENIED DEFENDANT A

6

FAIR TRIAL.

7

8

A.    SCOPE OF REVIEW

9

The Scope of review is whether the Superior Court abused    its discretion in denying

10

defendant's Post-Conviction claim that defense counsel's failure to object to false

11

testimony, presented by state's expert witness, resulted in a denial of his right to affair

12

trial. Napue v. Illinois 360 U.S. 264,269; Strickland v. Washington 466 U.S. 695

13

14

B.    MERIT OF ARGUMENT

15

On November 13th, 2002 prosecutor James Adkins called Dr. Carl Maschauer,

16

Ophthalmologist, to give jury testimony concerning the seriousness of victim's injury.

17

(A190) On March 14th, 2000, Prosecutor James Adkins presented evidence given

18

through the expert testimony of Dr. Maschauer that victim, James Bibbins, had no vision

19

in his right eye and had pre-existing visual acuity of 20/70 in his left eye with glasses

20

(A179 – A189) On November 13th, 2002 the prosecution called Dr. Maschauer in it's

21

case-in-chief. Maschauer testified that in May of 1999 Bibbins had a visual acuity of

22

20/40 in his left eye, the victim's best corrective visual acuity with glasses. (A192) Dr.

23

Maschauer stated under oath that a

24

re-examination of the victim's eyesight after the assault shown victim's eye sight

25

worsened from a visual acuity of 20/40 to 20/50 in the victims left eye. (A193) The

26

victim's visual acuity was a central issue to both prosecution and defense. (A190 – A196

27

and A277 - A280) Defendant petitioned the trial court and this Honorable Court for Dr.

28

Mashauer's medical records and was unable to obtain the information. (A281, 282)

Although Dr. Maschauer's medical records are not present due to time limitations on

A267

1    defendant's briefing schedule, copies will be supplied with defendant's reply brief for

2    this Court's examination.

3    The failure of defense counsel to object to the prosecution's use of false expert testimony

4    denied defendant a fair trial. The jury was unaware that the state presented false testimony which

5    led to questionable determinations. The Prosecutor presented the argument to the jury that

6    Bibbins failure to identify the defendant in a prior hearing was due to the defendant's positioning

7    at defense table. (A280)  The Prosecution knew Bibbins had been asked by the prosecutor on

8    March 13th, 2000 to stand, look around the courtroom to see if Bibbins could identify the person

9    who assaulted him. (A276)  After being asked to sit down by prosecutor James Adkins, Bibbins

10   stated, "No I don't see him." (A276)  Bibbin's vision became an issue to prosecution only after

11   the victim failed to identify Morris in a suggestive in-court procedure as a means to justify

12   Bibbins inability to identify Morris. Under a highly prejudicial procedure, the prosecution sent

13   Bibbins for an eye exam and presented the results of the exam by way of sworn expert testimony.

14   Defendant had a right to show that the testimony of Dr. Mashcauer was false and to show that it

15   was used by the state to justify the failure of the victim to identify Morris as the attacker.

16   Defendant requests the opportunity to have an evidentiary hearing to establish a record of the

17   aforementioned issue for this Court's review.

18

19

20

21

22

23

24

25

26

27

28

27

A268

ARGUMENT

VIII. TRIAL COURT ABUSED ITS DISCRETION BY DENYING DEFENDANT'S
POST-CONVICTION CLAIM THAT DEFENSE COUNSEL NOTIFIED THE
COURT OF A POTENTIAL CONFLICT OF INTEREST, WHICH DENIED
THE DEFENDANT THE RIGHT TO THE EFFECTIVE ASSISTANCE OF
CONFLICT-FREE COUNSEL

### A. SCOPE OF REVIEW

The trial Court abused it's discretion by denial of defendant's claim that failure of
trial judge to inquire into potential conflict of interest between defendant and defense
counsel denied the defendant, Alonzo Morris a fair trial. Holloway v. Arkansas 435
U.S. 475; Lewis b. State 757 A2d 709 (Del.Supr.2000) On September 23rd 2002,
defense counsel, James Ligouri petitioned the trial court for a hearing due to a conflict
of interest between defendant and himself. (A117) Defendant's 6th amendment right to
the effective assistance of counsel provides for representation that is free from conflicts
of interest, requiring automatic reversal where the trial court fails to give the defendant
an opportunity to show that a potential conflict impermissibly imperils his right to a fair
trial. Lewis v. State 757 A2d.709 (Del.Supr.2000) Where the trial court is on notice
that a potential conflict of interest exists and instructs the parties to proceed to trial
without making inquiry, the court has failed to protect the defendants essential right to
counsel and to a fair trial. As a result, the legal process is "contaminated." quoting
Satterwhite v. Texas 486 U.S. 249; Campbell v. Rice 265 F3d.878 (9th Cir. 2001) The
Trial Judge did not inquire into the potential conflict between defendant and counsel
prior to trial. There are no records to support trial court's decision that it resolved this
issue or even responded to defense counsel's petition. Where the trial court knows of a
conflict of interest and fails to conduct an inquiry, the reviewing court can assure that

A 269

the conflict resulted in effective assistance of counsel. Wood v. Georgia 450 U.S. 261, 273; Cuyler Supra. 446 U.S. 348

A review of the Superior Court docket sheet for the date of September 23rd, 2002 up through defendants second trial, shows that no inquiry was made by the trial court on this issue (A8-A12) To compel one charged with a grievous crime to undergo trial with assistance of an attorney with whom the defendant has become embroiled in an irreconcilable conflict is to deny the defendant of the effective assistance of any counsel whatsoever. Brown v. Craven 424 F, 2d.1167 (9th Cir.)

A 2·7ᴰ

CONCLUSION

**Wherefore**, Defendant _ Below, Appellant Alonzo W. Morris, Jr. respectfully requests that this Court reverse his convictions and remand this case for a new trial.

Respectfully Submitted,

Alonzo W. Morris, Jr. #26397

Delaware Correctional Center

1181 Paddock Road

Smyrna, DE 19977

A271

Westlaw.

