IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF

DELAWARE

ALONZO MORRIS, J.R.

        Petitioner,                      Civ. Act. No. 07-194-GMS

v.

THOMAS CARROLL, Warden

And JOSEPH R. BIDEN, III

Attorney General for the State of Delaware

        Respondents



**REPLY**

Pursuant to Rule 5(e) of the Rules Governing Section 2254 Actions, 28 U.S.C. Poll sec 2254, petitioner state the following in reply to the respondents answer to the petition for a writ of habeas corpus:

Petitioner's federal habeas petition was filed within one year of the date that conviction became final. Each legal action necessary to exhaust all State remedies were subject to equitable tolling provision section 2244(d) (2). According to the States claim that petitioners Post Conviction exceeded the one year tolling limitation by one day, ignore the fact that petitioner is an inmate in a state prison. It is obvious that the Post Conviction was post-dated prior to March 4, 2005. Thus petition is timely and the statuary tolling provisions of 2254(d) (2) require applications of equitable tolling.

The AEDPA standard of review that a federal habeas court must apply with respect to a state prisoner's claim that was adjudicated on the merits in state court is that, under the AEDPA, the court may not issue a writ based on such claim unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Section 2254 (d) (i) Under the "contrary to" clause, petitioner prays this court grant this writ based on the states court's arrival at conclusions opposite to those reached by this court on each question of law. The state court decided this case differently than clear United States Supreme Court precedence. The "Unreasonable application" of federal law by the State identifies the correct governing legal principle from this Court's decisions but unreasonably applies those principle to the facts of the petitioners case. William v. Taylor 120 S.Ct. 1495 (2000)

## **DISCUSSION**

It is important to emphasize that the functional absence of counsel, in this case left petitioner without representation during pre-trial and trial process. The actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. Strickland v. Washington 466 U.S. at 692, 104 S.Ct. at 2067 "The right to be represented by counsel is among the most fundamental of rights . . . lawyers in criminal courts are necessities, not luxuries." Gideon v. Wainwright, 372 335, 344. 83 S.Ct, 792, 796 (1963).

I.     Counsel deficient representation denied defendant his right to the effective assistance of counsel guaranteed under the 6th Amendment. Attorney's failure to challenge the veracity of the sworn statement used by police to procure the arrest warrant denied defendant a fair trial.

Defendant (Morris) first claim that his attorney was ineffective for not filing a motion which challenged the false sworn statement used by police officer to justify the defendant's warrant less arrest is based upon the officer's sworn testimony given at defendant's second trial. Kimmelman v. Morrison 477 U.S. at 385, 106 S.Ct. at 2588 see (A1-11)

On the claim of ineffective assistance of counsel, defendant has provided clear evidence that "a false statement knowingly and intentionally, or with reckless regard for the truth", had been manufactured and sworn to by affiant in the probably cause affidavit. It has long been established that searches and seizures are unreasonable and invalid unless based on probable cause. Katz v. U.S. 389 U.S. 347, 357 (1967), Johnson v. U.S. 333 U.S. 10, 14-15 (1948).

Counsel's representation fell below an objective standard of reasonableness for the following reasons:

1)  Counsels duty to investigate would have necessarily included a review of the discovery material provided by the State [FN1]

Counsel is not required to spend any specific number of hours preparing for trial, whether those preparations relate to investigation, witness interviews or other preparatory matters. Counsel has a duty to conduct an independent investigation of his client's case or to articulate a strategic reason for his failure to do so. Ineffective assistance doctrine teaches that "strategic choices" made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland Supra. 466 U.S. at 690, 104 S.Ct at 2066.

Here, counsel's behavior must be assessed as of the time he made the complained decision. There was no strategic reason for counsel's complete failure to pursue challenging the veracity of the probable cause affidavit in a pre-trial motion. Because of counsel's defective assistance, he was both unable and unprepared to make any strategic decisions regarding the false sworn document, including either objecting to its admission under, Franks v. Delaware 438 U.S. 154, 98 S.Ct. 2674, also, when faced with an adverse ruling, use the document to impeach Officer

---

FN1

> The arrest warrant's probably cause affidavit is false. (A1-11) On 11/1/99, the morning of the assault. The victim was unable to recall the events of incident (A12, 13, 13a). The State admitted this report, during the second trial as State's exhibit No.10 and provided defense with material through discovery. (A12, 13) On March 22, 2000 after the 1st trial public defender Ruth Smythe filed a motion for Judgment of Acquittal, challenging the veracity

of the sworn signed affidavit of probable cause. (A14-16)  A
hearing on the matter was held on March 24, 2000 in the Superior
Court, before Judge Richard Stokes (A17-24) (see) Wong Sun v.
U.S. 371 U.S. 471, 83 S.Ct. 407 (1963)

Davis credibility during the evidentiary hearing in the motion to dismiss.
Moreover, at trial, where the prosecutor requested the jury be instructed
that Officer Davis arrest was legal, counsel did nothing to protect
defendant's Due Process rights. (A25-31) A curative instruction was
given.

2)     An illegal arrest without more, does not bar subsequent
prosecution, nor is it a defense to a valid conviction U.S. v. Crews 445
U.S. 463, 100 S.Ct. 1244  But it has long been established under state and
federal law that violation of a defendants right to be free of illegal
searches and seizures provide for the exclusion from trial of any evidence
recovered or derived from an illegal search or seizure [FN2]

Since State exclusionary rule Article 1 Section 6 of the Delaware
Constitution reflect different and broader protection than those guaranteed
by the Fourth Amendment, it provides for the exclusion from trial of any
evidence recovered or derived from an illegal search or seizure.

FN2

> Eyewitness identification should be those of witness, not the
> product of government suggestion. (A32) No pre-trial
> identification procedures were done, all evidence came after arrest.
> U.S. v. Narciso 446 F. Supp 252  (Mich S.D.) "The essence of a
> provision forbidding the acquisition of evidence so acquired shall
> not be used before the court but that it shall not be used at all. Of
> course this does not mean that the facts thus obtained become
> sacred and inaccessible. If knowledge of there is gained from an
> independent source they may be proven like any other, but the
> knowledge gained by the Government's own wrong cannot be used
> by it in the way proposed." Wong Sung 371 U.S. 471

The illegal arrest infected the entire trial process. In this case the witness's identities were discovered and cooperation secured only as a result of the unlawful arrest. No part of this process was unaffected by defendants illegal arrest, the toxin in the case as injected in the probable cause affidavit, the evidentiary bud then blossomed; the fruit served at trial tainted by this illegality.

3) A conviction obtained through the use of false testimony known to be such by representatives of the State is a denial of due process, and there is also a denial of due process, when the State, though not soliciting false evidence, allows it to go uncorrected when it appears U.S.C.A. Const. Amend 14, Napue v. Illinois 360 U.S. 264, 79 S.Ct. 1173 (1959)

Even though counsel was present, he was functionally absent at critical stages of the entire trial process. He not only failed to challenge the veracity of the probable cause affidavit by requesting a Franks Hearing, but, counsel failed to subject the prosecutions case to meaningful adversarial testing by – presenting the trial court with a coherent argument at the evidentiary hearing held on the motion to dismiss indictment because the States use of erroneous and perjurious testimony before the grand jury to obtain the indictment. Also, by not objecting to the State's request for a curative instruction which justified this illegal act in violation of state and federal law. U.S. v. Agurs, 427 U.S. 97, 96 S. Ct. 2392 (1976) Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555 (1995)

The failure by prosecution to correct false evidence when it appeared denied defendants right to due process. The evidence was material and prosecution believed there was a reasonable likelihood that the false testimony could have affected the jury's decision and requested a curative instruction. Counsel's failure to object is a clear denial of the effective assistance of counsel rendering the adversary process itself presumptively

unreliable and no specific showing of prejudice is required when the
accused has been denied counsel functioning in any meaningful sense as
government's adversary. U.S. v. Cronic 466 U.S. 648, 104 S. Ct. 2039
(1984). The respondent states, "even assuming, arguendo, that Morris'
arrest was illegal, he could have realized no benefit from filing any motion
unless some evidence used at trial was seized." The record is clear, the
affidavit of probable cause is a false sworn statement known to be such
affiant at the time of its affirmation. "The principle that the State may not
knowingly use false evidence, including false testimony, to obtain a
tainted conviction, implicit in any concept of ordered liberty, does not
cease to apply merely because the false testimony goes only to the
credibility of the witness. The jury's estimate of truthfulness and
reliability of a given witness may well be determinative of guilt or
innocence and it is upon such subtle factors as the possible interest of
witness in testifying falsely that a defendant's life or liberty may depend.
It is of no consequence that the falsehood bore upon the witness'
credibility rather than directly upon defendant's guilt. A lie is a lie, no
matter what its subject, and, if it is in any way relevant to the case, the
prosecutor has the responsibility and duty to correct what he knows to be
false and elicit the truth. Napue v. Illinois 360 U.S. 264, 79 S.Ct. 1173
(1959)

As a general matter, it is through counsel that all other rights of the
accused are protected: "of all the rights that an accused person has, the
right to be represented by counsel is by far the most pervasive, for it
affects his ability to assert any other rights he may have." Kimmelman v.
Morrison 477 U.S. 365, 377, 106 S.Ct. 2574,2584 (1986) Likewise, "[t]
he presumption that counsel's assistance is essential requires the
conclusion that a trial is unfair if the accused is denied counsel at a critical
stage of his trial." U.S. v. Cronic 466 U.S. at 659, 104 S.Ct. at 2047.
Trial error "occur[s] during the presentation of the case to the jury," and is

- 8 -

amenable to harmless error analysis because it "may be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on trial]". Arizona v. Fulminante 499 U.S. 279. At the other end of the spectrum of constitutional errors lie "structural defects in the constitution of the trial mechanism, which, defy analysis by 'harmless error' standard." Brecht v. Abrahamson 507 U.S. 619. As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. U.S. v. Acosta 965 F.2d 1248 (3rd C.R. 1992) However, once the defendant has established a basis for his motion, i.e., the affiant intentionally presented false information in his probable cause affidavit to obtain arrest warrant, the burden shifts to the government to show that the search on seizure was reasonable. U.S. v. Johnson 63 F.39 242 (3rd Cir. 1995) Defendant was never given the opportunity to present a valid argument on this issue due to counsels functional deficiency. The existence of such deprivation of the right to counsel requires automatic reversal of this conviction because it infects the entire trial process. 'In cases in which there is a claim of denial of rights under the Federal Constitution, this Court is not bound by the conclusions of the lower courts, but have re-examined the evidentiary basis on which those conclusions are founded.'

II.   Counsel's failure to establish who was present and testified before the grand jury denied defendant any coherent argument that the State used false evidence to obtain the indictment.

It is necessary that this court note that the State provided defense with written documentation regarding who was subpoenaed to testify before the Grand Jury. (A33-35) Counsel clearly had a duty to familiarize himself with discovery materials provided by the State and because counsel failed in this regard, his behavior cannot be considered objectively reasonable under Strickland. Williams v. Washington 59F.3d 673 (7th Cir. 1995)

A review of defense counsels statement made during the evidentiary hearing on the motion to dismiss clearly shows attorney's deficient performance. Because counsel failed to establish who testified before the grand jury, he denied defense any chance of establishing a basis for, or, legal right to, dismissal of the indictment, on the ground that erroneous and perjurious testimony was presented by the chief investigating officer in the warrant affidavit, in a successful attempt at returning a true bill of indictment. (A36-52) [FN3] Counsel deficient performance resulted in prejudice by allowing the State to use a false sworn statement to invade the independent, impartial function of the grand jury. "The Due Process clause of the Fifth Amendment was violated when the defendant had to stand trial on an indictment which the government knew was based on perjured testimony, when the perjured testimony was material." United States v. Basurto 497 F.2d 781 (1974)

Let the record show that the counsel's own admission he stated before Superior Court: "**Your Honor, I (counsel) think it's simple that I (counsel) may not have chinned that bar so to speak, because I (counsel) don't know who went before the Grand Jury. But I (counsel) can only have you consider erroneous testimony was given to the Grand Jury.**" (A41, 42)

---

FN3

(A35) The Superior Court Docket No. 47, dated 9/18/2000 Supreme Court ordered subpoena and facsimile, requesting the State file original letter to Chief William Topping subpoenaing Daniel Davis to testify before Grand Jury on 11/15/1999.

At the close of the hearing, the Superior Court ruled that the use of a probable cause affidavit that used the name Alonzo Morris as opposed to J.R. Copes did not rise to the level of a substantial misrepresentation. (A42) However, if counsel would have provided the court with the fact that, the probable cause affidavit was false in it's entirety; the court would have been obligated to determine the issue on it's merits. The courts ruling was not based upon reasonable and logical inference. [FN4] The statement in the probable cause affidavit was in fact false. Failure of counsel to establish that Officer Davis testified before the grand jury and presented false sworn testimony by way of the affidavit of probable cause, is a denial of counsel at a critical stage of proceeding. Counsel entirely fails to subject the prosecutions case to meaningful adversarial testing, rendering the adversary process itself presumptively unreliable. U.S. v. Cronic 466. U.S. 648

The Supreme Court has established that "a conviction obtained through the use of false evidence known to be such by representatives of the State, must fall under the Fourteenth Amendment." 360 U.S. at 269

> "The same result obtains when the State although not soliciting false evidence, allows it to go uncorrected when it appears." 360 U.S. at 269

> "The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty." Giles v. Maryland, Supra, at 74

---

FN4

Transcript of Grand Jury were not available because no court reporter was present during Grand Jury testimony (A53)

The prosecuting attorney was under a duty to correct Officer Davis' false sworn affidavit, at the point at which it became apparent officer lied to the magistrate in order to obtain the arrest warrant. Furthermore, it was the obligation of defense counsel to bring this to the courts attention and failure to do so denied defendant his 6th Amendment right to the effective assistance of counsel.

III.    Counsel's failure to object to the State's use of expert testimony concerning fingerprint analysis denied defendants right to a fair trial.

Counsel was ineffective for failing to move the trial court to suppress the fingerprint analysis because the State failed to honor its discovery obligations. Delaware Superior Court Criminal Rule 16(a), (I), (D) states: "Upon request of a defendant the State shall permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments or copies thereof, which are within the possession, custody, or control of the State, the existence of which is known, or by the exercise of due diligence may become known, to the State, and which are material to the preparation of the defense or are intended for use by State as evidence in chief at trial." Del. Crim.R.Ann 16(a), (I), (D)

Also, Rule 16 (a), (I), (E) states: Upon request of a defendant, the State shall disclose to the defendant any evidence which the State may present at trial under Rules 702, 703, or 705 of the Delaware Rules of Evidence. [FN5] This disclosure shall be in the form of a written response that includes the identity of witness and the substance of the opinions to be expressed."

Officer Davis trial testimony concerning fingerprint testing was subject to discovery under Rule 16 (a), (I), (D) and (E). A review of the States discovery response for the first trial, (A57, 58), and, the second trial (A59-61), clearly show no reports of tests, examinations or written disclosure of substance of opinion or

- 12 -

identity of any expert in fingerprint analysis. Furthermore, "if testimony will
assist the trier of fact to understand the evidence or to determine a fact in issue: a
witness may testify as an expert based on grounds ranging from education to
experiences. The trial judge never determined whether Officer Davis testimony
met those requirements and counsel never made the court aware of its
responsibility to do so. Daubert v. Dow Pharmaceuticals, Inc. 509 U.S. 137, 113
S. Ct. 2786 (1993) The trial jury was obligated under, Delaware Rule of
Evidence 702, which is identical to Federal Rule of Evidence 702, and determine
Davis' expert qualification to testify as an expert in fingerprint analysis. A54-56a

Officer Davis testimony was unreliable and relevant to the issue. Kumho Tire
Company, LTD. v. Carmichael 526 U.S. 137, 119 S.Ct. 1167 (1999) The judicial
"gate keeping" obligation has been recognized as the guideline for admitting
expert testimony, to ensure that expert witness' testimony was reliable whether
based on scientific, or non-scientific experiences. It is through counsel acting in
the role of an advocate, requiring the prosecution's case survive the crucible of
meaningful adversarial testing, that all other rights of the accused are protected.
The State was allowed to inject into the record, material and information without
the experts qualifications on the basis of such evidence, usurping the exclusive
function of the jury to weigh evidence and determine credibility. (A62-71). It was
vital for defense to establish that Officer Davis was not qualified to testify as an
expert in fingerprint analysis because: A) 16 (a), (I), (E) obligated the government
to provide defendant with pre-trial discovery regarding Davis' expert
qualifications to testify to this matter, and, B) Davis' opinion was inadmissible
under both Daubert and Del. R. Evid. 704 (b) prohibiting testimony on ultimate
jury issue by witness whose qualifications did not rise to a level sufficient to assist
jury and was otherwise irrelevant and inadmissible. U.S. v. Dimarzo 80 F. 3d 656
(1st C.R. 1996) Anytime the State is not required to honor basic evidentiary
obligations, or, trial court held to it's "gate keeping" responsibility, counsel failed
to subject the prosecution's case to meaningful adversarial testing, or, provide
assistance at trial when the accused was confronted with the intricacies of the law.

U.S. v. Cronic 466 U.S. 648   Officer Davis was the chief investigating officer in
this case, who lied in the probable cause affidavit to obtain the arrest warrant,
testified falsely before the Grand Jury to obtain the indictment and testified as an
expert in forensic fingerprint analysis without any expert qualifications. It was
imperative for counsel to protect defendant's right to test prosecutions case on this
matter. Officer Davis was not an expert in fingerprint analysis by his own sworn
testimony during the second trial and such testimony was inadmissible. (A56a)

IV.    Conflict of Interest required trial court inquire, when trial counsel advised court of
problem, and, failure to do so requires automatic reversal.