900 A.2d 101
900 A.2d 101, 2006 WL 988041 (Del.Supr.)
**(Cite as: 900 A.2d 101)**

MHU
Law Library

Page 1

# H

Briefs and Other Related Documents
(The decision of the Court is referenced in the
Atlantic Reporter in a 'Table of Decisions Without
Published Opinions.')
Supreme Court of Delaware.
Alonzo **MORRIS**, Jr., Defendant Below-Appellant,
v.
**STATE** of Delaware, Plaintiff Below-Appellee.
**No. 2152005.**

Submitted: Jan. 27, **2006.**
Decided: **April 13, 2006.**

Court Below-Superior Court of the **State** of Delaware
in and for Sussex County, Cr. ID No. 9911000751.

Before HOLLAND, JACOBS and RIDGELY,
Justices.

## *ORDER*

JACOBS, Justice.
*1 This 13th day of **April 2006**, upon consideration of
the briefs on appeal and the record below, it appears
to the Court that:

(1) The defendant-appellant, Alonzo **Morris,** Jr.,
filed an appeal from the Superior Court's **April** 27,
2005 order denying his motion for postconviction
relief pursuant to Superior Court Criminal Rule 61.
We find no merit to the appeal. Accordingly, we
AFFIRM.

(2) In November 2002, **Morris,** on retrial, was found
guilty by a Superior Court jury of Assault in the First
Degree and Possession of a Deadly Weapon During
the Commission of a Felony.[FN1] **Morris'** convictions
and sentences were affirmed by this Court on direct
appeal.[FN2]

> FN1. **Morris'** original convictions were
> reversed by this Court in *Morris v. State,*
> 795 A.2d 653 (Del.2002).

> FN2. *Morris v. State,* Del.Supr., No. 21,
> 2003, C.J., Steele (Mar. 3, 2004).

(3) In this appeal, **Morris** claims that his trial counsel
provided ineffective assistance by failing to: a) move
to suppress his statement to police on the ground that

there was no probable cause for his arrest; b) properly
investigate the **State's** use of false evidence to obtain
an indictment; c) present evidence that his counsel in
his first trial improperly failed to move for a mistrial
on the ground of prosecutorial misconduct; d) object
to the **State's** use of improperly suggestive
techniques to elicit his in-court identification; e)
object to improper jury instructions; f) object to
testimony by the **State's** expert regarding the results
of fingerprint testing; and g) object to false testimony
by an eye doctor regarding the victim's visual acuity.
Finally, **Morris** claims that his trial counsel was
ineffective due to a conflict of interest.

(4) In order to prevail on his claims of ineffective
assistance of counsel, **Morris** must show that his
counsel's representation fell below an objective
standard of reasonableness and that, but for his
counsel's unprofessional errors, there is a reasonable
probability that the outcome of the proceedings
would have been different.[FN3] Although not
insurmountable, the Strickland standard is highly
demanding and leads to a "strong presumption that
the representation was professionally reasonable." [FN4]
This Court consistently has held that a defendant
must set forth concrete allegations of actual prejudice
and substantiate them, or risk summary dismissal.[FN5]

> FN3. *Strickland v. Washington,* 466 U.S.
> 668, 688, 694 (1984).

> FN4. *Flamer v. State,* 585 A.2d 736, 753
> (Del.1990).

> FN5. *Younger v. State,* 580 A.2d 552, 555-
> 56 (Del.1990).

(5) Morris' first claim is that his counsel was
ineffective by failing to move to suppress his
statement to police on the ground that there was no
probable cause for his arrest. At trial, two
eyewitnesses, including the victim of the assault,
identified **Morris** as the perpetrator. In addition, two
other witnesses confirmed the victim's identification
of **Morris** as the perpetrator immediately following
the attack. In light of the overwhelming evidence
against **Morris,** we conclude that there is no
reasonable probability that the outcome of the trial
would have been any different had his statement to
police been suppressed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00194-GMS    Document 4    Filed 04/05/2007    Page 253 of 296

900 A.2d 101
900 A.2d 101, 2006 WL 988041 (Del.Supr.)
(Cite as: 900 A.2d 101)

Page 2

(6) **Morris** next claims that his counsel was ineffective by failing to demonstrate that the **State** had relied on a false affidavit of probable cause and false testimony about a photo lineup to obtain his indictment. The record reflects that, at an evidentiary hearing prior to **Morris'** second trial, a police officer who had testified before the grand jury **stated** that he mistakenly assumed **Morris** had appeared in a photo lineup shown to witnesses. At the close of the evidentiary hearing, however, the trial judge ruled that the grand jury had not heard any evidence concerning a photo lineup. The judge also ruled that, while the affidavit of probable cause contained an error regarding Morris' name, the error was minor and did not undermine the reliability of the affidavit of probable cause. There was no error on the part of Morris' counsel in not pursuing this issue at the second trial and no evidence of any prejudice to Morris with respect to this claim.

**\*2** (7) Morris' third claim is based upon his contention that his counsel in his second trial should have presented evidence showing that his counsel in his first trial improperly failed to move for a mistrial on the ground of prosecutorial misconduct due to "collusion" with the prosecutor. There is no factual support in the record for this claim. We find no error on the part of **Morris'** counsel in not pursuing this issue at the second trial and no evidence of any prejudice to **Morris** with respect to this claim.

(8) **Morris'** fourth claim that his counsel failed to object to impermissibly suggestive techniques by the **State** to elicit his in-court identification is without any factual basis. The record reflects that, at trial, **Morris** was identified by the victim and another eyewitness to the attack. There is no evidence that the **State** engaged in any improperly suggestive acts that would have tainted these identifications. Because **Morris** has failed to show that any error on the part of his counsel resulted in prejudice to him with respect to this claim, it, too, must fail.

(9) **Morris'** fifth claim is that his counsel failed to object to the trial judge's improper jury instructions, in particular the instruction that a police officer may effect an arrest for a felony without an arrest warrant. Given the overwhelming evidence identifying **Morris** as the attacker, we find that **Morris** has failed to demonstrate that, even if the instruction had not been given, the outcome of the trial would have been any different.