Counsel's correspondence with the trial court requesting an exparte hearing to
determine whether there existed an ethical reason for him to require removal from
further representation, obligated the trial court to inquire into potential conflict
which may jeopardize the right of defendant to the fidelity of his counsel. Trial
counsel's pre-trial motion of September 23, 2002, required trial judge take
adequate steps to ascertain the probable risk of conflicting interest which may
deprive the guarantee of "assistance of counsel". Chief Justice Robinson, held
"An actual conflict of interest occurs [w]hen during the course of the
representation, the attorney's and the defendant's interest [d]iverge with respect to
a material, factual or legal issue or to a course of action." Melendez v. Carroll
United States District Court, D. Delaware, No. Civ. 04-15-37-SLR (2006)
"Actual conflict of interest" is evidenced by the correspondence from defense
counsel to trial judge, requesting a hearing with himself, defendant and the court.
No such hearing was held, requiring automatic reversal of defendant's conviction.
"Where defendant or his counsel objects to attorney conflict of interest prior to or
during trial, trial court must inquire as to extent of conflict or subject any
subsequent conviction to automatic reversal, and only, absent objection to conflict
of interest before or during trial is a showing of: (1) actual conflict, and 2) adverse
effect on attorneys' performance void conviction." U.S.C.A. Const. Amend 6,
Moss v. U.S. 323 F.3d 445 (6th Cir. 2003) The trial court committed reversible

- 14 -

error by failing to inquire into conflict. Also, counsel was ineffective for his
continued representation of defendant, believing representation of defendant
compromised his ethical obligation to act as a zealous attorney. (A72-74)

IV.     Counsel was ineffective for failing to object to false testimony presented by
        expert witness regarding victim's visual acuity.

The record is clear. Dr. Carl Maschauer's trial testimony at the first trial and
second trial are completely different. (A75-90) Defendant does not have to
establish that the inconsistency was due to anything other than an inadvertent
mistake or misstatement by Dr. Maschauer. The State had an obligation to correct
false evidence when it appears. Napue v. Illinois 79 S.Ct. 1173 Neither the
prosecution nor defense counsel noticed any discrepancy at the time or called it to
the courts attention. "The use of false testimony, to obtain a tainted conviction,
implicit of ordered liberty, does not cease to apply merely because the false
testimony goes only to the credibility of the witness". Napue v. Illinois 79 S.Ct.
1173 Counsel had a duty to investigate and review the discovery material
provided by the State and also Dr. Maschauer's first trial testimony, in order to
effectively cross examine the expert witness. Counsel was not aware of Dr.
Maschauer's false testimony because he decided not to read the first trial
testimony or the discovery material. There was no plausible excuse not to read
the first trial transcript of Dr. Maschauer's expert testimony, such a complete lack
of trial preparation put at risk the reliability of the adversarial testing process.
Because counsel failed in this regard, his behavior was not objectively reasonable
under Strickland. Williams v. Washington 59 F.3d 673 (7th Cir. 1995)

- 15 -

## CERTIFICATE OF SERVICE

I, Alonzo Morris, petitioner affirm that a true and correct copy of this reply was placed in the mail on this date 10/26/07 and set first class postage to the Department of Justice.

Alonzo Morris

Alonzo Morris

Petitioner

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
DELAWARE

ALONZO MORRIS, J.R.

Petitioner,                                    Civ. Act. No. 07-194-GMS

v.

THOMAS CARROLL, Warden

And JOSEPH R. BIDEN, III

Attorney General for the State of Delaware

Respondents

**Appendix for Petitioners**

**Reply Memorandum**



FILED

DEC - 3 2007

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

By Alonzo Morris

Date 11/06/07                    Petitioner

## **TABLE OF CONTENTS**

| | |
|---|---|
| A1 – 3 | Affidavit of Probable Cause |
| A4 – 11 | Officer Davis 2nd trial testimony regarding probable cause affidavit |
| A12 – 13 | Medical Service Report |
| A13a | Medical Service Report admitted into evidence by state at 2nd trial |
| A14 – 16 | Motion for Judgment of Acquittal 1st, trial |
| A17 – 24 | Transcript of Motion for Judgment of Acquittal Hearing |
| A25 – 27 | Motion to Dismiss filed by Liguori 2nd, trial |
| A28 – 30 | Transcript of Prosecution requesting curative instruction regarding defendants arrest, 2nd trial |
| A31 | Trial judge curative given to jury at 2nd, trial |
| A32 | Prosecutor James Adkins testimony concerning identification of defendant |
| A33 – 34 | Subpoena and facsimile for Officer Davis to testify before Grand Jury |
| A35 | Superior Docket Sheet, No.47 Supreme Court of Delaware ordering Superior Court file subpoena and facsimile |
| A36 – 40 | Liguori's argument to trial court regarding Grand Jury |
| A41 – 42 | Liguori's admission to ineffective assistance, regarding Grand Jury argument |
| A43 – 52 | Adkins, Davis and Barlow's testimony regarding, who testified before Grand Jury |
| A53 | Trial Court's denial of defendants request for transcript of testimony at Grand Jury hearing |
| A54 – 56 | Delaware Rule of Evidence 702, 703 and 705 |
| A56a | Officer Davis qualifications infingerprint analysis |
| A57 – 58 | State's Discovery Response for 1st trial |
| A59 – 61 | State's Discovery Response for 2nd trial |
| A62 – 71 | Davis 2nd trial testimony regarding fingerprint testing |
| A73 | Supreme Court docket, regarding correspondence Liguori complained of to trial court |

A74          Letter from Supreme Court Clerk to Liguori regarding defendants
             correspondence

A75          Liguori request a hearing on September 23, 2002 due to conflict of interest

A75-85       Dr. Maschauer 1st trial testimony regarding victim's visual acuity

A86 – 90     Dr. Maschauer's 2nd trial testimony regarding victims visual acuity

Adult
Complaint and Warrant
In the Justice of the Peace Court
In and for the State of Delaware
State of Delaware vs ALONZO W MORRIS J

I, DANIEL DAVIS (90806), of GEORGETOWN PD do hereby state under oath or affirmation, to the best of my knowledge, information and belief that the above-named accused violated the law of the state of Delaware by committing criminal acts in Sussex county on or about the date(s) and at or about the location(s) as indicated in Exhibit A hereto attached and made a part hereof.

WHEREFORE, your affiant prays that the above named accused may be forthwith approached and held to answer to this complaint consisting of 2 charges, and to be further dealt with as the law directs

_____
Affiant

SWORN TO and subscribed before me this 01 day of November A.D. 1999

_____
Judge/Master/Commissioner/Court Official

=================================================================
(To be completed by Judge/Master/Commissioner/Court Official)
Jurisdiction resides in Family Court because: (Check and complete as required)
A. _____ The crime was committed by a child
B. _____ A misdemeanor was committed against a child
C. _____ A misdemeanor was committed by one family member against
           another family member
D. _____ Other. Explain _____

=================================================================
WARRANT

TO ANY CONSTABLE or other authorized person:

WHEREAS, the foregoing complaint consisting of 2 charges, having been made, as listed in Exhibit A which is attached hereto and incorporated herein, and having determined that said complaint has been properly sworn to, and having found that there exists probable cause for the issuance of process, based upon the affidavit of probable cause which is attached hereto and incorporated herein as Exhibit B, you are hereby commanded in the name of the State of Delaware, to take ALONZO W MORRIS J accused, and bring same, before

**JUSTICE OF THE PEACE COURT 03, FORTHWITH, to answer said charges.**

GIVEN UNDER MY HAND, this 01 day of November A.D. 1999

_____
Judge/Master/Commissioner/Court Official

Warrant executed by DAVIS          of 8?      on 01 day of November 1999.
  Police Complaint No 8199003617   WR:8199000384:WR

A-1

Exhibit B
Affidavit of Probable Cause

```
State of Delaware vs ALONZO W MORRIS J      Police Complaint: 8199003617
Also known as: JR                          SBI Number: 00263971
Date of birth: 08/01/1972      Sex: M      Race: B     Accused's age: 27
Eyes: BRO      Hair: BLK      Height: 601      Weight: 165
Accused's home add: 23 DOUGLAS ST PO BOX   Social Security Number 220842385
                 :                         Driver's License DE - 1014746
                 : GEORGETOWN, DE 19947

                                           Name, Home and Work Addresses, and
Accused's Home Ph : 3028567075             Telephone Numbers of Next of Kin
                                           or Parent/Guardian
Accused's employer: SELF                   : MARY WILSON
                 :               .         : SAME
                 :                         :
                                             : GEORGETOWN, DE 19947
Accused's Emp Pho: 0                       Phone: 3028567075
Accused's Work Hr:                         Work :
                                                 :
                                                 :
Relation: Vict to accused: OTHERWISE KNO         :
```

Victim's Age : 74
Victim's D.O.B. : 01/04/1925
Date(s) and time(s) of offense: 11/01/1999 07:38
Location where offense occurred: 330 N. RACE ST GEORGETOWN DE 19947

   Your affiant DANIEL DAVIS can truly state that: ON THE 11/01/1999 AT APPROX
0730HRS THE GEORGETOWN POLICE WERE SUMMONED TO THE THREE HUNDRED BLOCK OF NOR
TH RACE ST IN REF TO AN ASSAULT. UPON THE POLICE ARRIVIAL THE VICTIM WAS CONTA
CTED AND MADE A STATEMENT. MR. BIBBINS ( THE VICTIM) STATED THAT HE HAD BEEN I
N AN ARGUMENT WITH ALONZO MORRIS OVER A PHONE CALL THAT MR. BIBBINS MADE TO MR
 MORRIS'S GIRLFRIEND. THE ARGUMENT BECAME HEATED AND MR. MORRIS STRUCK MR. BI
BBINS IN THE HEAD WITH A P.V.C. PIPE. THE PIPE CAUSED A MASSIVE CONTUSION ON T
HE LEFT SIDE OF THE VICTIMS HEAD. WHILE IN ROUTE TO THE HOSPITAL THE VICTIM HA
D TO BE PLACED ON A VENTALATOR. AT THE HOSPITAL THE VICTIMS BRAIN BEGAN TO SWE
LL AND HAD TO BE FLOWN TO A WASHINGTON D.C. HOSPITAL FOR EMERGENCY OPERATION T
O STOP THE SWELLING OF THE BRAIN. THE VICTIM WAS IN CRITICAL CONDITION AT THIS
TIME.
================================================================================

Affiant:
DANIEL DAVIS GEORGETOWN PD Phone Work

Victims:
JAMES BIBBINS

_____
                Affiant

Sworn and subscribed before me this 01 day of November A.D., 1999

A-2

Exhibit A

State of Delaware vs ALONZO W MORRIS J
------------------------------------------------------------------------
                    99-11-0696          Court Case: 9911000751
------------------------------------------------------------------------
Complaint Number: 8199003617    Arrest Number: 009666    Charge Sequence: 001
Charge: POSSESSION OF A DEADLY WEAPON DURING THE COMMISSION OF A FELONY
In Violation of: 11-DE-1447-0000-F-B
Location of Violation: 330 N. RACE ST GEORGETOWN DE 19947 PS 99 4493
  TO WIT: ALONZO  W MORRIS J, on or about the 1st day of November, 1999, in the
          County  of Sussex, State of Delaware, did knowingly possess a  deadly
          weapon  during  the commission of a felony by possessing  ONE  P.V.C.
          PIPE, a deadly weapon, during the commission of ASSAULT

Complaint Number: 8199003617    Arrest Number: 009666    Charge Sequence: 002
Charge: ASSAULT FIRST DEGREE
        -INTENTIONAL SERIOUS INJURYWEAPON DANGEROUS INSTRUMENT
In Violation of: 11-DE-0613-00A1-F-C   99-11-0097      PS 99 4494
Location of Violation: 330 N. RACE ST GEORGETOWN DE 19947
  TO WIT: ALONZO  W MORRIS J, on or about the 1st day of November, 1999, in the
          County  of Sussex, State of Delaware, did intentionally cause serious
          physical  injury to JAMES BIBBINS by means of a dangerous  instrument
          by  STRIKING  THE  VICTIM IN THE HEAD WITH A P.V.C.  PIPE  CAUSING  A
          MASSIVE CONTUSION  TO THE BRAIN. .

A-3

1        A    Yes.            .

2        Q    When did you prepare your warrant for Alonzo

3    Morris in this case?

4        A    I couldn't give you an exact time.

5        Q    Well, roughly speaking, Mr. Adkins asked you

6    and you refreshed your recollection with your report

7    that you arrested Alonzo at 2:00 o'clock?

8        A    Yes.

9        Q    So, obviously, you had to prepare it prior to

10   that?

11       A    Yes.  If there is a copy of the warrant,

12   there should be a time stamped on the warrant.

13       Q    Maybe Mr. Adkins can find that for us.   In

14   any event --

15            MR. LIGUORI:  May I approach, Your Honor?

16            THE COURT:  Yes.

17            (Witness being handed a document).

18            THE WITNESS:  It is not stamped on the face.

19   Apparently this is a copy that was generated out of the

20   computer and not --

21   BY MR. LIGUORI:

22       Q    For purposes right now, Detective, you agree

23   with me that you obviously had to prepare the warrant

Davis – Cross                                    B-93

1    before 2:00 o'clock in the afternoon?

2        A    I am guessing.

3        Q    Are you telling me you arrested my client

4    without a warrant?

5        A    . Yes, sir.

6        Q    Did you arrest him?

7        A    I placed him in custody, yes, sir.

8        Q    Where did you find him?

9        A    At, I believe, his grandmother's house.

10       Q    Where is that?

11       A    On Douglas Street.

12       Q    And what was he wearing?

13       A    That, I cannot tell you.

14       Q    Did you take any notes of that?

15       A    No, I did not.

16       Q    You had just come from the homicide

17   conference?

18       A    In the morning, yes, sir.

19       Q    And you have had the opportunity to

20   understand about transfer of blood or transfer of hair

21   or fibers, or anything; correct?

22       A    Well, the conference isn't that detailed.

23   But I am aware of what you are telling me or what you

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

Davis – Cross                    B–96

1        A    Yes, sir.

2        Q    And you do that because you want to have a

3    neutral and detached person make an independent

4    determination as to whether or not someone should be

5    arrested; is that fair to say?

6        A    Yes, sir.

7        Q    Whether or not they should be at liberty or

8    not at liberty; is that fair to say?

9        A    Yes.

10        Q    Did you do that in this case?

11        A    I believe so, yes.

12              MR. LIGUORI:  I forgot to mark this,

13    respectfully.  Mark this for identification.

14              THE CLERK:  Marked as Defendant's Exhibit D

15    for identification.

16              MR. ADKINS:  Your Honor, could I see that?

17              MR. LIGUORI:  Probable cause affidavit.

18              MR. ADKINS:  Can I just see it?

19              ˙ Your Honor, I have no objection if

20    Mr. Liguori wants that to be a Defendant's exhibit, as

21    long as the underlining and things like that are

22    explained.

23              MR. LIGUORI:  I will do that, Your Honor, and

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER



Davis – Cross                           B-97

1    we will try to clean it up.  Maybe there is a better

2    copy that maybe the officer might have.

3    BY MR. LIGUORI:

4         Q    What I want to do, for purposes of your

5    testimony here, is ask you to go to the highlights of

6    Defendant's D for identification and -- I can't use

7    that red thing because it gave me a headache watching

8    you do it.  So I am going to do this.  I want you to

9    tell me -- you prepared this?  This is your signature;

10   is that right?

11        A    Yes, sir.

12        Q    The 1st of November, 1999?

13        A    Yes, sir.

14        Q    You have a copy in front of you?

15        A    Yes, I do.

16        Q    And the part that is shown, it talks about

17   Alonzo Morris?  This is the probable cause affidavit

18   for Alonzo Morris; is that right?

19        A    Yes, sir.

20        Q    And you state and, in fact, swear that upon

21   your arrival, the victim -- that's Mr. Bibbins; right?

22        A    Yes, sir.

23        Q    The victim was contacted and made a

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER



Davis - Cross                                     B-98

1    statement; correct?

2          A    Yes, he did.

3          Q    Mr. Bibbins, the victim, stated that he had

4    been in an argument with Alonzo Morris?  Did he say

5    that?

6          A    Alonzo Morris, no.

7          Q    Did Mr. Bibbins say that?

8          A    No.

9          Q    He did not say that?

10         A    No.

11         Q    But you swore that he said that; correct?

12         A    Yes, I did.

13         Q    You swore that he said he was in an argument

14   with Alonzo Morris on a phone call that Bibbins made to

15   Mr. Morris' girlfriend?

16         A    Yes.

17         Q    That's not what Mr. Bibbins says, is it?

18         A    Mr. Bibbins said --

19         Q    I will let you rehabilitate yourself for

20   Mr. Adkins.  Just answer yes or no.

21              THE COURT:  He can answer yes or no and give

22   an explanation, Mr. Liguori.

23              MR. LIGUORI:  I apologize.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

Davis - Cross                                    B-99

1    BY MR. LIGUORI:

2         Q    Did Mr. Bibbins say at the scene that the

3    argument was over Mr. Bibbins' making a phone call to

4    Mr. Morris' girlfriend?

5         A    Mr. Bibbins stated that the reason he was

6    assaulted was over a phone call from J. R.'s

7    girlfriend.

8         Q    I don't wanted to beat a dead horse.  You

9    look at this.  Who made the phone call?  I am a neutral

10   and detached Magistrate.  I am going to read this.  Who

11   made the phone call?