(10) As his sixth claim, **Morris** argues that his counsel improperly failed to object to the **State's** expert's testimony regarding the results of fingerprint testing on the PVC pipe that was used in the attack. Specifically, **Morris** argues that, because the **State** did not disclose the opinion of its fingerprint expert prior to his first trial, the defense was not able to have the pipe tested by its own expert. The record reflects, however, that at **Morris'** first trial the **State's** expert testified that he was not able to lift any fingerprints from the pipe. There was no reason for **Morris'** counsel to object to that testimony, since it was favorable to **Morris**. Because **Morris** can show no error on the part of his counsel that resulted in prejudice to him, this claim also must fail.

(11) **Morris** next claims that his counsel failed to object to false testimony given by an expert witness for the **State**. Specifically, he argues that the victim's eye doctor lied about the victim's vision in order to explain why he was unable to identify **Morris** at the first trial, but was able to identify him at the second trial. The record reflects that there was a discrepancy between the eye doctor's testimony at the first trial and his testimony at the second trial. However, because the victim himself testified that the vision in his left eye, which was impaired as a result of the attack, had improved since the first trial, the eye doctor's testimony was not needed in order to explain why the victim was now able to identify Morris in court. Morris has not demonstrated that any error on the part of his counsel resulted in prejudice to him with respect to this claim.

**\*3** (12) Morris' final claim is that his counsel had a conflict of interest that compromised his ability to provide zealous representation. The record reflects that Morris accused his counsel of lying to him, which resulted in the trial judge clearing the courtroom and admonishing Morris and his counsel to be respectful to each other. There is nothing in the record, however, to suggest that an actual conflict of interest existed. Nor is there any evidence in the record to suggest that any action taken by Morris' counsel resulted in any prejudice to him. We find Morris' claim of a conflict of interest on the part of his counsel that negatively affected the outcome of the trial to be without merit.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED.

Del.Supr.,2006.
Morris v. State
900 A.2d 101, 2006 WL 988041 (Del.Supr.)

Briefs and Other Related Documents (Back to top)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A273.

900 A.2d 101                                                              Page 3
900 A.2d 101, 2006 WL 988041 (Del.Supr.)
**(Cite as: 900 A.2d 101)**

• 2005 WL 3445492 (Appellate Brief) State's
Answering Brief (Nov. 1, 2005) Original Image of
this Document with Appendix (PDF)
• 2005 WL 2739350 (Appellate Brief) Appellant's
Opening Brief (Sep. 7, 2005) Original Image of this
Document (PDF)
• 2005 WL 3733238 (Appellate Brief) Defendant's
Reply Brief (2005) Original Image of this Document
with Appendix (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

DAVIS - Direct

1   this as Defendant's 1. I know it's in the record.

2              THE COURT: All right. Defendant's 1.

3              THE CLERK: Entered as Defense Exhibit

4   No. 1.

5   BY MR. LIGUORI:

6       Q    As the chief investigating officer, did

7   you also present the evidence to the Grand Jury to

8   have an indictment returned against the defendant?

9       A    I'm not sure if I did or did not.

10      Q    Okay. If it wasn't you, who would it have

11  been that would have presented it to the Grand

12  Jury?

13      A    I don't remember.

14      Q    You have no recollection?

15      A    No, sir.

16      Q    Let me just then give you Defendant's

17  Exhibit 1 and ask you -- do you have the probable

18  cause affidavit there?

19      A    Yes, sir.

20      Q    And I believe this was flushed out at

21  trial, Officer Davis. But it appears that you

22  yourself put words in the mouth of the victim, what

23  the victim actually said to the people at the

DAVIS - Direct

1    scene, specifically with who he was in an argument

2    with and who had assaulted him.  Is that fair to

3    say?

4         A    I would say that I basically summarized

5    what his statement was.

6         Q    I understand the summary.  But the victim

7    never said Alonzo Morris to anybody, did he?

8         A    No.  He basically -- I think he said J.R.,

9    if my recollection is correct.

10        Q    And did you, in fact, have telephonic

11   communication with Officer Barlow that they were

12   identifying J.R. and J.R. Copes at the time?

13        A    Yes.

14        Q    Is that right?

15        A    Yes.

16        Q    You said no, no, that's really Alonzo

17   Morris?

18        A    Right.

19        Q    So your affidavit under oath there,

20   Defendant's 1, when you were attributing the

21   language of the victim who said his argument was

22   with Alonzo Morris, is not what the victim said, is

23   that right?



DAVIS - Direct

1    A    Right.  It's basically a summary, like I

2   said.

3    Q    And you don't know whether or not you

4   presented it to the Grand Jury?

5    A    I couldn't tell you, sir.  I don't

6   remember.

7    Q    How many officers are there in the

8   Georgetown Police Department?

9    A    Now?

10    Q    At that time, '99.

11    A    I couldn't tell you for sure.

12    Q    Is it normally part of your job to follow

13   through with your cases to bring them to the Grand

14   Jury?

15    A    It all depends I mean as far as manpower

16   goes, and if we're available to do that.  If not,

17   we would get another officer to do it.

18    Q    And have you subbed for other officers?

19    A    Sure.

20    Q    And you go into the Grand Jury armed with

21   what?

22    A    Probable cause sheet and crime report.

23    Q    I'm sorry?

DAVIS - Direct

1        A      And one of the crime reports.

2        Q      Okay.  Is it fair to say then that it is

3    likely or more likely than not that what you said

4    in your probable cause affidavit was told to the

5    Grand Jury?

6        A      I would be guessing, but yes, sir.

7        Q      Okay.

8        A      More than likely.

9        Q      Was there ever a photo lineup in this

10   case?

11       A      No.

12       Q      You did not testify at the preliminary

13   hearing, did you?

14       A      No.

15              MR. LIGUORI:  Thank you.  May I have one

16   moment, Your Honor?

17              (Brief pause.)

18              MR. LIGUORI:  No further questions.  Thank

19   you, Officer.