12        A    Mr. Bibbins.

13        Q    It is wrong; isn't it?

14        A    Yes, it is incorrect.

15        Q    You are incorrect, or is Mr. Bibbins

16   incorrect?

17        A    The statement was incorrect on the warrant.

18        Q    And who said Alonzo Morris?

19        A    Nobody did.  I did.

20        Q    So you then presented this document that had

21   inconsistencies in it?

22        A    Unfortunately so, yes, sir.

23        Q    Things that were not even said were in here;

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A9

Davis – Cross                           B-100

1    correct?

2         A    Yes.

3              MR. LIGUORI:  At some point in time, I will

4    give a clean copy.

5              THE COURT:  I am not concerned with a clean

6    copy or unclean copy.  It has been explained to the

7    jury.

8              MR. ADKINS:  I have no objection to that

9    coming in.

10             THE COURT:  You want to move it?

11             MR. LIGUORI:  I do.  I would like to use that

12   one.  This is my personal one with notes on it.

13             MR. ADKINS:  That is my only one that I may

14   need.

15             MR. LIGUORI:  I will make a copy.

16             THE COURT:  Substitute it later.

17             MR. LIGUORI:  Thank you.

18   BY MR. LIGUORI:

19        Q    So how does it come that you, in your

20   investigation, decide unilaterally to put words in

21   Mr. Bibbins' mouth?

22        A    There is -- I have known Alonzo Morris to be

23   the person that Mr. Bibbins said it was.



Davis - Cross                              B-101

1        Q    How does it come that you put words in

2    Mr. Bibbins' mouth?

3        A    I don't put words in his mouth.

4        Q    You said that he said Alonzo Morris.

5        A    That's something that I generalized.

6        Q    Generalized for a Magistrate?

7        A    Yes, sir.

8        Q    To justify the fact that you already arrested

9    him without a warrant?

10       A    I had taken him in custody, yes.

11       Q    I can split hairs.  Was he going to leave?

12       A    No, sir.

13       Q    He was arrested, wasn't he?

14       A    I had taken him into custody, yes, sir.

15       Q    You then, to justify what you had done, went

16   to the Magistrate and inserted out of the mouth of the

17   victim, "Alonzo Morris"?

18       A    As I know him to be, yes, sir.

19       Q    Well, what is your job?  To do what you know

20   to be or to take down what victims or witnesses tell

21   you?

22       A    Both.

23       Q    Well, let's discuss that then.  In an

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A 11



# Sussex County Emergency Medical Services

## *Patient Care Report* - *Priority 1 - ALS Transport*

| | | |
|---|---|---|
| **11/01/1999** | **Medic 104** | **Incident: 13352** |
| **Bibbins, James** | **SSN: Unknown** | **DOB Unknown** |
| **Location: Rt 9 e/o Georgetown** | **Georgetown** | |

**History of Condition:** The patient is a 73/o male with a chief complaint of Head pain.  Pt relates that sh was riding his bike when he was hit with a pipe. Pt unable to give any additional details of incident. Pt's only complaint is face and head pain. Pt denies loss of consciousness. BLS relates large amount of blood loss at scene

**PMH:** HTN

**Medications:** Unknown

**Allergies:** Unknown

---

## Assessment

**General Impression:** Pt presents conscious and alert, but not completely oriented.

**Primary Survey**   **Airway:** patent

**Breathing:** Rate: normal

Rhythm: regular

Quality: normal with positive left lung sounds and positive right lung sounds.

**Circulation:** Carotid pulse is present

Radial pulse is normal

Skin is cool, moist and normal in color with normal capillary refill.

**LOC:** awake

**Head, Face:** Large hematoma over right eye  Large amount of bleeding noted from head and nose.

**Left Pupil:** 3mm and Reactive          **Right Pupil** 3mm and Reactive

**Neck, C-Spine:** Normal, pt denies neck pain          **Jugular Veins:** Normal

**Chest:** No obvious chest injuries noted

**Left Lung:** clear          **Right Lung:** clear

**Abdomen, Pelvis:** Normal

**Extremities, Back:** Normal

**Neurological:** Pt remained conscious and alert, but not completely oriented.

**Differential Diagnosis:** R/O Head injury secondary to assault.

## Trauma Information

**Cause:** Assault

**Mechanism of Injury:** Pt was riding his bike when he was hit in the face with a pipe. Pt denies loss of consciousness. Unable recall events of incident.

---

## Summary

07:47

| 11/01/1999 | Medic 104 | Incident: 13352 |
|---|---|---|
| **Bibbins, James** | **SSN:** Unknown | **DOB** Unknown |
| **Location: Rt 9 e/o Georgetown** | Georgetown | |

07:47
    BLS arrival on scene
07:50 Time of Alert
08:01 ALS arrival to patient
08:01 Trauma Intervention: C-collar with result of: Pt had c-collar in place prior to ALS arrival
08:01 Trauma Intervention: long backboard with result of: Pt properly placed on LBB with CID and straps.
08:01 Oxygen adminstered at 15 lpm via non-rebreather mask
08:02    Vitals Signs - Pulse: 92  Respirations: 30  Blood Pressure: 220/140  SpO2: 99%
08:02    GCS - Eyes: 4  Verbal: 4  Motor: 6  GCS Total: 14    ECG: SR
08:03 Transport initiated to Beebe Medical Center on A 93.
08:05 18 gauge IV successfully established in left antecubital infusing 50 ml of 0.9% NaCl solution.
08:06    Vitals Signs - Pulse: 88  Respirations: 16  Blood Pressure: 210/110  SpO2: 99%
08:06    GCS - Eyes: 4  Verbal: 4  Motor: 6  GCS Total: 14    ECG: SR
08:09 Medical Direction from Dr. Shreeve at Beebe Medical Center: BMC advised of trauma pt and need for Trauma Team. No orders requested or given.
08:14    Vitals Signs - Pulse: 90  Respirations: 18  Blood Pressure: 210/100  SpO2: 99%
08:14    GCS - Eyes: 4  Verbal: 4  Motor: 6  GCS Total: 14    ECG: SR
08:14 Arrival at Beebe Medical Center and care turned over to Trauma Team in bed # 2.

### Reassessment and Reponse

    Pt remained conscious during transport. Pt had periods of slow deep respirations. Pt was still unable to recall events of incident.

**Signature:** _Holly R Cox_

    Holly R. Cox, NREMT-P

**Medics on the Call**
Cox, Holly
McCabe-Severs, Jennie

A 13

1           THE COURT:  The next exhibit.

2           THE CLERK:  Admitted as State's No. 10.

3           MR. ADKINS:  And just for purposes of the

4    record, this also includes the paramedic's report which

5    Mr. Liguori knows is within this packet.  The whole

6    packet has been provided.

7           THE COURT:  All right.

8    BY MR. ADKINS:

9       Q   Dr. Saliba, I am going to hand you now what

10   has been marked as State's Exhibit 10.  Do you

11   recognize those records?

12      A   Yes.

13      Q   Are they the emergency room medical records

14   for November 1, 1999, with respect to the treatment of

15   Mr. James Bibbins?

16      A   Yes.

17      Q   Were there any other doctors involved with

18   this patient besides you?

19      A   Yes.

20      Q   Do you remember who they were?

21      A   Yes.  According to the records and my

22   recollection, two other doctors.  First, the

23   anesthesiologist, who came for trauma alert, Dr. Fanto.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A. Ba

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR SUSSEX COUNTY

| | |
|---|---|
| STATE OF DELAWARE, | ) |
| | ) |
| V. | ) |
| | ) |
| ALONZO MORRIS, | ) |
| | ) |
| Defendant, | ) |

## NOTICE OF MOTION

TO:  James Adkins
     Deputy Attorney General
     Department of Justice
     114 E. Market Street
     Georgetown, Delaware  19947

PLEASE TAKE NOTICE, that the within Motion for Judgement of Acquittal will be presented to this Honorable Court on March 24, 2000.

Dated:  3/22/2000

RUTH M. SMYTHE
Assistant Public Defender
Office of the Public Defender
1. South Race Street
Georgetown, DE  19947

A 14

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR SUSSEX COUNTY

| | |
|---|---|
| STATE OF DELAWARE, | ) |
| | ) |
| | ) |
| V. | ) |
| | ) |
| | ) I.D. # 9911000751 |
| ALONZO MORRIS, | ) |
| | ) |
| | ) |
| Defendant, | ) |

MOTION FOR JUDGEMENT OF ACQUITTAL

COMES NOW, the defendant, Alonzo Morris, by and through his attorney, Ruth M. Smythe, Esquire, who respectfully moves this Honorable Court for Judgement of Acquittal not withstanding the verdict pursuant to Superior Court Criminal Rule 29 (c). The defendant and counsel submit the following:

1. Trial in the above case was before The Honorable Richard F. Stokes, March 13, 2000.

2. During testimony Sgt. Ronald Barlow of the Georgetown Police Department admitted he tesitifed incorrectly at Defendant Morris' preliminary hearing twice. He was twice asked by Deputy Attorney General Adkins whether or not witnesses to the assault for which Morris was being tried had been identified by eye witnesses and he replied "Yes by a photo lineup." In fact, there never was a photo lineup.

3. During testimony, Detective Daniel Davis of the Georgetown Police Department admitted he wrote incorrectly in his

A 15

sworn , signed affidavit of probable cause. In this document
Detective Davis wrote "the victim identified his attacker to be
Alonzo Morris". This was another falsehood - the victim indeed
identified his attacker to be Gerald or JR Copes, not Alonzo
Morris.

4.    Further, the jury had insufficient evidence to convict
Alonzo Morris, Jr., of the assault in as much although two
eyewitnesses identified him, several eyewitnesses were unable to;
further, one eyewitness, Sgt. Brock of Department of Corrections
testified he personally observed Defendant Morris coming out of the
street by the Post Office just entering Market Street in Georgetown.
between 8:05 and 8:15. This would indicate that Alonzo Morris, Jr.
could not have been the assailant of the victim.

.  WHEREFORE, the defendant respectfully moves this Honorable
Court for Motion of Acquittal of Judgement not withstanding the
verdict.

RUTH M. SMYTHE
Assistant Public Defender

A-16

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR SUSSEX COUNTY

------------------------------X

STATE OF DELAWARE               :   ID No. 9911000751

                                :

        v.                      :   Criminal Action Nos.
                                    S99-11-0096 and 0097
ALONZO W. MORRIS, JR.,          :

        Defendant.              :

------------------------------X

T R A N S C R I P T
O F
P R O C E E D I N G S

Sussex County Courthouse
Georgetown, Delaware
Friday, March 24, 2000

The above-entitled matter was scheduled
for hearing in open court at 9:45 o'clock a.m.

BEFORE:

THE HONORABLE RICHARD F. STOKES, Judge.

APPEARANCES:

    JAMES W. ADKINS, Deputy Attorney General,
        appearing on behalf of the State of
        Delaware.

    RUTH M. SMYTHE, Assistant Public Defender,
        appearing on behalf of the Defendant.

(A 17)

KATHY S. PURNELL
OFFICIAL COURT REPORTER

1                    P R O C E E D I N G S

2              THE BAILIFF:  Your Honor, Ms. Smythe

3         requested that we do the other matter she and

4         Mr. Adkins have together on Alonzo Morris.  It will

5         take only a couple of moments.

6              MS. SMYTHE:  It should not take long.

7              THE COURT:  All right.

8              MS. SMYTHE:  Your Honor, good morning.  I

9         filed the motion for judgment of acquittal and I

10        stand on what is outlined in the motion requesting

11        that the verdict be overturned.

12             THE COURT:  Mr. Adkins.

13             MR. ADKINS:  Well, Your Honor, as I'm sure

14        you recall, two of out of these three items were

15        brought up in trial.  It was brought up, I believe,

16        on the record in the courtroom.  Also this claims

17        that the defendant had concerns about Sergeant

18        Ronald Barlow testifying, that there are photo

19        lineups at preliminary hearing.  I think he was

20        trying to classify that as personal by the officer

21        at the time, although this motion does not speak

22        that strongly.  And as to personal, there has to be

23        intent to make a false statement under oath, and I

(A 18)

1    think what Sergeant Barlow did is a distance from

2    that.

3         We certainly would never ever condone the

4    type of mistake that Sergeant Barlow made at the

5    preliminary hearing. But despite that fact, I don't

6    believe that there should be this remedy of judgment

7    of acquittal for Alonzo Morris for various reasons.

8         Number one, I don't feel that it was

9    personal at the preliminary hearing. Number two,

10   whatever happened at the preliminary hearing is kind

11   of water under the bridge. Because after the

12   preliminary hearing, he was indicted by the grand

13   jury, and from that point forward, he was held on

14   that charge. Furthermore, the issue about the

15   credibility of Sergeant Barlow and this statement

16   was, I think, used very aggressively by the defense

17   in pointing it out in front of the jury for

18   impeachment purposes. So I think that was the best

19   use that could be made of that information at trial.

20   It was used by the defense, and the jury still saw

21   fit to find the defendant guilty as charged of

22   assault first and the weapons charge.

23         As to Item No. 3 in this motion for

(A 19)

KATHY S. PURNELL

1    judgment of acquittal about Daniel Davis writing in

2    the probable cause affidavit that the victim

3    identified his attacker to be Alonzo Morris, I just

4    think that is semantics.  That's the State's

5    position.  The officer was identifying in his arrest

6    warrant the true name of the defendant, and it's my

7    position that he was not trying to lie or anything

8    else.  You remember the facts of the case and this

9    investigation that the victim said, "J R. did it."

10    J.R. Copes and all of these matters about the

11    different names were brought out at trial.  So I

12    don't think that is an adequate basis for the motion

13    for judgment of acquittal.

14        And also the fourth item here in the motion

15    about insufficient evidence, certainly the jury had

16    no doubt about the sufficiency of the evidence in

17    this case, because there was a rather quick verdict

18    in this case.  And I disagree that two eyewitness

19    identifications, combined with all the other

20    evidence in the case concerning motive, cannot

21    constitute sufficient evidence to support this

22    verdict.

23        So for all those reasons, we ask that this

A-20

1    motion be denied.

2              THE COURT:  Is there anything further,

3    Ms. Smythe?

4              MS. SMYTHE:  No, Your Honor.

5              THE COURT:  All right.  This is the motion

6    for judgment of acquittal presented in the matter of

7    State versus Alonzo Morris.  In motions for judgment

8    of acquittal, one must review the record and the

9    evidence presented to see if any rational jury would

10   return a verdict of guilty, based upon the competent

11   evidence presented.

12             In this case, there was almost overwhelming

13   evidence of guilt.  The defendant, Mr. Morris, was

14   identified by at least two eyewitnesses, if my

15   memory is correct.  It was an employee from a

16   hardware store that took the stand and pointed him

17   and identified him as the assailant.

18             This was a case where the defendant was

19   found guilty of attacking an older man who was

20   living with a former girlfriend of the defendant's.

21   It was a confrontation, and the defendant ran up and

22   took a PVC pipe, swatted him in the head, poked his

23   right eye almost out, blinded the man.  But for

(A-21)

1      luck, the man might have been killed.  But in any

2      event, we had an eyewitness from one of the stores

3      in the area that clearly identified him, pointed him

4      out in court.

5              There was an older gentleman, who's name

6      escapes me right now, but he identified the

7      defendant as the assailant and he knew the defendant

8      for a rather long period of time and familiar with

9      him.  He also had the victim -- the victim made

10     spontaneous declarations that "J.R. did it," if my

11     memory is right.  Of course, all counts on those

12     statements as to identity, in any event, are not

13     hearsay, but in any event, they're spontaneous,

14     "J.R. did it."  And the defendant himself is known

15     as J.R.  I think there might have been reference to

16     J.R. Copes, but J.R., the defendant, lived in the

17     area near the Copes people, may have been a relative

18     as well.

19             There was opportunity for the defendant to

20     commit the crime, and there was motive.  So I'm not

21     surprised that the jury took approximately ten

22     minutes to return a verdict.  It might have been 15

23     minutes, but it wasn't very long.  A valiant effort

*A22*

KATHY S. PURNELL
OFFICIAL COURT REPORTER

1    was made by the defense, but the evidence was

2    overwhelming.

3         Now, this argument is being presented, of

4    course, the motive being that this is a jealous

5    fellow, he doesn't want anybody around his ex, and

6    that came out. And this thing about the photo

7    lineup, the question about the photo lineup, there

8    was testimony at the preliminary hearing about one

9    of the officers involved in the case, Officer

10    Barlow, that a photo lineup had happened.

11         Now, at trial it was very clearly presented

12    to a jury that the photo lineup had not occurred,

13    and Barlow was cross-examined by defense counsel

14    very effectively, and by that point, he had a prior

15    consistent statement under oath and let him have it

16    on that. If that was all the case was about, I

17    guess we could go home. There is a lot more to this

18    case than that.

19         So the jury knew that there was a prior

20    false statement by Barlow and they took that into

21    account, and the credibility, is as they're entitled

22    to do. This is not a case like Franks versus

23    Delaware, where you have a false affidavit by your

*( A 23*

8

1      affiant that's false and there is the subsequent

2      search and bad things happen in those kinds of

3      cases.   This is not Franks versus Delaware.   There

4      was no search done or anything like that, and you

5      can't hide your identity, either.

6           So as far as the reference in the affidavit

7      of the probable cause, the attacker was Alonzo

8      Morris.   All that is a reflection of Daniel Davis'

9      extensive background investigation that led to the

10     conclusion that the defendant was the assailant.

11          So for these reasons, the motion is denied.

12          MS. SMYTHE:   Thank you, Your Honor.

13          (Whereupon, the proceedings in the

14           above-entitled matter were concluded.)