20              THE COURT:  Do you have any questions?

21              MS. AYVAZIAN:  No questions, Your Honor.

22              THE COURT:  All right.  Thank you.  I am

23   going to ask you to give that to the clerk.  I am

A 277



# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR SUSSEX COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE | : | Criminal Action Nos. |
| | | |
| v. | : | **S99-11-0097** |
| | | Assault in the First Degree |
| ALONZO W. MORRIS | : | **S99-11-0096** |
| | | Possession of a Deadly Weapon |
| | : | During the Commission of a |
| | | Felony |

## CHARGE TO THE JURY

## BEFORE THE HONORABLE T. HENLEY GRAVES
## AND A JURY

Trial Date: November 12, 13, 15 and 18, 2002

James W. Adkins, Esquire, Department of Justice, Georgetown, Delaware, Attorney for the State.

James E. Liguori, Esquire, Dover, Delaware, Attorney for the Defendant.

$F_x$ $B$     $\approx$ /

## DUTY OR FUNCTION OF JUDGE AND JURY

Members of the jury, you have now heard all of the evidence that is going to be presented in this case, and in a few minutes you will hear the arguments of the attorney for the State and for the defendant. I shall not review the evidence that has been presented to you because you, the jury, are the sole and exclusive judges of the facts of the case, of the credibility of the witnesses, and of the weight and value of their testimony.

I shall now instruct you as to the applicable principles of law governing this case. No single one of these instructions states all of the law applicable to this case. Therefore, you should listen and consider all of these instructions together in reaching your verdict. It is your duty as jurors to follow the law as I shall state it to you. You are not to be concerned with the wisdom of any rule or law stated by me. You must apply the law as instructed even if you do not agree with that law because it is the law of this State as enacted by the Legislature.

It is your duty to determine the facts and to determine them only from the evidence presented to you. You are to apply the law, as I will instruct you, to the facts and, in this way decide the case.

If, in these instructions, any rule, direction or idea is stated in a manner which appears to give it more significance than other instructions, no such

emphasis is intended by me, and none should be inferred by you.

At times throughout this trial, I have been called upon to pass upon the question of whether or not certain evidence may be properly admitted. It is the duty of a lawyer to object to evidence which she or he believes may not properly be offered and you should not be prejudiced in any way against a lawyer who makes objections or the party she or he represents. You are not to be concerned with the reasons for such rulings and are not to draw any inferences from the rulings. Whether evidence is admissible is purely a question of law. In admitting evidence to which an objection is made, I do not determine what weight should be given to such evidence, nor do I pass upon the credibility of the witnesses. Any offer of evidence that has been rejected by me, you of course, must not consider. As to any questions to which an objection was sustained, you must not speculate upon what the answer might have been.

The defendant is charged by indictment with Assault in the First Degree and Possession of a Deadly Weapon During the Commission of a Felony. The defendant has pled "not guilty" to these charges.

The indictment is a mere accusation against the defendant. It is the charging document. It is not, in itself, any evidence of the guilt of the defendant, and you should not allow yourselves to be influenced in any way, however slightly, by the fact that an indictment has been filed against the defendant.    /

In these instructions, I will explain the elements of the offense(s) charged in the indictment. The elements of an offense are those physical acts, attendant circumstances, results and states of mind which are specifically included within the definition of the offense in the Criminal Code. If words are defined in the Criminal Code, I will give you their Code definitions. Otherwise, you should give words their commonly accepted meanings. I will also explain the burdens of proof the law imposes upon the State as well as other aspects of your function as jurors. Finally, I will explain the possible verdicts.

## COUNT 1 – ASSAULT IN THE FIRST DEGREE

In order to find the defendant guilty of Assault in the First Degree, you must find that the following elements have been established beyond a reasonable doubt:

1. The defendant caused serious physical injury to James Bibbins. "Serious physical injury" means physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health or prolonged loss or impairment of the function of any bodily organ;

### AND

2. The defendant acted intentionally. That is, it was the defendant's conscious object or purpose to cause serious physical injury;

### AND.

3. The defendant used a deadly weapon, alleged to be a P.V.C. pipe. Title 11 of the Delaware Code defines "deadly weapon" as including . . . "a firearm, a bomb, a knife of any sort (other than an ordinary pocket knife carried in a closed position), switchblade knife, billy, blackjack, bludgeon, metal knuckles, slingshot, razor, bicycle chains or ice pick or any dangerous instrument which is used, or attempted to be used, to cause death or serious physical injury. "Dangerous instrument" means any instrument, article or substance which, under the circumstances in which it is used or attempted to be used, is readily capable of

causing death or serious physical injury.

If, after considering all of the evidence, you find that the State has

established beyond a reasonable doubt that the defendant acted in such a manner as

to satisfy all of the elements which I have just stated, at or about the date and place

stated in the indictment, you must find the defendant guilty of Assault in the First

Degree. If you do not so find, or if you have a reasonable doubt as to any element

of this offense, you must find the defendant not guilty.

## COUNT 2 – POSSESSION OF A DEADLY WEAPON DURING THE COMMISSION OF A FELONY

The law of Delaware provides that it is a separate and additional offense if a person, at the time that person commits a felony, is in possession of a deadly weapon.

The statute reads, in pertinent part, as follows:

> A person who is in possession of a deadly weapon during the commission of a felony is guilty of possession of a deadly weapon during the commission of a felony.

In order to find the defendant guilty of Possession of a Deadly Weapon During the Commission of a Felony, you must find that all of the following elements have been established beyond reasonable doubt:

1.    That the defendant committed a felony, in this case the felony charged is Assault in the First Degree;

### AND

2.    That during the commission of the felony, the defendant knowingly possessed a deadly weapon. "Deadly weapon" has already been defined for you.

It is necessary to understand what is meant by "possession." By "possession" I do not mean merely that the weapon may have been in the area or vicinity of the defendant so that it might have been taken possession of, if the defendant wanted to do so. Rather, in order for the defendant to be found in possession of a deadly

weapon, as that word is used in this statute, you must find that the weapon was in the immediate personal possession of, or under the immediate control of the defendant so that it was physically available or accessible during the commission of the felony alleged.