15

16

17

18

19

20

21

22

23                                         A24

KATHY S. PURNELL

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR SUSSEX COUNTY

STATE OF DELAWARE,　　　　　　:　　I.D. NO. 9911000751, 9606013452

　　　　v.　　　　　　　　　　　:

ALONZO W. MORRIS, JR.,　　　　:

　　　　　　Defendant.　　　　:

## NOTICE OF MOTION

TO:　Prothonotary
　　　Superior Court
　　　P. O. Box 756
　　　Georgetown, DE  19947

**PLEASE TAKE NOTICE** that the within Motion to Dismiss will be heard at the

earliest convenience of the Court.

### LIGUORI, MORRIS & REDDING

BY:_____

　　　JAMES E. LIGUORI, ESQUIRE
　　　46 The Green
　　　Dover, DE  19901
　　　(302) 678-9900
　　　Attorney for Defendant

DATED:_____

Ex-B & F

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR SUSSEX COUNTY

| | | |
|---|---|---|
| **STATE OF DELAWARE,** | : | **I.D. NO. 9911000751, 9606013452** |
| **v.** | : | |
| **ALONZO W. MORRIS, JR.,** | : | |
| **Defendant.** | : | |

### MOTION TO DISMISS

**NOW COMES,** James E. Liguori, Esquire, attorney for Defendant and pursuant
to Criminal Rule 12(b)(1) prays the Court to dismiss indictment and/or retrial of the
above Defendant for the following reasons:

1.    Defendant was previously tried, convicted and won reversal on appeal on
the same charges he is now facing for trial before the Court on September 9, 2002;

2.    Defendant's successful reversal by the Delaware Supreme Court left
unanswered one issue in this motion. Specifically, Defendant avers that the State should
be barred from proceeding with prosecution in this case because the Defendant's
protections afforded him under the United States and Delaware Constitutions in regard to
the Double Jeopardy Clause of those Constitutions bars further prosecution;

3.    The State's argument to the jury was improper and was purposefully
improper, egregious and inexcusable;

B & F  2 of 4

(A 26)

4.    The State's argument was intended to goad the defense into asking the Court for a mistrial so as to afford the prosecution a more favorable opportunity to convict Defendant at a successive prosecution;

5.    The indictment in this matter should be dismissed because the State used erroneous and perjurious testimony before the Grand Jury in its successful attempt at returning a true bill of indictment against Defendant;

6.    The impairment of Defendant's procedural rights as a result of Paragraph 5 above rises to the level of a material defect in the institution of this criminal action presently before the Court.

**WHEREFORE**, Defendant prays this Honorable Court for a hearing well in advance of trial to take evidence and hear argument in the above two issues.

Respectfully submitted,

**LIGUORI, MORRIS & REDDING**

BY: _____

**JAMES E. LIGUORI, ESQUIRE**
46 The Green
Dover, DE 19901
(302) 678-9900
Attorney for Defendant

DATED: _____

cc:    Mr. Alonzo W. Morris, Jr.

R & F  3 of 4

A 27

1           MR. ADKINS:  May I approach?

2           THE COURT:  Yes.

3           (Whereupon, counsel approached the bench

4       and the following proceedings were had:)

5           THE COURT:  Your objection is?

6           MR. ADKINS:  I hope I am not wrong about

7   this, but the last time I read the arrest section,

8   which I think Your Honor may be looking for, you do not

9   have to have a warrant to arrest for a felony, even if

10  it is out of the presence.  Mr. Liguori keeps talking

11  about --

12          (Whereupon, the Bailiff approached the

13      bench and had a conference with the Court.)

14          THE COURT:  All right, take them out.

15          (Whereupon, the jury returned to the jury

16      room.)

17          MR. ADKINS:  Mr. Liguori keeps talking like

18  if you are arrested, you have to have a warrant.  I

19  want the jury instructed that it is not.  We heard that

20  enough as a negative like he did something wrong, and

21  he didn't.

22          THE COURT:  The perception I am getting is

23  that you are being critical of him as in the finger-

A28

1    prints, and this, that, and the other, because he

2    didn't have a warrant.

3              MR. LIGUORI:  No, I am showing, as I said in

4    my opening, that he rushed to judgment.  That's what I

5    am saying.  I do not even want to do it

6    chronologically.  You can make a curative instruction,

7    but I think, respectfully, that I am allowed to ask.

8              THE COURT:  You are allowed to ask.  I just

9    want the jury to know that --

10             MR. LIGUORI:  I respectfully submit that I

11   think if the felony is not committed in your presence,

12   you need to have probable cause.

13             THE COURT:  "An arrest by a peace officer

14   without a warrant for a felony, whether committed

15   within or without the State, is lawful whenever the

16   officer has reasonable ground to believe the person to

17   be arrested has committed a felony, whether or not a

18   felony has, in fact, been committed."  There is nothing

19   about "in his presence" there.

20             "Or a felony has been committed by the

21   person to be arrested, although before making the

22   arrest, the officer had no reasonable ground to believe

23   the person committed it."  That's, I presume, when he

*A 29*

B-111

1          MR. LIGUORI:  Payton v. New York.

2          THE COURT:  He was invited in the house.

3    They didn't storm through the house.  They were given

4    consent.

5          THE COURT:  I will let you look at Payton v.

6    New York.

7          MR. ADKINS:  Mr. Morris asked them to come in

8    and speak to Danny Davis because he was told Danny

9    Davis was there.

10          THE COURT:  What I am saying is I am still

11    leaning toward giving the curative, but I am going to

12    let him do research.

13          (Whereupon, counsel returned to the trial

14          table and the following proceedings were had:)

15          THE COURT:  All right.

16          THE BAILIFF:  The defendant had to use the

17    bathroom.

18          THE COURT:  You want me to take a break?

19          (Whereupon, a brief recess was taken.)

20          MR. ADKINS:  With regard to scheduling,

21    Dr. Saliba has arrived.  I arranged for him to be here

22    at 2:00.  He does have a very busy schedule.  I would

23    ask the Court to have him sandwiched in.

*(A 30)*

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

1    provision of a Delaware statute, which reads, in

2    pertinent part, as follows:

3         In a criminal prosecution, the voluntary

4    out-of-court statement of a witness who is present

5    and subject to cross-examination may be used as

6    affirmative evidence with substantive independent

7    testimonial value.

8         This rule in subsection (a) of this section,

9    shall apply regardless of whether the witness'

10   in-court testimony is consistent with the prior

11   statement or not.

12        With regard to this provision, caution must

13   be exercised by the jury when a conflict exists

14   between the out-of-court statements and the in-court

15   testimony, or when a conflict exists among the

16   out-of-court statements themselves.  The jury should

17   be particularly careful if there is no evidence to

18   corroborate an inconsistent out-of-court statement.

19   Nevertheless, the jury may convict on such statement

20   if it is satisfied beyond a reasonable doubt that the

21   statement is true.

22        A police officer may arrest a person for a

23   felony without an arrest warrant.

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

ADKINS - Direct

1    may have had two or three others.  Certainly not
2    more than that.  Not many.

3         Q    Your case, in your 15 or 20 hours of
4    preparation, a lot of your case was still on the
5    cuff, up in the air, wasn't it, in respect that you
6    didn't know exactly what the witnesses were going
7    to say, is that correct?

8         A    You know, that's the way I've always felt
9    about this case, that, you know, cases are brought
10   into this courtroom and everybody wants lawyers to
11   be well prepared.  And well prepared lawyers don't
12   ask questions that they don't know answers to.  So
13   it really -- when everybody is asking questions
14   that they know the answers to, not that it's
15   rehearsed, but you're just putting it on and you
16   know exactly what is going to happen.

17            In this case I would think it was kind of
18   refreshing, because it was, I think, about four
19   months after the incident there had not been any
20   identification procedures, any photo lineups done.
21   There was not a script in this case.  We weren't
22   calling X, Y and Z to the stand knowing that they
23   had already identified a person in a photo lineup.

KATHY S. PURNELL
OFFICIAL COURT REPORTER

A 32



**M. JANE BRADY**
**ATTORNEY GENERAL**

# STATE OF DELAWARE
## DEPARTMENT OF JUSTICE

**NEW CASTLE COUNTY**
Carvel State Building
820 N. French Street
Wilmington, DE 19801
Criminal Division (302) 577-8500
Fax: (302) 577-2496
Civil Division (302) 577-8400
Fax: (302) 577-6630

**KENT COUNTY**
Sykes Building
45 The Green
Dover, DE 19901
Criminal Division (302) 739-4211
Fax: (302) 739-6727
Civil Division (302) 739-7641
Fax: (302) 739-7652

**SUSSEX COUNTY**
114 E. Market Street
Georgetown, DE 19947
(302) 856-5352
Fax: (302) 856-5369

**PLEASE REPLY TO:**

Sussex County Office

November 5, 1999

Chief William Topping
Georgetown Police Department
Georgetown, DE 19947

RE:    *Grand Jury*

Dear Chief Topping:

The following officer(s) are subpoenaed to the Attorney General's Office at the designated times for presentation of the designated cases to the Sussex County Grand Jury on <u>Monday, November 15, 1999</u>.

| *Officer* | *Time* | *Defendant* |
|-----------|--------|-------------|
| D. Davis  | 1:10 p.m. | Alonzo Morris |

If you need any further information, please contact Carol Wilkins at 856-5353.

Sincerely,

James W. Adkins

James W. Adkins
Deputy Attorney General

A 33

(2.)

```
************************
***   TX REPORT   ***
************************


TRANSMISSION OK

TX/RX NO            4721
CONNECTION TEL                98587374
CONNECTION ID
ST. TIME           11/05 09:52
USAGE T            00'48
PGS. SENT             1
RESULT             OK
```

A34

SUPERIOR COURT CRIMINAL DOCKET                    Page    4
( as of  07/18/2003 )

S* e of Delaware v.  ALONZO W MORRIS                         DOB: 08/01/1972
Sι e's Atty: JAMES W ADKINS , Esq.          AKA:
Defense Atty: JAMES E LIGUORI , Esq.

        Event
No.    Date          Event                              Judge
----------------------------------------------------------------------------
        KATHY PURNELL.
39   07/31/2000
        TRANSCRIPT OF PROCEEDING ON MARCH 24, 2000, FILED BY KATHY S. PURNELL.
40   07/31/2000
        TRANSCRIPT OF PROCEEDING OF SENTENCING ON MAY 5, 2000, FILED BY DAVID
        WASHINGTON.
41   07/31/2000
        NOTICE FROM COURT REPORTERS OFFICE TO COURT RE:  FINAL TRANSCRIPT HAS
        BEEN FILED.  RECORD DUE IN SUPREME COURT WITHIN 10 DAYS.
42   08/01/2000
        RECORDS SENT TO SUPREME COURT, NO. 258, 2000.
43   08/04/2000
        LETTER FROM THE SUPREME COURT TO PROTHONOTARY
        RE: TRANSCRIPT MUST BE FILED BY 8-10-00.
45   08/09/2000                                    STOKES RICHARD F.
        AMENDED ORDER FILED.
46   09/18/2000
        LETTER FROM SUPREME COURT TO THE PROTHONOTARY.
        RE: DOCKET AND RETURN THE ENCLOSED COPIES.
47   09/18/2000                                    HOLLAND RANDY J.
        ORDER: FROM SUPREME COURT:
        THE STATE SHALL FILE WITH THE CLERK OF THE SUPREME COURT THE ORIGINAL
        LETTER DATED 11-5-99 TO CHIEF WILLIAM TOPPING AND ATTACHED FACSMILE
        CONFIRMATION.
48   10/24/2000
        LETTER FROM COURT, TO SUPREME COURT, STATING THAT THE TAPE OF STATEMEN
        TS OF RICK HUGHES,RONALD HIGGINS, DALE BERNER HAVE BEEN RECEIVED BY PR
        OTHONOTARY'S OFFICE AND SENT BACK TO SUPREME COURT. THIS HAS BEEN MARK
        ED AS DOCKET #48 ON THE DOCKET.  (MB) THE TAPE AND LETTER WERE SENT BA
        CK TO SUPREME COURT ON 10/24/00.
49   04/23/2002
        LETTER FROM JAMES W. ADKINS, TO THE HONORABLE RICHARD F. STOKES,
        RE: THE DELAWARE SUPREME COURT REVERSED THE DEFENDANT'S SENTENCE AND
        VACATED HIS CONVICTION.
57   04/26/2002                                    STOKES RICHARD F.
        LETTER FROM JAMES ADKINS TO JUDGE STOKES
        RE:  REQUEST SCHEDULING OF BOND HEARING AND RETRIAL DUE TO SUPREME
        COURT'S REVERSAL OF DEFENDANT'S SENTENCE.
58   04/26/2002                                    STOKES RICHARD F.
        LETTER FROM CLAYTON SWEENEY TO JUDGE STOKES
        RE:  RESPONDING TO JAMES ADKINS LETTER.  ARGUES THAT SUPERIOR COURT
        DOES NOT HAVE JURISDICTION WHILE MOTION FOR REARGUMENT IS BEFORE

A 35

1    motion for a judgment of acquittal.  It was denied.

2    And on appeal that particular issue was not raised.

3    This is now the law of the case.  As far as the

4    State is concerned, Mr. Liguori is precluded from

5    re-addressing these issues because they were

6    decided finally and not reversed on appeal.

7            THE COURT:  Mr. Liguori, is that correct?

8            MR. LIGUORI:  Your Honor, I think her

9    chronology of the events are accurate.

10   Respectfully, I think that you at any time can look

11   to determine if there was erroneous or perjurious

12   testimony before a Grand Jury to have a true bill

13   returned.  This is a new case now.  This is an

14   entirely new case.  It's here.  I'm saying to you

15   that it was initiated improperly, and I think it's

16   Rule 8 possibly.  I think it may be Rule 8.  I

17   think it's 8.

18           MS. AYVAZIAN:  Rule 6.

19           MR. LIGUORI:  Six.  I knew it was an even

20   number.  Rule 6, Your Honor.

21           THE COURT:  Yes, we do use rules here, we

22   just do not have them up here.

23           MS. AYVAZIAN:  6(C), Subsection 2.

KATHY S. PURNELL
OFFICIAL COURT REPORTER

A 36

```
 1              THE COURT:  Let's assume for a moment, Mr.
 2    Liguori -- we've read the transcripts.  Assume for
 3    the moment that officers were erroneous on that.  I
 4    am going to assume that they testified before the
 5    Grand Jury to more than just those things.  I mean
 6    we have three binders of evidence.  We do not have
 7    Bibbins.  We do not have the guy they found three
 8    days beforehand.
 9              MR. LIGUORI:  Bynum.  That's not in there.
10              THE COURT:  They do not have that.
11              MR. LIGUORI:  Right.
12              THE COURT:  But they have the rest of it.
13    Wouldn't the rest of it be the basis for the Grand
14    Jury?
15              MR. LIGUORI:  Not if it was erroneous and
16    they knew it was erroneous.  I think they then
17    institute a charge against somebody improperly,
18    illegally.  That's all I'm trying to get at.
19              THE COURT:  And what is the remedy?
20              MR. LIGUORI:  Dismiss it.
21              THE COURT:  Re-indict?
22              MR. LIGUORI:  They can try on good
23    evidence.  But I mean, respectfully, this
```

1    gentleman, Mr. Davis, was up in New Castle County.

2    This is how it's going to be, he was at some

3    seminar, and Barlow says, listen, the guy on the

4    ground said he thought it was J.R. or Gerald Copes,

5    something like that.  And Davis says, no, no, you

6    got it wrong; it's Alonzo Morris.  So now the

7    victim, Bibbins, is laying there saying it's J.R.

8    or Gerald or J.R. Copes.  Davis, in his affidavit,

9    first of all, to the judge, says the victim stated

10   that he had been in an argument with Alonzo Morris.

11   It's wrong.  It's not what the victim said.  And to

12   me it's an indication of initiating a process that

13   is improper.

14           THE COURT:  I may have mine on.

15           MR. LIGUORI:  That is improper.  It's

16   illegal.

17           THE COURT:  I am giving them wide

18   latitude.  I am going to let you explore it.  I do

19   not know where you are going with it.  Let's see.

20           MR. LIGUORI:  That's my proffer.  That is

21   basically all I'm going to do for both of those

22   witnesses.

23           MS. AYVAZIAN:  But, Your Honor, this was

KATHY S. PURNELL
OFFICIAL COURT REPORTER

A 38

1    not a proffer, these were the arguments that were

2    made in the Supreme Court.

3           THE COURT:  I may rule it is the law of

4    the case.  I am going to hear it and then I will

5    rule.

6           MS. AYVAZIAN:  But the risk is that we're

7    going to start inquiring into what went on in the

8    Grand Jury and there will be no end to it.

9           MR. LIGUORI:  No.  First of all, I don't

10   know.  Okay.  I suspect he did, from what I've

11   read, that he presented it to the Grand Jury.  And

12   I'm going to ask him, didn't you tell the Grand

13   Jury what you swore to under oath in your

14   affidavit.

15           MS. AYVAZIAN:  But what difference does it

16   make?  This is the same as an alias.  Every witness

17   at trial said it was J.R., J.R. Copes.  Alonzo

18   Morris is known as J.R. Morris.  He's also known as

19   J.R. Copes.  There is no other person involved.  It

20   was just a different name for the same individual.

21   And plus, there were two people who identified him

22   as the assailant at trial.

23           MR. LIGUORI:  That's not what initiated

KATHY S. PURNELL
OFFICIAL COURT REPORTER

A 39

1    the procedure, respectfully, Your Honor.  What

2    initiated the procedure were erroneous or I think

3    perjurious testimony before the Grand Jury.  And

4    it's different than an alias.  If they said J.R. or

5    Alonzo Morris known as J.R., I wouldn't be here

6    arguing that.