Finally, a person acts "knowingly" when that person is aware of the deadly weapon being in his possession at the time and place in question.

If, after considering all of the evidence, you find that the State has established beyond a reasonable doubt that the defendant acted in such a manner as to satisfy all of the elements which I have just stated, at or about the date and place stated in the indictment, you should find the defendant guilty of Possession of a Deadly Weapon During the Commission of a Felony. If you do not so find, or if you have a reasonable doubt as to any elements of this offense, you must find the defendant not guilty of Possession of a Deadly Weapon During the Commission of a Felony.

## PERMITTED INFERENCE OF STATE OF MIND

I have instructed you that an element of the offense charged is that the defendant acted with a required state of mind or with a particular belief. It is, of course, difficult to know what is going on in another person's mind. Therefore, our law permits the jury to draw an inference, or, in other words, to reach a conclusion about the defendant's state of mind from the facts and circumstances surrounding the acts the defendant is alleged to have done. In reaching this conclusion, you may consider whether a reasonable man in the defendant's circumstances would have had or lacked the requisite state of mind or belief. You should, however, keep in mind at all times that it is this defendant's state of mind or belief which is at issue here, and in order to convict the defendant, you are required to find beyond a reasonable doubt that the state of mind or belief required for guilt existed.

## PRESUMPTION OF INNOCENCE - BURDEN OF PROOF
## REASONABLE DOUBT

The law presumes every person charged with a crime to be innocent. This presumption of innocence requires a verdict of not guilty, unless you are convinced by the evidence that the defendant is guilty beyond a reasonable doubt.

The burden of proof is upon the State to prove beyond a reasonable doubt all of the facts necessary to establish each and every element of the crime charged.

Reasonable doubt is a practical standard.

On the one hand, in criminal cases the law imposes a greater burden of proof than in civil cases. Proof that a defendant is probably guilty is not sufficient.

On the other hand, there are very few things in this world that we know with absolute certainty.

Therefore, in criminal cases, the law does not require proof that overcomes every possible doubt.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. Therefore, if, based upon your conscientious consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you should find the defendant guilty. If, on the other hand, you think there is a real possibility or, in other words, a reasonable doubt, that the defendant is not guilty, you must give the defendant the benefit of that doubt by finding the defendant not guilty.

## DIRECT AND CIRCUMSTANTIAL EVIDENCE DEFINED

There are two types of evidence from which a jury may properly find the facts of a case. One is direct evidence. The testimony of an eyewitness is an example of direct evidence. The other is indirect or circumstantial evidence; that is, the proof of facts or circumstances from which the existence or non-existence of other facts may reasonably be inferred. In this case, the State and the defendant have relied in part upon circumstantial evidence.

It is not unusual in a criminal case to rely upon circumstantial evidence.

To warrant a conviction, all of the evidence, direct and circumstantial, must lead you to conclude beyond a reasonable doubt that the accused committed the offenses charged.

## **ALIBI**

A defense in this case is what is known as an alibi. The defense of alibi is a recognized defense under our law. The defendant contends he was somewhere other than at the place where the crime is alleged to have been committed at the time of its commission. If the evidence on this point raises in your mind reasonable doubt as to the defendant's guilt, you must give him the benefit of that doubt and return a verdict of not guilty.

## IDENTIFICATION OF DEFENDANT

A matter which has been raised in this case is the identification of the defendant. You must be satisfied beyond a reasonable doubt that the defendant has been accurately identified, and that the defendant was, indeed, the one that did the act charged, before you may find the defendant guilty of any crime. If there is any reasonable doubt about identification, you must give such defendant the benefit of such doubt and find him not guilty.

## PRIOR OUT-OF-COURT STATEMENTS - 11 DEL.C. §3507

You have heard evidence of unsworn statements of some of the witnesses occurring before trial. That is what a person may have told another person prior to trial. Such testimony is permissible, under a provision of a Delaware statute, which reads, in pertinent part, as follows:

> "(a)  In a criminal prosecution, the voluntary out-of-court statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value.
>
> (b)  The rule in subsection (a) of this section, shall apply regardless of whether the witness' in-court testimony is consistent with the prior statement or not . . ."

With regard to this provision, caution must be exercised by the jury when a conflict exists between the out-of-court statements and the in-court testimony, or when a conflict exists among the out-of-court statements themselves. The jury should be particularly careful if there is no evidence to corroborate an inconsistent out-of-court statement. Nevertheless, the jury may convict on such statement if it is satisfied beyond a reasonable doubt that the statement is true.

A police officer may arrest a person for a felony without an arrest warrant.

In this case Ronald Higgins' testimony was given through one who read Mr. Higgins' prior recorded testimony.

Testimony given as a witness at another hearing of the same proceeding is admissible evidence and you weigh it the same as all testimony given in this case.

## EXPERT WITNESSES

In this case, you have heard the testimony of an expert witness. Generally, witnesses cannot testify as to their opinions or conclusions. Expert witnesses may state their opinions and reasons for their opinions because by their education and experience, they have become "expert" in their field.

You should give such expert testimony only the weight you feel it deserves. If it is not based upon sufficient education or experience, or if the reasons given in support thereof are not sound, and you feel it is outweighed by other evidence, you may disregard it entirely.

## CREDIBILITY OF WITNESSES AND CONFLICTS IN TESTIMONY

You are the sole judge of the credibility of each witness who has testified and of the weight to be given to the testimony of each.

If you should find the evidence in this case to be in conflict, then it is your sworn duty to reconcile the conflicts, if you can do so as to make one harmonious story of it all. If you cannot reconcile these conflicts, then it is your duty to give credit to that portion of the testimony which you believe is worthy of credit, and you may disregard that portion of the testimony which you do not believe to be worthy of credit.