7         MS. AYVAZIAN:  It's a substantial

8    equivalent, and it doesn't appear as though this

9    merits -- this is a sufficient showing of public

10   interest to pierce the veil of the Grand Jury.  And

11   that's the State's argument.

12        THE COURT:  What's the second allegation

13   that you said was wrong?

14        MR. LIGUORI:  Under oath at the

15   preliminary hearing, Barlow said that the four

16   witnesses were given a photo lineup and they picked

17   my client out of a photo lineup.  That's absolutely

18   wrong.  That went through -- never happened.  In

19   his testimony --

20        THE COURT:  Do you know if Barlow

21   testified in front of the Grand Jury?

22        MR. LIGUORI:  I don't know.  I don't know.

23   I don't think he did.

A 40

1    record, as you have there -- wait a second, you

2    know, if you're going to ask them that, you have to

3    give enough copies of what my own tape says.  I'm

4    talking about the trial preparation.  In the

5    preparation, they knew the existence of that

6    person.  And Bynum said I was there waiting with my

7    cousin or niece.

8              THE COURT:  At trial?

9              MR. LIGUORI:  No, told them first, then

10   said it later on --

11             THE COURT:  Mr. Adkins said he had no

12   representation of telling him at first that he was

13   waiting for the cousin, but there is no -- they did

14   not know whether or not the cousin was there or

15   not.

16             MR. LIGUORI:  That might have been

17   inartful on my part for not getting that out, for

18   asking Mr. Adkins that.  But the point is, this

19   existed.  They knew they existed before he stood up

20   and called everybody a liar that there was another

21   eyewitness.

22             THE COURT:  Grand Jury argument.

23             MR. LIGUORI:  Your Honor, I think it's

A 41

1    simple that I may not have chinned that bar, so to

2    speak, because I don't know who went before the

3    Grand Jury.  But I can only have you consider that

4    erroneous testimony was given to the Grand Jury.

5         THE COURT:  I will wipe that one out right

6    now.  I do not find that you have chinned that bar.

7    I agree with you.  I do not find that the officer's

8    testimony, that he used the defendant's -- gave

9    them a name in the affidavit of Alonzo Morris as

10   opposed to J.R. Copes, rises to the bar of a

11   substantial misrepresentation.  It would be nicer

12   if it was clear, but I do not think that that rises

13   to substantial misrepresentation.  That is

14   basically what we have right now.

15        So that one is by the wayside.  I deny

16   your application as concerning the Grand Jury.  All

17   right.  Does the State wish to argue?

18        MS. AYVAZIAN:  Your Honor, it's the

19   State's position that the defense has not met its

20   burden of showing that the State intended to goad a

21   mistrial in this case.  All Mr. Liguori has is

22   speculation about a tactical advantage that he

23   thinks the State had in jeopardizing this trial and

A 42

ADKINS - Direct

1    outline for your summation?

2        A    I wasn't looking for that then.  Would you

3    like me to look for it now?

4        Q    If you don't mind, if you could look, with

5    the Court's permission.    .

6            THE COURT:  Let's break for ten minutes

7    while you are doing that.

8            (Whereupon, a recess was taken.)

9    BY MR. LIGUORI:

10       Q    Mr. Adkins, I just have two more

11   questions.  I know that you were unable to locate

12   your notes, your outline notes for your closing

13   summation, but I'm wondering if you have any

14   recollection as to whether or not the theme

15   included liar in it.

16       A    I do not.  I think my main theme, which

17   I'm sure if I can locate my notes, I'd find that

18   all these facts are not simply amazing

19   coincidences, they are proof beyond a reasonable

20   doubt that Alonzo Morris committed this crime.

21       Q    And who presented this case to the Grand

22   Jury?

23       A    Well, I certainly didn't, and I wasn't

(A43

ADKINS - Direct

1    present.  I don't know that I can answer that.  It

2    would have to be a Georgetown police officer, but I

3    don't know that I really know for sure firsthand

4    who the officer was.

5         Q    Thank you.  Thank you for this difficult

6    time.

7         A    That's all right.

8              MR. LIGUORI:  May I have one moment, Your

9    Honor?

10             THE COURT:  Yes.

11             (Brief pause.)

12             THE COURT:  The lady who had the phone,

13   that phone is going to stay in our custody for two

14   weeks.  You can come back in two Fridays and pick

15   it up.  Rather than confiscating it completely,

16   that is what the Court is going to do.  You are not

17   allowed to have phones in here, not allowed to have

18   them on.  Lawyers do not even have that.  There are

19   signs all over the place.  So two Fridays from now

20   you can come back and get it and we will turn it

21   over.

22             THE BAILIFF:  Chambers has it.

23             THE COURT:  We will let you all keep it.

*A44*

KATHY S. PURNELL
OFFICIAL COURT REPORTER

DAVIS - Direct

1    this as Defendant's 1. I know it's in the record.

2                THE COURT: All right. Defendant's 1.

3                THE CLERK: Entered as Defense Exhibit

4    No. 1.

5  · BY MR. LIGUORI:

6        Q    As the chief investigating officer, did

7    you also present the evidence to the Grand Jury to

8    have an indictment returned against the defendant?

9        A    I'm not sure if I did or did not.

10       Q    Okay. If it wasn't you, who would it have

11   been that would have presented it to the Grand

12   Jury?

13       A    I don't remember.

14       Q    You have no recollection?

15       A    No, sir.

16       Q    Let me just then give you Defendant's

17   Exhibit 1 and ask you -- do you have the probable

18   cause affidavit there?

19       A    Yes, sir.

20       Q    And I believe this was flushed out at

21   trial, Officer Davis. But it appears that you

22   yourself put words in the mouth of the victim, what

23   the victim actually said to the people at the

A 45

DAVIS - Direct

1    scene, specifically with who he was in an argument

2    with and who had assaulted him.  Is that fair to

3    say?

4        A    I would say that I basically summarized

5    what his statement was.

6        Q    I understand the summary. But the victim

7    never said Alonzo Morris to anybody, did he?

8        A    No.  He basically -- I think he said J.R.,

9    if my recollection is correct.

10       Q    And did you, in fact, have telephonic

11   communication with Officer Barlow that they were

12   identifying J.R. and J.R. Copes at the time?

13       A    Yes.

14       Q    Is that right?

15       A    Yes.

16       Q    You said no, no, that's really Alonzo

17   Morris?

18       A    Right.

19       Q    So your affidavit under oath there,

20   Defendant's 1, when you were attributing the

21   language of the victim who said his argument was

22   with Alonzo Morris, is not what the victim said, is

23   that right?

A46

DAVIS - Direct

1    A    Right.  It's basically a summary, like I

2    said.

3    Q    And you don't know whether or not you

4    presented it to the Grand Jury?

5    A    I couldn't tell you, sir.  I don't

6    remember.

7    Q    How many officers are there in the

8    Georgetown Police Department?

9    A    Now?

10   Q    At that time, '99.

11   A    I couldn't tell you for sure.

12   Q    Is it normally part of your job to follow

13   through with your cases to bring them to the Grand

14   Jury?

15   A    It all depends I mean as far as manpower

16   goes, and if we're available to do that.  If not,

17   we would get another officer to do it.

18   Q    And have you subbed for other officers?

19   A    Sure.

20   Q    And you go into the Grand Jury armed with

21   what?

22   A    Probable cause sheet and crime report.

23   Q    I'm sorry?

*A 47*

DAVIS - Direct

1     A    And one of the crime reports.

2     Q    Okay.  Is it fair to say then that it is

3    likely or more likely than not that what you said

4    in your probable cause affidavit was told to the

5    Grand Jury?

6     A    I would be guessing, but yes, sir.

7     Q    Okay.

8     A    More than likely.

9     Q    Was there ever a photo lineup in this

10    case?

11    A    No.

12    Q    You did not testify at the preliminary

13    hearing, did you?

14    A    No.

15         MR. LIGUORI:  Thank you.  May I have one

16    moment, Your Honor?

17         (Brief pause.)

18         MR. LIGUORI:  No further questions.  Thank

19    you, Officer.

20         THE COURT:  Do you have any questions?

21         MS. AYVAZIAN:  No questions, Your Honor.

22         THE COURT:  All right.  Thank you.  I am

23    going to ask you to give that to the clerk.  I am

*(A 48)*

KATHY S. PURNELL
OFFICIAL COURT REPORTER

BARLOW - Direct

1    going to ask you to stay out until the close of the

2    evidence, just in case. Just cautious. Next

3    witness?

4         MR. LIGUORI: Officer Barlow.

5                   MICHAEL R. BARLOW

6    was called as a witness by and on behalf of the

7    defendant, having been first duly sworn,

8    was examined and testified as follows:

9                   DIRECT EXAMINATION

10   BY MR. LIGUORI:

11        Q    Officer Barlow, good afternoon. My name

12   is Jim Liguori. Thanks for waiting around here for

13   this testimony.

14        A    Sure.

15        Q    My understanding is you were the first

16   officer on the scene back in 1999, November 1, when

17   Mr. Bibbins was struck by the Townsends plant, is

18   that right?

19        A    That's correct.

20        Q    And you then had the opportunity to take

21   certain information from Mr. Bibbins?

22             THE COURT: Ask him whether or not he went

23   to the Grand Jury. Isn't that the end of it, if he

A 49

BARLOW - Direct

1    did?  Then you keep going, asking questions if he

2    didn't.  Why keep going --

3            MR. LIGUORI:  I'll do what the Court says.

4    My way was to ask about preliminary hearing first,

5    because that is before the Grand Jury, and whether

6    or not they followed through.  That's all.

7            THE COURT:  You are attacking the Grand

8    Jury.  I understand what takes place at preliminary

9    hearing, what your proffer is, but I am interested

10   in the Grand Jury.  Then we can rewind the tape if

11   we need to.

12           MR. LIGUORI:  Okay.  Then I'll do that,

13   Your Honor.

14   BY MR. LIGUORI:

15       Q   Do you have any recollection as to whether

16   or not you presented this case, the State v. Alonzo

17   Morris case, before the Grand Jury in Sussex

18   County?

19       A   I did not.

20       Q   You're certain of that?

21       A   Yeah.  Not of the Grand Jury.  I did the

22   preliminary hearing.

23       Q   Do you know who did it before the Grand

BARLOW - Direct

1    Jury?

2         A    I have no idea.

3              MR. LIGUORI:  I'd still like the

4    opportunity to put on the record --

5              THE COURT:  Any police reports?

6              MR. LIGUORI:  Yes, that's what I'm going

7    to ask.

8              THE COURT:  Is it in the police reports

9    that which you say was testified to?

10             MR. LIGUORI:  I want to ask him that.

11             THE COURT:  All right.  Don't you have the

12   police reports?

13             MR. LIGUORI:  No.

14             THE COURT:  I want the State to tell me,

15   too, if it is in the police reports.

16   BY MR. LIGUORI:

17        Q    The issue with regard to this photo

18   lineup, the thing that you believed there was a

19   photo lineup -- and, in fact, we know that's not

20   true, correct?

21        A    That's correct.

22        Q    You testified under oath that at the

23   preliminary hearing you thought there was a photo



KATHY S. PURNELL
OFFICIAL COURT REPORTER

BARLOW - Direct

1    lineup.

2         A    Yes, that's correct.

3         Q    Was that ever transcribed or captured in a
4    police report?

5         A    Not to my knowledge, no, not a police
6    report.  I can't imagine why any police report
7    would be generated for that.  It was a court
8    proceeding.

9         Q    Okay.  But the point is, where did you get
10   the idea from?

11        A:    In my conversation with Detective Davis
12   prior to -- because when he was not able to be
13   present for the preliminary hearing and asked if I
14   could stand in, he gave me a verbal briefing to
15   bring me up to speed.  In the course of that
16   conversation, he talked about the witnesses and a
17   photo lineup, and I assumed that he had given them
18   a photo lineup.  So that's what I presented as
19   evidence.  I was mistaken.

20        Q    Have you seen Detective Davis' police
21   report in this matter?

22        A    No.

23        Q    Okay.

A 52

KATHY S. PURNELL
OFFICIAL COURT REPORTER

SUPERIOR COURT
OF THE
STATE OF DELAWARE

T. HENLEY GRAVES
*RESIDENT JUDGE*

SUSSEX COUNTY COURTHOUSE
1 THE CIRCLE, SUITE 2
GEORGETOWN, DELAWARE 19947
TELEPHONE (302) 856-5257

June 28, 2005

N440
Alonzo Morris
SBI No. 00263971
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977

### RE:    Defendant ID No. 9911000751(R-1)

Dear Mr. Morris:

You have recently written to the Court requesting copies of transcripts. Those requests were denied because I was unaware of your appeal of my April 27, 2005 decision concerning your Postconviction Motion.

In examining your request for transcripts, I note the following:

A.    You request a copy of the transcript of the Grand Jury testimony of November 15, 1999. There is no transcript of that testimony and a court reporter was not present during the Grand Jury testimony or voting.

B.    You request a transcript of the Motion for Judgment of Acquittal dated April 17, 2000. That would have been in your first trial which was handled by Judge Stokes. Since the Supreme Court reversed that conviction, that would be moot as far as your subsequent conviction and sentence imposed by me in 2002.

C.    You request a transcript of any hearing regarding a conflict of interest held by Superior Court between Alonzo Morris and James Liguori. I can recall no such hearing. I do recall that during the presentation of pretrial motions, Mr. Liguori was upset with some of the accusations that you had made about him and the issue was resolved in Court at that time. But the issue was not resolved with a hearing.

For the aforementioned reasons, your request for transcripts is denied.

**IT IS SO ORDERED.**

Yours very truly,

T. Henley Graves

THG:baj
cc:    Clerk of the Supreme Court
Prothonotary



Rule 702                    DELAWARE UNIFORM RULES OF EVIDENCE

required foundation and, therefore, the testimony was inadmissible. Alexander v. Cahill, 829 A.2d 117 (Del. 2003).

**Rule 702. Testimony by experts.**

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. (Amended, effective Dec. 10, 2001.)

## COMMENT

D.R.E. 702 was amended in 2001 to track amendments, effective Dec. 10, 2001, added "if F.R.E. 702 is in effect on December 31, 2000. D.R.E. 702 is consistent with the United States Supreme Court's decisions in Kumho Tire Co., Ltd. v. Carmichael ... and Daubert v. Merrell Dow Pharmaceuticals, Inc. ...

**Effect of amendments.** — The 2001 amendments, effective Dec. 10, 2001, added "if (1) the testimony ... the facts of the case."

**Plaintiff's failure to identify witness as expert in pretrial discovery was not error**, where the defendant waived this by not objecting at trial. Yankowski v. Wharton, 460 A.2d 1326 (Del. 1983).

Highest court applied free-step test to determine whether a trial court abused its discretion with respect to the admissibility of scientific or technical expert testimony, requiring that: (1) the witness be qualified as an expert by knowledge, skill, experience, training, or education ...; (2) the evidence is relevant and reliable; (3) the expert's opinion is based upon information reasonably relied upon by experts in the particular field; (4) the expert testimony should assist the trier of fact to understand the evidence or to determine a fact in issue; and (5) the expert testimony should not create unfair prejudice or confuse or mislead the jury. Goodridge v. Hyster Co., 845 A.2d 498 (Del. 2004).

An appeals court should apply the "abuse of discretion" standard to a trial judge's ruling on the admissibility of an expert's methodology or the reliability of the methodology required of the expert. Goodridge v. Hyster Co., 845 A.2d 498 (Del. 2004).

**Standard for admissibility of expert testimony.** — A trial judge is a gatekeeper for expert testimony and must assess whether the evidence presented is reliable and relevant, the objective of this gatekeeping function is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same intellectual rigor or performance that characterizes the practice of an expert in the relevant field. McElhinney v. Intervate Inc., ...

field. McElhinney v. Intervate Inc., ... (Del. Super. Ct. May 5, 2004).

Bancroptication, Inc. v. LePera, Del. No. M ... A.2d 513 (1999) (adopting Kumho Tire and Daubert as the correct interpretation of D.R.E. 702); Nelson v. State, Del. Supr., 628 A.2d 69 (1993).

**Expert's inadequate discussion of testimony.** — When an expert witness testifies in a general discussion, McElhinney v. State, 469 A.2d 366 (Del. 1983).

In a personal injury case, the injured party's expert witness testimony was inadmissible under this rule because the expert did not: (1) establish their qualifications to render opinions on causation; (2) show that the reasoning or methodology utilized to reach the diagnosis or prognosis; (3) show that the reasoning or methodology used were scientifically valid; and (4) explain why the expert's injury was properly to be applied to the injured party's injuries. Gann v. Trans... — A.2d — (Del. Super. Ct. June 28, 2002).

Where the plaintiff found unreliable, the part of witness's opinion that restaurant should have known of danger of patrons cutting a hand, the witness's opinion that restaurant should have known of danger of patrons cutting a hand, in the profit of a pedophile or child sexual abuse, the expert was scientifically unreliable and inadmissible, and the court, acting in its function as a gatekeeper, properly excluded such testimony. Ward v. Shoney's, Inc., 817 A.2d 367 (Del. Super. Ct. 2002).

**Expert testimony irrelevant.** — Expert witness testimony that defendant did not assault a person with a knife, was charged to testify as to the impact the failure of a passenger to wear a seat belt had as to the cause of certain injuries where was charged with the specific defendant deviated from a journalistic standard of care was well within the range of the jury; thus, no expert testimony was necessary. Garnett Co. v. Kanaga, 750 A.2d 1174 (Del. 2000).