In considering the credibility of witnesses and in considering any conflict in testimony, you should take into consideration each witness' means of knowledge, strength of memory and opportunity for observations, the reasonableness or unreasonableness of the testimony, the consistency or inconsistency of the testimony, the motives actuating the witness, the fact, if it is a fact, that the testimony has been contradicted, the witness' bias, or prejudice, or interest in the outcome of this litigation, the ability to have acquired the knowledge of the facts to which the witness testified, the manner and demeanor upon the witness stand, and the apparent truthfulness of the testimony, and all other facts and circumstances shown by the evidence which affect the credibility of the testimony.

## WITNESS' CONVICTION OF A FELONY

The fact that a witness had been convicted of a felony may be considered by you for only one purpose, namely, in judging the credibility of that witness. The fact of such a conviction does not necessarily destroy or impair the witness' credibility, and it does not raise an inference that the witness has testified falsely. It is simply one of the circumstances that you may take into consideration in weighing the testimony of such a witness.

## ELECTION OF DEFENDANT NOT TO TESTIFY

Ladies and gentlemen of the jury, the defendant has chosen not to testify. The defendant has a constitutional right to testify or not to testify as he chooses. That fact that the defendant did not testify must not be construed by you as an indication that the defendant is guilty of the crimes charged. Like every other person charged with an offense, this defendant is presumed innocent until proven guilty beyond a reasonable doubt.

Furthermore, because the burden of proof, as described earlier, is upon the State to prove the existence of all elements of the crime beyond a reasonable doubt, the defendant is not required to present any evidence on his own behalf. You shall not draw any inference of guilt or innocence from the defendant's choice not to testify.

## SYMPATHY

I instruct you that your verdict must be based solely and exclusively on the evidence in the case; that you cannot be governed by passion, prejudice, sympathy, public opinion or any motive whatever except a fair and impartial consideration of the evidence; and that you must not, under any circumstances, allow any sympathy which you might have or entertain for any of those involved to influence you in any degree whatsoever in arriving at your verdict.

## ATTORNEY'S BELIEF OR OPINION

The role of an attorney is to zealously and effectively advance the claims of the party he or she represents within the bounds of the law. An attorney may argue all reasonable inference from evidence in the record. However, it is not proper for an attorney to state his or her opinion as to the truth or falsity of any testimony or evidence or the guilt or innocence of an accused. What an attorney personally thinks or believes about the testimony or evidence in a case is not relevant, and you are instructed to disregard any personal opinion or belief concerning testimony or evidence which an attorney offers during opening or closing statements, or at any other time during the course of the trial.

Further, what an attorney states in his or her opening or closing arguments is not evidence. Evidence consists of testimony from witnesses testifying from the witness stand and exhibits introduced through their testimony. It is this evidence only which you may consider in reaching your verdicts.

## JURY'S DELIBERATIONS

Before concluding, I want to say a few words about your deliberation process. How you conduct your deliberations is solely within your province. However, I would like to suggest that you discuss the issues fully, giving all jurors a fair opportunity to express their views, before committing yourself to a particular position. Each of you has a duty to consult with the others with an open mind and to deliberate with a view to reaching an agreement. Each of you should decide the case for yourself, but only after impartially considering the evidence with your fellow jurors. You should not surrender your honest convictions solely because of the opinions of your fellow jurors, or for the mere purpose of returning a verdict, but you should not hesitate to reexamine your own view and change your opinion if you are persuaded by another view.

The next stage of this trial will be your deliberations. Evidence is now closed and while it is not unusual for a jury to make a request that they be permitted to have additional evidence, that is not appropriate or possible. Regardless of any feelings you may have as to wanting more information, you are duty bound to decide the case based upon the evidence which is before you.

## POSSIBLE VERDICTS - UNANIMITY

The possible verdicts are as follows:

### AS TO COUNT 1 - ASSAULT IN THE FIRST DEGREE:

1.    Guilty as charged; or

2.    Not guilty.

### AS TO COUNT 2 - POSSESSION OF A DEADLY WEAPON DURING THE COMMISSION OF A FELONY:

1.    Guilty as charged; or

2.    Not guilty.

All twelve jurors must unanimously agree as to any verdict returned by the jury.

When you have agreed upon your verdicts, notify the bailiff, and the bailiff will inform you when to return to the courtroom. Upon your return, the clerk will ask the foreperson as to each charge, "What is the jury's verdict?" and your foreperson will announce the verdict.

1    outline for your summation?

2        A    I wasn't looking for that then.  Would you

3    like me to look for it now?

4        Q    If you don't mind, if you could look, with

5    the Court's permission.

6            THE COURT:  Let's break for ten minutes

7    while you are doing that.

8            (Whereupon, a recess was taken.)

9    BY MR. LIGUORI:

10       Q    Mr. Adkins, I just have two more

11   questions.  I know that you were unable to locate

12   your notes, your outline notes for your closing

13   summation, but I'm wondering if you have any

14   recollection as to whether or not the theme

15   included liar in it.

16       A    I do not.  I think my main theme, which

17   I'm sure if I can locate my notes, I'd find that

18   all these facts are not simply amazing

19   coincidences, they are proof beyond a reasonable

20   doubt that Alonzo Morris committed this crime.

21       Q    And who presented this case to the Grand

22   Jury?

23       A    Well, I certainly didn't, and I wasn't

KATHY S. PURNELL
OFFICIAL COURT REPORTER



A 278

ADKINS - Direct

1    present.  I don't know that I can answer that.  It

2    would have to be a Georgetown police officer, but I

3    don't know that I really know for sure firsthand

4    who the officer was.

5         Q    Thank you.  Thank you for this difficult

6    time.

7         A    That's all right.

8              MR. LIGUORI:  May I have one moment, Your

9    Honor?

10             THE COURT:  Yes.

11             (Brief pause.)

12             THE COURT:  The lady who had the phone,

13   that phone is going to stay in our custody for two

14   weeks.  You can come back in two Fridays and pick

15   it up.  Rather than confiscating it completely,

16   that is what the Court is going to do.  You are not

17   allowed to have phones in here, not allowed to have

18   them on.  Lawyers do not even have that.  There are

19   signs all over the place.  So two Fridays from now

20   you can come back and get it and we will turn it

21   over.