**Child sexual abuse cases.** — When the State intends to have an expert witness testify to characteristics common in child sexual abuse ...

properly admissible as testimony by experts. Yankowski v. Wharton, 460 A.2d 1326 (Del. 1983).

**Police officer drug testimony.** — In a possession with intent to deliver case, the difficulty of an officer's testimony as properly admissible, because of the officer's specialized knowledge of drug dealing, and having assisted the trier of fact by providing information regarding personal use of the drugs versus intent to deliver. Baxter v. State, 768 A.2d 130 (Del. 2001).

Police detective was properly permitted to express an opinion that defendant intended to deliver the cocaine found on his person, because the detective was qualified to testify about drug dealing. And to the extent the jury did not themselves conform to the Daubert factors was not final under the Daubert factors that at the scene of his arrest, and his person, failure to conform to the Daubert factors was not final relationship under the relevant reliability rates. Norwood v. State, 813 A.2d 1141 (Del. 2003).

Expert who relied upon test and themselves under this rule because the expert did not: (1) establish their qualifications to render opinions on causation; (2) show that the reasoning or methodology utilized to reach the diagnosis or prognosis; (3) show that the reasoning or methodology used were scientifically valid; and (4) explain why the opinion ...

Under this rule, a trial court five step test to determine the admissibility of expert or scientific testimony requires that the trial court be satisfied that: (1) the witness is qualified as an expert by knowledge, skill, experience, training, or education; (2) the evidence is relevant and reliable; (3) the expert's opinion is based upon information reasonably relied upon by experts in the particular field; (4) the expert testimony will assist the trier of fact to understand the evidence or to determine a fact in issue; and (5) the expert testimony will not create unfair prejudice or confuse or mislead the jury. State v. Kent, — A.2d — (Del. Super. Ct. Mar. 15, 2002).

**Freelance physical injury resulting from action against a newspaper**, the issue of whether the media defendant deviated from a journalistic standard of care was well within the range of the jury, thus, no expert testimony was necessary. ...

To determine the admissibility of expert testimony that assault was a result of an injury that ... State v. Mercer, 732 A.2d 234 (Del. Super. Ct. 1997).

victim, the State must afford the defendant adequate pretrial discovery and notice of the intent to call such an expert. Powell v. State, 527 A.2d 276 (Del. 1987).

The following conditions are prerequisite to the admissibility of such expert testimony: (1) the State must provide adequate notice of its intention to use such a witness sufficiently in advance of trial to enable the defendant to prepare for cross-examination; (2) the expert witness concerning the qualifications of the witness must be conducted out of the presence of the jury; (3) the expert must not be called to testify to the issue or cause concerning the significance of the expert's testimony. Wheat v. State, 527 A.2d 269 (Del. 1987).

Unless there is demonstrated a special nexus to the crime or the complainant had direct knowledge of the attack, the testimony was admissible. State v. Mercer, 732 A.2d 234 (Del. 1997).

The admissibility of expert testimony in child sexual abuse cases is limited to instances where the victim's testimony would need assistance in understanding ... State v. Flonny, 715 A.2d 865 (Del. Super. Ct. 1997), aff'd, 720 A.2d 1132 (Del. 1998).

Where an improper expert was called to testify and is generally accepted within the scientific community. State v. Flonny, 715 A.2d 865 (Del. Super. Ct. 1997), aff'd, 720 A.2d 1132 (Del. 1998).

In a prosecution that the defendant did not fit the profile of a pedophile or child sexual abuse was scientifically unreliable and inadmissible, and (1) would have the court, acting in its function as a gatekeeper, expert properly testify ... (2) would not be reliable relied upon, (2) would not be reliable relied upon, (3) would not be relevant ... State v. Mercer, 732 A.2d 234 (Del. Super. Ct. 1997).

In a prosecution for first degree murder, an expert to testify as to whether the defendant want to the determination of whether he acted under the influence of extreme or the testimony was admissible to prove his state of mind at the time of ... State v. Magner, 732 A.2d 234 (Del. Super. Ct. 1997).

**Proof of extreme emotional distress.** — In a prosecution for first degree murder, expert testimony was admissible to prove his state of mind at the time of the offense ... under the influence of extreme emotional distress. State v. Magner, 732 A.2d 234 (Del. Super. Ct. 1997).

**Child sexual abuse cases.** — When the State intends to introduce evidence of defendant's psychiatric condition ...

In a prosecution for first degree murder, evidence of defendant's psychiatric condition ...

Case 1:07-cv-00104-GMS    Document 24-2    Filed 12/03/2007    Page 59 of 190

## Rule 703. Bases of opinion testimony by experts.

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Upon objection, facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. (Amended, effective Dec. 10, 2001.)

### COMMENT

D.R.E. 703 tracks F.R.E. 703 in effect on December 31, 2000, except the words "Upon objection, facts or data that are otherwise inadmissible" have been inserted at the beginning of the last sentence of D.R.E. 703. These words were added to ensure that any party who wants to exclude expert basis information from the

jury must raise the issue by objection. See D.R.E. 802.

Schenley Indus., Inc., Del. Ch., 339 A.2d 197 (1975), and Storey v. Castner, Del. Supp. 314 A.2d 187 (1973).

**Effect of amendments.** — The 2001 amendment, effective Dec. 10, 2001, added "in order for the opinion or inference to be admitted" to the end of the second sentence and added the last sentence.

**Character evidence and expert opinion testimony distinguished.** — The rule governing the presentation of character evidence should not be confused with the rules relating to the formulation of opinion testimony by expert witnesses. McCloskey v. State, 457 A.2d 332 (Del. 1983).

**Testimony of coroner was admissible.** Testimony of coroner's medical expert was not lost of earning capacity was admissible. McNally v. Eckman, 466 A.2d 363 (Del. 1983).

**Skid mark testimony.** — In a 10 Del. C. § 3724 wrongful death suit, under Del. Evid. R 401, 402, 403, 702 and 703, a court allowed an investigating officer to testify on a truck's skid marks and speed before colliding with a car in which a decedent was killed as a passenger; under cross-examination, in an effort to stop sign, and (2) decedent's family's accident reconstruction expert's opinion that was based on the officer's skid-mark testimony was inadmissible, even though the witness had the requisite degree of education, skill, and experience to testify as to how skid marks could indicate speed, leaving the jury to decide the weight to be given to the skid mark evidence and the opinions to be derived from it. Duman v. Butler, — A.2d — (Del. Super. Ct. July 21, 2004).

**Testimony of epidemiologist.** — Epidemiologist will not be permitted to state an opinion concerning the probable cause of decedent's disease or death but will be permitted to state epidemiological statistics concerning groups such as the deceased who had been exposed to

asbestos and/or cigarette smoking. Lee v. A.C. & S. Co., 542 A.2d 352 (Del. Super. Ct. 1987).

**Testimony of medical doctor as to causation.** — Trial court properly allowed doctor not premised merely on a review of a single photograph of plaintiff's car damage after a rear-end collision by defendant; however, the photograph was properly excluded as basis in limine regarding the name doctor's testimony because it hazard testimony elicited on cross examination regarding repair costs not administered by the doctor. Trial court properly premised on cost to the doctor on direct examination, as well as avoided speculation about the relationship between the estimated vehicle repair costs and the force of impact sustained in the accident. Palmieri v. Burkhardt, 650 A.2d 218 (Del. 2004).

**DNA identification procedures are based** upon generally accepted scientific principles and the use of DNA samples that restriction fragment length polymorphism technology is accepted in the field of human genetic research. State v. Pennell, 584 A.2d 513 (Del. Super. Ct. 1989).

The statistical frequencies of genotypes (alleles of a particular length) through use of a proper data base can be useful in expressing an opinion as to possible match of DNA samples. State v. Pennell, 584 A.2d 513 (Del. Super. Ct. 1989).

Procedures in matching DNA samples were based upon tests and procedures may be relied upon by experts in the field and expert opinion, therefore, that the samples matched the blood sample from the victim, was admissible at trial. State v. Pennell, 584 A.2d 513 (Del. Super. Ct. 1989).

**Admission of statistical information re-**

garding DNA identification. — The statistical probabilities, or frequencies of DNA with characteristics being found in the population, have not been demonstrated to be reliable based upon the evidence adduced to this point and that each of the large number should in some respect is accepted in the jury with their potential for an extremely prejudicial effect, as the danger of prejudice at this time outweighs the probative value. State v. Pennell, 584 A.2d 513 (Del. Super. Ct. 1989).

**Expert's opinion properly admitted without statistical evidence and propriety of admissible.** — Public Service Commission's award's approval of increased standard offer service rates was not arbitrary, and was supported by substantial evidence, under 26 Del. C. § 1006(a)(1), consistent with public justified that the proposed price were representative of wholesale market prices plus a margin; prices for market model in the statistical evidence and producers reaching their conclusions were not admitted into evidence, in no way affected the experts ability to testify as the Del. C. § 1006, Conectiv New Energy, Inc. v. PSC, 825 A.2d 303 (Del. Super. Ct. 2003).

Conectancy affidavit inadequate to op-

## Rule 704. Opinion on ultimate issue.

Testimony in the form of an opinion or inference otherwise admissible is not objectionable merely because it embraces an ultimate issue to be decided by the trier of fact.

### COMMENT

D.R.E. 704 tracks F.R.E. 704(a) except for the adoption of the word "admissible." The 1984 Committee added the word "merely" to make it clear that the rule must be read in connection with D.R.E. 701. Thus, testimony admissible under D.R.E. 701, 702, or 703 is not rendered inadmissible under D.R.E. 704 merely because it embraces an ultimate issue.

On the Delaware Rules of Evidence December 31, 2000. That provision prohibits an expert from stating an opinion about whether a defendant possessed the requisite state of mind

**Probable physical injury resulting from an assault with a knife is not a matter** beyond the comprehension of a nonexpert, and testimony on the issue is improper even though it touches on an issue to be decided by the jury. Lewis v. State, 416 A.2d 208 (Del. 1980).

Fact that testimony by state troopers as to what was safe speed on ice-covered road embraced ultimate issue of negligence was of no consequence in the admis-

pose or support summary judgment statements, or summary allegations which, without a factual foundation, do not amount to more than speculation and conjecture and cannot be considered that each large number should in some respect opposed to granting of party's motion for summary judgment. Lynch v. Abbey Produce Corp., 506 A.2d 42 (Del. Super. Ct. 1985).

**Legally incorrect assumptions concerning the ownership of condemned property are** sufficient to require that an expert witness who forms an opinion concerning the fair market value of property, and an appraisal based upon legally invalid assumptions is irrelevant, and may prejudice the interests of the condemned property. Del. Expressway Co. of Wilmington v. Parcel of Land, 607 A.2d 1160 (Del. Super. Ct. 1992).

Where an expert's proposed testimony did not assist the trier of fact, embraced an ultimate issue, and embraced applicable domestic law, pursuant to Del. Evid. R. 702, 704, the testimony was inadmissible. In re Walt Disney Co. Derivative Litig., — A.2d — (Del. Ch. Mar. 9, 2004).

**Expert testimony inappropriate.** — City of Wilmington v. Parcel of Land, 607 A.2d 1160 (Del. Super. Ct. 1992).

say. . . . The fact that the doctor based his opinion, in part, on hearsay such as asking other doctors what they did recently did not prepared rise, and, absent any supporting the fact that the doctor did not have any supporting literature in his deposition did not disqualify his opinion. Conaway v. Baybarth Med. Ctr., — A.2d — (Del. Super. Ct. Mar. 26, 2001).

or condition constituting an element of the crime charged or of a defense thereto. The Committee found F.R.E. 704(b) inconsistent with D.R.E. 704 and, therefore, recommended against adopting a similar provision.

This rule may be unconstitutional. See Hughes v. State, 437 A.2d 559 and Wagner v. State, — A.2d —. (Del. Super. Ct. 1983) and Matthews v. State, Del. Supp. 278 A.2d 295 (1971) is consistent, however, with Stawecki v. State, Del. Supp. 354 A.2d 421 (1976) and Pak Corp. v. Chicago Aerial Indus., Inc., Del. Super. 274 A.2d 141 (1971).

Davis – Cross                                B-104

1          A     I do not know the specific time, no, sir.

2          Q     Let me just go another place for a second.

3    Tell me about your experience as a fingerprint person

4    for Georgetown Police Department.  What type of

5    schooling have you gone to to do that?

6          A     I have been to several schools, one of which

7    was a forty-hour class in the Delaware State Police

8    Academy for criminalistics.  The next one was another

9    thirty-hour class in criminalistics.

10         Q     Is there anyone else who does fingerprint

11   analysis at the Georgetown Police Department?

12         A     Yes.  Now, they do, yes, sir.

13         Q     Back in 1999, was there anyone else?

14         A     No.

15         Q     And did you determine that State's 1, the

16   pipe, was of significant evidentiary value?

17         A     Yes.

18         Q     Why?

19         A     It was the weapon of the attack.

20         Q     That's the only reason?

21         A     That and the possibility of latent

22   fingerprints.

23         Q     And how about transfers?  How about blood or



M. JANE BRADY
ATTORNEY GENERAL

**STATE OF DELAWARE**
**DEPARTMENT OF JUSTICE**

**NEW CASTLE COUNTY**
Carvel State Building
820 N. French Street
Wilmington, DE 19801
Criminal Division (302) 577-2055
Civil Division (302) 577-2500
Fax: (302) 577-6630

**KENT COUNTY**
Sykes Building
45 The Green
Dover, DE 19901
(302) 739-4211
Fax: (302) 739-6727

**SUSSEX COUNTY**
114 E. Market Street
Georgetown, DE 19947
(302) 856-5352
Fax: (302) 856-5369

PLEASE REPLY TO: Sussex

January 4, 2000

Ruth Smythe, Esquire
Public Defender's Office
1 South Race Street
Georgetown, DE  19947

     RE: **State v. Alonzo W. Morris, Jr.**
        **Cr.A.Nos.  S99-11-0096 & 0097**
        <u>**I.D. #9911000751**</u>

Dear Counsel:

     Pursuant to Superior Court Criminal Rule 16, the following information concerning the above captioned case is being supplied.

     Rule 16(a)(1)(A):  Relevant written, recorded or oral statements made by defendant or any juvenile or adult co-defendant in response to interrogation by a person then known by the defendant to be a state agent:

     Defendant made an oral statement the substance of which is contained in the enclosed copy of Det. Davis' Supplement Report, dated November 1, 1999 containing one page.

     Rule 16(a)(1)(B):  Defendant's Prior Record.

     Enclosed is a copy of defendant's known criminal history record information as same is maintained in the Attorney General's Office Case Tracking System.  Although this is the single best source of such data available within the State, I caution you that such information is occasionally incomplete or inaccurate.  I therefore suggest that you discuss this matter with your client who should be able to correct erroneous data and complete the record as needed.  In addition, I intend to discuss any discrepancies with you prior to trial.

A 57

State v. Alonzo W. Morris, Jr.
January 4, 2000
Page - 2 -


Rule 16(a)(1)(C):  Documents and Tangible Objects.

Inspection of documents and tangible objects will be permitted upon reasonable notice and during normal business hours. Please contact my office to arrange for a mutually convenient time for inspection. Please contact Det. Davis of Georgetown Police Department to see the recovered PVC pipe, and photos of the crime scene and the victim.

Rule 16(a)(1)(D):  Reports of Examinations and Tests.

Results or reports of mental or physical examinations and scientific tests or experiments which the State intends to use during its case-in-chief, or material to the defense:

See enclosed copy of the victim's medical records from Beebe Medical Center.

Rule 16(a)(1)(E):  Expert Witnesses.

The identity and substance of the opinions of expert witnesses:

Are as follows: Anis K. Saliba, M.D., Thomas Shreeve, M.D., and Frances Esposito, M.D. may be called as expert medical witnesses to testify concerning the facts and conclusions contained in the medical records of the victim provided herein.

Please be advised that this response, together with any acknowledgments of information to be supplied when received, constitute the State's entire response to its discovery obligations under Rule 16 and/or any written request filed by the defendant. If, prior to or during trial additional evidence or material is discovered which is subject to discovery shall be disclosed immediately. Further discovery, except to the extent referred to herein is objected to as being outside the scope of the State's obligation under Rule 16. Should you wish to pursue the matter further, please file a motion to compel further response as provided by Rule 16.

Please be advised that when the victim was interviewed at the scene, he incorrectly stated the defendant's name as "J.R. Copes" and said that "J. R. Copes" had hit him.

State's Reciprocal Discovery Request:

Pursuant to Superior Court Criminal Rule 16(b), please provide me with the following:

A 58



**M. Jane Brady**
**Attorney General**

## STATE OF DELAWARE
### DEPARTMENT OF JUSTICE

NEW CASTLE COUNTY
Carvel State Building
820 N. French Street
Wilmington, DE 19801
Criminal Division (302) 577-8500
Fax: (302) 577-2496
Civil Division (302) 577-8400
Fax: (302) 577-6630
TTY: (302) 577-5783

KENT COUNTY
102 West Water Street
Dover, DE 19901
Criminal Division (302) 739-4211
Fax: (302) 739-6727
Civil Division (302) 739-7641
Fax: (302) 739-7652
TTY: (302) 739-1545

SUSSEX COUNTY
114 E. Market Street
Georgetown, DE 19947
(302) 856-5352
Fax: (302) 856-5369
TTY: (302) 856-2500

July 25, 2002

**PLEASE REPLY TO :** Sussex

James E. Liguori, Esquire
Liguori Morris & Redding
46 The Green
Dover, DE 19901

RECEIVED
7-29-02

RE: **State v. Alonzo W. Morris, Jr.**
**Cr.A.Nos. S99-11-0096 & 0097**
**I.D.#9911000751**

Dear Counsel:

Pursuant to Superior Court Criminal Rule 16, the following information concerning the above captioned case is being supplied.