22             THE BAILIFF:  Chambers has it.

23             THE COURT:  We will let you all keep it.

BARLOW - Direct

1    did?   Then you keep going, asking questions if he

2    didn't.   Why keep going --

3              MR. LIGUORI:   I'll do what the Court says.

4    My way was to ask about preliminary hearing first,

5    because that is before the Grand Jury, and whether

6    or not they followed through.   That's all.

7              THE COURT:   You are attacking the Grand

8    Jury.   I understand what takes place at preliminary

9    hearing, what your proffer is, but I am interested

10   in the Grand Jury.   Then we can rewind the tape if

11   we need to.

12             MR. LIGUORI:   Okay.   Then I'll do that,

13   Your Honor.

14   BY MR. LIGUORI:

15        Q    Do you have any recollection as to whether

16   or not you presented this case, the State v. Alonzo

17   Morris case, before the Grand Jury in Sussex

18   County?

19        A    I did not.

20        Q    You're certain of that?

21        A    Yeah.   Not of the Grand Jury.   I did the

22   preliminary hearing.

23        Q    Do you know who did it before the Grand

BARLOW - Direct

1    Jury?

2        A    I have no idea.

3            MR. LIGUORI:  I'd still like the

4    opportunity to put on the record --

5            THE COURT:  Any police reports?

6            MR. LIGUORI:  Yes, that's what I'm going

7    to ask.

8            THE COURT:  Is it in the police reports

9    that which you say was testified to?

10           MR. LIGUORI:  I want to ask him that.

11           THE COURT:  All right.  Don't you have the

12   police reports?

13           MR. LIGUORI:  No.

14           THE COURT:  I want the State to tell me,

15   too, if it is in the police reports.

16   BY MR. LIGUORI:

17       Q    The issue with regard to this photo

18   lineup, the thing that you believed there was a

19   photo lineup -- and, in fact, we know that's not

20   true, correct?

21       A    That's correct.

22       Q    You testified under oath that at the

23   preliminary hearing you thought there was a photo

BARLOW - Direct

1   going to ask you to stay out until the close of the

2   evidence, just in case. Just cautious. Next

3   witness?

4            MR. LIGUORI:  Officer Barlow.

5                   MICHAEL R. BARLOW

6   was called as a witness by and on behalf of the

7   defendant, having been first duly sworn,

8   was examined and testified as follows:

9                DIRECT EXAMINATION

10  BY MR. LIGUORI:

11       Q    Officer Barlow, good afternoon. My name

12  is Jim Liguori. Thanks for waiting around here for

13  this testimony.

14       A    Sure.

15       Q    My understanding is you were the first

16  officer on the scene back in 1999, November 1, when

17  Mr. Bibbins was struck by the Townsends plant, is

18  that right?

19       A    That's correct.

20       Q    And you then had the opportunity to take

21  certain information from Mr. Bibbins?

22            THE COURT:  Ask him whether or not he went

23  to the Grand Jury. Isn't that the end of it, if he

KATHY S. PURNELL
OFFICIAL COURT REPORTER

A293

A282

BARLOW - Direct

1    lineup.

2        A    Yes, that's correct.

3        Q    Was that ever transcribed or captured in a

4    police report?

5        A    Not to my knowledge, no, not a police

6    report.  I can't imagine why any police report

7    would be generated for that.  It was a court

8    proceeding.

9        Q    Okay.  But the point is, where did you get

10   the idea from?

11       A    In my conversation with Detective Davis

12   prior to -- because when he was not able to be

13   present for the preliminary hearing and asked if I

14   could stand in, he gave me a verbal briefing to

15   bring me up to speed.  In the course of that

16   conversation, he talked about the witnesses and a

17   photo lineup, and I assumed that he had given them

18   a photo lineup.  So that's what I presented as

19   evidence.  I was mistaken.

20       Q    Have you seen Detective Davis' police

21   report in this matter?

22       A    No.

23       Q    Okay.

KATHY S. PURNELL
OFFICIAL COURT REPORTER

A29 4                              A 283

1    record, as you have there -- wait a second, you

2    know, if you're going to ask them that, you have to

3    give enough copies of what my own tape says.  I'm

4    talking about the trial preparation.  In the

5    preparation, they knew the existence of that

6    person.  And Bynum said I was there waiting with my

7    cousin or niece.

8              THE COURT:  At trial?

9              MR. LIGUORI:  No, told them first, then

10   said it later on --

11             THE COURT:  Mr. Adkins said he had no

12   representation of telling him at first that he was

13   waiting for the cousin, but there is no -- they did

14   not know whether or not the cousin was there or

15   not.

16             MR. LIGUORI:  That might have been

17   inartful on my part for not getting that out, for

18   asking Mr. Adkins that.  But the point is, this

19   existed.  They knew they existed before he stood up

20   and called everybody a liar that there was another

21   eyewitness.

22             THE COURT:  Grand Jury argument.

23             MR. LIGUORI:  Your Honor, I think it's

1    simple that I may not have chinned that bar, so to

2    speak, because I don't know who went before the

3    Grand Jury.  But I can only have you consider that

4    erroneous testimony was given to the Grand Jury.

5         THE COURT:  I will wipe that one out right

6    now.  I do not find that you have chinned that bar.

7    I agree with you.  I do not find that the officer's

8    testimony, that he used the defendant's -- gave

9    them a name in the affidavit of Alonzo Morris as

10   opposed to J.R. Copes, rises to the bar of a

11   substantial misrepresentation.  It would be nicer

12   if it was clear, but I do not think that that rises

13   to substantial misrepresentation.  That is

14   basically what we have right now.

15        So that one is by the wayside.  I deny

16   your application as concerning the Grand Jury.  All

17   right.  Does the State wish to argue?