Rule 16(a)(1)(A): Relevant written, recorded or oral statements made by defendant or any juvenile or adult co-defendant in response to interrogation by a person then known by the defendant to be a state agent:

Defendant made an oral statement the substance of which is contained in the enclosed copy of Det. Davis' Supplement Report, dated November 1, 1999 containing one page. State previously provided a copy of defendant's taped statement to defense counsel - Ruth Smythe, Esquire, along with taped statements of witnesses: Hill, Swan, Hughes, Higgins, Berner and Middleton. See enclosed copy of cover letter to Ms. Smythe, dated March 9, 2000.

Rule 16(a)(1)(B): Defendant's Prior Record.

Enclosed is a copy of defendant's known criminal history record information as same is maintained in the Attorney General's Office Case Tracking System. Although this is the single best source of such data available within the State, I caution you that such information is occasionally incomplete or inaccurate. I therefore suggest that you discuss this matter with your client who should be able to correct erroneous data and complete the record as needed. In addition, I intend to discuss any discrepancies with you prior to trial.

A-59

State v. Alonzo W. Morris, Jr.
July 25, 2002
Page - 2 -

Rule 16(a)(1)(C): Documents and Tangible Objects.

Inspection of documents and tangible objects will be permitted upon reasonable notice and during normal business hours. Please contact the Prothonotary's Office to see the recovered PVC pipe, and photos of the crime scene and the victim which were previously admitted into evidence as exhibits. In addition please find enclosed copies of the following police reports:

Sgt. Barlow's Crime Report, dated November 1, 1999, containing 3 pages
Det. Davis' Supplement Report, dated November 1, 1999, containing 1 page, re: Defendants statement
Det. Davis' Supplement Report, dated November 1, 1999, containing 1 page, re: witness interview
Det. Davis' Supplement Report, dated November 1, 1999, containing 1 page, re: another witness interview
Det. Davis' Supplement Report, dated November 4, 1999, containing 1 page
Det. Davis' Supplement Report, dated November 9, 1999, containing 1 page
Det. Davis' Supplement Report, dated November 11, 1999, containing 1 page

Rule 16(a)(1)(D): Reports of Examinations and Tests.

Results or reports of mental or physical examinations and scientific tests or experiments which the State intends to use during its case-in-chief, or material to the defense:

See enclosed copy of the victim's medical records from Beebe Medical Center and Washington Hospital Center. We are in the process of obtaining the victim's medical records from Dr. Carl Maschauer of the Sussex Eye Center and will forward them to you upon our receipt of same.

Rule 16(a)(1)(E): Expert Witnesses.

The identity and substance of the opinions of expert witnesses:

Are as follows: Anis K. Saliba, M.D., Thomas Shreeve, M.D., and Frances Esposito, M.D. may be called as expert medical witnesses to testify concerning the facts and conclusions contained in the medical records of the victim provided herein. Dr. Carl Maschauer of Sussex Eye Center in Georgetown, Delaware may be called as an expert witness to testify as to the condition of victim's eyesight before the assault as compared to his eyesight following the assault.

A 60

State v. Alonzo W. Morris, Jr.
July 25, 2002
Page - 3 -

Please be advised that this response, together with any acknowledgments of information to be supplied when received, constitute the State's entire response to its discovery obligations under Rule 16 and/or any written request filed by the defendant. If, prior to or during trial additional evidence or material is discovered which is subject to discovery shall be disclosed immediately. Further discovery, except to the extent referred to herein is objected to as being outside the scope of the State's obligation under Rule 16. Should you wish to pursue the matter further, please file a motion to compel further response as provided by Rule 16.

Please be advised that when the victim was interviewed at the scene, he incorrectly stated the defendant's name was "J. R. Copes" and said that "J. R. Copes" had hit him.

State's Reciprocal Discovery Request:

Pursuant to Superior Court Criminal Rule 16(b), please provide me with the following:

1. An opportunity to inspect and copy or photograph any books, papers, documents, photographs, tangible objects or copies or portions thereof, which are within the possession, custody, or control of the defendant, which the defendant intends to introduce as evidence in chief at the trial.

2. An opportunity to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with the particular case, or copies thereof within the possession or control of the defendant, which the defendant intends to introduce as evidence in chief at trial or which were prepared by a witness whom the defendant intends to call at the trial when the results or reports relate to that witness' testimony.

3. Disclosure of any evidence the defendant may present at trial under Rules 702, 703 or 705 of the Delaware Uniform Rules of Evidence, including the identify of the witness and the substance of the opinions to be expressed.

Please be advised that your failure to respond will be presumed to mean that you have no materials discoverable under Rule 16(b) and that the State will rely upon that presumption.

Sincerely yours,

James W. Adkins
Deputy Attorney General

cc: Prothonotary
    file
JWA:jyj

A 6/

Davis — Direct                    B-71

1    depending on who you were and how young you were.

2                MR. LIGUORI:  Objection.

3                THE COURT:  It is your pace.  So I am

4    striking the answer.

5                MR. ADKINS:  I think I am done with that at

6    this point.  Take your seat.

7                THE COURT:  Ed, can you move that back?

8                THE BAILIFF:  Yes, Your Honor.

9    BY MR. ADKINS:

10       Q    Officer Davis, I would like to hand you

11   Exhibit 1.  Do you recognize that?

12       A    Yes, sir, I do.

13       Q    Have you ever been in possession of that

14   before?

15       A    Yes, sir.

16       Q    How did you come into possession of that?

17       A    Officer Barlow took this at the scene for

18   evidence and then gave it to me for processing.

19       Q    What, if anything, did you do with that pipe?

20       A    Well, considering the diameter of the pipe,

21   how large it is, what we basically do in order to find

22   fingerprints, we would fume anything that the assailant

23   came in contact with.  What I mean by that is basically

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A62

Davis - Direct                          B-72

1    a fume is a process where fingerprints are raised from

2    any object.

3            In order to do this, you would have to

4    surround the object and enclose it and process it as in

5    fuming.  The process of fuming I used is basically a

6    heated chamber with Super Glue, for lack of a better

7    term, and, basically, the fumes adhere to the oils of

8    the fingerprints which is on the item.  after the

9    fuming is done, you are able to recognize if there are

10   any prints on the item.

11       Q    And when you did that process, were you able

12   to make out any type of latent prints on that pipe?

13       A    After the fuming, I couldn't find anything

14   that I could see.  So, basically, my second step was to

15   dust it with fluorescent powder.  Fluorescent powder

16   during the day or during regular light, you couldn't

17   see it.  But in the darkness of a room with a UV light,

18   if there were any prints on the pipe, they would show

19   up immediately.  It is almost like fluorescence.

20       Q    You did that process?

21       A    Yes, sir.

22       Q    With respect to either of these processes,

23   were you able to locate any visible latent prints

*A63*

EILEEN G. KIMMEL

Davis - Direct                    B-73

1    whatsoever?

2         A    No, I wasn't.

3         Q    If you had located any visible latent

4    fingerprint, what would you then do with it?

5         A    I would basically lift a print, attach a

6    crime report to the print, and send the print to S.B.I.

7         Q    For what purpose?

8         A    For identification.

9         Q    You don't do that process?

10        A    No, I do not.

11        Q    You lift latent prints?

12        A    Yes, I do.

13        Q    There were no latent prints of value on that

14   pipe?

15        A    I could not find any, sir.

16        Q    Is there anything about that pipe that would

17   tend to deter there being latent prints?

18        A    Basically, when you are lifting latent

19   prints, in order to get a print, the space would have

20   to be smooth and flat. Unfortunately, for this piece

21   of pipe, it is very old. It has been scarred and

22   busted. And even if there was a print on there, I

23   doubt if I would be able to lift it and have it

A-64

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

1   analyzed.

2       Q    Do you know if there is any family or people

3   by the name of Copes who live on Douglas Street?

4       A    Yes, sir.

5       Q    And do you know anybody in particular?

6       A    The only name that comes to mind at this time

7   is Francine, and I am not sure if that is Mr. Morris'

8   aunt or cousin.  I am not sure of the relation.

9       Q    Do you know Alonzo Morris, Jr.?

10      A    Yes.

11      Q    Do you know if he goes by any nickname?

12      A    Yes.  He goes by two names.  J. R. Copes and

13  J. R. Morris.  I know him as J. R. Morris or Alonzo

14  Morris, Jr.

15      Q    Did you make the arrest in this case?

16      A    Yes.

17      Q    Do you know approximately what day and what

18  time?

19      A    I believe it was the same day, November 1st.

20  But for the time, I know it was in the afternoon, but I

21  don't know the exact time.

22      Q    Would you have that time noted in a police

23  report or any other thing that you have written in this

A 65

Davis — Cross                          B-77

1    Mr. Morris, did he?

2         A    No, he did not.

3         Q    We now have Mr. Bibbins saying, "Oh, that is

4    Alonzo Morris over there," yesterday, didn't he?

5         A    Yeah, he did.

6              MR. LIGUORI:  May I have that pipe, ma'am?

7    BY MR. LIGUORI:

8         Q    I guess this is sort of like the stuff you do

9    in what we are going to call CSI Georgetown?  That's

10   what we are going to call that.  That's the kind of

11   stuff?

12        A    If you want to call it that, yes, sir.

13        Q    Let me ask you this.  You previously

14   testified, haven't you, at that hearing in March about

15   the examination you did to this item, didn't you?

16        A    Yes, I did.

17        Q    Did you testify with regard to the fact that

18   you put it in a heated chamber and fumed it?

19        A    I believe I did, sir.

20             MR. LIGUORI:  May I approach, Your Honor?

21             THE COURT:  You may.

22   BY MR. LIGUORI:

23        Q    Let me show you your sworn testimony and ask

A-66

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

Davis - Cross                                    B-78

1    you to read it.  Page 108, Mr. Adkins.

2         A    The whole thing, sir?

3         Q    You can just look at that, and then I am

4    going to ask you questions, Officer.

5         A    .(Witness reading).

6         Q    Under oath in March of 2000, did you swear

7    that you did a fuming of that item?

8         A    No.

9         Q    You didn't, did you?

10        A    I didn't?

11        Q    You didn't say it, did you?

12        A    No, I did not.

13        Q    So you told the Court that day that you, in

14   fact, only did a dusting; correct?

15        A    I believe that was the question.

16        Q    Fluorescent dusting.  No, that wasn't the

17   question.  The question was, "What did you do?," and

18   you didn't talk about fuming, did you?

19        A    No, sir, I didn't.

20        Q    Tell us about this chamber.  How big is this

21   chamber?

22        A    Well, basically, we didn't have a chamber

23   until I had to make it.  I had to make the whole

*A 67*

Davis - Cross                                    B-79

1     chamber.  It was approximately maybe six, six and a

2     half feet long.  I had to make it.  It was wrapped in

3     plastic, see-thru plastic, and sealed with duct tape in

4     order to contain the fumes.

5          Q    So it is something that is not recognized as

6     being scientific; it is something that you put

7     together?

8          A    Well, the process is scientific, I would

9     imagine.

10         Q    The application of the process, though, is

11    the way you conjured up this box?

12         A    Yes.

13         Q    Or chamber?

14         A    It basically didn't matter in any way or

15    shape the chamber is constructed, although the fuming

16    is basically what you have to do.

17         Q    We saw a lot of the photos of where people

18    apparently have put dirt down to cover up Mr. Bibbins'

19    blood?

20         A    Yes.

21         Q    You were up at a conference at Vo-Tech;

22    right?

23         A    Polytech.

                                        *A68*

Davis — Recross                          B-138

1      Q    If you find my blood on you after you have

2  hit me, right, you are close to connecting me?

3      A    Yes, sir.

4      Q    It can also exclude me if you don't find my

5  blood on yourself; correct?  Or did I get that wrong?

6  I probably did.  You know what I am trying to say.

7      A    Yes.

8      Q    So the point is it is not necessarily from

9  the assailant.  From an investigative point of view,

10  blood splattering is a crucial element; correct?

11     A    I believe so, yes.

12     Q    You didn't collect any blood splatters?

13     A    No.

14     Q    You didn't analyze the shirt that the

15  defendant was arrested in?

16     A    No, sir, I did not.

17     Q    Now, let's go back to the issue of your

18  testimony at the previous hearing with regard to what

19  efforts you went to to try to get the prints off of

20  that pipe.

21     A    Okay.

22     Q    First and foremost -- and I do not want to

23  beat a dead horse -- you agree with me that you never

Davis - Recross                    B-139

1   testified to fuming, or whatever you call it?

2        A    Apparently not, yes, sir.

3        Q    And, in fact, this was a question Mr. Adkins

4   asked you right when you started.

5             MR. LIGUORI:  May I approach?

6             Page B-108.

7   BY MR. LIGUORI:

8        Q    Mr. Adkins didn't limit your response to just

9   dusting, did he, in Line 4?

10       A    Okay.  Yes, sir.

11       Q    He did not, did he?  He didn't limit it.  He

12  did not say, "Detective Davis, tell me about the

13  dusting that you did"?

14       A    No, he didn't say that.  He said, "Did you

15  attempt to collect any type of latent fingerprints off

16  of that pipe?"

17       Q    "Yes, I did try"?

18       A    Yes, I did.

19       Q    And then he questioned you, the good

20  prosecutor that he is, "How did you do that?"  What do

21  you say?

22       A    "I used what is called fluorescent powder,

23  fingerprint powder, which illuminates in a UV light

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER                    A 70

Davis - Redirect                      B-140

1    situation." Did you say, "I built the fuming box and I

2    stuck it in it"?

3        A    No, I did not.

4        Q    That was under oath in March of 2000?

5        A    Yes.

6             MR. LIGUORI:  Nothing further.

7                  FURTHER REDIRECT EXAMINATION

8    BY MR. ADKINS:

9        Q    Were you asked, "Is that all you did"?

10       A    No.

11       Q    Were you asked whether you did any other type

12   of processing for fingerprints?

13       A    No.

14       Q    Did you do other types of processing besides

15   the fluorescent?

16       A    Yes, sir.

17            MR. LIGUORI:  Thank you.

18            THE COURT:  All right.  You are excused.

19   Thank you.

20                                      (Witness steps down.)

21            THE COURT:  Call your next witness.

22            MR. ADKINS:  The State calls Dr. Maschauer.

23            MR. LIGUORI:  May I approach, Your Honor?

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A71

IN THE SUPREME COURT OF THE STATE OF DELAWARE

513 , 2002

J. E. LIGUORI

PETITION FOR A WRIT OF PROHIBITION
BY ALONZO MORRIS.

J. R. WILLIAMS

DF $ 00.00

2002

| 1 | Sep 11 | Petition for a writ of prohibition dated 9/11/02 by petitioner. (copies sent to:  Judge Graves, John Williams, Esquire and to Prothonotary-SC) (eas) |
|---|--------|---|
| 2 | Sep 11 | Writ of Prohibition dated 09/09/02 by petitioner. (mfm) |
| 3 | Sep 11 | Letter dated 09/07/02 from Alonzo Morris to Clerk requesting to proceed with this matter in forma pauperis. (mfm) |
| 4 | Sep 11 | Letter dated 09/07/02 from Alonzo Morris to Chief Justice Veasey regarding the double jeopardy issue in his case Morris v. State 795A2d.653 (Del.2002). (mfm) |
| 5 | Sep 11 | Affidavit of Court Appointed Counsel to Waive Filing Fee. (served by mail 9/11/02) (eas) |
| 6 | Sep 13 | Letter dated 9/13/02 from Chief Deputy Clerk to James Liguori, Esquire forwarding the Writ of Prohibition dated 9/9/02 and two letters dated 9/7/02 filed by Mr. Alonzo Morris for appropriate disposition. (dlw) |

$A73$



# Liguori, Morris & Redding

**Attorneys At Law**
46 The Green, Dover, Delaware 19901
(302) 678-9900 • Fax (302) 678-3008

September 23, 2002

James E. Liguori
Gregory A. Morris
Laura A. Yiengst

Honorable T. Henley Graves
Resident Judge
Sussex County Superior Court
P. O. Box 746
Georgetown, DE 19947

### Re:    Ex-Parte Communication
### State v. Alonzo W. Morris, Jr.

Dear Judge Graves:

I've enclosed a portion of a pro se motion the above Defendant filed with the Supreme Court.

I'm troubled by the highlighted area of Page Three of his petition because not only is his assertion false, but he intimates that the court and I are somehow in collusion to prevent Defendant from a fair hearing and/or trial.

I truly believe that for Mr. Morris to make such an allegation against me and the court compromises my ethical obligation to act as his zealous attorney.

I can only see trouble ahead, if at this juncture, the Defendant is already resorting to lies and innuendo to our Supreme Court about my relationship with him and the court. I request an in camera hearing as soon as practical with the Defendant, myself and the court to determine whether there exists an ethical reason for me to request removal from further representation of this Defendant.

Respectfully submitted,

James E. Liguori

JEL:sec

Enclosure

cc:    Mr. Alonzo W. Morris, Jr.