18        MS. AYVAZIAN:  Your Honor, it's the

19   State's position that the defense has not met its

20   burden of showing that the State intended to goad a

21   mistrial in this case.  All Mr. Liguori has is

22   speculation about a tactical advantage that he

23   thinks the State had in jeopardizing this trial and

Davis – Cross                        B–102

1    investigation of a dying declaration, what would you

2    rather have?  What you believe was said or what was

3    actually said?

4         A    What was actually said.

5         Q    Well, what was actually said in this

6    situation was not what you showed the Judge, was it?

7         A    Well, no.  He called him by J. R., which I

8    knew to be Alonzo Morris.

9         Q    Did he call him J. R. or did he say Jerrold?

10        A    Well, he said J. R., but unfortunately for

11   Mr. Bibbins, his jaw was broken.  So with respect to

12   that, I am sure it sounded like Jerrold.

13        Q    So how do you know that, Officer?  That is

14   something you are interjecting.  You never spoke to

15   him, did you?

16        A    No.  I did talk to his doctor later on.

17        Q    But we are talking about at the scene.  He is

18   sitting on the sidewalk and you are getting this

19   information and you and Barlow are working hand in

20   hand?

21        A    Officer Barlow got the statement before I

22   arrived.

23        Q    You and Barlow are working hand in hand.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER



1    term?

2         A    I have degree, a Doctor of Optometry.  So I

3    am an optometrist.

4         Q    You have a Doctor of Optometry?

5         A    Correct.

6         Q    Are you licensed to practice in the State of

7    Delaware?

8         A    Yes, sir.

9         Q    Do you, in fact, practice in the State of

10   Delaware?

11        A    Yes, sir.  Yes, I do.

12        Q    For how long have you been a licensed

13   practicing Doctor of Optometry?

14        A    Seventeen years.

15        Q    Do you have an office here in Georgetown?

16        A    Yes, sir, I do.

17        Q    And are you familiar with a seventy-five-

18   year-old gentleman, an African-American man, by the

19   name of James Bibbins?

20        A    Yes, I am.

21        Q    Is James Bibbins a patient of your practice

22   and has he been for a few years?

23        A    Yes, sir, he has since 1976.

1       Q     How about his peripheral vision?  Can you say

2    anything about that at this point as of today?

3       A     I did not check that today, but I would say

4    it is certainly no better.  It is either going to be

5    the same or worse, based on his glaucoma.

6       Q     Now, I want to ask you another question to

7    try to explain this to the jury, if you can.  Let's say

8    you have people who see good, and let's say they have

9    20/20 vision.

10      A     Correct.

11      Q     You said that Mr. Bibbins only sees at all

12   out of his left eye and he has 20/70 vision.  Could you

13   tell us what that means in terms of his being able to

14   see clearly a distance away?

15      A     What 20/70 means is that what a person can

16   see at seventy feet, Mr. Bibbins would only be able to

17   see something twenty feet away.  He would have to be

18   somewhere between one-fourth as close or one-third as

19   close.

20      Q     So can you correlate that in terms of feet?

21   In other words, would he be able to see clearly, for

22   example, facial features more than ten or fifteen feet

23   away, or whatever?

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 289



Maschauer - Direct                    B-81

1          A      No, he would not.  Most people can see

2     clearly facial features, if you are looking for

3     freckles, moles, anything along those lines, fine

4     detail, you are only going to see it thirty or forty

5     feet away.  That means, basically, he would be able to

6     see it ten to twelve feet away maybe, at best.

7          Q      Ten or twelve feet?

8          A      Yes, sir.

9                MR. ADKINS:  Your Honor, I have a tape

10    measure here.  I would like permission to approach the

11    witness and give him one end and walk over to the

12    defendant with the other end.

13               THE COURT:  You may do so.

14               MS. SMYTHE:  At the same time, I would like

15    Mr. Adkins to measure from the door to the entrance of

16    the court.

17    BY MR. ADKINS:

18         Q      What is your reading, Dr. Maschauer?

19         A      It says twenty-three feet seven inches.

20               MR. ADKINS:  Thank you.

21               I don't have any more questions of

22    Dr. Maschauer.  If Ms. Smythe wants him to measure

23    anything else, I will leave the tape measure with him.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 290

1       A    It is Sussex Eye Center.  It is a

2    professional association.

3       Q    Have you had as one of your patients

4    Mr. James Bibbins, an elderly gentleman?

5       A    Yes, sir.

6       Q    Was he one of your patients prior to November

7    1, 1999?

8       A    Yes.  He first came to our office in 1996.

9       Q    Just prior to November 1, 1999, could you

10   please explain to the jury what the physical condition

11   of his eyes were and his vision?

12      A    When last seen in May of 1999, Mr. Bibbins

13   had vision acuity of 20/50 in the right eye and 20/40

14   in the left eye.  He also had some retinal problems and

15   glaucoma, which gave him tunnel vision, which basically

16   means he can see things almost like looking through a

17   paper towel.  But at that time, it was 20/50 in the

18   right eye and 20/40 in the left eye.

19      Q    Was that without glasses or with prescription

20   glasses?

21      A    That would have been with his best

22   correction, with glasses.

23      Q    So did you prescribe glasses for him to wear?

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

Maschauer – Direct                    B-144

1      A    Yes.  He was wearing them at that time, yes.

2      Q    And did you see him after his injury on

3    November 1, 1999?

4      A    Yes.  He was seen on January 19, 2000, and at

5    that time, his vision in his right eye -- well, there

6    was no vision.  He couldn't see light.  You could shine

7    a bright light in his eyes and he saw absolutely

8    nothing.  Just darkness.  And the left eye had 20/50

9    visual acuity.

10     Q    So even the vision in the left eye had

11   worsened; is that right?

12     A    At least that day when we recorded his

13   vision.  It can vary a little bit.  Each person any day

14   they come in, they might see a little bit better one

15   day than another.  The right eye was significantly

16   different because he couldn't see anything.

17     Q    Was he one hundred percent absolutely blind

18   in the right eye?

19     A    Absolutely one hundred percent.  In fact,

20   there was a recommendation at first that his eyeball

21   should be removed because so much damage had been done

22   that it was worried that it would become painful for

23   Mr. Bibbins.