*A 74*

SUPREME COURT OF DELAWARE

CATHY L. HOWARD
*Clerk*

AUDREY F. BACINO
*Assistant Clerk*

DEBORAH L. WEBB
*Chief Deputy Clerk*

LISA A. SEMANS
*Senior Court Clerk*

SUPREME COURT BUILDING
55 THE GREEN,
P.O. BOX 476
DOVER, DE 19903

(302) 739-4155

September 13, 2002

James E. Liguori, Esquire
Liguori, Morris & Redding
46 The Green
Dover, DE 19901

Re: *In the Matter of Alonzo Morris, No. 513, 2002*

Dear Mr. Liguori:

Enclosed are copies of two letters dated September 7, 2002 and a copy of a Writ of Prohibition dated September 9, 2002 filed with the Court by Mr. Alonzo Morris in the above captioned matter on September 11, 2002. The Court has requested me to provide you with a copy of Mr. Morris' letters and Writ of Prohibition for appropriate disposition. Please inform Mr. Morris that all further correspondence to the Court on his behalf should be through you as his attorney.

By copy of this letter, I am informing John R. Williams, Esquire, Deputy Attorney General, of the Court's action regarding Mr. Morris' two letters and Writ of Prohibition. I am providing Mr. Williams with copies of Mr. Morris' documents for informational purposes only. The Court will take no further action regarding Mr. Morris' two letters and Writ of Prohibition.

Very truly yours,

Deborah L. Webb

cc:   Mr. Alonzo Morris
      John R. Williams, Esquire
      (with a copy of Mr. Morris' documents)

$A 74$

1    term?

2        A    I have degree, a Doctor of Optometry.  So I

3    am an optometrist.

4        Q    You have a Doctor of Optometry?

5        A    Correct.

6        Q    Are you licensed to practice in the State of

7    Delaware?

8        A    Yes, sir.

9        Q    Do you, in fact, practice in the State of

10   Delaware?

11       A    Yes, sir.  Yes, I do.

12       Q    For how long have you been a licensed

13   practicing Doctor of Optometry?

14       A    Seventeen years.

15       Q    Do you have an office here in Georgetown?

16       A    Yes, sir, I do.

17       Q    And are you familiar with a seventy-five-

18   year-old gentleman, an African-American man, by the

19   name of James Bibbins?

20       A    Yes, I am.

21       Q    Is James Bibbins a patient of your practice

22   and has he been for a few years?

23       A    Yes, sir, he has since 1976.

Maschauer - Direct                    B-76

1        Q     Since 1976.  Just prior to November 1st of

2    1999, any time within six months or a year after that,

3    was Mr. Bibbins at your office for any type of eye exam

4    where you would do an examination of his eyesight in

5    his left and right eyes?

6        A     Yes.  He was in on June 23rd, 1999.

7        Q     At that time, June 23rd, 1999, did he have

8    any severe right eye trauma or injury?

9        A     No, sir.

10       Q     Did he have an eye exam at that time?

11       A     Yes, sir, he did.

12       Q     Could you please detail for us, if you could

13   -- I guess eye doctors talk in terms of people having

14   20/20 vision or 20/40, whatever.  Do you have anything

15   with regard to his vision when he had two eyes prior to

16   June 23, 1999?

17       A     Yes.  The right eye, he had best corrective

18   visual acuity of 20/50, and the left eye, he had best

19   corrective visual acuity of 20/70.  And that was with

20   his glasses.

21       Q     Has Mr. Bibbins had any other eye, I will

22   call them maladies, for lack of a better term, even as

23   of June, 1999?

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER                    A 76

1        A     Yes, sir.  He was diagnosed with glaucoma

2   before that, and glaucoma is an eye disease where you

3   lose your vision over a period of time.

4        Q     In what way did the glaucoma affect

5   Mr. Bibbin's vision, in terms of affecting distance

6   peripheral vision?  Could you explain a little bit more

7   about what the glaucoma means in Mr. Bibbins' case?

8        A     How it affected his eyes is that it would

9   cause him to lose his peripheral vision.  He would

10   still have straight-ahead vision, for example, looking

11   directly at you, but he may not be able to see things

12   off to the side.

13        Q     Did your office also have Mr. Bibbins or have

14   you had him in subsequent to November 1st, 1999, with

15   regard to eye examinations and prescription glasses?

16        A     Yes, sir.

17        Q     And when have you had him in subsequent to

18   that?

19        A     He has been in a couple of times.  The most

20   recent time that I see that we did a more comprehensive

21   exam was January 19th, 2000.  And at that time, he was

22   unable to see out of his right eye anything at all,

23   including light.  His best corrective visual acuity was

1   20/70 again, same as it was back in June.

2        Q    That is for the left eye?

3        A    That is for the left eye.

4        Q    Which is the only seeing eye?

5        A    Which is his only seeing eye.

6        Q    Would you say he is legally blind in his

7   right eye?

8        A    Yes.  More than legally blind.  He has

9   absolutely no sight.  In fact, the determination they

10  are trying to determine now is whether or not they have

11  to remove the eye.

12       Q    So in addition to having glaucoma and loss of

13  peripheral vision with both eyes, now, after November

14  1st and as recently as January, what would be his

15  peripheral vision, if you can explain it to the jury,

16  with no right eye and just the left eye at 20/70 and

17  glaucoma in the left eye?

18       A    Everything from basically in front of his

19  nose to the right, he does not see because his eye is

20  completely missing or not functioning.  In the left

21  eye, which would pretty much take care of straight

22  ahead and out to left, his eyesight has been

23  compromised.  So, basically, he has a little bit of

1   tunnel vision looking straight ahead, but falling off

2   to the right.

3       Q   Can you describe his glaucoma condition in

4   even more detailed terms in terms of whether he has

5   perfectly round tunnel vision or whether even that is

6   compromised?

7       A   On May 24th of 1999, a vision field test was

8   performed.  A threshold vision field test determines

9   how sensitive your eye is and it tells us how much

10  damage to your peripheral vision has been done.

11          At that time, he had a very irregular-shaped

12  field of view, and it was not actually even centered.

13  It was -- looking at it here, it is actually skewed so

14  that he really misses more to the left with some still

15  central vision.  But it is missing more on the left

16  side than it is on the right.  So it is sort of oval.

17      Q   Did you have the opportunity to see James

18  Bibbins in your office at 9:00 a.m. this morning?

19      A   Yes, sir, I did.

20      Q   And did you do any type of eye exam with him?

21      A   I checked to see if his vision had improved

22  or decreased since January, and it was still 20/70 this

23  morning with his glasses on.

1       Q       How about his peripheral vision?  Can you say

2   anything about that at this point as of today?

3       A       I did not check that today, but I would say

4   it is certainly no better.  It is either going to be

5   the same or worse, based on his glaucoma.

6       Q       Now, I want to ask you another question to

7   try to explain this to the jury, if you can.  Let's say

8   you have people who see good, and let's say they have

9   20/20 vision.

10      A       Correct.

11      Q       You said that Mr. Bibbins only sees at all

12  out of his left eye and he has 20/70 vision.  Could you

13  tell us what that means in terms of his being able to

14  see clearly a distance away?

15      A       What 20/70 means is that what a person can

16  see at seventy feet, Mr. Bibbins would only be able to

17  see something twenty feet away.  He would have to be

18  somewhere between one-fourth as close or one-third as

19  close.

20      Q       So can you correlate that in terms of feet?

21  In other words, would he be able to see clearly, for

22  example, facial features more than ten or fifteen feet

23  away, or whatever?

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A-80

1        A    No, he would not.  Most people can see

2    clearly facial features, if you are looking for

3    freckles, moles, anything along those lines, fine

4    detail, you are only going to see it thirty or forty

5    feet away.  That means, basically, he would be able to

6    see it ten to twelve feet away maybe, at best.

7        Q    Ten or twelve feet?

8        A    Yes, sir.

9             MR. ADKINS:  Your Honor, I have a tape

10   measure here.  I would like permission to approach the

11   witness and give him one end and walk over to the

12   defendant with the other end.

13            THE COURT:  You may do so.

14            MS. SMYTHE:  At the same time, I would like

15   Mr. Adkins to measure from the door to the entrance of

16   the court.

17   BY MR. ADKINS:

18       Q    What is your reading, Dr. Maschauer?

19       A    It says twenty-three feet seven inches.

20            MR. ADKINS:  Thank you.

21            I don't have any more questions of

22   Dr. Maschauer.  If Ms. Smythe wants him to measure

23   anything else, I will leave the tape measure with him.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER                    A-81

Maschauer - Cross                                    B-82

1            Your Honor, I really don't want to get in a

2       situation where Ms. Smythe is a witness in this case.

3       If we are going to have measurements, I would rather

4       she somehow use a witness who is on the stand.

5                  THE COURT:  Very well.

6                         CROSS EXAMINATION

7       BY MS. SMYTHE:

8            Q    Doctor, would you come down here, please?

9            A    (The witness leaves the stand.)

10           Q    Would you read where we are at now?

11           A    Seventeen feet, eleven inches.

12                THE COURT:  Where is that from, just for the

13      record?

14                MS. SMYTHE:  This is from the entrance, the

15      gate into the main portion of the courtroom --

16                THE COURT:  What was the measurement?

17                MS. SMYTHE:  -- to the defendant.  Seventeen

18      feet, eleven inches.

19      BY MS. SMYTHE:

20           Q    Doctor, you are talking about seeing, I

21      think, moles and seeing such things clearly from a

22      distance of twenty to seventy feet?

23           A    I said that.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

1        Q     20/70?

2        A     Correct.  That is his visual acuity.

3        Q     How about actually just seeing a person's

4    facial features and recognition?  How would that work?

5    Would that be just as difficult?

6        A     I would certainly think so.

7        Q     Facial features are as difficult as mouth

8    marks and scars on the skin?

9        A     I am sure if you recognized someone that is

10   more family, like a family member, you would probably

11   see them a greater distance because you are used to

12   seeing their face.  In general, looking at features of

13   people, I think twenty or thirty feet or so would be

14   the length.

15       Q     But at twenty feet you could see pretty well?

16       A     An average person, sure.

17       Q     No, a person with the 20/70 vision in one

18   eye?

19       A     No, ma'am.  That is what I was saying.  This

20   person could only see between a third or fourth of that

21   distance.  So, at best, if we seen even forty feet, a

22   distance of forty feet, Mr. Bibbins would only be able

23   to see between ten and twelve feet.

A 83

Maschauer - Redirect                    B-84

1       Q      In manner of recognition of people?

2       A      Yes, ma'am.

3       Q      That hasn't changed since this mishap in

4    November?  That reading was the same?

5       A      Yes, ma'am.  In his one remaining good eye.

6       Q      In the one eye?

7       A      Yes, ma'am.

8       Q      Does he have cataracts, as well?

9       A      Yes, ma'am, he does have some very early

10   cataracts.

11      Q      Did he have them in November?

12      A      I didn't see him in November.  But, yes, I am

13   sure he did.

14      Q      And today's vision is still 20/70?

15      A      Yes, ma'am.

16             MS. SMYTHE:  Thank you.

17                     REDIRECT EXAMINATION

18   BY MR. ADKINS:

19      Q      So by the same token, Dr. Maschauer, if on

20   November -- I will give you this hypothetical.  If on

21   November 1st, just prior to his losing the sight in his

22   right eye, so he, therefore, had the sight in his right

23   eye, as well as the sight in his left eye, he was

                     EILEEN G. KIMMEL
                OFFICIAL COURT REPORTER                    A84

Barlow - Direct                                    B-86

1      examined and testified as follows:

2                            DIRECT EXAMINATION

3      BY MR. ADKINS:

4          Q     Officer Barlow, is it true that you are a

5      police officer with the Georgetown Police Department?

6          A     That's correct.

7          Q     Officer Barlow, how long have you worked as a

8      police officer?

9          A     For ten years.

10         Q     Are you also an assisting officer to the

11     investigating officer, Daniel Davis, with respect to

12     this case, State versus Alonzo Morris, Jr.?

13         A     That's correct.

14         Q     On Monday, November 1st, 1999, were you

15     requested to respond to the three hundred block of

16     North Race Street in the area of Townsends to a

17     complaint?

18         A     Yes.

19         Q     And what did you see upon responding?

20         A     Upon my arrival, I observed an elderly black

21     gentleman sitting on the curb holding a bloody rag to

22     his face.  There was a group of people around.  There

23     was some school children waiting for a school bus.  It

Maschauer - Redirect                    B-85

1    within a foot or two of a person arguing with them,

2    should he have any problem in identifying that

3    individual whom he is having an argument with that

4    close?

5          A     He wouldn't have trouble then or now.

6          Q     If they were that close?

7          A     Absolutely.

8                MR. ADKINS:   Thank you.   No further

9    questions.

10               MS. SMYTHE:   No further questions, Your

11   Honor.

12               THE COURT:   May he be excused?

13               MR. ADKINS:   I ask that he be excused.

14               THE COURT:   Thank you, Doctor.   You are not

15   to talk about your testimony with anyone until the case

16   is over.

17                               (Witness steps down.)  A-85

```
 1            (Whereupon, counsel approached the bench
 2       and the following proceedings were had:)
 3            MR. LIGUORI:  Respectfully, I would ask for a
 4  proffer as to what this physician is going to testify
 5  to.  The last time he was called, it was to buttress
 6  the fact that Mr. Bibbins could not identify Mr. Morris
 7  in the courtroom.  Mr. Bibbins has identified my client
 8  in the courtroom, and I don't believe that the
 9  testimony is relevant or necessary now.
10            THE COURT:  That may not be the purpose.  I
11  don't know if that is why he is calling him.
12            MR. ADKINS:  It is not.  I think I have to
13  prove the element of serious physical injury.  I think
14  I have to prove the loss of a bodily organ.  That is,
15  that he has total, one hundred percent, loss of
16  eyesight in the right eye.
17            THE COURT:  That is what it is going to be
18  limited to?
19            MR. ADKINS:  I am going to ask what his
20  eyesight was before and what it was after, and what
21  were the injuries to his eye.
22            MR. LIGUORI:  That is no problem.
23            (Whereupon, counsel returned to the trial
```

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A-86

Maschauer - Direct                    B-143

1        A    It is Sussex Eye Center.  It is a

2    professional association.

3        Q    Have you had as one of your patients

4    Mr. James Bibbins, an elderly gentleman?

5        A    Yes, sir..

6        Q    Was he one of your patients prior to November

7    1, 1999?

8        A    Yes.  He first came to our office in 1996.

9        Q    Just prior to November 1, 1999, could you

10   please explain to the jury what the physical condition

11   of his eyes were and his vision?

12       A    When last seen in May of 1999, Mr. Bibbins

13   had vision acuity of 20/50 in the right eye and 20/40

14   in the left eye.  He also had some retinal problems and

15   glaucoma, which gave him tunnel vision, which basically

16   means he can see things almost like looking through a

17   paper towel.  But at that time, it was 20/50 in the

18   right eye and 20/40 in the left eye.

19       Q    Was that without glasses or with prescription

20   glasses?

21       A    That would have been with his best

22   correction, with glasses.

23       Q    So did you prescribe glasses for him to wear?

Maschauer - Direct                    B-144

1    A    Yes.  He was wearing them at that time, yes.

2    Q    And did you see him after his injury on

3    November 1, 1999?

4    A    Yes.  He was seen on January 19, 2000, and at

5    that time, his vision in his right eye -- well, there

6    was no vision.  He couldn't see light.  You could shine

7    a bright light in his eyes and he saw absolutely

8    nothing.  Just darkness.  And the left eye had 20/50

9    visual acuity.

10    Q    So even the vision in the left eye had

11    worsened; is that right?

12    A    At least that day when we recorded his

13    vision.  It can vary a little bit.  Each person any day

14    they come in, they might see a little bit better one

15    day than another.  The right eye was significantly

16    different because he couldn't see anything.

17    Q    Was he one hundred percent absolutely blind

18    in the right eye?

19    A    Absolutely one hundred percent.  In fact,

20    there was a recommendation at first that his eyeball

21    should be removed because so much damage had been done

22    that it was worried that it would become painful for

23    Mr. Bibbins.

A 88

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

Maschauer — Cross                    B-146

1    position on this.  I, of course, sent to Mr. Liguori

2    months ago the records of Dr. Maschauer, his total

3    packet, and that is what he has here today.  Included

4    in those records is this letter from Washington

5    Hospital that does describe the injury to the right

6    eye.  I guess it would be my attempt to get this in

7    through business records of his, that these are his

8    business records.

9              THE COURT:  I not going to let you piggyback

10   in that fashion.

11             MR. ADKINS:  All right.

12             (Whereupon, counsel returned to the trial

13        table and the following proceedings were had:)

14             MR. ADKINS:  I have no further questions.

15             THE COURT:  Mr. Liguori?

16             MR. LIGUORI:  Thank you, Your Honor.

17                      CROSS-EXAMINATION

18   BY MR. LIGUORI:

19        Q    Thank you for coming in.  I just wanted to ask

20   you do you know if Mr. Bibbins has a Delaware driver's

21   license?

22        A    Yes, sir, I do.

23             MR. LIGUORI:  Nothing further.

Maschauer - Cross                B-147

1           MR. ADKINS:  Redirect on that.

2                REDIRECT EXAMINATION

3    BY MR. ADKINS:

4        Q    You testified that he is blind in his right

5    eye.  Do you know of any way that you can get a

6    driver's license when you are blind in your right eye?

7    What is going on here?

8        A    Absolutely.  Delaware law allows a person to

9    be blind in one eye, and it does not hold that against

10   the fellow eye.  All you have to do is have 20/50

11   visual acuity in one eye in order to get a driver's

12   license.

13           Even though Mr. Bibbins has tunnel vision,

14   the law does not say you have to have peripheral

15   vision.  There is absolutely no reason Mr. Bibbins

16   can't get a driver's license based on the current

17   Delaware laws.

18       Q    Are you familiar with the testing they give

19   for a driver's license, eye testing?

20       A    Yes.

21       Q    Does that test check out peripheral vision?

22       A    No.  That is not a requirement.  Just being

23   able to see 20/50, which Mr. Bibbins can.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A90